# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>KALOBIOS PHARMACEUTICALS, INC.,<br><br>Debtor. | Chapter 11<br><br>Case No. 15-12628 (LSS)<br><br>**Hearing Date: TBD**<br>**Objection Deadline: TBD** |

## EMERGENCY MOTION OF GREGORY REA, RTAT LLC, EDWARD H. PAINTER, NANCY RETZLAFF, AND ARMISTICE CAPITAL MASTER FUND, LTD. TO (I) ESCROW CERTAIN FUNDS; OR ALTERNATIVELY, (II) EXPEDITE THE ADVERSARY PROCEEDING

Gregory Rea, RTAT LLC, Edward H. Painter, Nancy Retzlaff, and Armistice Capital Master Fund, Ltd. (collectively, the "Movants") hereby move (the "Motion") the Court for entry of an order in the above-captioned chapter 11 case of KaloBios Pharmaceuticals, Inc. ("KaloBios," the "Debtor," or the "Company") pursuant to section 105 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended and applicable herein, the "Bankruptcy Code") (i) escrowing certain Funds (as defined below); (ii) expediting the Proceeding (as defined below); and (iii) related relief.  In support of the Motion, the Movants respectfully state as follows:

## PRELIMINARY STATEMENT

This action arises out of an unconsummated private placement of unregistered shares of the Debtor's common stock in December 2015.  The Debtor fraudulently induced the Movants to participate in the proposed private placement by making knowingly false representations in the governing Securities Purchase Agreement (as defined more fully below, the "SPA").  Principal among these falsehoods, the Debtor expressly represented that neither the Company nor any director or officer thereof is or has been the subject of any action or investigation involving a claim of violation of securities laws, and further, that it was not aware of any pending criminal or

civil investigations that could have a material adverse effect on its business.  While making these representations out of one side of its mouth, it appears that the Debtor's Chief Executive Officer and Chairman of the Board of Directors, Martin Shkreli, and the Debtor's outside counsel, was negotiating out of the other side with both the Federal Bureau of Investigation and the U.S. Securities and Exchange Commission regarding their imminent indictment, arrest, and prosecution.

After inducing participation in the proposed placement on false pretenses, and only a matter of hours before federal agents arrested both Shkreli and the Company's outside counsel, the Debtor hastily announced that the transaction contemplated by the SPA—the sale of common stock to the Movants—had closed.  The Debtor knew this statement was false because it had not complied with the express preconditions to closing required by the SPA.  In particular, as detailed in the Complaint, representations and warranties were false, required deliverables were not provided to the Movants, and material adverse effects were present.  Moreover, upon information and belief, several of the potential investors never even wired the required funds. For example, upon information and belief, both Shkreli and the Debtor's own financial advisor were going to purchase stock through SPAs, but had not wired funds prior to the arrest on December 17.  The Debtor nonetheless claimed that the transaction had closed as pretext to justify its wrongful retention of the $8,083,194 that parties had sent to the Debtor (of which $5,399,972.46 (the "Funds") came from the Movants) in anticipation of the transaction's consummation.

To date, the Debtor has rebuffed repeated requests by the Movants for the return of the funds paid in connection with the contemplated private placement.  Instead of returning the funds, on December 29, 2015, in furtherance of its efforts to rebuff the Movants, the Debtor filed

a voluntary petition (the "Petition") for relief under chapter 11 of the Bankruptcy Code. Contemporaneously with the filing of this Motion, the Movants are filing a Complaint to initiate an adversary proceeding (the "Proceeding"). Through the Proceeding, the Movants seek a ruling returning them to the status quo ante through a declaratory judgment that the transaction never closed, and that the funds (which are held in a resulting or constructive trust) are being wrongfully retained by the Debtor, are not property of the estate, and should be immediately returned to the Movants. Alternatively, the Movants seek damages and other relief for the Debtor's fraud, breach of contract, and unjust enrichment.

By this Motion, the Movants seek an order from this Court escrowing the Funds sent to the Debtor by the Movants to prevent dissipation of the Funds during the course of this bankruptcy proceeding. If the Court is unwilling to escrow the Funds, this Court should expedite the Proceeding because the Movants have more than a colorable claim and face imminent, irreparable harm if the Funds are expended before the outcome of the Proceeding is determined.

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicate for the relief requested herein is Bankruptcy Code section 105.

