# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re

KaloBios Pharmaceuticals, Inc.,[1]

      Debtor.

Chapter 11

Case No.: 15-12628 (LSS)

## DEBTOR'S OBJECTION TO THE EMERGENCY MOTION OF GREGORY REA, RTAT LLC, EDWARD H. PAINTER, NANCY RETZLAFF, AND ARMISTICE CAPITAL MASTER FUND, LTD. TO (I) ESCROW CERTAIN FUNDS; OR ALTERNATIVELY, (II) EXPEDITE THE ADVERSARY PROCEEDING

**HOGAN LOVELLS US LLP**
Peter A. Ivanick
Lynn W. Holbert
John D. Beck
875 Third Avenue
New York, NY 10022
(212) 918-3000

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric. D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

*Counsel To Debtor and Debtor in Possession.*

---

[1]      The last four digits of the Debtor's tax identification number are 7236. The address of the Debtor is 442 Littlefield Ave., San Francisco, California 94080.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ................................................................................................3

    I.    Mr. Shkreli Takes Control and is Appointed CEO. ...............................4

    II.    The PIPE Transaction. ................................................................4

    III.    Consummation of the PIPE Transaction. ............................................6

    IV.    Mr. Shkreli's Indictment and Arrest. ...............................................8

    V.    Fallout from Mr. Shkreli's Indictment and Arrest. ..............................9

    VI.    The PIPE Investor's Reaction. .......................................................10

    VII.    The Debtor's Post-Petition Reconstitution of the Board of Directors and Appointment of Officers. ..............................................................11

    VIII.    The Movants' Improper Attempt to Escrow the Funds. .........................15

OBJECTION...................................................................................................16

    I.    The SPA was validly consummated and the Movants remedy for any alleged breach is for damages or rescission, not an implied trust.....................17

        A.    The Debtor And Movants Consummated A Valid Securities Purchase Transaction. ...............................................................17

        B.    Any Breach Of The Representations And Warranties In The SPA Entitles Movants To A Rescission Claim Or Contract Damages. ............18

    II.    Even if the Movants could bring an implied trust claim, section 510(b) bars the relief sought by the Adversary Complaint and the Motion. ..........................19

    III.    Even if an implied trust is available, it is not warranted under these circumstances...........................................................................24

        A.    No Resulting Trust Exists Because There Is No Indication The Movants Intended The Debtor To Hold The Funds In Trust....................24

        B.    The Court Should Not Impose A Constructive Trust Because The Movants Have An Adequate Contract Remedy, And Equity Favors Providing The Debtor The Opportunity To Reorganize.........................26

            1.    The Existence Of A Contract Between The Parties Bars The Imposition Of A Constructive Trust. ...........................................26

            2.    Principles Of Equity Do Not Support The Court's Imposition Of A Constructive Trust...........................................................27

C.      The Movants Have Shown No Legitimate Basis For More Favorable
        Treatment Than Otherwise Afforded By The Bankruptcy Code. .............28

IV.     The Motion improperly seeks a pre-judgment injunction without first seeking
        a TRO and posting a bond as is required by FRBP 7065 and FRCP 65. ..............29

CONCLUSION .....................................................................................................................37

KaloBios Pharmaceuticals, Inc. (the "Debtor" or "KaloBios") hereby files this objection (the "Objection") to the *Emergency Motion of Gregory Rea, RTAT LLC, Edward H. Painter, Nancy Retzlaff, and Armistice Capital Master Fund, Ltd. to (I) Escrow Certain Funds; or Alternatively, (II) Expedite the Adversary Proceeding* [Dkt. No. 13] (the "Motion", and the movants thereof, the "Movants"). In support of the Objection, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      Since its voluntary bankruptcy filing on December 29, 2015 (the "Petition Date"), the Debtor has relentlessly worked to stabilize its financial and operational affairs after the chaos caused by the brief reign of former-CEO Martin Shkreli that began in November of 2015 and ended on December 18, 2015 after Mr. Shkreli was indicted and arrested for securities fraud violations. The Debtor has hired an experienced and well-regarded Chief Restructuring Officer, Eugene Davis, and recently appointed to its Board of Directors Dr. Cameron Durrant, a world-renowned pharmaceutical and biotech executive and business person, and the Honorable Ronald Barliant, a former bankruptcy judge and current bankruptcy practitioner from Chicago, Illinois. In addition, the Debtor has appointed Dean "Kip" Witter of The Brenner Group, LLC, as its interim Chief Financial Officer. In short, the Debtor has quickly and effectively overhauled its corporate management so that it can return to implementing its business plan of improving the lives of cancer patients with the research and development of innovative, Humaneered®, monoclonal antibodies.

2.      The Movants, on information and belief, all friends or business associates of Mr. Shkreli who purchased securities of the Debtor with full knowledge of the investigation of Mr. Shkreli, now seek to yet again derail the Debtor's business by rescinding their purchase of the Debtor's securities, while simultaneously asking the Court to escrow most of the Debtor's

operating capital pending adjudication of their legally unsound claims.   The Movants, sophisticated investors who apparently appreciate that any claims they hold against the Debtor relating to their purchase of the Debtor's equity securities are subject to mandatory subordination under section 510(b) of the Bankruptcy Code, argue that this Court should exercise its equitable powers to declare that the Debtor merely held the money in trust—despite the lack of any express trust or escrow—and that they are therefore entitled to the return of their money.  This blatant end run around the clear application of section 510(b) has already been rejected by those courts to consider it and should fare no better here.

3.       Further, the Movants' requested relief is procedurally flawed.  By the Motion, the Movants essentially seek a pre-judgment injunction that their capital contributions be placed into escrow without going through the necessary procedural steps of seeking a temporary restraining order ("TRO") followed by a hearing on the injunction upon expiration of the TRO.  But more importantly, regardless how the Motion is procedurally couched, the Movants should be required to post a bond—as they would be required to if they had properly moved for a TRO as contemplated by under Rule 65(c) of the Federal Rules of Civil Procedure ("FRCP")[2]—to secure the Debtor against the losses it is likely to suffer if it is unable to meet its current obligations necessary to preserve the drug lines it is developing and otherwise continuing to operate as a going concern.

4.       In short, an implied trust is not supported by the facts, and, even if it were, courts have held that an implied trust theory cannot be used to circumvent section 510(b)'s subordination of claims arising from the purchase of a debtor's securities.  Accordingly, the

---

[2] FRCP 65 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure ("FRBP") 7065.

Court should deny the Motion and permit the Debtor to use all its estate assets to effectuate its reorganization for the benefit of its stakeholders.

## BACKGROUND

5.      On the Petition Date, the Debtor filed a voluntary petition (the "Petition") for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").[3] The Debtor continues to operate its businesses and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      The Debtor is a publicly traded (ticker symbol: KBIO) biopharmaceutical company[4] dedicated to helping the lives of patients with innovative therapies.  Its mission is to improve the lives of cancer patients with innovative, Humaneered®, monoclonal antibodies.

7.      The Debtor is currently investigating certain Humaneered® antibodies in clinical development programs that focus on treating cancer including: (i) KB004 (anti-EphA3) Humaneered® mAb ("KB004") to treat patients with hematologic malignancies, solid tumors, and their stem cells; and (ii) KB003 (anti-GM-CSF) Humaneered® mAb ("KB003"), which the Debtor intends to evaluate in oncology indications where GM-CSF may play a key role in such indications as chronic myelomonocytic leukemia.

8.      On November 9, 2015, the Board of Directors of the Debtor announced by Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") a restructuring plan involving, among other measures, reductions in headcount as part of a plan to reduce operating costs in an effort to focus its limited resources on the ongoing development of KB003 as a

---

[3] All section references refer to the Bankruptcy Code unless otherwise noted.

[4] The Company was incorporated on March 15, 2000 in California and reincorporated as a Delaware corporation in September 2001.

treatment for chronic monomyelocytic leukemia.  The November 9, 2015 Form 8-K is attached hereto as **Exhibit A**.

## I.        MR. SHKRELI TAKES CONTROL AND IS APPOINTED CEO.

9.        On November 17, 2015, a group of investors consisting of Mr. Shkreli, David Moradi (through Anthion Partners II LLC ("Anthion"), a private investment vehicle of which Mr. Moradi is the Managing Member) and Marek Biestek acquired over 50.1% of the Debtor's outstanding shares of common stock in the aggregate through open market purchases.  The Debtor announced the acquisition by a Form 8-K filed with the SEC on November 23, 2015, which is attached hereto as **Exhibit B**.

10.       As of November 23, 2015, Mr. Shkreli, Mr. Moradi, Anthion and Mr. Biestek owned an aggregate of approximately 70.0% of the outstanding shares of common stock of KaloBios.  Mr. Shkreli was the controlling shareholder, beneficially holding more than 50% of the outstanding shares of the Debtor at that time.

