## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| KaloBios Pharmaceuticals, Inc. | Case No. 15-12628 (LSS) |
| Debtor.[1] | **Requested Objection Deadline:** **March 17, 2016, at 5:00 p.m. (ET)** **Requested Hearing Date:** **March 21, 2016, at 2:00 p.m. (ET)** |

## DEBTOR'S MOTION FOR AN ORDER: (I) APPROVING LETTER OF INTENT AND TERM SHEET WITH CHEVAL HOLDINGS, LTD., BLACK HORSE CAPITAL LP AND BLACK HORSE CAPITAL MASTER FUND LTD.; (II) APPROVING BIDDING PROCEDURES GOVERNING SUBMISSION AND CONSIDERATION OF COMPETING AND SUPPLEMENTAL PLAN SPONSORSHIP PROPOSALS; (III) APPROVING BREAKUP FEE; (IV) SCHEDULING AND AUTHORIZING THE DEBTOR TO CONDUCT AN AUCTION PURSUANT TO SUCH PROCEDURES; AND (V) GRANTING RELATED RELIEF

KaloBios Pharmaceuticals, Inc., as debtor and debtor in possession (the "Debtor"

or "KaloBios") in the above-captioned chapter 11 case, hereby moves (the "Motion") for entry of

an order substantially in the form attached hereto as **Exhibit A** (the "Bid Procedures Order"): (i)

approving Debtor's entry into that certain Letter of Intent and annexed Term Sheet, dated March

9, 2016 (collectively as attached as Exhibit B to the Motion, the "LOI"), between the Debtor and

Cheval Holdings, Ltd., Black Horse Capital LP, and Black Horse Capital Master Fund Ltd.

(collectively, the "Stalking Horse");  (ii) approving the bidding and auction procedures annexed

as Exhibit 1 to the proposed Bid Procedures Order (the "Bidding Procedures") governing the

Debtor's investigation, receipt and consideration of competing and supplemental plan

sponsorship proposals (individually, a "Proposed Transaction" and collectively, the "Proposed

Transactions"); (ii) approving and authorizing the Breakup Fee(as defined herein); (iii)

---

[1]      The last four digits of the Debtor's federal tax identification number are 7236.  The Debtor's address is 442 Littlefield Ave., San Francisco, CA 94080.

scheduling and authorizing the Debtor to conduct an auction for Proposed Transactions (the "Auction"); (iv) approving the Procedures Notice (as defined herein) and the related noticing procedures; and (v) granting related relief.  In support of this Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of this case is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105(a), 363(b), 503 and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

3.      The Debtor consents to the entry of a final order or judgment by the Court in connection with this Motion to the extent that it is later determined that the Court cannot enter such final order or judgment consistent with Article III of the United States Constitution absent consent of the parties.

## GENERAL BACKGROUND

4.      On December 29, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.     The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.     No trustee, examiner or committee has been appointed in this chapter 11 case.

## BACKGROUND RELEVANT TO THIS MOTION

### A.     The Debtor's Business

7.     The Debtor is a publicly traded biopharmaceutical company dedicated to helping the lives of patients with innovative therapies.[2]  The Debtor focuses on developing treatments for rare and neglected diseases.  As a small biotech venture, the Debtor also pursues strategic alliances and partnerships with other companies and organizations that share its commitment to developing and advancing treatments for rare and neglected diseases.

### B.     Events Leading To Commencement Of Debtor's Chapter 11 Case

8.     KaloBios is a development stage venture.  KaloBios's business model has always been premised – and still is today – on its ability to successfully meld its technical and scientific experience with adequate capital to develop and make the most of market opportunities for the treatments and therapies being developed or made available to it through partnering with other firms.  In late 2014 and early 2015, this business model began to break down for the Debtor after it experienced setbacks in its efforts research and develop treatments for certain pulmonary conditions.  In early 2015, the Debtor attempted to implement a restructuring of its business to reorient its focus on the development and commercialization of certain oncology treatments (for which its research and testing also had shown promise).  The Debtor, however, could not fully realize on this restructuring plan because of its liquidity constraints.

---

[2]     The Debtor's common stock traded on the NASDAQ Exchange, until delisted effective January 13, 2016.  The Debtor's common stock currently trades in over-the-counter markets.

9.      On November 5, 2015, the Board of Directors of KaloBios approved a restructuring plan involving, among other measures, reductions in headcount as part of a plan to reduce operating costs. The positions eliminated represented approximately 61% of the company's workforce. KaloBios announced the restructuring plan by a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on November 9, 2015.

10.     The aim of this further restructuring was to allow KaloBios to focus its limited resources on the ongoing development of KB003 (a/k/a lenzilumab) as a treatment for chronic monomyelocytic leukemia. As a part of its restructuring, KaloBios also announced that it would pause enrollment in the Phase 2 cohort expansion phase of its ongoing clinical study of KB004 in certain hematologic malignancies.

11.     KaloBios also announced its intent to repay in full its outstanding loan obligations to MidCap Financial, its secured lender. KaloBios expected this move to generate significant cash savings when compared to repayment of the debt in the ordinary course of business. KaloBios thereafter implemented this aspect of its restructuring plan by repaying approximately $6.6 million of outstanding loan obligations to MidCap Financial. As a result, KaloBios had no appreciable secured debt as of the Petition Date.

12.     Unfortunately, these cost-cutting measures and efforts by the company to explore strategic alternatives were not immediately successful. On November 13, 2015, KaloBios issued a press release announcing that liquidity constraints had forced the company to move to winddown its remaining operations.

13.     On November 18, 2015, however, KaloBios announced a group of investors, including Martin Shkreli, acquired over 50.1% of KaloBios's outstanding shares of common stock in the aggregate through open market purchases. By November 23, 2015, as

stated in a Form 8-K issued that date, KaloBios announced that the investor group had acquired in the aggregate approximately 70% of the outstanding shares of common stock of KaloBios. Based on that announcement, Mr. Shkreli was then a controlling shareholder, beneficially holding more than 50% of the outstanding shares of KaloBios at that time. The same Form 8-K disclosed that KaloBios's then Interim President, Interim Chief Executive Officer and Chief Financial Officer had been terminated and that Mr. Shkreli had been appointed as Chief Executive Officer of the Company and elected as Chairman of the Board.

14. On December 9, 2015, KaloBios announced by a Form 8-K filed with the SEC that it entered into a Securities Purchase Agreement with the purchasers identified therein (the "PIPE Investors") relating to a private placement (the "PIPE Transaction") by KaloBios of up to an aggregate 511,596 shares of the company's common stock, par value $0.001 per share, at a purchase price of $29.32 per share, or up to $15,000,000. Between December 3, 2015 and December 15, 2015, certain of the PIPE Investors wired the company approximately $8.2 million. In a Form 8-K filed on December 16, 2016, it was announced that the PIPE Transaction had closed.

15. On December 17, 2015, Mr. Shkreli was arrested following a federal indictment, charging him with multiple counts of securities fraud, securities fraud conspiracy, and wire fraud conspiracy. According to the U.S. Department of Justice's press release announcing the indictment, Mr. Shkreli's indictment and arrest relate to his tenure as CEO of Retrophin, Inc., an unrelated biopharmaceutical company, and as a founder and managing member of hedge funds MSMB Capital Management LP and MSMB Healthcare Management LP. In addition to Mr. Shkreli, Evan Greebel, an attorney who had briefly represented the Debtor after the Shkreli-lead investor group acquired control, was indicted and arrested.

16.     The same day, Mr. Shkreli was terminated as CEO of KaloBios and resigned from its Board of Directors.  In addition, on December 17, 2015 and in the following days, several individuals who had joined the Debtor's Board with Mr. Shkreli also resigned their positions as directors.  Further, it was announced that Christopher Thorn, who had come on board as KaloBios's Interim Chief Financial Officer with Mr. Shkreli, also resigned his position with the company.  Moreover, the company's independent public accounting firm (which itself had been engaged soon after Mr. Shkreli had joined the company's management) submitted its resignation.