## BACKGROUND

4.      The Complaint contains a detailed chronology of the relevant facts. Below is a summary of the facts most pertinent to this Motion.

5.      In early December 2015, Kalobios' CEO, Martin Shkreli, contacted the Movants about participating in a private placement of unregistered shares of KaloBios common stock.  On or about December 3, 2015, KaloBios' financial advisor sent Movants a Securities Purchase Agreement (the "SPA"). The SPA is attached to the Complaint as Exhibit B.

6.      Section 2.1 of the SPA required that the parties fulfill their contractual obligations by the Closing Date, defined in Article I as "in no event later than the third Trading Day following the date hereof."  The SPA was dated Thursday, December 3, 2015, meaning the Closing Date was set to be no later than December 8, 2015.  Section 2.1 further stated, "On or prior to the [December 8, 2015] . . . the Company shall deliver to each purchaser its respective Shares . . . and the Company and each Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing."

7.      Section 2.2 required that the Company deliver four documents at closing: (1) a copy of the SPA "duly executed by the Company"; (2) a "legal opinion of Company Counsel" in an agreed-upon form; (3) a copy of irrevocable instructions to the Company's transfer agent instructing it to deliver the Purchasers' stock certificates; and (4) a copy of an accompanying registration rights agreement "duly executed by the Company."

8.      Moreover, Section 2.3(b) expressly conditioned closing on the "delivery by the Company of the items set forth in Section 2.2(a) of this Agreement."  Section 2.3(b) also conditioned the Movants' obligation to close on the absence of a "Material Adverse Effect with respect to the Company since the date hereof[.]"  This clause contained no modifier requiring that the Company have knowledge of events that could lead to a Material Adverse Effect. Simply put, any Material Adverse Effect - like the arrest of the Company's controlling stockholder, Chairman, and CEO, Martin Shkreli - would nullify the Movants' obligation to

4

perform.Section 2.3(b) also conditioned closing on "the accuracy in all material respects when made and on the Closing Date of the representation and warranties of the Company contained herein (unless as of a specific date therein)[.]" (emphasis added).

**The Stock Purchase Agreement's Representations And Warranties**

9.      In Section 3.1(j), the Company represented and warranted that "[n]either the Company nor any Subsidiary, <u>nor any director or officer thereof</u>, is or has been the subject of any Action [defined to include an action, suit, inquiry, notice, violation, proceeding or investigation] involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty" (emphasis added).  In that subsection, the Company also represented that "[t]here has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the [Securities and Exchange] Commission of the Company or any current or former director or officer of the Company."

10.     In Section 3.1(j), the Company also represented and warranted that, "[e]xcept as set forth in Schedule 3.1(j), there is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company . . . before or by any court, arbitrator, governmental or administrative agency or regulatory authority . . . which . . . would, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect."  Schedule 3.1(j) stated: "None."

11.     Additionally, in Section 3.1(i), the Company represented and warranted that "[s]ince the date of the latest audited financial statements included within the SEC Reports, except as disclosed in a subsequent SEC Report filed prior to the date hereof or as set forth on <u>Schedule 3.1(i)</u>: (i) there has been no event, occurrence or development that has had or that

would reasonably be expected to result in a Material Adverse Effect."  Schedule 3.1(i) stated: "None."

**Movants Execute The SPA And Send Funds To KaloBios**

12.     Beginning on December 3, 2015, KaloBios' financial advisor sent the Movants disclosure schedules, instructions for wiring payment, a registration rights agreement (the "Registration Agreement"), and instructions for the Movants to execute and return the documents.

13.     As further detailed in the Complaint, in compliance with the instructions received from KaloBios' financial advisor, the Movants executed and returned the SPA and the Registration Agreement and sent the Funds to the Debtor's account.

**Behind The Scenes at KaloBios**

14.     Unbeknownst to the Movants, the FBI was knocking at the door.  A federal investigation of Shkreli had been underway since at least January 2015, when Retrophin Inc. ("Retrophin"), a biopharmaceutical company that Shkreli had founded, received a subpoena from prosecutors seeking information about its relationship with Shkreli.

15.     KaloBios and Shkreli knew that he was the subject of federal scrutiny.  In August 2015, Retrophin filed suit against Shkreli in a case captioned Retrophin Inc. v. Shkreli, 15-cv-06451 (S.D.N.Y. 2015).  Retrophin alleged criminal activity that was later reflected in the Department of Justice's criminal indictment of Shkreli.  For example, the complaint alleges that "Shkreli used his control over Retrophin to enrich himself, and to pay off claims of MSMB investors (who he had defrauded)."