11.       In the same November 23 Form 8-K, the Debtor announced that, on November 19, 2015, it had terminated Mr. Herb Cross from his position as Interim President, Chief Executive Officer and Chief Financial Officer of the Company, effective immediately, appointed Mr. Shkreli as Chief Executive Officer of the Company and elected Mr. Shkreli as Chairman of the Board.

## II.       THE PIPE TRANSACTION.

12.       The Debtor hired Chardan Capital Markets, LLC ("Chardan") as its financial advisor by an engagement letter dated December 3, 2015.

13.       On December 3, 2015, the Debtor entered into a Securities Purchase Agreement (the "SPA") with certain purchasers identified thereunder (the "PIPE Investors") to effectuate a

private placement by the Debtor of up to an aggregate 511,596 shares of the company's common stock, par value $0.001 per share, at a purchase price of $29.32 per share, or up to $15,000,000 (the "PIPE Transaction").  Upon information and belief, the PIPE Investors largely consisted of friends and business associates of Mr. Shkreli.  The Debtor filed a Form 8-K with the SEC announcing its entry into the SPA and also disclosing that the Debtor had entered into a Registration Rights Agreement (the "RRA") with the PIPE Investors, also on December 3, 2015. The SPA, RRA and December 3 Form 8-K are attached hereto as **Exhibits C**, **D**, and **E**.

14.    In the period between December 3, 2015 and December 15, 2015, the PIPE Investors, including Movants, wired their subscription amounts under the SPA to the Debtor's bank account. As set forth on the Debtor's Commercial Checking Statement for December 2015 as issued by Comerica Bank, attached hereto as **Exhibit E-2**, all such wires were made directly to the Debtor's principal operating account.

15.    During that time, however, the public trading price of the Debtor's common stock declined.  As a result of discussions between the Debtor and the PIPE Investors, the parties voluntarily agreed to amend the SPA to reduce the purchase price per share for those PIPE Investors who were unaffiliated with the Debtor to $24.855, which was the NASDAQ closing price of the Debtor's common stock on December 15, 2015.    This price reduction was memorialized in Amendment No. 1 to the SPA dated December 15, 2015 (the "SPA Amendment"). The SPA amendment is attached hereto as **Exhibit F**.

### III.    CONSUMMATION OF THE PIPE TRANSACTION.

16.    The last wire of a subscription amount for shares purchased under the SPA and SPA Amendment was received by the Debtor on December 15, 2015.[5]  In total, the PIPE Investors transferred approximately $8.2 million to the Debtor, of which $5,399,972.46 (the "Funds") came from the Movants.  In addition, sixteen PIPE Investors, *including each of the Movants*, provided signature pages to the SPA and SPA Amendment.  Chardan coordinated compiling the documents relating to the PIPE Transaction and signature pages for the various parties.

17.    On December 16, 2015, Kaye Scholer, LLP ("Kaye Scholer"), the Debtor's outside legal counsel, executed its legal opinion with respect to the PIPE Transaction.  The Kaye Scholer legal opinion is attached hereto as **Exhibit G**.  All transaction deliverables appear to have been in possession of Chardan (other than the purchase price funds, which were transferred directly to the Debtor's bank account), and the release of funds and signature pages by the participating PIPE Investors was not subject to any further conditions.

18.    Substantially concurrent with payment of the purchase price and the legal issuance of the purchased shares, the Debtor executed and delivered to the transfer agent, Computershare, instructions to print certificates evidencing the PIPE Investor's ownership of their respective shares.  The Instruction Letter is attached hereto as **Exhibit H**.  Computershare's issuance of the physical stock certificates was delayed, however, because Computershare required the Debtor first provide a new incumbency certificate along with addresses for the PIPE Investors.  Since that time, the Debtor has provided Computershare with an updated instruction

---

[5] Mr. Shkreli and Chardan, the Debtor's financial advisor and an expected investor in the PIPE Transaction, did not wire their subscription amounts to the Debtor.

letter and the shares are issued in the names of the PIPE Investors has been recorded by Computershare.  The Updated Instruction Letter is attached hereto as **Exhibit I**.

19.     On December 16, 2015, the Debtor filed a Form 8-K with the SEC announcing that "the transactions set forth in the Purchase Agreement were consummated and 350,224 shares of the Company's common stock, par value $0.001 per share was issued to the Purchasers for the aggregate purchase price of approximately $8,818,000."[6]   The December 16 Form 8-K is attached hereto as **Exhibit J**.

20.     On December 18, 2015, David Moradi and Anthion filed a Schedule 13D with the SEC, disclosing that "[o]n December 16, 2015, Anthion acquired 3,410 shares of Common Stock in connection with a private placement of the Issuer's securities."  Anthion also reported the December 16 purchase via Form 4 filed on December 17, 2015 (which Form 4 was later amended on December 18).  The Moradi/Anthion Schedule 13D and amended Form 4 is attached hereto as **Exhibits K** and **L**. In addition, three directors of the Debtor at the time, Tom Fernandez, Marek Biestek and Michael Harrison, also each reported the December 16 purchase via Form 4s filed on December 18, 2016.  The Fernandez, Biestek and Harrison Form 4s are attached hereto as **Exhibits M**, **N** and **O**.

21.     As of the Petition Date, because of the dilution from the PIPE Transaction, Mr. Shkreli is the beneficial owner of approximately 47% of the Debtor's common stock and the PIPE Investors are the beneficial owners of approximately 26% of the Debtor's common stock.

---

[6] The December 16 Form 8-K incorrectly included approximately $600,000 of funds that had not been wired by two Purchasers, Mr. Shkreli and Chardan.  The December 16 Form 8-K was signed by then-CEO, Mr. Shkreli.

IV.     **MR. SHKRELI'S INDICTMENT AND ARREST.**

22.     On December 17, 2015, Mr. Shkreli was arrested following a federal indictment, charging him with multiple counts of securities fraud, securities fraud conspiracy, and wire fraud conspiracy. According to the press release by the U.S. Department of Justice ("DOJ") announcing the indictment, Mr. Shkreli's indictment and arrest relate to his tenure as CEO of Retrophin, Inc. ("Retrophin"), a biopharmaceutical company that trades under the ticker symbol RTRX, and as founder and managing member of hedge funds MSMB Capital Management LP ("MSMB Capital") and MSMB Healthcare Management LP ("MSMB Healthcare").[7]  In addition to Mr. Shkreli, the Debtor's former outside Counsel, Evan Greebel of Kaye Scholer, was also indicted and arrested in connection with Retrophin.  The indictment of Messrs. Shkreli and Greebel is attached hereto as **Exhibit P**.  Besides certain common investors and employees, including Mr. Shkreli, and prior representation by Mr. Greebel, the Debtor has no business affiliation to Retrophin, MSMB Capital or MSMB Healthcare.

23.     The Motion is peppered with assertions that the Motions did not know or had no reason to know that Mr. Shkreli was being investigated by federal authorities until after the wired funds to the Debtor for the PIPE Transaction. *See, e.g.,* Motion, ¶ 14 ("Unbeknownst to the Movants, the FBI was knocking at the door. Afederal investigation of Shkreli had been underway since at least January 2015 …."); ¶  26 ("Unbeknownst to Movants, a federal investigation of Shkreli had been underway since at least January 2015, when Retrophin Inc., … a biopharmaceutical company that Shkreli had founded, received a subpoena from prosecutors seeking information about its relationship with Shkreli."); ¶ 44 ("After transferring the Funds, the Movants later learned that a federal investigation of Shkreli had been underway since at least

---

[7] The indictment contains no mention of Mr. Shkreli's activities in connection with the Debtor.

January 2015."). Contrary to what the Movants now assert, even leaving aside their close historical relationships with Mr. Shkreli, the Movants had every reason to know, and likely did know, that Mr. Shkreli was under investigation by federal authorities. On February 19, 2015, Retrophin, Inc., announced that that it had received a subpoena from the U.S. Attorney for the Eastern District of New York (the same office that would eventually indict Mr. Shkreli) seeking information about Mr. Shkreli and his hedge fund (**Exhibit Q** hereto).  News of the U.S. Attorney's criminal investigation of Mr. Shkreli was immediately picked up by major media outlets, which also reported that Mr. Shkreli was being separately investigated by the SEC. For example, Bloomberg reporters filed multiple stories on the issue which are attache as **Exhibit R** hereto.

**V.  FALLOUT FROM MR. SHKRELI'S INDICTMENT AND ARREST.**

24.    On December 17, 2015, the Debtor terminated Mr. Shkreli as CEO and he resigned from the Board of Directors.  In addition, on December 17, 2015, Tony Chase resigned from the Board of Directors and from the Debtor's Audit Committee.  The Debtor announced Mr. Shkreli's termination and resignation by Form 8-K filed with the SEC on December 21, 2015.  The December 21 Form 8-K is attached hereto as **Exhibit S**.