17.     In the weeks that followed, the fallout from these events presented KaloBios with further challenges.  Certain of the PIPE Investors engaged counsel and began making demands of KaloBios to return the cash they had funded to it in connection with the PIPE Transaction and threatened litigation if their demands were not heeded.  Further, multiple purported shareholder class actions (collectively, the "Shareholder Litigations") were filed against KaloBios, Mr. Shkreli and (in one case) Mr. Thorn.

18.     In the face of this adversity, the remaining members of the Debtor's board, with the assistance of the Debtor's professional advisors, undertook efforts to stabilize the company's situation and to preserve the value of the Debtor's business and assets.  Such actions included the commencement of this chapter 11 case on the Petition Date.  Additionally, on January 7, 2016, the Debtor's Board of Directors was reconstituted with Dr. Cameron Durrant, a veteran pharmaceutical industry executive, and Mr. Ronald Barliant, a former bankruptcy judge, joining the three-person Board as independent directors.

C.     **The Debtor's Go-Forward Business Plan**

19.     As previously discussed in this case, the Debtor's management has made herculean efforts to further develop and implement the Debtor's two-pronged business plan,

which is focused on: (a) the Debtor's acquisition of the worldwide rights from Savant Neglected Diseases, LLC ("Savant") of its program for use of benznidazole as a treatment for Chagas Disease in humans; and (b) the KB003 (a/k/a lenzilumab) oncology oriented drug research and development program.

(1)    The Savant LOI And Contemplated Transactions

20.    Prior to the Petition Date, on December 3, 2015, the Debtor announced that it had entered into a non-binding letter of intent to acquire a benznidazole program for the treatment of Chagas disease from Savant (the "Savant Prepetition LOI").  Under the Savant Prepetition LOI, the Debtor and Savant agreed, among other things, to a negotiation period through and including February 29, 2016, to pursue a binding agreement with respect to the Debtor acquiring from Savant the rights to benznidazole.

21.    Following the Petition Date, the Debtor and Savant revisited certain terms of the Savant Prepetition LOI in light of the changed circumstances since the original letter of intent was reached and the Debtor's pending bankruptcy.  After intensive, arms'-length negotiations, the Debtor and Savant reached agreement on terms for a proposed postpetition binding Letter of Intent (the "Savant Postpetition LOI"), which were set forth in Exhibit A to the Debtor's motion, dated February 23, 2016, filed under seal [D.I. 196].  On February 26, 2016, this Court entered its Order [D.I. 211] approving the Savant Postpetition LOI, and authorizing the Debtor to perform its obligations thereunder.  On February 29, 2016, the Debtor and Savant executed the Savant Postpetition LOI.  The Debtor has since remitted to Savant the initial deposit amount of $500,000 and the initial Development Services payment of $87,500.  Further, the development teams for the Debtor and Savant are in active communication and working together on the development plan for benznidazole, as intended by the Savant Postpetition LOI.

22.     The Savant Postpetition LOI contemplates that the Debtor will emerge from bankruptcy no later than June 30, 2016, and makes the Debtor's timely exit from bankruptcy under a confirmed and effective plan of reorganization one of several conditions to the consummation of the transactions with Savant.  To this end, the Savant Postpetition LOI further provides that the parties will complete definitive documentation by June 30, 2016.  Upon exit from bankruptcy, the Debtor is required to pay Savant the balance of the $3,000,000 Initial Payment.  Other requirements to consummating the Savant transactions include, *inter alia,* that the Debtor exit bankruptcy with an unencumbered cash balance of not less than $10,000,000. Following the Debtor's emergence from bankruptcy, additional payments will be due to Savant, including those that become payable as certain developmental and regulatory milestones are surpassed.

23.     The Savant Postpetition LOI provides the Debtor with an opportunity for the Debtor to acquire a proven treatment for a debilitating tropical disease, seek FDA approval of that treatment, and bring that treatment to market in the near term.  Thus, successful implementation of the transactions contemplated by the Proposed Binding LOI will allow the Debtor to realize the meaningful revenue stream that it has long been without.

24.     In addition, the rights to be acquired by the Debtor under the Savant Postpetition LOI may allow the Debtor to apply for a priority review voucher ("PRV") under the priority review voucher program administered by the U.S. Food and Drug Administration ("FDA").[3]  If the Debtor is granted a PRV, it will be able to market and sell the PRV, potentially

---

[3]     On August 20, 2015, the FDA published its final order *Designating Additions to the Current List of Tropical Diseases in the Federal Food, Drug, and Cosmetic Act,* 21 C.F.R. Part 317, Docket No. FDA-2008-N-0567 *(*https://www.federalregister.gov/articles/2015/08/20/2015-20554/designating-additions-to-the-current-list-of-tropical-diseases-in-the-federal-food-drug-and-cosmetic (Last accessed March 10, 2016)), which added Chagas disease to the list of "tropical diseases", treatments for which may be eligible to receive a priority review voucher.

for several hundred million dollars.  Even if the Debtor is not granted a PRV in the near term, however, the potential to obtain a PRV and the income from sale of benznidazole for treatment of Chagas disease will aid the Debtor in raising capital to fund investigation and clinical trials of its other existing and future drug lines.

(2)    Further Development of KB003

25.    The other current pillar of the Debtor's go forward business plan is its research and development program for KB003, otherwise known as lenzilumab.  KB003 is a Humaneered®, recombinant monoclonal antibody (mAb) that has shown potential for efficacy in the treatment of a particularly deadly form of leukemia, known as Chronic Myelomonocytic Leukemia ("CMML"), Juvenile Myelomonocytic Leukemia ("JMML") and certain solid tumors.

26.    There presently exists an unmet medical need for CMML and JMML treatments. The Debtor believes KB003 may create significant value for the Debtor's estate and stakeholders.  Further, patients' lives may be improved and prolonged as a result of these drugs proving to be effective and tolerable.[4]

**D.    The Debtor's Postpetition Marketing Efforts To Date**

27.    The Debtor's management and professional advisors are well aware that access to adequate capital is necessary to consummate the transactions contemplated by the Savant Postpetition LOI and to pursue research, testing, development and commercialization, if possible, of the Debtor's KB003 and KB004 lines.  Accordingly, the Debtor commenced efforts identify viable sources of financing to as soon as possible after the Petition Date.

28.    As the Court is aware, circumstances necessitated that the Debtor seek bankruptcy relief on an emergency basis.  In the initial weeks of the Bankruptcy Case, the

---

[4]    The Debtor continues to believe that its KB004 line has promise.  KB004 has the potential to selectively attack tumors at the source by targeting tumor stem cells, the microenvironment that protects the tumors and the vasculature that feeds them without harming normal cells.

Debtor's management and professionals had to focus their attention on stabilizing the business, addressing corporate governance issues and fending off attempts by certain disgruntled investors to deny the Debtor access to most of the cash it held as of the Petition Date. Despite these early challenges, by January 19, 2016, the Debtor had engaged, subject to Court approval, Alexandre Zyngier and his firm Batuta Capital Advisors, LLC ("Batuta"), as its financial advisor in this case. Mr. Zyngier and his team at Batuta immediately set about contacting potential financial and strategic investors for the Debtor.[5]

29.    Despite the early challenges faced by the Debtor in this case, Batuta contacted on the Debtor's behalf approximately 190 potential financial and strategic investors. Of those contacted, approximately 100 parties communicated expressions of interest to the Debtor, including 27 parties who received confidential information from the Debtor. Virtually all of these contacts occurred prior to this Court's approval of the Savant Postpetition LOI on February 26, 2016 [D.I. 211].