**The Company Purports To Close The Transaction**

16.     In the evening of December 16, 2015, KaloBios filed with the SEC a Form 8-K, attached to the Complaint as Exhibit D, stating that the transactions set forth in the SPA "were consummated" on December 16, 2015, and that 350,224 shares of the Company's common stock were issued to purchasers subject to their respective SPA versions for "the aggregate purchase price of approximately $8,818,000."

17.     KaloBios' assertion that the transactions set forth in the SPA "were consummated" on December 16, 2015 was false and materially misleading.  KaloBios had not fulfilled its obligations under the SPA or completed conditions precedent to the closing of the transaction, and it cannot fulfill all such conditions now.  For example, KaloBios had failed to deliver to the Movants a copy of the SPA executed by the Company, a legal opinion of Company Counsel addressed to each Purchaser, a copy of the irrevocable instructions to the Transfer Agent, or an executed Registration Rights Agreement as required by Section 2.2 of the SPA.

18.     KaloBios had also failed to comply with Section 2.1, which required it to deliver the purchased shares and make the closing deliveries on or prior to the Closing Date, which was to be December 8, 2015, at the latest.  Upon information and belief, several of the potential investors never even wired the funds required to purchase the stock that the Company intended to issue pursuant to the SPA.  For example, upon information and belief, both Shkreli and KaloBios' own financial advisor were going to purchase stock through SPAs, but had not wired funds prior to the arrest on December 17.

19.     Moreover, KaloBios could not truthfully confirm the "accuracy in all material respects when made and on the Closing Date of the representations and warranties of the Company" as required by Section 2.3(b)(i) of the SPA.

20.    In particular, the Company's representation in Section 3.1(j) of the SPA that neither it "nor any director or officer . . . is or has been the subject of any Action [including any investigation] involving a claim or violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty" was materially and knowingly false when made and at the supposed closing.

21.    So was the Company's representation in Section 3.1(j) that "[t]here has not been, and to the knowledge of the Company, there is not pending or contemplated, any investigation by the [SEC] of the Company or any current or former director or officer of the Company."

22.    The Company's representation in Section 3.1(j) of the SPA regarding the absence of any "action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of the Company, threatened against or affecting the Company . . . before or by any court, arbitrator, governmental or administrative agency or regulatory authority . . . which . . . would, if there were an unfavorable decision, have or reasonably be expected to result in a Material Adverse Effect" was also materially and knowingly false when made and at the supposed closing.

23.    As of the supposed closing, KaloBios could not truthfully confirm that there had "been no Material Adverse Effect with respect to the Company since [the date of the SPA signing]" as required by Section 2.3(b)(iv) of the SPA.  Specifically, the Company's representation in Section 3.1(i) of the SPA regarding the absence of any "event, occurrence or development that has had or that would reasonably be expected to result in a Material Adverse Effect" was materially and knowingly false when made and at the supposed closing.

24.     By December 16, 2015, KaloBios, through Shrkeli, its outside counsel and potentially others, knew or should have known about the FBI investigation, the gravity of the potential charges, and the fact that Shkreli's and its outside counsel's arrest was imminent.

25.     KaloBios made these knowingly false representations to induce the Movants to invest.  The money involved was significant.  The $8.8 million allegedly raised in the purported private placement dwarfed the roughly $4.5 million that it cost the Control Group to purchase a 70.1% stake in the Company, and it was nearly as great as the $10 million in equity financing promised by Shkreli and his investor group just weeks prior (discussed below).

**The Truth About KaloBios Emerges**

26.     Unbeknownst to Movants, a federal investigation of Shkreli had been underway since at least January 2015, when Retrophin Inc. ("Retrophin"), a biopharmaceutical company that Shkreli had founded, received a subpoena from prosecutors seeking information about its relationship with Shkreli.  At approximately 6:30 a.m. on December 17, 2015 (the very next morning after the purported closing of the transaction contemplated by the SPA), FBI agents arrested Shkreli on charges of securities fraud, securities fraud conspiracy, and wire fraud conspiracy for orchestrating interrelated schemes to defraud investors in MSMB Capital Management LP and MSMB Healthcare Management LP, and a scheme to misappropriate assets of Retrophin.  Later that day, Shkreli was terminated as CEO of KaloBios and resigned from his position as a member of its board of directors.