25.    On December 17, 2015, NASDAQ halted trading in the Debtor's stock, and on December 18, 2015, the Debtor received a letter from NASDAQ indicating that it intended to delist the Debtor's securities under its discretionary authority.  NASDAQ cited a number of reasons for its decision, including, among other things, the criminal indictment and arrest of Mr. Shkreli as well as the Debtor's failure to timely file its Quarterly Report on Form 10-Q for the quarter ending September 30,  2015. On December 23, 2015, the Debtor announced by a Form 8-K filed with the SEC and a press release NASDAQ's intention to delist its securities. The

December 23 Form 8-K is attached hereto as **Exhibit T**. The Debtor is currently appealing NASDAQ's decision to delist its securities, but, as of the date hereof, trading has not resumed.

26.     By the same December 23 Form 8-K and press release, the Debtor also announced that its independent registered public accounting firm, Marcum LLP, resigned, and its Interim Chief Financial Officer, Christopher Thorn, submitted his resignation.  On December 27, 2015, Tom Fernandez and Marek Biestek resigned as members of the Board of Directors.  The Debtor announced their resignations by a Form 8-K filed with the SEC and a press release on December 28, 2015.  The December 28 Form 8-K is attached hereto as **Exhibit U**.

## VI.     THE PIPE INVESTOR'S REACTION.

27.     Following Mr. Shkreli's indictment and termination and NASDAQ delisting the Debtor's securities, certain of the PIPE Investors made informal requests that KaloBios rescind the PIPE Transaction and return their respective capital contributions, as well as threatening litigation.

28.     Unfortunately, this recent turmoil necessitated that KaloBios seek bankruptcy protection on an emergency basis. Specifically, the Debtor perceived an imminent threat from the PIPE Investors' informal, yet increasingly aggressive demands for return of the proceeds of the PIPE Transaction that, absent a bankruptcy filing and imposition of the automatic stay, would place a significant portion of its liquid assets at risk of being frozen. It is this same risk that the Movants again impose on the Debtor with the Motion seeking to place the Funds into escrow. The Debtor commenced this Chapter 11 case to preserve its assets and ensure that it has the best possible opportunity to implement a restructuring for the benefit of all its stakeholders, including equity holders and unsecured creditors. The relief requested in the Motion would improperly put the Debtor's chance of reorganization in extreme jeopardy.

## VII.    THE DEBTOR'S POST-PETITION RECONSTITUTION OF THE BOARD OF DIRECTORS AND APPOINTMENT OF OFFICERS.

29.    As mentioned above, the Debtor has worked relentlessly since the Petition Date to reconstitute its Board of Directors to include experienced and independent directors who are not affiliated with Mr. Shkreli or connected to the PIPE Transaction.  As a result of the Debtor's efforts, the Debtor's Board was reconstituted on January 7, 2016, when Dr. Cameron Durrant and former bankruptcy judge Ronald Barliant were appointed to the Board, and Michael Harrison resigned from the Board.  The Debtor's three-member Board now consists of Dr. Durrant, Mr. Barliant and David Moradi.

30.    Dr. Durrant is an experienced medical doctor and business executive who holds a Bachelor of Medicine and Bachelor of Surgery from Welsh National School of Medicine, Cardiff, UK, a Diploma of the Royal College of Obstetricians and Gynecologists, London, UK, and a Masters in Business Administration, Henley Management College, Oxford, UK.  Dr. Durrant is also a member of the Royal College of General Practitioners.

31.    Dr. Durrant serves or has served as the president, executive officer or a member of the board of directors of numerous pharmaceutical, health, and life sciences companies, including, among others: ECR Pharmaceuticals (President and CEO); Hi-Tech Pharmacal (Corporate Officer); PediatRx Inc. (Founder, Chairman, CEO, CFO); Taran Pharma Limited (Founder); PediaMed Pharmaceuticals (President and CEO); Immune Pharmaceuticals (Director); ReliefBand (Director); Bexion Pharmaceuticals (Director); and Alcyone Life Sciences (Director).  Dr. Durrant has also held key, executive roles at industry leaders such as Worldwide Vice President, Infectious Diseases, Global Strategic Marketing at Johnson & Johnson and Vice President and Head of Global Business Planning and Operations at Pharmacia Corporation (now part of Pfizer).

32.     Mr. Barliant, a former bankruptcy judge, is "of counsel" with Goldberg Kohn in Chicago, Illinois.  Since joining Goldberg Kohn in September 2002, first as a principal and now in a counsel role in the Bankruptcy & Creditors' Rights Group, Mr. Barliant has represented debtors and creditors in complex bankruptcy cases. His debtor representations include a machine tool manufacturing company in a Delaware Chapter 11 case involving significant environmental and mass tort liabilities (plan confirmed with future claimants trust 11 months after filing), a wireless telecommunications carrier in a Chapter 11 case requiring the restructuring of debts owed the FCC for PCS licenses (plan confirmed 5 months after filing), and a home products manufacturing company in a pre-negotiated Chapter 11 case involving a debt-for-equity swap and the issuance of new debt securities (plan confirmed 75 days after filing).

33.     Before joining Goldberg Kohn, Mr. Barliant served as a United States Bankruptcy Judge for the Northern District of Illinois from 1988 to 2002.[8]  During his tenure on the bench, one of the largest cases over which he presided was Comdisco Inc. (in the technology services industry), involving more than $4 billion in debt.  Other prominent cases he heard include Florsheim Group Inc. (men's shoes); Birmingham Steel Corp. (specialty steel); Archibald Candy Corp. (confectionaries under Fanny May and Fanny Farmer brands); e-spire Communications Inc. (telecommunications); Ben Franklin Retail Stores (retail); Keck, Mahin & Cate (law firm); Forty-Eight Insulations Inc. (asbestos products); Outboard Marine Corp. (boat engines); and the developers in several significant single-asset real estate cases.  Before becoming a bankruptcy judge, he represented the trustee in the Chapter 7 case of the owner and operator of an oil refinery, Energy Cooperative Inc., which at the time was the largest Chapter 7 case in the history of the Northern District of Illinois.

---

[8] Near the end of his term, Mr. Barliant sat by designation as a visting bankruptcy judge in this District.

34.    Mr. Barliant has taught debtor-creditor relations at John Marshall Law School and has frequently lectured and participated in panel discussions on bankruptcy-related topics at the invitation of many organizations, including the Federal Judicial Center, the National Conference of Bankruptcy Judges, the American Bankruptcy Institute, the American Bar Association, the Commercial Finance Association, the Turnaround Management Association, the Chicago Bar Association and LexisNexis Mealey's.

35.    Mr. Barliant received his law degree in 1969 from Stanford University School of Law, where he was a member of the editorial board of the Stanford Law Review.   He received his B.A. in 1966 from Roosevelt University.

36.    In addition to reconstituting its Board of Directors, the Debtor has also retained an experienced Chief Restructuring Officer, Chief Financial Officer and Controller.  In particular, shortly before the Petition Date, on December 23, 2015, Eugene I. Davis joined the Debtor as Chief Restructuring Officer.  Mr. Davis has vast experience in chapter 11 restructuring matters. Since forming his advisory firm, Pirinate Consulting, in 1997, Mr. Davis has advised, managed, sole, liquidated or served as the Chief Executive Officer, Chief Restructuring Officer, and Chairman of the Board of a number of businesses, including companies operating in the telecommunications, automotive, manufacturing, high-technology, medical technologies, metals, energy, financial services, consumer products and services, import-export, mining and transportation and logistics sectors.

37.    Mr. Davis has provided strategic advice to debtors in numerous chapter 11 cases. Indeed, Mr. Davis has decades of experience in financial consulting and turnaround management and has provided restructuring or crisis management services in many bankruptcy cases, in both this district and elsewhere, including, but not limited to, *In re RBX Corp.*, No. 01-00436 (Bankr.

W.D. Va. Feb. 6, 2001) (Mr. Davis served as CRO); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Sept. 7, 2011) (Pirinate served as Litigation Trustee); *In re Quebecor World (USA) Inc.*, No. 08-10152 (Bankr. S.D.N.Y. Jan. 21, 2008) (Mr. Davis served as the Litigation Trustee); *In re Terrestar Corp.*, No. 11-10612 (Bankr. S.D.N.Y. Feb. 16, 2011) (Mr. Davis served as CRO); *In re Tom's Foods Inc.*, No. 05-40683 (Bank. M.D. Ga. April 6, 2005) (Mr. Davis served as CRO and as Liquidating Trustee); *In re Vertis Holdings, Inc.*, No. 12-12821 (MFW) (Bankr. D. Del Oct. 10, 2012) (Mr. Davis was Chairman of the Debtor's Restructuring Committee); *In re AES Eastern Energy, L.P.*, No. 11-14138 (KJC) (Bankr. D. Del. Dec. 30, 2011) (Mr. Davis served as the Liquidating Trustee); *In re Seahawk Drilling, Inc. and Official Committee of Unsecured Creditors*, No. 11-20089 (Bankr. S.D. Tex. Feb. 11, 2011) (Mr. Davis served as the Liquidating Trustee); *In re Saint Vincents Catholic Medical Centers of New York*, No. 10-11963 (Bankr. S.D.N.Y. April 14, 2010) (Mr. Davis served as the Liquidating Trustee).[9]