30.    Batuta's efforts on the Debtor's behalf to date have been thorough. But, given the events that have transpired since November 2015, it is possible that there are a number of parties interested in the opportunity to make an investment in and/or provide financing to the Debtor that for various reasons were not able or willing to commit to terms as acceptable to the Debtor as those being provided by the Stalking Horse. As noted above, the Debtor's bankruptcy filing was unplanned, and it was forced to address several challenges to its reorganization prospects early in this case. Further, despite the fact that Martin Shkreli's tenure as an officer or

---

[5]    These efforts were further disrupted for several days when the Debtor and its management and professionals had to mobilize to respond to the U.S. Trustee's emergency motion, filed on February 1, 2016 [D.I. 106], for appointment of a chapter 11 trustee or, in the alternative, to convert the case to a chapter 7 liquidation proceeding. The Debtor responded to that motion on February 3, 2016 [D.I. 127, 130, 133, 138 & 144], a full day evidentiary hearing was held on the motion on February 4, 2016 [D.I. 152], and the Court entered an order denying the motion on February 10, 2016 [D.I. 164].

director of the Debtor lasted less than a month from late November to mid-December 2015, the Debtor is mindful that it continues to be connected with Mr. Shkreli to some extent in the media. Based on feedback the Debtor has received from certain potential investors, notwithstanding the acknowledged merit of the Debtor's go-forward business plan, this unfortunate linkage with Mr. Shkreli has causes some parties to shy away from this potential investment or move more slowly in considering this opportunity than they otherwise would.

31.    These circumstances make it all the more critical that the Debtor obtain prompt approval of the LOI, the Bidding Procedures and the Breakup Fee.  Whereas some debtors just pay lip service to the notion that a stalking horse deal will set a floor for other potential bidders and help make the market for investors in the debtors' assets and business, that is not the case here.  The willingness of the Stalking Horse at this relatively early stage of the Debtor's chapter 11 reorganization to commit in accordance with the terms of the LOI to the DIP Financing and Exit Financing to be provided to the Debtor is absolutely essential to the Debtor's ability to realize the highest and best value for its business and assets.

## THE STALKING HORSE LOI AND TERM SHEET

32.    The LOI and annexed Term Sheet are the result of communications, a due diligence process and arms'-length, good faith negotiations between representatives of the Debtor and the Stalking Horse dating back to at least the second-half of January 2016.  The Stalking Horse was among the first of the potential investors with which the Debtor established contact after this chapter 11 case was filed.  Indeed, it was the Stalking Horse that appeared on an anonymous basis through counsel at the February 4, 2016 hearing on the Trustee/Conversion Motion to affirm that it had provided the debtor with a letter of intent and remained interested in

pursuing a transaction with the Debtor.[6]  Discussions between the parties have continued since

that date, resulting in the execution of the LOI.

33.    The material terms of the LOI include the following:[7]

| Generally Applicable LOI Terms | |
|---|---|
| **Lender/Stalking Horse:** | Collectively, Black Horse Capital LP, Black Horse Capital Master Fund Ltd., and Cheval Holdings, Ltd. Stalking Horse reserves the right to include other investors in the Stalking Horse group.  The inclusion of additional investors will not alter the terms of the LOI or this Term Sheet. |
| **Agent:** | Black Horse Capital Master Fund Ltd. |
| **Aggregate Financing Commitment:** | A total of $10 million, to be advanced $3 million as DIP Financing and $7 million as Exit Financing. |
| **Breakup Fee:** | • Upon the occurrence of a Triggering Event (defined below), Stalking Horse shall be entitled to a breakup fee and expense reimbursement which shall consist of: <br><br> (1) either, as determined in Stalking Horse's discretion,: (a) payment in the amount of $300,000 ("Cash Option Breakup Fee"), or (b) the option to purchase $2 million of stock in the reorganized Debtor at a price of $1.75 per share ("Stock Option Breakup Fee"); and <br><br> (2) reimbursement of up to $200,000 of reasonable documented attorneys' fees and other expenses incurred by Stalking Horse in connection with this transaction ("Breakup Attorneys' Fees").  The Cash Option Breakup Fee, Stock Option Breakup Fee and Breakup Attorneys' Fees are collectively referred to as the "Breakup Fee." <br><br> • Stalking Horse shall be entitled to the Breakup Fee (each a "Triggering Event") if Debtor: (i) consummates a sale of any of its IP rights or other assets which is not approved by Stalking Horse, (ii) consummates a sale of all or substantially all of its assets or common stock which is not approved by Stalking Horse, (iii) accepts an alternative DIP financing and/or exit financing proposal to that contemplated by LOI, or (iv) consummates a plan of reorganization which is not approved by Stalking Horse. <br><br> • For the avoidance of doubt: <br><br> ➢ In the event that the Breakup Fee is triggered because the Debtor accepts an alternative exit financing proposal after the DIP Financing has been funded by Stalking Horse, Stalking Horse shall be entitled to: (i) repayment of the DIP Financing through |

---

[6]    *See In re KaloBios Pharmaceuticals, Inc.,* Case No. 15-12628 (LSS), Transcript of Feb. 4, 2016 Hearing, at 49-51.

[7]    This summary of the terms of the LOI is qualified in its entirety by reference to the LOI itself. In the event of any conflict, the LOI shall control. Capitalized terms used but not otherwise defined within this summary of the LOI have the meanings ascribed to them in the LOI

|  | issuance of stock as set forth herein, and (ii) receipt of the Breakup Fee. |
|---|---|
|  | ➢ The Cash Option Breakup Fee and the Breakup Attorneys' Fees shall be an allowed administrative claim under 11 U.S.C. §503. |
|  | ➢ In the event the Breakup Fee is triggered under (i), (ii) or (iii) above and Stalking Horse exercises the Cash Option Breakup Fee, both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable to Stalking Horse out of the proceeds of such sale or alternative financing.  In the event that the Breakup Fee is triggered under (iv) above and Stalking Horse exercises the Cash Option Breakup Fee, both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable as a priority administrative claim under any confirmed plan. |
|  | ➢ Upon the occurrence of a Triggering Event, the Breakup Fee is due and owing regardless of whether the parties have executed definitive Loan Documents and/or Exit Financing Documents. |
| **Payment of Stalking Horse's Attorneys' Fees and Expenses:** | • Debtor shall pay in full at the closing of the DIP Financing all of Stalking Horse's reasonable professional costs and fees incurred in relation to the DIP Financing ("DIP Financing Attorneys' Fees"), including, without limitation, due diligence for and the negotiation and documentation of this Term Sheet, the Loan Documents, the Breakup Fee Order , and the DIP Order. |
|  | • Debtor shall pay in full at the closing of the Exit Financing all of Stalking Horse's reasonable professional costs and fees incurred in relation to the Exit Financing ("Exit Financing Attorneys' Fees"), including, without limitation, negotiation and documentation of Exit Financing Documents, the Stalking Horse Plan and Disclosure Statement and confirmation order. |
|  | • For the avoidance of doubt, if Stalking Horse funds the DIP Financing, Debtor shall pay the DIP Financing Attorneys' Fees; if Stalking Horse funds the Exit Financing, Debtor shall also pay the Exit Financing Attorneys' Fees.  If Stalking Horse is entitled to the Breakup Fee, at the time the Breakup Fee is paid or the stock is issued, Stalking Horse shall also be entitled to payment of the Breakup Attorneys' Fees.. |
| **Milestones:** | • On or before March 25, 2016: The Bankruptcy Court shall have entered the Bid Procedures Order (which shall approve the LOI, including the Breakup Fee). |
|  | • On or before March 28, 2016: Debtor shall provide the Stalking Horse with a substantially complete draft of its proposed Stalking Horse Plan (as defined herein). |
|  | • On or before March 30, 2016: Stalking Horse to provide Debtor with substantially complete drafts of Loan Documents, proposed DIP Order and Exit Financing Documents. |
|  | • On or before April 7, 2016: Debtor shall have filed a Motion to approve the DIP Financing. |
|  | • On or before April 13, 2016: Debtor shall have filed with the Bankruptcy Court its proposed plan of reorganization and related |