27.     On December 17, 2015, FBI agents also arrested Evan Greebel, then-outside counsel to KaloBios, on the charge of wire fraud conspiracy for his role in the Retrophin scheme with Shkreli.  The SEC also filed a related civil complaint against Shkreli, Greebel, and others in the United States District Court for the Eastern District of New York.

28.     In addition to its more obvious effects on the day-to-day operations of the Company, Shkreli's arrest constituted a Material Adverse Effect on KaloBios because it imperiled financing key to the Company's operations.  In its Form 8-K dated November 23, 2015, the Company attached a November 19, 2015 press release announcing that Shkreli and his investor group had committed to a $10 million equity financing facility, subject to applicable stockholder approval.  This financing commitment was critical given the Company's previously announced  restructuring disclosed in a Form 8-K dated November 5, 2015.

**Movants Take Action; The Company Stalls**

29.     As soon as the Movants learned of the criminal proceedings against Shkreli, they began contacting the Company, Kaye Scholer, LLP (listed in the SPA as counsel to KaloBios) and KaloBios' financial advisor.  The Movants engaged in repeated conversations with Kalobios' management, former management and current attorneys and expressly and repeatedly requested the return of the Funds that the Movants sent to KaloBios.

30.     The Movants came to the conclusion that the transactions described in the SPA had not been consummated—despite the representations by KaloBios to the contrary. Accordingly, they redoubled their effort to engage the Company and its advisors in an effort to retrieve the delivered Funds.  To date, the Movants have not received any indication that the Funds would be returned, and they have encountered only delay and evasion on the part of KaloBios.

31.     On December 30, 2015, the Movants learned that the Company had filed a voluntary petition for relief under Bankruptcy Code.

**ARGUMENT**

I.    **THE FUNDS SHOULD BE ESCROWED PENDING THE OUTCOME OF THE PROCEEDING.**

32.    The Movants seek entry of an order escrowing the Funds that the Debtor fraudulently induced the Movants to send prior to the filing of this case, pending the adjudication of the Proceeding.  As set forth in the Complaint, the circumstances surrounding the SPA and the transfer of the Funds created a resulting trust, or alternatively a constructive trust, and accordingly the Funds are not property of the estate.  The Movants have a likelihood of success on these arguments to this Court.  However, a successful outcome will be meaningless if the Funds are expended by the Debtor during the course of the Proceeding.  Accordingly, the Movants request that this Court order the Debtor to hold the Funds in escrow until such time as the Proceeding can be litigated to conclusion.

a.    **The Movants Will Successfully Argue That A Resulting Trust Arose through The SPA.**

33.    Delaware law[1] provides that a resulting trust arises from the presumed intentions of the parties and upon the circumstances surrounding the particular transaction.  See In re Catholic Diocese of Wilmington, Inc. (Official Committee of Unsecured Creditors v. Catholic Diocese of Wilmington, Inc.), 432 B.R. 135, 148-49 (Bankr. D. Del. 2010) (imposing a resulting trust, noting that "[u]nder Delaware law, '[a] resulting trust is one implied by law from the supposed intentions of the parties and the nature of the particular transaction.'" (quoting Greenly v. Greenly, 29 Del. Ch. 297, 49 A.2d 126 (Del. Ch. 1946)); see also Bodley v. Jones, 30 Del. Ch. 480, 59 A.2d 463 (Del. 1947); Blue Rock Liquors v. Reilly, 1994 Del. Ch. LEXIS 220 (Del. Ch. Nov. 28, 1994).

---

[1]    Section 5.9 of the SPA provides that Delaware law governs the construction, validity, enforcement and interpretation of the Transaction Documents (as defined in the SPA).

34.    In imposing a resulting trust, the court presumes, absent contrary evidence, that the person supplying the purchase money for property intends that its purchase will inure to his benefit.  See Catholic Diocese of Wilmington, 432 B.R. at 148 ("[A] resulting trust 'arises where a person conveys property under circumstances that raise an inference that the person does not intend the person taking or holding the property to have the beneficial interest in the property.'"); Greenly, 49 A.2d at 129 ("in the absence of evidence to the contrary, the person who supplies the purchase price intends that the property shall inure to her own benefit, and that a conveyance in the name of another is for some mere incidental reason"); see also Branca v. Branca, 443 A.2d 929 (Del. 1982); 5 Scott, The Law of Trusts § 440 (3rd ed. 1967); Bogert, The Law of Trusts and Trustees § 454 (rev. 2d ed. 1977).  In determining whether such a trust arose, "The payment of the consideration and the real intent of the person who paid it are . . . the usual important elements to be considered in determining whether such a trust exists."  Greenly, 49 A.2d at 129.