38.    The Debtor's reconstituted Board has also resolved to retain the services of an interim Chief Financial Officer and interim Controller through The Brenner Group on a postpetition basis.  The Brenner Group, based in Cupertino, California, is one of the life sciences

---

[9] Over the last two decades, Mr. Davis also has served as a board member for numerous distressed companies, including the following: Patriot Coal Corporation; WMIH Corp. (formerly Washington Mutual); McLeodUSA, LLC; Ardagh Glass Inc.; Building Materials Holding Corporation; Merisant Company, Inc.; Ambassadors International Inc.; General Chemical Industrial Products; Bluestem Group Inc., (Formerly, Capmark Financial Group Inc.); U.S. Concrete, Inc.; Merisant Worldwide Inc.; Entegra Power Group, LLC; Foamex International, Inc.; Atlas Air Worldwide Holdings Inc.; Aventine Renewable Energy Holdings, Inc. (alternate name Pacific Ethanol Central, LLC); Anchor Glass Container Corporation; 1511419 Ontario Inc.; Trident Exploration Corp.; The Cash Store Financial Services, Inc.; Haights Cross Communications Inc.; Orchid Cellmark Inc.; SeraCare Life Sciences Inc.; Dex Media, Inc.; Trident Resources Corp.; Global Power Xchange Limited (formerly, Reliance Globalcom Ltd.); High Voltage Engineering Corporation; FXI, Inc.; Cadence Innovation LLC; Sports Supply Chain, Inc.; Emerson Radio Corp.; Congoleum Corporation; Rural/Metro Corp.; U.S. Concrete, Inc.; TerreStar Corporation; Terrestar Networks, Inc.; Granite Broadcasting Corporation; Viskase Companies Inc.; ION Media Networks Inc.; Trump Entertainment Resorts, Inc.; Foamex International Inc.; HRG Group, Inc. (formerly, Harbinger Group Inc.); Spectrum Brands Holdings, Inc.; Connacher Oil and Gas Ltd.; MModal IP LLC;  Ambassadors International Inc.; Pliant, LLC (formerly, Pliant Corp.);  and Emerald Plantation Holdings Limited.

and technology community's most established professional services firms.  Since 1987, more than 2,000 companies have used The Brenner Group for their finance and accounting needs.

39.    The Brenner Group has agreed to provide Dean "Kip" Witter III as Interim Chief Financial Officer to the Debtor on a postpetition basis.  Mr. Witter is a seasoned financial and operating executive with over 25 years of experience with both large and small high-technology, fast-paced companies.    His area of emphasis and expertise are on finance, operations, administration, and control.  He has held positions as chief financial officer and chief operating officer of emerging high-tech companies.  Mr. Witter holds an MBA from Stanford University and a BA in Applied Mathematics from Harvard College.

40.    The Brenner Group has also agreed to provide Caligari Lindsay as Controller to the Debtor on a postpetition basis.  Mr. Lindsay is a seasoned finance and accounting executive with over 15 years' experience in early and mid-stage technology companies. Mr. Lindsay holds an MBA from Notre Dame de Namur University and a BA from the University of Southern California.

41.    In addition to their experience and qualifications, The Brenner Group, and in particular Messrs. Witter and Lindsay, have worked with the Debtor since November 2015 and have invaluable knowledge and experience with the Debtor's business and financial affairs.

42.    In short, the Debtor has assembled an extraordinarily qualified, respected and independent Board of Directors and interim management and finance team.

**VIII.    THE  MOVANTS'  IMPROPER  ATTEMPT  TO  ESCROW  THE FUNDS.**

43.    On January 7, 2016, the Movants filed an adversary complaint (the "<u>Adversary Complaint</u>") thereby commencing an adversary proceeding, Adv. Case No. 16-50001 (the "<u>Adversary Proceeding</u>"), seeking (i) a declaration that the Debtor holds the Funds in a Resulting

Trust and that the Funds are not property of the estate; or (ii) alternatively, a declaration that the Funds are held in a constructive trust and are not property of the estate, as well as (iii) various claims for fraud, breach of contract and unjust enrichment under Delaware law.

44.    Contemporaneously with the filing of the Adversary Complaint, the Debtor also filed the Motion, seeking to (i) escrow the Funds or, alternatively, (ii) expedite the Adversary Proceeding. The Debtor also filed a motion for an expedited hearing on the Motion on shortened notice [Dkt. No. 14], which the Court granted and set the Motion for hearing on January 12, 2015 [Dkt. No. 15].

## OBJECTION

45.    The Movants assert that, despite the issuance of their shares, the PIPE Transaction never closed and the Funds they transferred in exchange for their shares are held by the Debtor in an implied trust.  This is not correct.  The SPA was consummated when the Movants wired their funds to the Debtor and the Debtor issued the Movants' securities. Any alleged breach of the SPA gives rise to contract damages or a claim for rescission, not an implied trust.  But even if available, the facts of this case do not support an implied trust, which would effectively permit the Movants to rescind their securities purchase—while avoiding the implications of section 510(b)—to the detriment of the Debtor's reorganization efforts and the recoveries of general unsecured creditors.[10]

---

[10] The Debtor currently estimates that general unsecured claims may exceed $2 million.

## I.     THE SPA WAS VALIDLY CONSUMMATED AND THE MOVANTS REMEDY FOR ANY ALLEGED BREACH IS FOR DAMAGES OR RESCISSION, NOT AN IMPLIED TRUST.

### A.     The Debtor And Movants Consummated A Valid Securities Purchase Transaction.

46.     The PIPE Transaction was a transaction for the sale of stock that was consummated when the Movants transferred the money to the Debtor and the Debtor issued the shares.  This occurred on December 16, 2015 after the Movants had wired their Funds and sent their signature pages to the SPA Amendment to Chardan (who was compiling all transaction documents), Kaye Scholer issued its legal opinion, and the Debtor issued its Form 8K announcing the securities issuance and sent the instruction letter to the Transfer Agent.[11]

47.     The possibility that Chardan's delivery of the transactional documents to the Movants may have been lost in the chaos of Mr. Shkreli's indictment and arrest—which the Debtor does not concede—should not erase the fact that the parties consummated the PIPE Transaction.   But to the extent the Court finds that the mere delivery of the transaction documents to the Movants was in fact required—which the Debtor disagrees—out of an

---

[11] The SPA required the Debtor to send a letter irrevocably instructing the Transfer Agent to deliver certificates evidencing the shares to the PIPE Investors. The Debtor submitted this instruction letter to Computershare on December 16, 2015. Computershare's issuance of the certificates was delayed, however, because Computershare required the Debtor first provide a new incumbency certificate along with addresses for the PIPE Investors.  Section 158 of Delaware General Corporation Law ("DGCL") and Delaware case law confirm, however, that shares are owned by the purchasers as a matter of corporate law immediately upon issuance, even if physical certificates had not been printed or delivered. *See, e.g., In re Appraisal of Dell Inc.,* 2015 WL 4313206 (Del. Ch. July 13, 2015) ("[A] paper stock certificate is not actually a share of stock. It is only evidence of ownership of a share of stock."); *Testa v. Jarvis,* 1994 WL 30517 (Del. Ch. Jan. 12, 1994) ("[P]ossession of a certificate does not itself constitute ownership of the shares . . . ."); *Haskell v. Middle States Petro. Corp.,* 35 Del. 380, 165 A. 562 (1933) (characterizing as "well-settled law" the proposition that "a person may be the legal owner of stock even though he has received no certificate; therefore, the certificate is only evidence of ownership"); *see also* D. DREXLER et al., 1 DELAWARE CORPORATION LAW & PRACTICE § 18.01  ("A stock certificate is not the stock itself; it is merely evidence of the shares.  Because certificates are only evidence of ownership, the issuance of a certificate is not essential to the issuance of stock, and a person may become an owner of stock although no certificate is ever issued."). In any event, since that time, the Debtor provided Computershare with an updated instruction letter and the shares issuance in the names of the PIPE Investors has been recorded by Computershare.

abundance of caution, the Debtor delivered the transaction documents to the Movants on January 11, 2016.  Such delivery unquestionably means that the PIPE Transaction has been validly consummated.  Any argument that such delivery was not effective because the Movants have now terminated the SPA is unfounded. Section 5.1 of the SPA provides that if the Closing had not occurred by December 30, 2015, any party would have been permitted to terminate the SPA at that time but the SPA did not terminate automatically.  Although no Movant attempted to formally terminate the SPA after December 30, 2015, any attempt to do so would have been prohibited by the automatic stay.  *See, e.g.*, 11 U.S.C. § 362(a); *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009).  Thus, if indeed required to do so, the Debtor unquestionably fulfilled its obligations under the SPA when it delivered the transaction documents to the Movants.