|  | disclosure statement, both of which are acceptable to the Stalking Horse. Such Debtor's plan of reorganization acceptable to the Stalking Horse, the "Stalking Horse Plan")<br>• On or before April 29, 2016: The Bankruptcy Court shall have entered the DIP Order.<br>• On or before May 13, 2016: The Bankruptcy Court shall have entered an order acceptable to the Stalking Horse approving the disclosure statement related to the Stalking Horse Plan acceptable to the Stalking Horse and authorizing solicitation of the Stalking Horse Plan.<br>• On or before June 15, 2016: The Bankruptcy Court shall have entered an order acceptable to the Stalking Horse confirming the Stalking Horse Plan acceptable to the Stalking Horse.<br>• On or before June 30, 2016: The Stalking Hose Plan shall have become effective by its terms. |
|---|---|
| **Shkreli Equity:** | The availability of any DIP Financing or Exit Financing to be provided by the Stalking Horse is conditioned upon, among other things, the requirement that Martin Shkreli not be an employee, consultant, officer or director of the Debtor. Additionally, it shall be a condition, among others, of the availability of the Exit Financing that after the effective date of the Stalking Horse Plan, Martin Shkreli will not hold with power to vote more than 20% of the voting common stock of the Reorganized Debtor. |

## Terms specific to DIP Financing

| **DIP Financing Commitment:** | • DIP Financing shall be $3 million (with OID of 6 points) and shall be made available in one draw.<br>• The DIP Financing will consist of a credit facility secured by a priming lien on all of the Collateral (defined below). Additional terms of the credit facility will include, without limitation, the terms outlined below. |
|---|---|
| **DIP Financing OID, DIP Financing Commitment Fee and Interest Rate:** | The DIP Financing shall be subject to:<br><br>(i) a commitment fee of $150,000 (5%) ("DIP Financing Commitment Fee");<br><br>(ii) Original Issue Discount of 6 points ($191,000) ("OID"); and<br><br>(iii) interest ("Interest") at the annual rate of twelve percent (12%) calculated on the basis of a 360-day year and actual days elapsed, which Interest rate shall increase by five percent (5%) upon an Event of Default. |
| **Use of DIP Financing Proceeds:** | Advances under the DIP Financing will be used by the Debtor for working capital purposes and for other costs of the Debtor, all in accordance with a rolling 13 week budget ("Budget"), and in accordance with the terms and conditions of the Loan Documents and DIP Order. During any period prior to the effective date of a Stalking Horse Plan when the Debtor's cash on hand is less than $5,000,000, the Budget shall be subject to the Stalking Horse's reasonable approval. |
| **Collateral:** | The Loan Documents and the DIP Order will grant the Stalking Horse first priority priming security interests, mortgages, and/or deeds of trust, in and liens on all real and personal property of the Debtor and its estate of any kind or nature whatsoever, tangible, intangible or mixed, now |

| | existing or hereafter acquired or created, whether existing before or arising after the commencement of the Bankruptcy Case (the "Collateral"). The Collateral shall include Debtor's cash. For the avoidance of doubt, the foregoing definition of "Collateral" excludes any chapter 5 avoidance actions or proceeds thereof. |
|---|---|
| **Repayment of DIP Financing:** | On the effective date of any plan confirmed by the Bankruptcy Court, the entire principal amount of the First Tranche DIP Financing plus all accrued and unpaid Interest, OID and the DIP Financing Commitment Fee shall, at Stalking Horse's option, either (i) be paid in cash, or (ii) convert to common stock of the reorganized Debtor. The conversion price for the DIP Financing shall be $1.75 per share based upon current outstanding shares of 4,451,000. Delivery of shares at conversion shall be on a fully anti-dilution basis. |
| **Conditions to Funding of DIP Financing:** | Funding of the DIP Financing is subject to the following conditions:<br><br>    (i) Entry of the Bid Procedures Order (which shall be in a form acceptable to the Stalking Horse and provide, *inter alia,* for approval of the LOI, including the Breakup Fee); and<br><br>    (ii) Entry of an order acceptable to the Stalking Horse approving the DIP Financing, which shall, among other things, adjudicate (i) all DIP Financing indebtedness to have superpriority claim status under §§ 364(c)(1) and 507(b) of the Bankruptcy Code, and (ii) the Stalking Horse's claims to be fully secured by first priority priming liens in the Collateral under sections 364(c) and (d) of the Bankruptcy Code. The DIP Order will include, among other things, the following provisions: (a) the Stalking Horse will have full stay relief (subject to appropriate notice and cure periods as may be set forth in the Loan Documents) so that Stalking Horse can enforce its rights in the event of a default without having to obtain any other or further court order, including, without limitation, the enforcement of such remedies against the Collateral, (b) the Debtor will not seek to obtain any other loan(s), without the prior written consent of the Stalking Horse, unless such other loan(s) are part of an overall financing commitment to the Debtor determined after a competitive auction process (conducted pursuant to Bankruptcy Court approved procedures) to be a higher or better offer for financing than the combined package of DIP Financing and Exit Financing that the Stalking Horse has committed to provide, (c) the Debtor will not seek approval for, or incur any debt which will prime, or be *pari passu* with, the liens against the Collateral granted to the Stalking Horse, (d) the Debtor will agree and the DIP Order will so provide that there will be no section 506(c) surcharge claims against the Stalking Horse or its Collateral, (e) approval of all fees set relating to the DIP Financing, and (f) a finding that the Loan is an arms-length transaction, in good faith, for reasonable consideration, and is not a fraudulent transfer under the Bankruptcy Code or other applicable law. |
| **DIP Financing Maturity / Events of Default:** | "Maturity Date" for the DIP Financing will be the earlier to occur of (i) the effective date of the Stalking Horse Plan or any other plan of reorganization confirmed by the Bankruptcy Court or (ii) the occurrence of any event of default (subject to any notice and cure provisions, as may be set forth in the Loan Documents) to be set forth in the Loan Documents ("Event of Default"). |

| | |
|---|---|
| | Such Events of Default may include:<br><br>(a) failure to achieve a Milestone as set forth in the LOI;<br><br>(b) dismissal or conversion of the Bankruptcy Case;<br><br>(c) filing by Debtor of one or more motion(s) or application(s) in the Bankruptcy Case and/or approval of a sale or licensing of any of the Collateral with a total book value in excess of $250,000, including, without limitation, Debtor's IP rights, which is not approved by the Stalking Horse;<br><br>(d) appointment of a Chapter 11 trustee;<br><br>(e) entry of one or more order(s) in the Bankruptcy Case granting one or more lien(s) on Collateral with a total book value in excess of $100,000 to any person or entity other than the Stalking Horse; *provided, however,* that a lien may be granted to Savant in connection with the Savant Deal to the extent that such lien encumbers only the assets Debtor acquires from Savant and does not become valid, perfected and enforceable until after the effective date of a plan of reorganization confirmed by the Bankruptcy Court;<br><br>(f) Judgment or settlement of the adversary proceeding with the PIPE Plaintiffs, without the Stalking Horse's consent, that results in the Debtor's payment of cash out of its estate above an agreed upon threshold; and<br><br>(g) other customary events of default as may be set forth in the Loan Documents. |
| **Terms Specific to Exit Financing** ||
| **Exit Financing Commitment:** | • The Exit Financing shall be in the amount of $7 million (such amount, the "<u>Exit Financing Amount</u>").<br>• Availability of the Exit Financing shall be conditioned upon, among other things, closing of the Savant Deal, no uncured Event of Default under the DIP Financing, and occurrence of the effective date under the confirmed Plan. |
| **Exit Financing Commitment Fee:** | At the closing of the Exit Financing, a commitment fee of 7% ($490,000) ("<u>Exit Financing Commitment Fee</u>") shall accrue to the benefit of the Stalking Horse and shall be fully earned when due and is non-refundable in all cases. |
| **Subscription:** | On the effective date of the Stalking Horse Plan, in exchange for the Exit Financing Amount plus the Exit Financing Commitment Fee, Debtor shall issue to the Stalking Horse 3,745,000 shares of the reorganized Debtor based upon current outstanding shares of 4,451,000. Delivery of shares at conversion shall be on a fully anti-dilution basis. |
| **Registration:** | If the Stalking Horse is providing the Exit Financing, unless an exception to the registration requirement under section 1145 of the Bankruptcy Code or other applicable law applies, issuance of the stock must be registered under the 1933 Act. To the extent necessary, Debtor shall promptly, following the occurrence of the Stalking Horse Plan effective date, file a registration statement under the 1933 Act, and shall comply with all other applicable laws relating to such registration, and |