35.    The circumstances in this case support determining that a resulting trust arose when the Funds were transferred pursuant to the SPA.  The presumed intention of the parties in this case was that the Movants would pay a specified purchase price in exchange for shares of the Company pursuant to the terms of the SPA.  Section 2.1 of the SPA embodied that intention by specifically providing that, "On or prior to [December 8, 2015] . . . the Company shall deliver to each Purchaser its respective Shares . . . and the Company and each Purchaser shall deliver the other items set forth in Section 2.2 deliverable at the Closing."  Accordingly, the Court should determine that a resulting trust was created for holding the Funds for the benefit of the Movants.

36.     As noted above, in fact closing under the SPA never occurred.  In particular, the preconditions to closing under the SPA were never satisfied, and the deliverables were never provided to the Movants prior to the alleged closing.  Section 2.3(b) expressly conditioned closing on the "delivery by the Company of the items set forth in Section 2.2(a) of this Agreement."  Section 2.2 required that the Company deliver four documents at closing: (1) a copy of the SPA "duly executed by the Company"; (2) a "legal opinion of Company Counsel" in an agreed-upon form; (3) a copy of irrevocable instructions to the Company's transfer agent instructing it to deliver the Purchasers' stock certificates; and (4) a copy of an accompanying registration rights agreement "duly executed by the Company."  The Movants never received those deliverables prior to the purported closing.

37.     Section 2.3(b) also conditioned the Movants' obligation to close on the absence of a "Material Adverse Effect with respect to the Company since the date hereof[.]"  This clause contained no modifier requiring that the Company have knowledge of events that could lead to a Material Adverse Effect.  Simply put, any Material Adverse Effect - like the arrest of the Company's controlling stockholder, Chairman, and CEO, Martin Shkreli - would nullify the Movants' obligation to perform.Section 2.3(b) also conditioned closing on "the accuracy in all material respects when made and on the Closing Date of the representation and warranties of the Company contained herein (unless as of a specific date therein)[.]" (emphasis added).  In fact, material adverse effects were present, including the arrest of the Company's controlling stockholder, Chairman, and CEO, Martin Shkreli, which nullified Movants' obligation to perform under the SPA.

38.     In short, the transactions contemplated by the SPA never closed, and, therefore, the Company never gained ownership over the funds.  Rather, they continue to reside in a resulting trust, and now should be returned to the Movants.

**b.  Alternatively, The Movants Will Successfully Argue That A Constructive Trust Arose Through The SPA.**

39.     If this Court does not agree that a resulting trust arose due to the intentions of the parties to the SPA, a constructive trust certainly arose due to the fraudulent conduct of the Debtor and its principals.  A constructive trust is not designed to effectuate the presumed intent of the parties, but to redress a wrong.  In particular, a constructive trust is imposed when a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty.  See Opdyke v. Kent Liquor Mart, Inc., 40 Del. Ch. 316, 181 A.2d 579 (Del. 1962); Blue Rock Liquors v. Reilly, 1994 Del. Ch. LEXIS 220; Brophy v. Cities Serv. Co., 31 Del. Ch. 241, 70 A.2d 5 (Del. Ch. 1949); Greenly v. Greenly, 49 A.2d at 129.

40.     Here, the Company had a duty to perform under the SPA in good faith. Winshall v. Viacom Intern., Inc., 55 A.3d 629, 636 (Del. Ch. 2011) (under Delaware law, an implied covenant of good faith and fair dealing inheres in every contract).  It did not do so.  As noted herein, the Company made material misrepresentations of fact and these misrepresentations made it impossible for the Company to ever satisfy the preconditions to closing under the SPA.

41.     In Section 3.1(j), the Company represented and warranted that "[n]either the Company nor any Subsidiary, nor any director or officer thereof, is or has been the subject of any Action [defined to include an action, suit, inquiry, notice, violation, proceeding or investigation] involving a claim of violation of or liability under federal or state securities laws

or a claim of breach of fiduciary duty" (emphasis added).  In that subsection, the Company also

represented that "[t]here has not been, and to the knowledge of the Company, there is not

pending or contemplated, any investigation by the [Securities and Exchange] Commission of the

Company or any current or former director or officer of the Company."