> **B.     Any Breach Of The Representations And Warranties In The SPA Entitles Movants To A Rescission Claim Or Contract Damages.**

48.     When a seller intentionally misrepresents a fact embodied in a contract, as the Movants allege, the buyer is free to press a claim for rescission or for compensatory damages. *E.g.*, *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1035-36 (Del. Ch. 2006). The Movants, however, argue that the representation made by the Debtor that no officer or director was under investigation was not true and thus left a condition to closing unsatisfied, warranting the Court to impose an implied trust on the funds transferred instead of contract damages or rescission.

49.     As a practical matter, the Movants' argument unravels when considering that, if extrapolated, it would also support the imposition of an implied trust months or years after a consummated transaction simply because a representation was wrong at the time of closing. This, of course, is an absurd result.  Rather, *prior to closing*, any false representations of the

Debtor would excuse the Movants obligations to close under the SPA, *but if the transaction is nevertheless consummated*, the Movants then must bring claims for breach of the SPA. This result is clearly contemplated by section 4.8 of the SPA, which provides the Movants a contractual indemnification right for damages arising from the breach of any representation.

50.     Finally, upon information and belief, the Movants are friends and business associates of Mr. Shkreli who had actual knowledge, prior to the date of the SPA, of the investigation of Mr. Shkreli. As such, the Movants not only did not rely upon any representation to the contrary when determining whether to execute the SPA or wire their funds, they expressly knew it to be false and entered into the SPA (as well as the SPA Amendment), and wired their funds to the Debtor.  The Movants cannot now hide behind a boiler plate representation – as opposed to one the Movants insisted upon for fear Mr. Shkreli was being investigated – to argue that equity requires this Court's imposition of an implied trust for their benefit and to the detriment of the Debtor's reorganization and payment in full to the unsecured creditors.

51.     Thus, an implied trust is unavailable and the Movants must bring claims for rescission or damages for any alleged breach of the SPA by the Debtor.

## II.     EVEN IF THE MOVANTS COULD BRING AN IMPLIED TRUST CLAIM, SECTION 510(B) BARS THE RELIEF SOUGHT BY THE ADVERSARY COMPLAINT AND THE MOTION.

52.     By its express terms, section 510(b) subordinates rescission and damages claims arising from the purchase of the Debtor's securities. Subordination reflects the different risks allocated between creditors and shareholders under the absolute priority rule.  *In re Telegroup, Inc.,* 281 F.3d 133, 139 (3d Cir. 2002); *In re Granite Partners, L.P.*, 208 B.R. 332, 337 (Bankr. S.D.N.Y. 1997); John J. Slain & Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy—Allocating the Risk of Illegal Securities Issuance Between Securityholders and*

*the Issuer's Creditors*, 48 N.Y.U.L.Rev. 261, 286–87 (1973) ("Slain & Kripke").[12] While both the shareholder and the creditor bear the risk of the corporation's insolvency, the shareholder alone bears the risk that his investment was induced by fraud or other illegality. *Telegroup,* 281 F.3d at 141; *In re Stylesite Marketing, Inc.*, 253 B.R. 503, 510 (Bankr. S.D.N.Y. 2000) (citing *Jezarian v. Raichle (In re Stirling Homex Corp.)*, 579 F.2d 206, 213–14 (2d Cir. 1978)); *In re Granite Partners, L.P.*, 208 B.R. at 336-38; Slain & Kripke at 288. "Congress enacted § 510(b) to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *Telegroup,* 281 F.3d at 142.  Section 510(b) accomplishes this end by requiring the creditors to be paid in full before defrauded former and present shareholders may receive a distribution. *In re Stylesite Marketing, Inc.*, 253 B.R. at 510; *In re Granite Partners, L.P.*, 208 B.R. at 339; H. Rep. No. 95–595, at 195-96 (1977).

53.    The Third Circuit is among those Circuits that have construed the reach of section 510(b) quite broadly.  According to the Third Circuit, for a claim to "aris[e] from the purchase or sale of … a security," 11 U.S.C. § 510(b),  it requires  merely "some nexus or causal relationship between the claims and the purchase of the securities, but not as limiting the nexus to claims alleging illegality in the purchase itself.." *Telegroup,* 281 F.3d at 138. Consistent with this approach, courts in the Third Circuit have applied section  510(b) to a wide variety of claims that on their face seem attenuated from any direct cause connection with a purchase or sale of securities.  *See, e.g., Telegroup,* 281 F.3d at 144 (holding subordinated under section 510(b) a

---

[12] Congress relied heavily on the Slain & Kripke article in enacting section 510(b). *See* H.R. Rep. No. 95-595, at 196 (summarizing the argument in the Slain & Kripke article and stating that "[t]he bill generally adopts the Slain/Kripke position"); *id* at 194 ("The argument for mandatory subordination is best described by Professors Slain and Kripke.").

clam for breach of a provision in a stock purchase agreement requiring the issuer to use its best efforts after the issuance of the stock to register its stock); *The Liquidation Trust of U.S.Wireless Corp., Inc. v. Wax (In re U.S. Wireless Corp., Inc.),* 384 B.R. 713, 727-28 (Bankr. D. Del. 2008) (subordinating money judgment arising out of debtor's breach of employment agreement to the extent that the damages were attributed to debtor's actions that prevented former office from realizing value of equity securities that otherwise would have been available to him as part of his compensation package); *In re Touch America Holdings, Inc.,* 381 B.R. 95, 106 (Bankr. D. Del. 2008) (subordinating claims of former directors and officers of debtor for indemnification and contribution arising out of their liability to putative class plaintiffs in an ERISA action alleging mismanagement of the debtor's 401(k) plan's investment in equity securities of an affiliate of the debtor); *In re Int'l Wireless Communications Holdings, Inc.,* 257 B.R. 739, 746 (Bankr. D. Del. 2001) (holding that claims against the debtor for breach of a supplement to a share purchase agreement arise from the purchase or sale of those securities); *In re Kaiser Group Int'l, Inc.,* 260 B.R. 684 (Bankr. D. Del. 2001) (holding that claims for breach of a merger agreement arise from the purchase or sale of debtor's securities).   The instant dispute is just another permutation in which section 510(b) is properly applied to subordinate claims.

54.    As discussed above, the Movants have, at best, a claim for damages or rescission arising from their purchase of the Debtor's securities. But because these claims fall squarely within the purview of the subordination provisions of section 510(b), the Movants seek to achieve the same result while not only avoiding subordination, but effectively elevating themselves to the treatment of a secured creditor.

55.    Movants in their papers steadfastly ignore the existence of section 510(b), but it is apparent that Movants' assertions that the proceeds of the PIPE Transactions never became

property of the Debtor's estate are crafted as an effort to avoid section 510(b)'s mandatory subordination of their claims. In *In re Commercial Fin. Servs., Inc.*, 268 B.R. 579 (Bankr. N.D. Okla. 2001), the claimant made a similarly vain attempt to skirt the effect of section 510(b), asserting "that the Court cannot even consider subordination of its rescission claim under Section 510(b) because the property it seeks to recover is not and has never been property of the estate. *Id.* at 594 (citing 11 U.S.C. § 541(d)). Following a thorough analysis of the language and legislative intent for section 510(b), the court concluded that if the instrument at issue was a "security," section 510(b) would likely apply. It reasoned that a "constructive trust claim that might prevail in other circumstances may not prevail when the party seeking to rescind the purchase of a security had a better opportunity to avoid the risk of fraud than did a debtor's general unsecured creditors." *Id.* at 600. That is certainly true here. Even setting aside their apparent connections with Mr. Shkreli and his Turing Pharmaceuticals enterprise and their likely knowledge that Mr. Shkreli was under investigation by the SEC, each of the PIPE Investors has to be viewed as having entered into the PIPE Transaction with eyes wide open to their subordinate status as common stockholders and the very substantial risk that their investment company—which just weeks before had been on the brink of completely shutting down its operations—would be a total loss.

56.    The court in *Stylesite Marketing* likewise addressed this very issue. In *Stylesite*, a purchaser of the Chapter 11 debtor's securities brought an adversary proceeding for imposition of a constructive trust for the consideration it had paid, asserting that it had been induced to enter the agreement by "trick and deceit." *In re Stylesite Marketing., Inc.,* 253 B.R. at 509. The court held that a constructive trust cannot circumvent the clear application of section 510(b) and

therefore "even if [the purchaser] is entitled to a constructive trust, its remedy should still be subordinated to the payment of all other claims." *Id.* at 510.

57.     Further, even if the Court were to agree with Movants that the PIPE Transaction did not close and the Movants were not validly issued stock, section 510(b) would still subordinate their claims because "nothing in § 510(b)'s text requires a subordinated claimant to be a shareholder." *E.g.*, *In re Betacom of Phoenix, Inc.*, 240 F.3d 823, 829 (9th Cir. 2001); *see also In re Med Diversified*, 461 F.3d 251 (2d Cir. 2006) (subordinating claim arising from failure to issue securities pursuant to severance agreement); *In re PT–1 Commc'ns, Inc.*, 304 B.R. 601 (Bankr. E.D.N.Y.2004) (subordinating claim based on failure to issue stock). All that is required is that the claim broadly "arises from" the purchase or sale of a security of the Debtor. *See In re Enron Corp.*, 341 B.R. 141, 152-53 (Bankr. S.D.N.Y. 2006) ("[T]he majority of courts in recent years that have confronted related issues concerning the scope of section 510(b) have concluded that the phrase 'arising from' should be read broadly to encompass claims, such as claims for breach of contract, even more indirectly related to the purchase or sale of a security."); *In re Gen. Mar. Corp.*, No. 13 CIV. 5019 ER, 2014 WL 5089406, at *3 (S.D.N.Y. Sept. 29, 2014) ("[T]he Bankruptcy Court correctly observed that courts interpret section 510(b) broadly").