| | shall use its reasonable best efforts to cause such registration statement to be declared effective by the SEC within 180 days following the effective date of the Stalking Horse Plan. |
|---|---|
| **Conditions to Funding of Exit Financing:** | Funding of the Exit Financing is subject to the following conditions:<br><br>(i) The Court shall have entered order(s) acceptable to the Stalking Horse approving the disclosure statement related to the Stalking Horse Plan and authorizing solicitation of the Stalking Horse Plan; and<br><br>(ii) The Court shall have entered an order confirming the Stalking Horse Plan; and<br><br>(iii) the Stalking Horse Plan shall have become effective by its terms. |
| **Management Equity:** | Any terms of the Stalking Horse Plan regarding or related to any equity package(s) offered to the directors and officers of the reorganized Debtor shall be subject to Stalking Horse's approval. |
| **Management Rights:** | If the Stalking Horse is providing the Exit Financing, the Stalking Horse shall be entitled, but not obligated, to designate one person for election to the reorganized Debtor's Board of Directors. |
| **Exit Financing Events of Default:** | If Stalking Horse is providing the Exit Financing, it shall be an event of default under the Exit Financing Documents if within 180 days following the effective date of the Stalking Horse Plan: (i) Debtor fails to obtain either an exemption from registration or to have a registration statement to be declared effective by the SEC, and (ii) to the extent the shares are not freely tradable upon issuance, such shares have not been deemed by the SEC to be freely tradable.  If there is an event of default under the Exit Financing Documents, Debtor shall pay liquidated damages to the Stalking Horse in the form of additional shares in the reorganized Debtor.  The shares issued to the Stalking Horse shall increase by 10% for every 30 days that the Debtor remains in default. |
| **Listing Requirement:** | If the Stalking Horse provides Exit Financing, Debtor shall use its best efforts to: cause the company's securities to (i) continue to be listed on an exchange, and (ii) be listed on NASDAQ or another reputable exchange within a reasonable period of time after the effective date of the Stalking Horse Plan. |

### THE BIDDING PROCESS AND AUCTION

34.    In the exercise of its business judgment, the Debtor believes that it is in the best interests of its estate to subject the proposed transactions with the Stalking Horse to an open-market bidding process to ensure that maximum value is received for the Debtor's business and assets.  To that end, the Debtor seeks authority to pursuant to the Bidding Procedures to solicit competing offers each a "Qualified Bid" made by a "Qualified Bidder") for transactions

(each, a "<u>Proposed Transaction</u>") to acquire New Common Stock[8] to be issued under the Debtor's plan of reorganization.

35.    The Bidding Procedures contemplate the Debtor's consideration of two types of Proposed Transactions: Primary Plan Transactions; and Secondary Plan Transactions (either a "<u>Plan Transaction</u>"). As used in the Bidding Procedures, the terms have the following meanings:

- "<u>Primary Plan Transaction</u>" means "a Proposed Transaction for a Primary Plan Sponsor and/or its Affiliates to acquire New Common Stock that would, if consummated: (1) result in the Primary Plan Sponsor and/or its Affiliates holding in excess of 40% of the New Common Stock authorized and issued under the Plan; or (2) render the Debtor unable to issue New Common Stock to the Stalking Horse in the amounts required and on the terms required by the LOI." (Bid. Pro. ¶ A.2(i))

- "<u>Secondary Plan Transaction</u>" means "a Proposed Transaction for a Secondary Plan Sponsor and/or its Affiliates to acquire New Common Stock that would, if consummated: (1) result in the Secondary Plan Sponsor and/or its Affiliates holding 40% or less of the New Common Stock authorized and issued under the Plan; and (2) not interfere with the Debtor's ability to issue New Common Stock to the Stalking Horse in the amounts required and on the terms required by the LOI." (Bid. Pro. ¶ A.2(l))

Hence, a Primary Plan Transaction is a Proposed Transaction that would supersede and replace the Stalking Horse's Plan Transaction.  It, by definition, must be a higher and better Bid, as determined by the Debtor in its business judgment, compared to the Stalking Horse's Plan Transaction.  A Secondary Plan Transaction, on the other hand, is an investment in the Debtor by means of acquiring 40% or less of the New Common Stock that would be compatible with and could be made along-side of the Stalking Horse's Plan Transaction (or for that matter a competing Bidder's proposed Primary Plan Transaction).

---

[8]    As used in this Motion, the term "<u>New Common Stock</u>" means common equity in the reorganized Debtor to be authorized and issued on the effective date of a confirmed plan of reorganization filed by and for the Debtor to replace the existing equity interests in the Debtor.

36.    The proposed bidding and auction process is highly advantageous to the Debtor's estate, as it will provide a market-based valuation of the Debtor, maximize recoveries to all stakeholders and provide the capital necessary to fund a plan. The Bidding Procedures have been agreed to by the Stalking Horse. Further, the Bidding Procedures reflect the Debtor's goal of conducting the bidding process in a controlled, fair and open manner.

37.    The Bidding Procedures benefit the Debtor's estate by creating a bidding process that ensures, among other things: (a) structure and logistical integrity to the process; (b) the Debtor's ability to compare the relative values of competing offers, if any; (c) that potential purchasers have the financial wherewithal to timely consummate a stock purchase agreement to be implemented under a plan of reorganization; and (d) competitive bidding.

38.    The Bidding Procedures prescribe the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence by prospective bidders, the deadline and requirements for submitting a bid, the method and criteria for bids to become "Qualified," the manner in which qualified bids will be negotiated, clarified, and improved, and the criteria for selecting Winning Bidders, including if necessary, through a public auction.