42.    In Section 3.1(j), the Company also represented and warranted that,

"[e]xcept as set forth in Schedule 3.1(j), there is no action, suit, inquiry, notice of violation,

proceeding or investigation pending or, to the knowledge of the Company, threatened against or

affecting the Company . . . before or by any court, arbitrator, governmental or administrative

agency or regulatory authority . . . which . . . would, if there were an unfavorable decision, have

or reasonably be expected to result in a Material Adverse Effect."  Schedule 3.1(j) stated:

"None."

43.    Additionally, in Section 3.1(i), the Company represented and warranted

that "[s]ince the date of the latest audited financial statements included within the SEC Reports,

except as disclosed in a subsequent SEC Report filed prior to the date hereof or as set forth on

Schedule 3.1(i): (i) there has been no event, occurrence or development that has had or that

would reasonably be expected to result in a Material Adverse Effect."  Schedule 3.1(i) stated:

"None."

44.    It is clear now that these statements, among others, were untrue.  After

transferring the Funds, the Movants later learned that a federal investigation of Shkreli had been

underway since at least January 2015.  The very day after the alleged closing of the SPA, the FBI

arrested Shkreli on charges of securities fraud, securities fraud conspiracy, and wire fraud

conspiracy for orchestrating interrelated schemes to defraud investors in MSMB Capital

Management LP and MSMB Healthcare Management LP, and a scheme to misappropriate assets of Retrophin.

45.     The Company has since refused to return the Funds sent to it in contemplation of closing the transactions contemplated by the SPA, and instead initiated this bankruptcy proceeding in an attempt to prevent the Movants from recovering their Funds.  The Debtor's fraudulent conduct during the negotiations and alleged execution of the SPA should result in the imputation of a constructive trust for the Funds and a finding that such Funds consequently are not property of the estate and should be returned to the Movants.

**c.  The Funds Are Traceable And Should Be Escrowed Immediately To Prevent The Debtor Expending The Funds Prior To The Conclusion Of The Proceeding.**

46.     To recover trust funds that have been commingled with non-trust funds, a beneficiary of the trust must be able to trace the funds held in trust.  Here, under the circumstances, the Court should find that the Funds are traceable, even to the extent that the Debtors' account into which the Funds were placed also has non-trust funds.

47.     This Court has applied the lowest intermediate balance test to determine whether trust funds placed into a non-segregated account are traceable.  See Catholic Diocese of Wilmington, 432 B.R. at 150-51.[2]  Under the lowest intermediate balance test, "if the amount on deposit in the commingled fund has at all times equaled or exceeded the amount of the trust, the trust's funds will be returned in their full amount."  Id. at 151 (referring to the lowest intermediate balance test as "a longstanding principal of trust law" that "has been routinely applied by federal courts in this Circuit and throughout the country").[3]

---

[2]     The Court also noted that, in certain circumstances, a more lenient "nexus" test might apply.  Here, because the Movants meet the more stringent standard of the lowest intermediate balance test, the Movants reserve the right to argue that they meet the more lenient nexus test in the alternative.

[3]     Ultimately the Court in the Catholic Diocese of Wilmington case, which involved numerous transfers of funds from various parties into and out of a pooled investment account and an operating account and

48.      The Funds in the amount of $5,399,972.46 were transferred to the

Debtor's account between December 4 and December 16, 2015.  The Debtor's bankruptcy

petition reflects that the Debtor's total assets are $8,374,463.  <u>See</u> Voluntary Petition for Non-

Individuals Filing for Bankruptcy, at 5 [Docket No. 1].  If the cash balance of the Debtors'

account never fell below the amount of the Funds transferred (which is likely to be the case,

given the timing of the transfers of the Funds in mid-December and the Petition Date just

approximately two weeks later), then the Movants are able to trace the Funds under the lowest

intermediate balance test, and such Funds are not property of the estate.

49.      If the Funds are not escrowed and the Debtor is permitted to continue to

use the Funds, then the status quo will not be preserved, as the Movants' ability to trace the

Funds may be destroyed, thereby jeopardizing the Movants' ability to recover the trust assets.