58.     Thus, even if the Movants were to ultimately prevail on their claim for an implied trust, section 510(b) subordinates their claim behind general unsecured creditors, making the Movants' request that the monies be placed in escrow unwarranted.

### III.    EVEN IF AN IMPLIED TRUST IS AVAILABLE, IT IS NOT WARRANTED UNDER THESE CIRCUMSTANCES.

59.    Under Delaware law,[13] absent the existence of an express trust, a court may use its equitable powers to imply a trust under two limited circumstances: (i) where the facts of a transfer suggest the existence of a resulting trust; or (ii) where fraud or misrepresentation require the imposition of a constructive trust in order to achieve the goals of equity.  *E.g.*, *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 769 F. Supp. 671, 712 (D. Del. 1991), *aff'd*, 988 F.2d 414 (3d Cir. 1993).  If the Court determines that it may impose an implied trust despite the Movants' adequate contract remedies, it should nevertheless decline to do so because, as detailed in turn below, the Movants did not wire the funds with the intent that the Debtor hold the Funds in trust and equity does not require the imposition of a constructive trust, especially when granting the requested relief will severally hamstring, if not eliminate, the Debtor's reorganization chances.

### A.    No Resulting Trust Exists Because There Is No Indication The Movants Intended The Debtor To Hold The Funds In Trust.

60.    A resulting trust arises from the parties' presumed intent for one party to hold money in trust for the other party despite the lack of an express trust.  *See Adams v. Jankouskas*, 452 A.2d 148 at 152 (Del. 1982) ("A resulting trust arises from the presumed intentions of the parties and upon the circumstances surrounding the particular transaction."); *Hudak v. Procek (Hudak I)*, 727 A.2d 841, 843 (Del. 1999) ("A resulting trust is one that is imposed by a court of equity to give effect to the presumed intentions of the parties.").  As a general matter, a court establishes a resulting trust based on the intentions of the parties, as well as the circumstances of

---

[13] Because the SPA is governed by Delaware law and the Debtor is a Delaware corporation, the property interests at stake here are governed by Delaware law.

a given transaction. *Adams,* 452 A.2d at 152; *E. Lake Methodist Episcopal Church, Inc. v. Trs. of Peninsula-Del. Annual Conference of United Methodist Church, Inc.*, 731 A.2d 798, 809 (Del. 1999).

61.     The Parties' intent can best be derived from the provision of the SPA itself, which makes no mention of an escrow or trust arrangement. Section 5.3 of the SPA contains an "Entire Agreement" integration clause stating that the SPA "contains the entire understanding of the parties with respect to the subject matter hereof . . . ."  In the Adversary Complaint and Motion, the PIPE Investors state that they "intended" the funds be held in trust and that "it was presumed that the funds would be held in trust." *See, e.g.*, Complaint ¶¶ 35, 77.  These statements are undercut by the SPA's integration clause and the fact that the SPA makes no mention of an escrow or trust.

62.     If the court does look beyond the SPA to determine the parties' intent, the actions of the parties make clear that the money was not to be held in trust.  When the Movants wired the purchase price to the Debtor they failed to include a demand that the funds be held in escrow or trust.  As articulated in greater detail above, after the parties executed the SPA, the SPA Amendment, and the RRA, the Debtor issued the Movants' their securities and the Movants transferred their money directly to the Debtor with no mention that such monies should be held in escrow or trust.  The Debtor's law firm, Kaye Scholer, issued its legal opinion in connection with the closing, and the Debtor filed a Form 8K with the SEC announcing the securities purchase.  In addition, in the following days—even after Mr. Shkreli's arrest—four of the PIPE Investors who were also directors and officers of the Debtor, David Moradi, Tom Fernandez, Marek Biestek and Michael Harrison, each filed a Form 4 with the SEC as required under section 12 of the Securities Exchange Act of 1934 disclosing that they had purchased securities of the

Debtor.  Moreover, David Moradi and his investment vehicle, Anthion, filed a Schedule 13D on December 18, 2015, disclosing that "[o]n December 16, 2015, Anthion acquired 3,410 shares of Common Stock in connection with a private placement of the Issuer's securities."

63.    Thus, to the Debtor's best knowledge at this time, every written record of the PIPE Transaction—and statements made by other PIPE Investors besides Movants—inescapably leads to the conclusion that the PIPE Transaction was consummated and the shares were issued to the PIPE Investors, including the Movants.

64.    In short, there is no indication that the Parties ever intended the Debtor hold the Funds in trust and therefore a resulting trust cannot exist.

> **B.     The Court Should Not Impose A Constructive Trust Because The Movants Have An Adequate Contract Remedy, And Equity Favors Providing The Debtor The Opportunity To Reorganize.**
>
> **1.     The Existence Of A Contract Between The Parties Bars The Imposition Of A Constructive Trust.**

65.    A court may craft a constructive trust in favor of a beneficial owner if one party obtains the legal title to property by fraud, violation of confidence or fiduciary relations, or by similarly unconscientious means. *Heller v. Kiernan*, No. CIV.A. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002), *aff'd*, 806 A.2d 164 (Del. 2002).  Constructive trusts, therefore, ultimately exist to prevent one party from being unjustly enriched at the expense of another party to whom a duty is owed. *Adams*, 452 A.2d at 152.  If there is a valid contract between the parties, however, claims for constructive trust are not permitted. *See In re Stylesite Mktg., Inc.*, 253 B.R. at 508 ("[T]he refusal to disaffirm the Agreement leaves a valid contract that bars the imposition of a constructive trust."); *see also In re First Cent. Fin. Corp.*, 377 F.3d 209, 213 (2d Cir. 2004) ("[W]e conclude that this principle-that the existence of a written agreement precludes a finding

of unjust enrichment-also applies to constructive trust . . .”). Here, the SPA is a valid contract governing the relationship between the parties that provides the Movants remedies for any alleged wrongs.[14]

### 2.    Principles Of Equity Do Not Support The Court's Imposition Of A Constructive Trust.

66.    Even if a constructive trust were permitted despite a valid contract, principles of equity do not warrant the Court's imposition of a constructive trust.    The Movants' only allegations of fraud relate to the Debtor allegedly concealing that Mr. Shkreli was under investigation by the DOJ.    As stated above, upon information and belief, the Movants were friends and business associates of Mr. Shkreli and had actual knowledge that he was under investigation by the DOJ.

67.    Further, the Court must consider the Movants' equitable claim for a constructive trust in the broader context of the Debtor's reorganization. *See In re Commercial Fin. Servs., Inc.*, 268 B.R. at 599 (2001) (“A state law constructive trust claim that might prevail in other circumstances may not prevail when the party seeking to rescind the purchase of a security had a better opportunity to avoid the risk of fraud than did a debtor's general unsecured creditors.”). Here, practically all of the Debtor's cash on hand is proceeds from the PIPE Transaction, a large portion of which the Movants seek to escrow.    This would significantly cripple any chance for the Debtor to reorganize, pay its unsecured creditors in full, and continue developing and evaluating drugs, especially KB003, with the hope of one day providing truly groundbreaking treatment to cancer patients. Rather, the Movants seek to effectively rescind their purchase of the

---

[14] Although the Movants allege they were fraudulently induced into entering the SPA, they cannot prevail on their fraud claim and invalidate the SPA because, as discussed above, they had actual knowledge of the investigation of Mr. Shkreli. *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 323 (Del. Ch. 2013) (listing “reasonable reliance” of the false representation as an element of fraud in Delaware).

Debtor's securities—while circumventing section 510(b)—and extricate their capital from the Debtor to the detriment of its ongoing biotech operations and before unsecured creditors are paid in full.

### C.    The Movants Have Shown No Legitimate Basis For More Favorable Treatment Than Otherwise Afforded By The Bankruptcy Code.

68.    In the bankruptcy context, courts should be cautious when considering whether to impose an implied trust. *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 217 (2d Cir. 2004). The chief purposes of the bankruptcy laws are "to secure a prompt and effectual administration and settlement of the estate of all bankrupts within a limited period," *Katchen v. Landy*, 382 U.S. 323, 328-29 (1966), "to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors," *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91 (2d Cir. 1988), and "to protect the creditors from one another," *Young v. Higbee Co.*, 324 U.S. 204, 210 (1945). But by creating a separate allocation mechanism outside the scope of the bankruptcy system, an implied trust "can wreak . . . havoc with the priority system ordained by the Bankruptcy Code." *See In re First Cent. Fin. Corp.*, 377 F.3d at 217 (citing *In re Haber Oil Co.*, 12 F.3d 426, 436 (5th Cir. 1994)); *see also In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994) ("A constructive trust is fundamentally at odds with the general goals of the Bankruptcy Code.").