39.    The following is a summary of the Debtor's proposed Bidding Procedures:

| Summary of Bidding Procedures[9] | |
|---|---|
| **Participation Requirements:** | To participate in the bidding process, each Potential Bidder must first deliver the following materials to the Debtor and its advisors: (a) an executed Confidentiality Agreement; and (b) written evidence of the Potential Bidder's financial, operational and other ability to close the Proposed Transaction and provide adequate assurance of future |

---

[9]    Capitalized terms used in the summary below but not defined herein shall have the meanings ascribed to them in the Bidding Procedures. This is a summary only and is not a full recitation of the Bidding Procedures. Interested parties are encouraged to read the Bidding Procedures in their entirety and not rely on this summary. To the extent that the Motion and Bidding Procedures are inconsistent, the Bidding Procedures shall control.  To the extent that Local Rule 6004-1 applies, this constitutes the Debtor's summary of the Bidding Procedures terms required by such rule.

| | |
|---|---|
| | performance under all contracts and leases to be assumed. |
| **Due Diligence:** | If the Stalking Horse SPA has been executed by April 7, 2016, the Debtor will make WORD and PDF copies of the Stalking Horse SPA available to Potential Bidders in the Data Room by such date. If the Stalking Horse SPA has not been executed by such date, the Debtor will make a WORD copy of a proposed form of stock purchase agreement and/or other or related agreements for Potential Bidders to use in connection with formulating their Bids for a Primary Plan Transaction. In addition, the Debtor will post in the data room an exemplar of a proposed form of stock purchase agreement and/or other or related agreements for Potential Bidders to use in connection with formulating their Bids for a Secondary Plan Transaction.<br><br>Potential Bidders wishing to conduct due diligence concerning the Proposed Transaction shall be granted (i) reasonable access to the Debtor's management during normal business hours and (ii) access to all relevant information regarding the business of the Debtor reasonably necessary to enable a Potential Bidder to evaluate the Proposed Transaction.<br><br>All due diligence must be completed before the Bid Deadline, unless otherwise determined by the Debtor. |
| **Bid Deadline:** | Any Potential Bidder interested in pursuing a Proposed Transaction must submit a Qualified Bid prior to **4:00 p.m. prevailing Eastern Time on April 20, 2016**. |
| **Qualified Bids:** | In order for a Bid to be considered, it must be a "Qualified Bid." A Potential Bidder will be deemed to be a "Qualified Bidder" if the Debtor and its advisors, in their sole discretion, determine that such Potential Bidder submitted a Qualified Bid.<br><br>For the avoidance of doubt, the Stalking Horse shall automatically be a Qualified Bidder and its Bid shall automatically be a Qualified Bid so long as the Stalking Horse SPA has been fully executed prior to the Bid Deadline, the Stalking Horse is not in default of its material obligations under the LOI or the Stalking Horse SPA, or an Event of Default has occurred under the LOI and not been cured prior to the Bid Deadline. |
| **Qualified Bid Requirements; Deposit:** | A Bid will be considered a "Qualified Bid" only if:<br><br>    (a) The Bid is for the acquisition of shares of New Common Stock pursuant to the terms of the Bidder Agreement that contains the applicable economic terms required by Subparagraph C.2(b) of the Bidding Procedures and other terms at least as favorable to the Debtor's estate than the Stalking Horse SPA, as determined by the Debtor in its sole discretion; and<br><br>    (b) The Bid either:<br><br>        (i) If a Bid for a Primary Plan Transaction, contains terms consistent with the requirements for a Primary Plan Transaction and proposes a minimum purchase price, including any assumption of liabilities, that in the Debtor's business judgment, has a value greater than the aggregate of (1) the total consideration to the Debtor set forth in the LOI, plus (2) the Cash Option Breakup Fee, plus (3) the Expense Reimbursement, plus (4) $500,000; or |

|  | (ii) If a Bid for a Secondary Plan Transaction, contains terms consistent with the requirements for a Secondary Plan Transaction and proposes a minimum purchase price for New Common Stock of at least $1,000,000; and |
|  | (c) The Bid is accompanied by the Potential Bidder's written representation to the Debtor, *inter alia,* that such Potential Bidder is an "accredited investor" as defined in Rule 501(a)(1), (a)(2), (a)(3), (a)(7) or (a)(8) under the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder; |
|  | (d) The Bid provides that it shall remain irrevocable until the earlier of (x) the Effective Date of the Plan implementing the Winning Bid(s) (as defined below) or (y) June 30, 2016; and |
|  | (e) The Bid is made by a person or entity that reasonably demonstrates evidence of fully committed and firm financing for each component of debt or equity in support of such Bid and other ability to consummate the Proposed Transaction, in each case solely acceptable to the Debtor; and |
|  | (f) The Bid provides for the Primary Plan Transaction or Secondary Plan Transaction that is the subject thereof to be fully consummated and funded by the Potential Bidder and/or its Affiliates no later than June 30, 2016; and |
|  | (g) The Potential Bidder provides written evidence that the Potential Bidder has obtained authorization and approval from its board of directors (or comparable governing body) with respect to the submission of its Bid and the execution of the agreements associated therewith, or a representation that no such authorization or approval is required; and |
|  | (h) The Bid provides that any cash portion of the purchase price will be paid in cash, cash equivalents, or such other consideration acceptable to the Debtor in its sole discretion; and |
|  | (i) The Potential Bidder provides by wire transfer of immediately available funds, in the form of cash or a letter of credit, to an escrow agent designated by the Debtor before the Bid Deadline of an earnest money cash deposit (the "<u>Deposit</u>") of: (i)   If a Bid for a Primary Plan Transaction, not less than $750,000; or (ii)   If a Bid for a Secondary Plan Transaction, not less than $250,000; and |
|  | (j) The Potential Bidder provides evidence reasonably satisfactory to the Debtor that the Potential Bidder is reasonably likely to obtain prompt regulatory approval, if any is required, to consummate the Proposed Transaction; and |
|  | (k) The Bid is submitted in the form of a legally binding stock purchase agreement and/or other or related agreements (collectively, the "<u>Bidder Agreement</u>"), fully executed by the Potential Bidder in a clean copy and marked to show the proposed changes to the Plan Sponsor SPA in a redlined copy, and such Bidder Agreement satisfies the additional requirements stated in ¶ C.2(k) of the Bidding Procedures. |
| **Auction:** | If one or more Qualified Bids has been submitted for a Proposed Transaction in accordance with these Bidding Procedures, the Debtor |

| | |
|---|---|
| | will conduct an Auction on **April 26, 2016, at 10:00 a.m. prevailing Eastern time**, with respect to such Qualified Bids in order to determine the highest and best Bid(s) (the "Winning Bid(s)") to submit for approval by the Bankruptcy Court at the Approval Hearing (as defined below). The Auction shall be organized and conducted by the Debtor at the offices of its counsel, Hogan Lovells US LLP, 875 Third Avenue, New York, NY 10022, or such other location as may be announced prior to the Auction to the Auction Participants. The Auction will be recorded by stenographic means by an authorized court reporter. |
| | The first Qualified Bid at the Auction shall be deemed to have been made by the Initial Highest Bidder for a Primary Plan Transaction or Secondary Plan Transaction, as applicable, in the amount of the Initial Highest Bid for such transaction type. A Qualified Bidder for a Secondary Plan Transaction that has not submitted a Qualified Bid for a Primary Plan Transaction by the Bid Deadline shall not be authorized to bid at the auction for a Primary Plan Transaction. |
| | Thereafter, the Auction will continue in the manner determined by the Debtor above; *provided, however,* (i) additional Bids must be Qualified Bids (except that such subsequent additional or revised Qualified Bids made at the Auction need not be received by the Bid Deadline) and (ii) additional Qualified Bids must be made in higher increments of at least $250,000 in cash for any Primary Plan Transaction or $100,000 in cash for any Secondary Plan Transaction (the "Minimum Bid Increment"). |
| **Selection of the Winning Bid(s):** | At the conclusion of the Auction, the Debtor shall: (i) select the highest and best offer for a Primary Plan Transaction and a Secondary Plan Transaction (each, a "Winning Bid"); (ii) notify the person(s) that made the Winning Bid(s) (the "Winning Bidder(s)") that the offer of such person(s) has/have been determined by the Debtor to be the Winning Bid(s), subject only to Bankruptcy Court approval; and (iii) file a notice with the Bankruptcy Court announcing the Winning Bidder(s) and conduct a hearing for approval of same at the nearest upcoming date scheduled for approval of the disclosure statement to accompany the Plan (the "Disclosure Statement Hearing") or at an intervening hearing scheduled by the Bankruptcy Court (such hearing, whether the Disclosure Statement Hearing or an intervening hearing scheduled by the Bankruptcy Court, the "Approval Hearing"). Prior to the commencement of the Approval Hearing, the Winning Bidder(s) shall complete and sign all agreements and documents as necessary to bind the Winning Bidder(s) to all of the terms and conditions contemplated by their respective Winning Bid(s). |
| | The Debtor shall not be deemed to have finally accepted any Qualified Bid unless and until such Qualified Bid and the Debtor's acceptance thereof have been authorized by order of the Bankruptcy Court following the conclusion of the Approval Hearing. |

## THE PROPOSED NOTICE PROCEDURES

40.    The Debtor proposes to serve the Bid Procedures Order and a notice of the Bidding Procedures and the Auction (the "Procedures Notice"), in substantially the form

attached to the Bid Procedures Order as Exhibit 2, within three (3) business days after entry of the Bid Procedures Order, upon the Notice Parties (as defined below).