Due to the state of the Debtor's business, it is unlikely that expended funds would be replaced by

the Debtor's earnings.  Accordingly, once the Funds are used by the Debtor, the Movants have

very little chance of a return of their money even if they are successful on each count of the

Complaint, including the Movants' request for imposition of a resulting or constructive trust.

Absent the Funds being escrowed, the Movants will therefore likely suffer irreparable harm and

will not be able to be adequately compensated if the res of the trust has been expended, or

through a damages award that the Debtor cannot pay.  Given the likelihood of the Movants to

succeed in establishing that either a resulting or constructive trust arose when the Funds were

transferred, the Funds should be immediately escrowed to prevent such harm to the Movants.

50.      Nor will escrowing the Funds cause the Debtor to suffer significant

prejudice, because the Debtor will still have sufficient operating capital pending adjudication of

---

fluctuations in the balance by tens of millions of dollars, concluded that the funds at issue were not traceable. <u>Id.</u> at 158-59.

the Adversary Proceeding. The Debtor's bankruptcy petition reflects that the Debtor's total assets are $8,374,463. See Voluntary Petition for Non-Individuals Filing for Bankruptcy, at 5 [Docket No. 1]. Approximately $5,399,972.46 of the Debtor's assets are the Funds. The Debtor, through counsel, acknowledged at the first day hearing on December 30, 2015 that, for the time being, there is surplus cash in the Debtor's account. Accordingly, the Movants respectfully request that the Court grant this Motion as soon as practicable.

## II.  IF THIS COURT IS UNWILLING TO ESCROW THE FUNDS, THE PROCEEDING SHOULD BE EXPEDITED TO PREVENT IRREPARABLE HARM TO THE MOVANTS.

51.     The Bankruptcy Code provides this Court with broad authority to impose orders that will provide the necessary relief to effectuate justice under the circumstances. Specifically, Bankruptcy Code section 105(a) states "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Pursuant to section 105(a), as detailed below, if this Court does not escrow the Funds, the Court at a bare minimum should expedite the Proceeding because the Movants have established colorable claims in the Proceeding and may be irreparably harmed through the dissipation of the trust res if the Proceeding is not expedited.

### a.  Movants' Claims Are More Than Colorable

52.     This Court has stated that "in deciding whether there is a colorable claim, the court should undertake the same analysis as when a defendant moves to dismiss a complaint for failure to state a claim." In re Centaur, LLC, Case No. 10-10799 KJC, 2010 WL 4624910, at *4 (Bankr. D. Del. Nov. 5, 2010) (internal citations omitted). Accordingly, a colorable claim "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." In re Optim Energy, LLC, Case No. 14-10262 (BLS), 2014 WL 1924908, at *6 (Bankr. D. Del. May 13, 2014), aff'd, 527 B.R. 169 (D. Del. 2015) (internal citations omitted).

18

The required showing for establishing that claims are colorable is a "relatively easy one to make." Adelphia Commc'ns Corp. v. Bank of Am., N.C. (In re Adelphia Commc'ns Corp.), 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005). The Court need not engage in an extensive review of the merits or conduct a mini-trial. See id. (internal citations omitted); see also In re STN Enters., 779 F.2d 901, 905 (2d Cir. 1985).

53.    The Movants' claims for imputation of a trust, as well as Movants' claims for fraud, breach of contract, and unjust enrichment, surpass this minimal threshold. The facts here, as set forth above – and in more detail in the Complaint – support the claims made by the Movants.

54.    As explained in Part I above, the claim that a resulting, or alternatively a constructive trust was established is colorable. The Movants' remaining claims in the Complaint are more than colorable as well. The facts demonstrate that the Company fraudulently induced the Movants into entering into the SPA. See ABRY Partners V, L.P. v. F & W Acquisition LLC, 891 A.2d 1032, 1050 (Del. Ch. 2006) (To state a fraud claim, the plaintiff must plead facts supporting an inference that: (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance). The Company made a number of material misrepresentations to the Movants, including through the representations and warranties in the SPA as explained above, and the Movants relied upon these misrepresentations to their detriment. As a result of the fraud, the Movants are entitled to damages.