69.    The Movants' implied trust theory suggests that equity entitles them to more favorable treatment than other creditors who transfer money in advance of delivery of goods or services. Not only is their reasoning incorrect, but, as discussed above, it is in direct contrast to the underlying policy of the bankruptcy process and the rationale underlying section 510(b). *See In re First Cent. Fin. Corp.*, 377 F.3d at 217; *In re Stylesite Mktg., Inc.*, 253 B.R. at 510. Thus, even assuming there was no closing – which the Debtor strongly disagrees – the Movants should

have a claim against the Debtor for failure to comply with its obligations under the SPA that should be treated just like any other claim in bankruptcy (e.g., the filing of a proof of claim followed by adjudication of the parties' respective rights under the SPA and the Bankruptcy Code). The Movants are not entitled to receive more favorable treatment than a creditor who places a down payment on real estate, pays in advance for delivery of goods, or otherwise transfers money to the Debtor only to have a bankruptcy filing occur prior to the Debtor's performance under the contract. In fact, not only should the Movants not receive more favorable treatment, section 510(b) dictates the subordination of their claims.

70.    Accordingly, equity cannot permit the Movants to extricate themselves from the bankruptcy claims adjudication process, while derailing the Debtor's reorganization and depriving general unsecured creditors payment in full on their claims.

### IV.    THE MOTION IMPROPERLY SEEKS A PRE-JUDGMENT INJUNCTION WITHOUT FIRST SEEKING A TRO AND POSTING A BOND AS IS REQUIRED BY FRBP 7065 AND FRCP 65.

71.    The Motion is a curious piece of drafting. It appears that Movants, despite having filed the Adversary Complaint against the Debtor, have gone to great pains to decouple this Motion from the Adversary Proceeding. Movants have filed the Motion only in the Debtor's main case and captioned it as a contested matter. Further, Movants identify section 105 of the Bankruptcy Code as the only predicate for the extraordinary relief they seek. Neither FRBP 7065 nor FRCP 65 even appears in the Motion. Moreover, one would scour the Motion in vain for any appearance of the words "injunction", "enjoin" or the like.

72.    Yet an injunction is just what Movants seek here. According to the Motion, "Movants request that this Court order the Debtor to hold the Funds in escrow until such time as the Proceeding can be litigated to conclusion." Motion ¶ 32. A demand, such as the one

Movants make here, to compel funds to be escrowed pending the outcome of litigation is unquestionably a provisional remedy in the nature of a request for a mandatory injunction. *See Savoy Records, Inc. v. Trafalgar Assocs. (In re Trafalgar Assocs.),* 53 B.R. 693, 696 (Bankr. S.D.N.Y. 1985) ("Although not so styled, Savoy's request for the creation of an escrow account is a request for one of two provisional remedies, either a mandatory injunction or an attachment.").[15]

73.    Movants essentially are asking this Court to issue a pre-judgment injunction in order to protect their ability to collect on a money judgment *if* they are eventually successful in the Adversary Proceeding.  Such a "preliminary asset freeze order . . . would rank and operate as an extraordinary remedy." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 341 (1999) (Ginsburg, J., concurring in part and dissenting in part).  Indeed, because of the extraordinary nature of such relief and because it was historically unavailable from a court of equity, the five-Justice majority in *Grupo Mexicano* held that such pre-judgment asset freeze orders are *per se* beyond the authority of federal courts to issue in civil litigation.

74.    We do not here argue that *Grupo Mexicano* renders this Court powerless to grant any provisional relief whatsoever on account of the Movants' claims sounding in equity.  But *Grupo Mexicano* and its progeny do caution strongly against granting such relief without holding Movants' to the full measure of their burden to obtain what amounts to a mandatory injunction that will leave the Debtor without the funds it will need to function beyond the very short term.  As this Court observed in a decision issued in the year following *Grupo Mexicano,* "prejudgment sequestration or attachment under Federal Rule of Civil Procedure 64 and 65, as incorporated in

---

[15] Movants have not requested, and have articulated no basis for, an attachment remedy under applicable non-bankruptcy law.

the Federal Rules of Bankruptcy Procedure 7064 and 7065, is an extraordinary remedy and should be granted sparingly." *In re Sabratek Corp.,* 257 B.R. 732, 738 (Bankr. D. Del. 2000) (citing *Grupo Mexicano,* 527 U.S. at 340).

75.    Against this backdrop, it is clear that, despite Movants' ostrich-like attempt to blind themselves to the existence of FRCP 65 and FRBP 7065, Movants are subject to the Rule 65(c) requirement to provide security to the Debtor in connection with their demand for provisional relief that amounts to a mandatory pre-judgment asset freeze injunction.  Rule 65(c) provides:[16]

> Security. The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security.

Fed. R. Civ. P. 65(c).  "Rule 65(c) constrains a district court's authority to enter a preliminary injunction, making it contingent upon the posting of a bond." *Zambelli Fireworks Mfg. Co., Inc. v. Wood,* 592 F.3d 412, 426 (3d Cir. 2010).

76.    Compelling policy considerations underlie the Rule 65(c)'s requirement that security be provided by the party seeking provisional injunctive relief as a condition to obtaining an injunction.  As the Third Circuit has explained,

---

[16] In instances when, like the Movants here, applicants have entirely failed to even acknowledge that they may be required to post a bond under FRCP 65(c), courts have given significant weight to the applicant's wanton ignorance of the bond requirement. *See, e.g., Jurista v. Amerinox Processing, Inc.,* 492 B.R. 707, 783 (D.N.J. 2013) ("Plaintiff fails to even acknowledge the bond requirement, let alone provide an estimate of the amount of such a bond. Therefore, rather than engage in an extensive analysis of the bond requirement, the Court merely considers Plaintiff's failure to acknowledge this point as another factor weighing against the imposition of an injunction under these circumstances."); *In re W.R. Grace & Co.,* 475 B.R. 34, 209 (D. Del. 2012) (finding appellant's failure to address bond requirement in bankruptcy reorganization case as another factor counseling against the imposition of a stay).

> The requirement of security is rooted in the belief that a defendant deserves protection against a court order granted without the full deliberation a trial offers. That protection consists of a promise that the defendant will be reimbursed for losses suffered if it turns out that the order was erroneous in the sense that it would not have been issued if there had been the opportunity for full deliberation.

*Am. Bible Soc. v. Blount,* 446 F.2d 588, 595 n.12 (3d Cir. 1971).   The Third Circuit has cautioned further that such protections are essential when a preliminary injunction is sought, observing that "'because of attenuated procedure, an interlocutory order has a higher than usual chance of being wrong.'" *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 805-06 n.9 (3d Cir. 1989) (quoting O. Fiss & D. Rendleman, *Injunctions* 383 (1984)).[17]   Here, the procedure of necessity must be particularly attenuated because Movants are seeking to sequester the vast majority of the Debtor's funds by a Motion now scheduled to be heard on just three business days' notice to the Debtor and other parties in interest.

77.    It, therefore, should surprise no one that "[o]n its face" the language of Rule 65(c) "admits no exceptions." *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 210 (3d Cir. 1990).   In application, the Third Circuit has instructed that a party (other than the U.S. government) may be excused from the requirement of posting a bond as a condition of obtaining provisional injunctive relief only "when complying with the preliminary injunction 'raises no risk of monetary harm to the defendant.'" *Id.* (quoting *Frank's GMC Truck Center, Inc. v. General Motors Corp.,* 847 F.2d 100, 103 (3d Cir. 1988)).

---

[17] Moreover, a bond is essential because the Debtor and other parties in interest may not have an adequate remedy to compensate them for the erroneous issuance of an order sequestering the funds.   As the Supreme Court has stated "A party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Corp. Linoleum & Plastic Workers,* 461 U.S. 757, 770 n.14 (1983).   For this reason, imposing a bond as a condition to issuing any pre-judgment injunction benefits the Movants as well by limiting their liability and informing them "of the price of a wrongful injunction." *Sprint Comm. Co. L.P. v. CAT Comm. Intern., Inc.,* 335 F.3d 235, 240 n.5 (3d Cir. 2003).

78.     The Movants' request that compels the Debtor to escrow $5.4 million or more of its cash is similar in material respects to the injunction that was issued by the trial court without imposition of a bond, and later reversed as to the lack of such a bond by the Third Circuit, in *Hoxworth*.[18]  There, investors brought a class action against a securities firm (Blinder, Robinson) and its president (Meyer Blinder) alleging, among other things, securities fraud claims arising from the investors' purchases and sales of penny stocks.  The injunction ordered Meyer Blinder to cause Blinder, Robinson and its corporate parent to repatriate approximately $11 million that had been transferred abroad while that lawsuit was pending and to place those funds in a specific segregated account where they could not be used without further court order.[19]  *Id.* at 193-94.  There was considerable, uncontradicted evidence presented by the plaintiffs that Blinder, Robinson was in serious financial distress. *Id.* at 192-93.