## RELIEF REQUESTED

41.    By this Motion, the Debtor requests that the Court enter the Bid Procedures Order in substantially the form attached as **Exhibit A** hereto: (i) approving the Debtor's entry into the LOI (which includes and incorporates the Term Sheet); (ii) approving the Bidding Procedures annexed as Exhibit 1 to the Bid Procedures Order to governing the submission and consideration of competing and supplemental Plan Transaction proposals; (iii) approving and authorizing the Breakup Fee; (iv) scheduling and authorizing the Debtor to conduct the Auction; (v) approving the Procedures Notice and the related noticing procedures; and (vi) granting related relief.

## BASIS FOR RELIEF REQUESTED

### A.    Approval Of The Bidding Procedures Is Appropriate And In The Best Interests Of The Debtor's Estate And Stakeholders Therein

42.    Section 363(b)(1) of the Bankruptcy Code provides: "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).  Section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

43.    A debtor should be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and in connection with the confirmation of a chapter 11 plan if it demonstrates a sound business purpose for doing so. *See In re Federal Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del . 2003) (finding that a court should approve a debtor's use of assets outside ordinary course of business if debtor can demonstrate a sound

business justification for proposed transaction); *see also In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 154 (Bankr. D. Del. 1999) (finding that in evaluating business purpose of a sale, bankruptcy court may consider effect of sale on reorganization).

44.    Indeed, the paramount goal of a chapter 11 process is to maximize the proceeds received by the estate. *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.),* 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."); *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3d Cir. 1986) (noting the fairness and reasonableness of prices); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the …debtor's duty…is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bag Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.),* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)); *In re Summit Global Logistics, Inc.,* No. 08-11566, 2008 WL 819934, at *14 (Bankr. D.N.J. Mar. 26, 2008) (describing a proposed transaction as one that "maximize[d] value and return to interested parties"). To that end, courts have recognized that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate of a debtor and therefore are appropriate. *See Integrated,* 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); *In re Fin. News Network Inc.,* 126 B.R. 152, 156 (S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estate.").

45.    With this in mind, courts have deferred to a debtor's business judgment in the context of bidding and auction procedures, *In re Trans World Airlines Inc.,* No. 01-0056, 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001) ("It is not the function of a bankruptcy court to independently exercise a business judgment as to which proposal among competing proposals should be adopted by the debtor in effecting a § 363(b) sale.").

46.    In the Debtor's case, the bid of the Stalking Horse, as embodied in the LOI (including the annexed Term Sheet), sets forth a bidding floor which ensures an acceptable minimum recovery to the Debtor's estate, and will progress to confirmation even in the absence of market interest in submitting competing bids for a Plan Transaction.  However, in exercising its fiduciary duties, the Debtor has determined that the Bidding Procedures are the most appropriate method for encouraging bidders to submit competing Bids—offers that can only increase recoveries to the Debtor's stakeholders and that will ensure the consideration offered pursuant to the LOI and Term Sheet is the highest and best the market can sustain.

47.    Additionally, the Bidding Procedures provide the Debtor with the ability to solicit bids for Secondary Plan Transactions, *i.e.* supplemental plan sponsorship proposals. This gives the Debtor a mechanism to identify accredited investors willing to smaller investments through the acquisition of New Common Stock along-side of the Stalking Horse (or other Winning Bidder for a Primary Plan Transaction) on terms consistent with such Primary Plan Transaction.  The Debtor's estate benefits from having this procedure in place because it helps ensure that the Debtor will have adequate liquidity to promptly emerge from bankruptcy.

48.    The Bidding Procedures provide a framework for the Debtor to entertain competing Bids for a Plan Transaction and, if such competing Bids are received, to conduct in an orderly yet competitive auction in a fashion encouraging bids that maximize the net value

realized from the Plan Transaction by the Debtor's estate.  In particular, the Bidding Procedures contemplate an open and fair auction process with reasonable barriers to entry and provide potential bidding parties with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.

49.    The Bidding Procedures provide the Debtor with an adequate opportunity to consider competing Bids and select the highest and best offers for Plan Transactions. The Debtor therefore believes that submitting the LOI to a market-based test will ensure its restructuring maximizes recovery to its estate.  Accordingly, the Debtor and its stakeholders can be assured that, taking into account the financial condition of the business and the economy, the consideration obtained will be fair and reasonable and at or above market.

50.    Bidding procedures for plan sponsorship proposals have been previously approved by this Court. *See, e.g., The Wet Seal, Inc.,* Case No. 15-10081 (CSS) (Bankr. D. Del. Feb. 18, 2015); *In re Brookstone Holdings Corp.,* Case No. 14-10752 (BLS) (Bankr. D. Del. April 25, 2014); *In re Tuscany Int'l Holdings (U.S.A.) LTD.,* Case No. 14-10193 (KG) (Bankr. D. Del. Mar. 21, 2014); *In re Oncure Holdings, Inc.,* Case No. 13-11540 (KG) (Bankr. D. Del. Jul. 24, 2013*); In re Protostar Ltd.,* Case No. 09-12659 (MFW) (Bankr. D. Del. Aug. 24, 2009); *In re Midway Games Inc.,* Case No. 09-10465 (KG) (Bankr. D. Del. June 3, 2009); *In re Internet Corp.,* Case No. 08-11859 (KG) (Bankr. D. Del. May 12, 2009); *In re VI Acquisition Corp.,* Case No. 08-10623 (KG) (Bankr. D. Del Oct. 17, 2008); *In re Linens Holding Co.,* Case No. 08-10832 (CSS) (Bankr. D. Del May, 13, 2008); *In re Global Home Products LLC,* Case No. 06-10340 (KG) (Bankr. D. Del May 4, 2006); *In re Russell-Stanley Holdings. Inc.,* Case No. 05-12339 (MFW) (Bankr. D. Del. Sept. 9, 2005); *In re Ultimate Elecs., Inc.,* Case No. 05-10104 (PJW) (Bankr. D. Del. Mar. 24, 2005).

51.     In sum, the Debtor believe that the proposed Bidding Procedures create an appropriate framework for expeditiously establishing that the Debtor is receiving the best and highest offer for a Plan Transaction.    Accordingly, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtor's sound business judgment under the circumstances.

## B.     The Breakup Fee Should Be Approved

52.     To induce the Stalking Horse to serve in that capacity for a plan sponsorship auction, pursuant to the LOI, the Debtor has agreed, subject to Court approval, to certain bid protections, including the negotiation of the proposed Bidding Procedures and the Breakup Fee provisions appearing at pages 5-6 of the Term Sheet annexed to and incorporated in the LOI.  Specifically, in consideration for and as an inducement to the Stalking Horse to set the floor price for the Plan Transaction on the terms set forth in the LOI, the Debtor seeks to provide the Stalking Horse with the Breakup Fee.  As bankruptcy courts have long recognized, break-up fees and other termination fees are a reasonable, normal and, in many cases, necessary component of significant sales conducted under the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets .... In fact, because the ... corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize values.