55.    The facts also demonstrate that the Company breached the SPA.  See

VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003) (citation omitted) (To

state a claim for breach of contract under Delaware law, a plaintiff must plead: (1) the existence

of the contract, whether express or implied; (2) the breach of an obligation imposed by that

contract; and (3) the resultant damage to the plaintiff).  The SPA required, among other things,

that in exchange for their investments, Movants would receive the Shares of KaloBios common

stock whose value was contingent on the accuracy of the representations and warranties

contained in the SPA.  That did not occur.  The representations and warranties also were

inaccurate, the required deliverables were never provided prior to the alleged closing, and the

Company failed to close on or before the contemplated closing date of December 8, 2015.

Nonetheless, the Company retained the funds that were transferred.  As a result, Movants are

entitled to damages for the Debtor's breach.

56.    Finally, the Company unjustly enriched itself at the Movants' expense.

See Jackson Nat'l Life Ins. Co. v. Kennedy, 741 A.2d 377, 393 (Del. Ch. 1999) (In Delaware, to

state a claim for unjust enrichment, a plaintiff must plead the following elements: (1) an

enrichment, (2) an impoverishment, (3) a relation between the enrichment and the

impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by

law).  The Company took the funds transferred by the Movants and were enriched as a result, to

the Movants' impoverishment.  As noted above and in the Complaint, the Movants are asserting

a claim against the Company for breach of the SPA as a result.  However, to the extent that the

Court determines that the SPA was never executed by the Company, and the transactions

contemplated by the SPA never closed and the SPA is terminated or not binding on the Company

as a result, the Company is without justification in retaining the Funds, and the Movants are left without a remedy at law.

### b. Movants Have Demonstrated A Threat Of Harm

57. The Movants will suffer harm if the funds are not escrowed or the proceeding is not expedited.  The Debtor continues to expend funds for administrative costs that continue to accrue.  Upon information and belief, the Debtor's cash on hand consists of the Funds transferred to the Debtor by the Movants.  The Movants are not willing creditors of the Debtor.  Rather, they sought, based on material misrepresentations, to become equity holders of the Debtor on or before December 8, 2015.  This did not happen.  The Movants' Funds should not now be held hostage during a lengthy trial even as the Debtor continues to use the Movants' Funds to pay for the litigation and the bankruptcy case.  Delay harms the Movants.  Delay also harms the Debtor's creditors who are held in limbo as to the Debtor's reorganization plans because such plans cannot be determined until the conclusion of the Proceeding.  Accordingly, expedited proceedings are warranted in this case.

58. Moreover, by the Proceeding, the Movants are seeking, among other things, a declaration that the transaction contemplated by the SPA failed to close, and that the Funds are held in trust and should be returned to the Movants.  In other words, the very ownership of the Debtor (which continues to take corporate action) remains in question.

59. These types of threatened injury are, by their nature, irreparable because they cannot be remedied by a subsequent award of monetary damages.  See ZRII, LLC v. Wellness Acquisition Group, Inc., C.A. No. 4374-VCP, 2009 WL 2998169, at *13 (Del. Ch. Sept. 21, 2009); Hollinger Int'l, Inc. v. Black, 844 A.2d 1022, 1090 (Del. Ch. 2004) ("Injury is irreparable when a later money damage award would involve speculation."), aff'd, 872 A.2d 559 (Del. 2005); see also County of York Employees Ret. Plan v. Merrill Lynch & Co., C.A. No.

4066-VCN, 2008 WL 4824053, at *8 (Del. Ch. Oct. 28, 2008) (noting that even where damages might be calculable, "the mere theoretical possibility that damages could be awarded does not preclude the Court, as it exercises its equitable discretion and balances the various factors informing its decision, from expediting the proceedings.").

60.    For these reasons as well, the Court should expedite consideration of the Proceeding in order for the Movants to avoid irreparable harm.

## CONCLUSION

For the reasons set forth above, Movants respectfully request that the Court enter an order (i) escrowing the Funds pending the outcome of the Proceeding; or, alternatively, (ii) expediting the Proceeding and setting the matter for trial; and (iii) granting such further relief that this Court deems proper.

January 7, 2016

WOMBLE CARLYLE SANDRIDGE &
RICE, LLP

/s/ Matthew P. Ward
Matthew P. Ward (Del. Bar No. 4471)
Ericka F. Johnson (Del. Bar No. 5024)
Morgan L. Patterson (Del. Bar No. 5388)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone:  (302) 252-4320
Facsimile:  (302) 252-4330
E-mail:  maward@wcsr.com
E-mail:  erjohnson@wcsr.com
E-mail:  mpatterson@wcsr.com

*Attorneys for Movants*