79.     In granting the injunction against the defendants without the condition of a bond, the district court relied on its view that the failure to repatriate and sequester the assets would have a "chilling effect" on the willingness and ability of the plaintiffs to pursue the securities fraud case.  *Id.* at 209.  This, the Third Circuit ruled, was reversible error.  In reversing, the Third Circuit emphasized that "Blinder, Robinson is engaged in a business where liquidity and the ability to raise capital, which includes one's own capital, are critical to success, if not survival." *Id.* at 210.  Accordingly, the Court "rejected[ed] the proposition that complying with such an

---

[18] The Third Circuit affirmed that the District Court had the jurisdiction and power to grant a provisional injunction as a means of protecting the securities fraud plaintiffs' ability to recover damages if the securities fraud action against the defendants was ultimately successful.  As discussed above, this aspect of the Third Circuit's decision was effectively overruled by the Supreme Court in its later *Grupo Mexicano* opinion.

[19] In certain respects, the *Hoxworth* injunction was less draconian than the one Movants seek here.  In *Hoxworth*, defendants at least retained the ability to transfer and use their assets in the ordinary course of business. *Id.* at 210.  Movants seek an injunction that would leave the Debtor with no access whatsoever to the escrowed funds pending the outcome of the Adversary Proceeding.

injunction creates no risk of financial harm to [the defendants]." *Id.* As discussed below, the situation here is no different. KaloBios is a development-stage pharmaceutical company and its viability depends on adequate liquidity to continue is product development efforts and to attract additional capital going forward.

80.    According to one recent decision of the Third Circuit, it has "never excused a [trial court] from requiring a bond where an injunction prevents commercial, moneymaking activities." *Zambelli Fireworks*, 532 F.3d at 426. Yet Movants' demand that the Debtors sequester the vast majority of their cash in an escrow account does exactly that.[20] The Debtor was at the time of the PIPE Transaction (less than six weeks ago) and is today a development stage venture. Indeed, the investor presentation provided by Debtor's management at the time to Movants and other prospective PIPE Investors makes clear that one pillar of the Debtor's go-forward business plan is to document and consummate a transaction with Savant Neglected Diseases, LLC, to acquire the worldwide rights to Savant's benznidazole program, a compound being developed to treat Chagas Disease.[21] *See* KaloBios Pharmaceuticals, Inc. Investor Presentation (Dec. 2015) (attached as an Exhibit to the Dec. 3 Form 8-K attached hereto as **Exhibit D** hereto). As described in the investor presentation, the Savant transaction requires the Debtor to make a near-term investment of $2 million and to pay Savant up to another $20 million over time as certain regulatory milestones are achieved. The Funds raised from the Movants and

---

[20] According to the Motion, Movants are demanding that the Debtor escrow approximately $5.4 million of $8.1 of the funds raised through the PIPE Transaction. On information and belief, however, Movants may attempt to expand that relief to encompass additional funds received by the Debtor in connection with the PIPE Transaction. If so, and if such relief is granted, it would prove even more crippling to the Debtor.

[21] As described in the investor presentation, Chagas Disease is a chronic parasitic infection believed to afflict approximately 30,000 people in the United States. Although the benznidazole program is approved for use in Latin America, it presently is unavailable in the United States and elsewhere.

others as part of the PIPE Transaction were raised specifically in contemplation of the Debtor's need for additional capital to implement the Savant transaction as part of its turnaround.

81.     The Movants, thus, are no doubt aware of the devastating effect that withholding $5.4 or more of cash from the Debtor will have on the Debtor's ability to implement the Savant transaction specifically and its broader turnaround generally.  The Savant transaction, at present, exists in the form of a letter of intent which must be further documented and implemented in the very near term.  As the Debtor will demonstrate at the appropriate time in connection with the Motion and Adversary Proceeding, sequestering this amount of funds will make it virtually impossible for the Debtor to make the balance of the initial $1.75 million payment contemplated by the Savant transaction or take the additional steps necessary to bring that deal to fruition.

82.     Moreover, the Movants' actions in bringing this Motion and commencing the Adversary Proceeding during this fragile interval in the Debtor's lifecycle, is highly deleterious to the Debtor's ability to maintain the commitment and continued focus of its remaining eight critical employees and to obtain support from its vendors, several of whom are essential to the Debtor's ability to further develop its KB0003 drug research program.  Further, the events that have transpired since December 17th have no doubt shaken investor faith in the Debtor's prospects for a successful turnaround.  These ill-considered litigation tactics by a subset of the PIPE Investors are tremendously disruptive to the Debtor's ability to right the ship.

83.     If a provisional injunction requiring the vast majority of the Debtor's cash to be sequestered in an escrow account based on the as-yet unproven (and likely never to be proven) assertion of the Movants that they will prevail in arguing that the funds do not belong to the Debtor, it will almost certainly be a fatal blow to the Debtor's ability to preserve and enhance value for all of its constituencies.  Without the assurance that there will be some source of

recovery available for the Debtor and its estate in the likely event that the Movants are not ultimately successful, any such victory will almost certainly be a Pyrrhic one for the Debtor. Hence, a meaningful bond must be a precondition to granting the Movants the relief they are seeking here.

84.     The amount of the bond Movants must provide as a condition to obtaining the injunction they seek is committed to this Court's sound discretion. *See Zambelli Fireworks,* 592 F.3d at 426.  But that discretion is not entirely unfettered.  Recognizing that the bond amount also functions as a cap on the enjoined party's ability to recover damages if the injunction is later determined to have been improvidently granted, the Seventh Circuit has instructed that "[w]hen setting the amount of security, [trial] courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.,* 201 F.3d 883, 888 (7th Cir. 2000).  Doing so recognizes the reality that setting a high bond does not automatically entitle the enjoined party to a damages recovery if the injunction is later overturned. *Id.*  Rather, it would still have to prove its loss attributable to the wrongfully issued injunction. *Id.*  Conversely, "an error in the other direction produces irreparable injury [to the wrongfully enjoined party], because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.* (citing *W.R. Grace,* 461 U.S. at 770 n.14).

85.     In bankruptcy reorganization cases, such as this one, "the quantifiable costs and potential damages could be considerably high." *Jurista,* 492 B.R. at 783 (citing *W.R. Grace,* 475 B.R. at 208-09).  The circumstances here require the amount of the bond be fixed, at minimum, at the amount of the funds that the Movants seek to sequester in a court-supervised escrow account (*i.e.,* $5.4 million).  Additionally, because of the far-reaching consequences of denying the Debtor the liquidity it needs both to continue its drug development efforts and to attract

additional capital to its enterprise, an additional premium should be added to this bond amount to protect against the likely prospect that denying the Debtor access to these funds will likely be fatal to its restructuring efforts and cause the Debtor's entire business to fail.

86.    Though this Court is not required to determine the appropriate bond amount with precision, the Debtor recognizes that fixing the appropriate level of the bond above the $5.4 million that Movants seek to forcibly escrow may require further development of an evidentiary record about the scope and degree of harm to the Debtor, its estate and various stakeholders if such an injunction turns out to be erroneous.  Thus, in the event that the Court is inclined to grant Movants their requested injunction (and for all the reasons explained above, the Debtor strongly disagrees that such an injunction is appropriate here), the Debtor proposes that the Court fix the initial bond amount at an amount equal to the amount that Movants would have the Debtor escrow (*i.e.,* $5.4 million).  A further hearing should then be scheduled on an expedited basis to consider how much the initial bond amount should increase to take into account the potential for far-reaching damages to the Debtor's business and reorganization prospects traceable to effects of such a bond.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Debtor respectfully submits that the Court should deny the Movants' request to place the funds in escrow or expedite the Adversary Proceeding. Alternatively, the hearing on the Motion should be treated as (i) a hearing confined to the Movant's request to expedite the Adversary Proceeding and their request for the PIPE Investor funds to be placed in escrow or (ii) a TRO hearing on the escrow request with any such decision to temporarily escrow the Funds subject to being revisited at least as soon as a TRO would

normally expire, with the Movants required to post a bond or other security in connection with enjoining the Debtor from using funds in its possession.

Dated: January 11, 2016
   Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Gregory W. Werkheiser*

Eric D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail: eschwartz@mnat.com
   gwerkheiser@mnat.com
   mharvey@mnat.com

- and -

Peter Ivanick, Esq. (*pro hac vice* pending)
Lynn W. Holbert, Esq. (*pro hac vice* pending)
John D. Beck, Esq. (*pro hac vice* pending)
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile:   (212) 918-3100
E-mail: peter.ivanick@hoganlovells.com
   lynn.holbert@hoganlovells.com
   john.beck@hoganlovells.com

*Proposed Counsel to the Debtor and Debtor-in-Possession*