*Integrated,* 147 B.R. at 659-60.  Specifically, "[b]reakup fees and other strategies may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs. L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (internal quotations omitted); see also Integrated, 147 B.R. at 660-61 (noting that break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.,* 140 B.R. 191, 194 (Bankr. N.D. Ohio

27

1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's. . . . due diligence").

53.    Break-up fees are appropriate where they "provide some benefit to the debtor's estate," including (a) "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely" and (b) promoting more competitive bidding "by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Calpine Corp. v. O'Brien Envt'l. Energy. Inc. (In re O'Brien Envt'l Energy. Inc.),* 181 F.3d 527, 536-37 (3d Cir. 1999). In connection therewith, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.* at 537.

54.    Historically, bankruptcy courts have approved bidding incentives, such as break-up fees and expense reimbursements, under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of business judgment. *See O'Brien,* 181 F.3d at 534-35; *Integrated,* 147 B.R. at 657 ("break-up fee arrangements outside bankruptcy are presumptively valid under the business judgment rule"); *995 Fifth Ave.,* 96 B.R. at 28.

55.    In addition to the traditional business judgment rule, the Third Circuit established standards for determining the appropriateness of bidding incentives in the bankruptcy context.  The Third Circuit has held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. *See O'Brien,* 181 F.3d at 535 ("We ... conclude that the determination whether break-up fees or

28

expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context. Nonetheless, the considerations that underlie the debtor's judgment may be relevant to the Bankruptcy Court's determination on a request for break-up fees and expenses.").

56.     Evaluated under the Third Circuit's more rigorous "administrative expense" standard, considering the extraordinary circumstances in this Bankruptcy Case, the Breakup Fee proposed herein passes muster and should be approved. The Bidding Procedures are the product of good faith, arm's-length negotiations between the Debtor and the Stalking Horse. The Debtor believes that the Breakup Fee contains the most favorable terms achievable by the Debtor under the circumstances and will serve it intended purpose to compensate the Stalking Horse for the risk and expense of serving in that role.

57.     The Stalking Horse would not have entered into the LOI and Term Sheet without the Breakup Fee.  Indeed, the Breakup Fee was used by the Debtor to induce the Stalking Horse to both research the value of the Debtor's business and convert that value to a dollar figure on which other bidders could rely, and submit a bid without which bidding for a Plan Transaction might be more limited or non-existent. *See, e.g., Integrated,* 147 B.R. 650; *995 Fifth Ave.,* 96 B.R. at 28. The Breakup Fee will compensate the Stalking Horse for the benefit it provides to the Debtor's estate in the event the LOI promotes one or more Qualified Bids thereby triggering the Auction.

58.    Indeed, the value of the Stalking Horse to set a floor and induce other parties to submit competing bids for a Plan Transaction is especially pronounced here where the Debtor is trying to shake off the taint flowing from the brief period of time that Martin Shkreli held control of the company.  To have the Debtor's business and assets validated by receipt of the LOI provides other potential bidders with an objective basis against which to measure the value of the Debtor's business and assets.  The existence of the LOI provides an essential signal to the market that, despite the Debtor's recent challenges, the Debtor now has a viable foundation for its go-forward business and restructuring plans.

59.    Finally, the Breakup Fee will permit the Debtor to insist that competing bids for a Plan Transaction be materially higher or otherwise better than the Stalking Horse's bid, to the benefit of the Debtor's estate and stakeholders.  Such measures will increase the likelihood that the price at which the New Common Stock will be sold will reflect its true worth. *See O'Brien,* 181 F.3d at 537. The Debtor believes that all of the Bidding Procedures proposed herein will increase the likelihood that the Debtor will receive the greatest possible consideration pursuant to a Plan Transaction.  Moreover, the Bidding Procedures will allow for an orderly and expeditious Auction process, thereby maximizing the value of the Debtor's estate and avoiding a prolonged stay in bankruptcy.

60.    Accordingly, the Debtor believes that the Breakup Fee is reasonable, given the benefits to the estate of having a floor for recoveries and the corresponding risk to the Stalking Horse that a Qualified Bidder's overbid ultimately may be accepted, and that the Breakup Fee is necessary to preserve and enhance the value of its estate. For the reasons set forth above, the Debtor respectfully requests approval of the Breakup Fee.

C.    **Proposed Notice Is Appropriate**

61.    A debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of an auction, the terms and conditions of the sale, and the deadline for filing any objections. The Debtor submits that the Procedures Notice fully complies with Bankruptcy Rule 2002 and other applicable Bankruptcy Rules, and includes information regarding the Bidding Procedures necessary to enable interested parties to participate in the Auction.

62.    The Debtor further submits that the notice to be provided through the Procedures Notice of the Bidding Procedures and the method of service proposed herein constitutes good and adequate notice of the Bidding Procedures and the other components of the Debtor's receipt and consideration of competing and supplemental for a Plan Transaction. Therefore, the Debtor respectfully requests this Court approve the foregoing notice procedures.

D.    **Waiver of Automatic Fourteen-Day Stay Under Bankruptcy Rule 6004(h)**

63.    Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to request a stay pending appeal before the order can be implemented.  *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

64.    Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, commentators agree that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  *See generally* 10

31

Collier on Bankruptcy ¶ 6004.11 (16th ed. 2015).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id*.

65.     If the effectiveness of the Bid Procedures Order is unduly delayed it will impair the Debtor's ability make the best use of the limited time available to the Debtor to market its business and assets.   This would directly prejudice the Debtor's estate and stakeholders by reducing the likelihood that the Debtor will receive and be able to consummate a Plan Transaction.

### NOTICE

66.     Notice of this Motion will be given by overnight courier delivery to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the plaintiffs in Adv. Pro. No. 16-50001 (LSS) (the "PIPE Plaintiffs"); (c) counsel to the named plaintiffs in the Shareholder Litigations; (d) counsel to Savant; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Attorneys for the District of Delaware, the Northern District of California and the Eastern District of New York; (h) the Attorneys General for the states of California and New York; (i) the United States Food and Drug Administration; (j) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; (j) counsel to the Stalking Horse; and (i) all parties who have requested notice under Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The Debtor submits that, under the circumstances, no other or further notice is required.

[CONTINUED ON NEXT PAGE]

32

WHEREFORE, the Debtor respectfully requests that the Court enter the Bid Procedures Order in substantially the form attached as **Exhibit A** hereto: (i) approving the Debtor's entry into the LOI (which includes and incorporates the Term Sheet); (ii) approving the Bidding Procedures annexed as Exhibit 1 to the Bid Procedures Order to governing the submission and consideration of competing Plan Transaction proposals; (iii) approving and authorizing the Breakup Fee; (vi) scheduling and authorizing the Debtor to conduct the Auction for the Plan Transaction; (v) approving the Procedures Notice and the related noticing procedures; and (vi) granting related relief.

Dated:  March 10, 2016
       Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Gregory W. Werkheiser*
Eric D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
Marcy J. McLaughlin (No. 6184)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail:eschwartz@mnat.com
      gwerkheiser@mnat.com
      mharvey@mnat.com
      mmclaughlin@mnat.com

- and -

Peter Ivanick, Esq. (admitted *pro hac vice*)
Pieter Van Tol, Esq. (admitted *pro hac vice*)
John D. Beck, Esq. (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile:  (212) 918-3100
E-mail:peter.ivanick@hoganlovells.com
      pieter.vantol@hoganlovells.com
      john.beck@hoganlovells.com

*Counsel for the Debtor and Debtor in Possession*

9890429.4