## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| | Chapter 11 |
| KaloBios Pharmaceuticals, Inc., | |
| | Case No. 15-12628 (LSS) |
| Debtor.[1] | |
| | **Re: D.I. 238** |
| | **Hearing Date:** |
| | **March 21, 2016, at 2:00 p.m. (ET)** |

## NOTICE OF AMENDMENT TO DEBTOR'S MOTION FOR AN ORDER: (I) APPROVING LETTER OF INTENT AND TERM SHEET WITH CHEVAL HOLDINGS, LTD., BLACK HORSE CAPITAL LP AND BLACK HORSE CAPITAL MASTER FUND LTD.; (II) APPROVING BIDDING PROCEDURES GOVERNING SUBMISSION AND CONSIDERATION OF COMPETING AND SUPPLEMENTAL PLAN SPONSORSHIP PROPOSALS; (III) APPROVING BREAKUP FEE; (IV) SCHEDULING AND AUTHORIZING THE DEBTOR TO CONDUCT AN AUCTION PURSUANT TO SUCH PROCEDURES; AND (V) GRANTING RELATED RELIEF

**PLEASE TAKE NOTICE** that on March 10, 2016, the above-captioned debtor and debtor in possession (the "Debtor") filed the **Debtor's Motion For An Order: (I) Approving Letter Of Intent And Term Sheet With Cheval Holdings, Ltd., Black Horse Capital LP And Black Horse Capital Master Fund Ltd.; (II) Approving Bidding Procedures Governing Submission And Consideration Of Competing And Supplemental Plan Sponsorship Proposals; (III) Approving Breakup Fee; (IV) Scheduling And Authorizing The Debtor To Conduct An Auction Pursuant To Such Procedures; And (V) Granting Related Relief** (D.I. 238)  (the "Motion").  Exhibit B to the Motion consisted of that certain Letter of Intent and Term Sheet, each dated March 9, 2016 (the "Original LOI/Term Sheet"), by and between a syndicate of investors consisting of funds managed by Black Horse Capital LP, Black Horse Capital Master Fund Ltd. and Cheval Holdings, Ltd. (collectively, the "Black Horse Entities"), and the Debtor.

**PLEASE TAKE FURTHER NOTICE** that subsequent to the filing of the Motion, the Black Horse Entities, Nomis Bay LTD and the Debtor have reached agreement on terms of a revised Letter of Intent and Term Sheet, each dated March 18, 2016 (the "Amended LOI/Term Sheet"), substantially in the form attached hereto as **Exhibit 1**.  For the reference of the Court and parties-in-interest, attached hereto as **Exhibit 2** is a redline marked to show changes between the Original LOI/Term Sheet and the Amended LOI/Term Sheet.

---

[1]     The last four digits of the Debtor's federal tax identification number are 7236.  The Debtor's address is 442 Littlefield Ave., San Francisco, CA 94080.

**PLEASE TAKE FURTHER NOTICE** that the Amended LOI/Term Sheet amend and supersede in their entirety the Original LOI/Term Sheet.

**PLEASE TAKE FURTHER NOTICE** that the Motion is hereby deemed amended as to any part that is inconsistent with the Amended LOI/Term Sheet.

**PLEASE TAKE FURTHER NOTICE** that it is the intention of the Debtor to proceed with the Motion, as amended hereby, at the hearing thereon scheduled for Monday, March 21, 2016, at 2:00 p.m. ET.

Dated: March 18, 2016
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Gregory W. Werkheiser*
Eric D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
Marcy J. McLaughlin (No. 6184)
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@mnat.com
gwerkheiser@mnat.com
mharvey@mnat.com
mmclaughlin@mnat.com

and

Peter Ivanick, Esq.
Lynn W. Holbert, Esq.
John D. Beck, Esq.
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100
Email: peter.ivanick@hoganlovells.com
       lynn.holbert@hoganlovells.com
       john.beck@hoganlovells.com

*Counsel for Debtor and Debtor in Possession*

# **EXHIBIT 1**

## **Amended LOI/Term Sheet**

March 18, 2016

**VIA E-MAIL TO CAMERON DURRANT, MD, MBA
(CAMERONDURRANT@YAHOO.COM)**

Kalobios Pharmaceuticals, Inc.
442 Littlefield Avenue
San Francisco, CA 94080

Dear Dr. Durrant:

On behalf of a syndicate of investors consisting of Nomis Bay LTD and funds managed by Black Horse Capital LP, Black Horse Capital Master Fund Ltd. and Cheval Holdings, Ltd. (collectively, the *"Lender"*)[1], we are pleased to submit the following amended letter and attached amended term sheet (the *"Term Sheet"*) for debtor-in-possession financing in the principal amount of Three Million Dollars ($3,000,000.00)[2] and exit financing in the principal amount of Eleven Million Dollars ($11,000,000.00)[3] to Kalobios Pharmaceuticals, Inc., a Delaware corporation (the *"Debtor"*).  This amended letter and the amended Term Sheet are collectively referred to herein as the "Letter of Intent."  By executing this Letter of Intent, the signatories are expressing their intent to consummate a transaction on the terms set forth in this Letter of Intent.  As such, it is the intent of the parties hereto to prepare, execute, authorize and deliver agreements relating to the transaction described herein (the *"Transaction"*) and to consummate the Transaction. This Letter of Intent amends and supersedes in its entirety the letter and term sheet, each dated March 9, 2016, between the Debtor and certain of the parties comprising the Lender (the "Superseded Letter of Intent"), which Superseded Letter of Intent shall be null and void effective upon the execution by the parties of this Letter of Intent.

1.  <u>Effect of Letter of Intent</u>.  Except as set forth in this <u>Section 1</u>, this Letter of Intent is not intended to be, and shall not constitute, a binding or enforceable agreement between the parties hereto.  Instead, it merely sets forth the parties' present intent with regard to the terms proposed, which terms may or may not become part of a definitive agreement.  Except for the provisions of <u>Sections 3</u> (Governing Law) and <u>4</u> (Termination of Breakup Fee Obligations) of this Letter of Intent, the sections of the Term Sheet entitled "Breakup Fee and Expense Reimbursement" and "Attorneys' Fees and Expenses", and this <u>Section 1</u> (which are intended to be binding agreements of Lender and the Debtor), no legal or

---

[1] Lender reserves the right to include other investors in the Lender group.  The inclusion of additional investors will not alter the terms of this LOI or the Term Sheet.
[2] The funding of the debtor-in-possession financing is conditioned upon, among other things, the Debtor's execution of a binding letter of intent for the Savant Deal (defined in the Term Sheet), as set forth in the section of the Term Sheet entitled "Amount."
[3] The funding of the exit financing is conditioned upon, among other things, the closing of the Savant Deal (defined in the Term Sheet), as set forth in the section of the Term Sheet entitled "Amount."

equitable rights, responsibilities or duties are created hereby or thereby.  Neither party may rely on any promise inconsistent with this Section 1.  This Section 1 supersedes all other conflicting or ambiguous language in this Letter of Intent or any contemporaneous document or other instrument that precedes this Letter of Intent, with the exception of that certain Confidentiality Agreement dated January 26, 2016, between the entities comprising Lender party thereto on such date and the Debtor.  On December 29, 2015, the Debtor filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*).  The Debtor's case is No. 15-12628.  The parties acknowledge that this Letter of Intent, any Loan Documents (as defined below) and the terms of the Exit Financing shall not be effective unless and until approved by the Bankruptcy Court.

2.  Negotiation of Definitive Agreements.  The parties shall negotiate and execute Loan Documents (as defined in the Term Sheet) and Exit Financing Documents (as defined in the Term Sheet) as Lender may require in connection with the Transaction.  Lender shall deliver substantially complete drafts of the Loan Documents, proposed DIP Order, and Exit Financing Documents (all defined in the Term Sheet) to the Debtor not later than March 30, 2016.

3.  Governing Law.  This Letter of Intent is governed by and shall be interpreted under the laws of the State of Delaware without giving effect to any choice of law principles.

4.  Termination of Breakup Fee Obligations.  In the event that definitive Loan Documents are not signed by the Debtor and the Lender on or before April 7, 2016 or the Bankruptcy Court fails to enter the DIP Order by April 29, 2016, as described in the Term Sheet, then the Debtor's obligations with respect to the "Breakup Fee" as described in the Term Sheet shall terminate and be of no further force or effect, provided, however, that the Debtor's obligation with respect to such Breakup Fee shall remain in effect and a Breakup Fee shall be payable as described in the Term Sheet if the failure to execute definitive Loan Documents on or before April 7, 2016 or the Bankruptcy Court's failure to enter the DIP Order by April 29, 2016, results from the Debtor's (a) breach of its obligations under the Term Sheet, (b) failure to negotiate in good faith the terms of the Loan Documents or DIP Order (both defined in the Term Sheet) (c) negotiation or consummation of a sale of any of its IP rights or other assets, (d) negotiation or acceptance of an alternative DIP Financing and/or Exit Financing (as defined in the Term Sheet), (e) negotiation or consummation of a plan of reorganization that is not approved by Lender or (f) determination to effect a sale of all or substantially all its assets or of its common stock which is not approved by Lender.

5.  Termination of LOI.  This Letter of Intent is deemed automatically withdrawn by Lender if either: (i) a Chapter 11 Trustee is appointed in the Debtor's bankruptcy case, or (ii) it is not executed by the Debtor by March 18, 2016.  Either party shall have the option to withdraw this Letter of Intent if the Breakup Fee Order (defined in the Term Sheet) is not entered by the Court on or before March 25, 2016.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

This Letter of Intent may be signed in two or more counterparts, any one of which need not contain the signature of more than one party, but all such counterparts will constitute one and the same agreement.

If you are in agreement with the terms of this Letter of Intent, please date and sign in the space provided below and return a signed copy to the Lender.

Best regards,

**LENDERS**:

**BLACK HORSE CAPITAL MASTER FUND LTD.**

By:   Black Horse Capital Management LLC,
        its investment advisor
        By:____Dale Chappell_____

        Signature:_____

        Its:_____

**BLACK HORSE CAPITAL LP**

By:   Black Horse Capital Management LLC,
        its general partner
        By:____Dale Chappell_____

Signature:_____

Its:_____

**CHEVAL HOLDINGS, LTD.**

By:____Dale Chappell_____

Signature:_____

Its:  Director

**NOMIS BAY LTD**

By:____James Keyes_____

Signature: _____

Its:  Director

Agreed and accepted this 18th day of March, 2016.

**KALOBIOS PHARMACEUTICALS, INC.**

By:_____
Name:__Dr. Cameron Durrant_____

Signature: _____
Title:_____

Enclosures

cc: Eric D. Schwartz (eschwartz@mnat.com)
     Peter Ivanick (peter.ivanick@hoganlovells.com)
     Gregory Werkheiser (gwerkheiser@mnat.com)

## TERM SHEET FOR PROPOSED DIP LOAN AND EXIT FINANCING

MARCH 18, 2016

BORROWER:            Kalobios Pharmaceuticals, Inc., in all capacities, including, but not limited to its capacity as debtor-in-possession (the "Debtor").

LENDER:              All references to "Lender" in this term sheet means, collectively, Black Horse Capital LP, Black Horse Capital Master Fund Ltd., Cheval Holdings, Ltd. (collectively, the "Black Horse Entities") and Nomis Bay LTD ("Nomis"). Lender reserves the right to include other investors in the Lender group. The inclusion of additional investors will not alter the terms of the LOI or this Term Sheet.

AGENT:               Black Horse Capital Master Fund Ltd.

BANKRUPTCY CASE:     The voluntary Chapter 11 bankruptcy proceeding that Debtor commenced on December 29, 2015 in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with Case Number 15-12628 ("Bankruptcy Case").

ADVERSARY CASE:      The adversary case commenced in the Bankruptcy Case by the filing of an adversary complaint with case number 16-50001 ("Adversary Case") regarding the Debtor's sale of securities prior to the commencement of the Bankruptcy Case.

OVERVIEW:            Lender will provide the DIP Financing to provide Debtor with necessary funds to operate its business until confirmation of a reorganization plan, and Exit Financing to facilitate consummation of the Savant Deal (defined below) as well as confirmation of the Stalking Horse Plan (defined below). The entire transaction will be subject to approval by, and under the supervision of, the Bankruptcy Court. Funding of the DIP Financing is conditioned on, among other things, the parties' execution of the Loan Documents and entry by the Bankruptcy Court of the DIP Order (defined below) and an order approving the Breakup Fee. Funding of the Exit Financing is conditioned on, among other things, the parties' execution of the Exit Financing Documents (defined below), the terms of the Stalking Horse Plan and Stalking Horse Plan confirmation order, which are all subject to Lender's approval, and there being no uncured Event of Default (as defined below).

LOAN DOCUMENTS:      Debtor shall execute and deliver to Lender such loan and security agreements, deposit control agreements, promissory notes, mortgages,

deeds of trust, assignments, pledges, instruments, documents, certificates, opinions and assurances, and any other documents (the "Loan Documents") as Lender may require in connection with the DIP Financing, all of which shall be in form and substance acceptable to and approved by Lender. The Loan Documents will contain representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default and remedies as required by Lender, and as are appropriate for a transaction of this type. All orders of the Bankruptcy Court approving or authorizing the DIP Financing and/or Exit Financing, and all motions relating thereto, shall be in form and substance acceptable to and approved by Lender.

EXIT FINANCING
DOCUMENTS:

Debtor shall execute and deliver to Lender an agreement for the purchase of stock in the reorganized Debtor and any other documents ("Exit Financing Documents") as Lender may require in connection with the Exit Financing as are appropriate for a transaction of this type, all of which shall be in form and substance acceptable to and approved by Lender.

AMOUNT:

A total of $14 million, to be advanced as follows:
- First Tranche: DIP Financing
  - DIP Financing shall be $3 million (with OID of 6 points) and shall be made available in one draw.
  - The funding of such DIP Financing shall be conditioned upon, among other things, no uncured Event of Default, entry by the Bankruptcy Court of the DIP Order and an order approving the Breakup Fee (defined below), as well as the Debtor's execution and Bankruptcy Court approval of a binding letter of intent with Savant Neglected Disease LLC ("Savant Deal"). Lender acknowledges that it has been provided complete copies of (i) the Savant Deal as fully executed by the Debtor and Savant Neglected Diseases LLC and (ii) the Bankruptcy Court's Order entered February 26, 2016 (D.I. 211) approving the Savant Deal, such that the Savant Deal-related condition to funding the DIP Financing is satisfied.
  - The DIP Financing will consist of a credit facility secured by a priming lien on all of the Collateral (defined below). Additional terms of the credit facility will include, without limitation, the terms outlined below.
- Second Tranche: Exit Financing.
  - The Exit Financing shall be in the amount of $11 million (such amount, the "Exit Financing Amount").

2

        o   Availability of the Exit Financing shall be conditioned upon, among other things, closing of the Savant Deal, no uncured event of default under the DIP Financing, and occurrence of the effective date under the confirmed Stalking Horse Plan (defined below).

**DIP FINANCING MATURITY:**

"Maturity Date" for the DIP Financing will be the earlier to occur of (i) the effective date of the Debtor's plan of reorganization that has been approved by Lender ("Stalking Horse Plan") or any other plan of reorganization confirmed by the Bankruptcy Court, or (ii) the occurrence of any event of default (subject to any notice and cure provisions, as may be set forth in the Loan Documents) to be set forth in the Loan Documents ("Event of Default") including, without limitation, (a) failure to achieve a Milestone as set forth below, (b) dismissal or conversion of the Bankruptcy Case, (c) filing by Debtor of one or more motion(s) or application(s) in the Bankruptcy Case and/or approval of a sale or licensing of any of the Collateral with a total book value in excess of $250,000, including, without limitation, Debtor's IP rights, which is not approved by Lender, (d) appointment of a Chapter 11 trustee, (e) entry of one or more order(s) in the Bankruptcy Case granting one or more lien(s) on Collateral with a total book value in excess of $100,000 to any person or entity other than Lender; *provided, however,* that a lien may be granted to Savant in connection with the Savant Deal to the extent that such lien encumbers only the assets Debtor acquires from Savant and does not become valid, perfected and enforceable until after the effective date of a plan, (f) Adversary Case judgment or settlement, without Lender's consent, that results in more than $250,000 debit to the cash resources of the Debtor, and (g) other customary events of default as may be set forth in the Loan Documents.

**USE OF PROCEEDS:**

Advances under the DIP Financing will be used by the Debtor for working capital purposes and for other costs of the Debtor, all in accordance with a rolling 13 week budget ("Budget"), and in accordance with the terms and conditions of the Loan Documents and DIP Order.  During any period prior to the effective date of a Stalking Horse Plan when the Debtor's cash on hand is less than $5,000,000, the Budget shall be subject to the Lender's reasonable approval.

**OID, COMMITMENT FEE AND INTEREST RATE FOR DIP FINANCING:**

The DIP Financing shall be subject to (i) a commitment fee of $150,000 (5%) ("DIP Financing Commitment Fee"), (ii) OID of 6 points ($191,000) ("OID"), and (iii) interest ("Interest") at the annual rate of twelve percent (12%) calculated on the basis of a 360-day year and actual days elapsed, which Interest rate shall increase by five percent (5%) upon an Event of Default.

| | |
|---|---|
| DIP FINANCING PAYMENTS: | The DIP Financing Commitment Fee, OID, principal and Interest earned will accrue until Maturity or Conversion. |
| COLLATERAL: | The Loan Documents and the DIP Order will grant Lender first priority priming security interests, mortgages, and/or deeds of trust, in and liens on all real and personal property of the Debtor and its estate of any kind or nature whatsoever, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing before or arising after the commencement of the Bankruptcy Case (the "Collateral"). The Collateral shall include Debtor's cash. For the avoidance of doubt, the foregoing definition of "Collateral" excludes any chapter 5 avoidance actions or proceeds thereof. |
| REPAYMENT OF DIP FINANCING: | On the effective date of any plan confirmed by the Bankruptcy Court, the entire principal amount of the First Tranche DIP Financing plus all accrued and unpaid Interest, OID and the DIP Financing Commitment Fee shall, at Lender's option, either (i) be paid in cash, or (ii) convert to common stock of the reorganized Debtor. The conversion price for the DIP Financing shall be $1.75 per share based upon current outstanding shares of 4,451,000. Delivery of shares at conversion shall be on a fully anti-dilution basis. |
| SUBSCRIPTION: | On the effective date of the Stalking Horse Plan, in exchange for the Exit Financing Amount plus the Exit Financing Commitment Fee (defined below), Debtor shall issue to Lender 5,885,000 shares of the reorganized Debtor based upon current outstanding shares of 4,451,000. Delivery of shares at conversion shall be on a fully anti-dilution basis. |
| MANAGEMENT EQUITY: | Any term of the Stalking Horse Plan regarding or related to any equity package(s) offered to the directors and officers of the reorganized Debtor shall be subject to Lender's approval. |
| REGISTRATION: | If Lender is providing the Exit Financing, unless an exception to the registration requirement under section 1145 of the Bankruptcy Code or other applicable law applies, issuance of the stock must be registered under the 1933 Act. To the extent necessary, Debtor shall promptly, following the occurrence of the Stalking Horse Plan effective date, file a registration statement under the 1933 Act, and shall comply with all other applicable laws relating to such registration, and shall use its reasonable best efforts to cause such registration statement to be declared effective by the SEC within 180 days following the effective date of the Stalking Horse Plan. |
| EXIT FINANCING | If Lender is providing the Exit Financing, it shall be an event of |

EVENT OF DEFAULT:   default under the Exit Financing Documents if within 180 days following the effective date of the Stalking Horse Plan: (i) Debtor fails to obtain either an exemption from registration or to have a registration statement to be declared effective by the SEC, and (ii) to the extent the shares are not freely tradable upon issuance, such shares have not been deemed by the SEC to be freely tradable.  If there is an event of default under the Exit Financing Documents, Debtor shall pay liquidated damages to Lender in the form of additional shares in the reorganized Debtor.  The shares issued to Lender shall increase by 10% for every 30 days that the Debtor remains in default.

LISTING REQUIREMENT: If Lender provides Exit Financing, Debtor shall use its best efforts to: cause the company's securities to (i) continue to be listed on an exchange, and (ii) be listed on NASDAQ or another reputable exchange within a reasonable period of time after the effective date of the Stalking Horse Plan.

FEES:

- BREAKUP FEE AND EXPENSE REIMBURSEMENT:

    Upon the occurrence of a Triggering Event (defined below), Lender shall be entitled to a breakup fee and expense reimbursement which shall consist of:

    (1) either, as determined in Lender's discretion,: (a) payment in the amount of $420,000 ("Cash Option Breakup Fee"), or (b) if the DIP Financing has not been funded, the option to purchase $2.8 million of stock in the reorganized Debtor at a price of $1.75 per share, or if the DIP Financing has been funded, the option to purchase $2 million of stock in the reorganized Debtor at a price of $1.75 per share ("Stock Option Breakup Fee"); and

    (2) reimbursement of up to $200,000 of reasonable documented attorneys' fees and other expenses incurred by Lender in connection with this transaction ("Breakup Attorneys' Fees").  The Cash Option Breakup Fee, Stock Option Breakup Fee and Breakup Attorneys' Fees are collectively referred to as the "Breakup Fee".

    The Lender shall be entitled to the Breakup Fee (each a "Triggering Event") if Debtor: (i) consummates a sale of any of its IP rights or other assets which is not approved by Lender, (ii) consummates a sale of all or substantially all of its assets or common stock which is not approved by Lender, (iii) accepts an alternative DIP financing and/or exit financing proposal to that contemplated by this Term Sheet, or (iv) consummates a plan of reorganization which is not approved by Lender.

    For the avoidance of doubt:

5

- o In the event that the Breakup Fee is triggered because the Debtor accepts an alternative exit financing proposal after the DIP Financing has been funded by Lender, Lender shall be entitled to: (i) repayment of the DIP Financing through issuance of stock as set forth herein, and (ii) receipt of the Breakup Fee.
- o The Cash Option Breakup Fee and the Breakup Attorneys' Fees shall be an allowed administrative claim under 11 U.S.C. §503.
- o In the event the Breakup Fee is triggered under (i), (ii) or (iii) above and Lender exercises the Cash Option Breakup Fee, both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable to Lender out of the proceeds of such sale or alternative financing. In the event that the Breakup Fee is triggered under (iv) above and Lender exercises the Cash Option Breakup Fee, both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable as a priority administrative claim under any confirmed plan.
- o Upon the occurrence of a Triggering Event, the Breakup Fee is due and owing regardless of whether the parties have executed definitive Loan Documents and/or Exit Financing Documents.

- DIP FINANCING COMMITMENT FEE: At the closing of the DIP Financing, the DIP Financing Commitment Fee shall accrue to the benefit of the Lender and shall be fully earned when due and is non-refundable in all cases.

- EXIT FINANCING COMMITMENT FEE: At the closing of the Exit Financing, a commitment fee of 7% ($770,000) ("Exit Financing Commitment Fee") shall accrue to the benefit of the Lender and shall be fully earned when due and is non-refundable in all cases.

- ATTORNEYS' FEES AND EXPENSES:
  Debtor shall pay in full at the closing of the DIP Financing all of Lender's reasonable professional costs and fees incurred in relation to the DIP Financing ("DIP Financing Attorneys' Fees"), including, without limitation, due diligence for and the negotiation and documentation of this Term Sheet, the Loan Documents, the Breakup Fee Order (defined below), and the DIP Order.

Debtor shall pay in full at the closing of the Exit Financing all of Lender's reasonable professional costs and fees incurred in relation to the Exit Financing ("Exit Financing Attorneys' Fees"), including, without limitation, negotiation and documentation of Exit Financing Documents, the Stalking Horse Plan and Disclosure Statement and confirmation order.

For the avoidance of doubt, if Lender funds the DIP Financing, Debtor shall pay the DIP Financing Attorneys' Fees; if Lender funds the Exit Financing, Debtor shall also pay the Exit Financing Attorneys' Fees.  If Lender is entitled to the Breakup Fee, at the time the Breakup Fee is paid or the stock is issued, Lender shall also be entitled to payment of the Breakup Attorneys' Fees.

MILESTONES:    Each of the following shall constitute a milestone ("Milestone"). Either Party shall have the right to waive or defer the date for the other Party's compliance with a Milestone without constituting an event of default under the DIP Financing.

- On March 18, 2016: Debtor shall have filed with the Bankruptcy Court an amendment to a Motion presently pending, seeking approval of this Term Sheet and the Breakup Fee in substitution of the Prior Letter of Intent.

- On or before March 25, 2016: The Bankruptcy Court shall have entered the Breakup Fee Order.

- On or before April 1, 2016: Debtor shall provide Lender with a substantially complete draft of its proposed Stalking Horse Plan.

- On or before March 30, 2016: Lender to provide Debtor with substantially complete drafts of Loan Documents, proposed DIP Order, and Exit Financing Documents.

- On or before April 7, 2016: Debtor shall have filed a Motion to approve the DIP Financing.

- On or before April 13, 2016: Debtor shall have filed with the Bankruptcy Court the Stalking Horse Plan and related disclosure statement, both of which are acceptable to Lender.

- On or before April 29, 2016: The Bankruptcy Court shall have entered the DIP Order.

- On or before May 13, 2016: The Bankruptcy Court shall have entered an order acceptable to Lender approving the disclosure statement related to the Stalking Horse Plan acceptable to the Lender and authorizing solicitation of the Stalking Horse Plan.

- On or before June 15, 2016: The Bankruptcy Court shall have entered an order acceptable to the Lender confirming a Stalking Horse Plan acceptable to the Lender.

- On or before June 30, 2016: The Stalking Horse Plan shall have become effective by its terms.

To the extent that any of the foregoing Milestones contemplate one party's opportunity to review and approve pleadings or other documents prepared by the other party before filing with the Bankruptcy Court, the reviewing party shall provide its comments on such pleadings or other documents to the drafting party within three (3) business days of receipt of such drafts, unless the parties agree otherwise.

**SHKRELI EQUITY:** The availability of any DIP Financing or Exit Financing to be provided by Lender is conditioned upon, among other things, the requirement that Martin Shkreli not be an employee, consultant, officer or director of the Debtor. Additionally, it shall be a condition, among others, of the availability of the Exit Financing that after the effective date of the Stalking Horse Plan, Martin Shkreli will not hold with power to vote more than 20% of the voting common stock of the Reorganized Debtor.

**CONDITIONS TO FUNDING:** A) The DIP Financing shall be subject to and contingent upon the following:

(1) Breakup Fee Order: The Bankruptcy Court shall enter an order in form and substance acceptable to Lender approving this Term Sheet and the Breakup Fee (the "Breakup Fee Order").

(2) DIP Order: The Bankruptcy Court shall enter an order in form and substance acceptable to Lender approving the DIP Financing (the "DIP Order"). The DIP Order will, among other things, adjudicate (i) all indebtedness under the Loan to have superpriority claim status under Bankruptcy Code §§ 364(c)(1) and 507(b), and (ii) Lender's claims to be fully secured as stated below under Bankruptcy Code §§ 364(c) and (d), with first priority liens on all of the Collateral having the priorities specified herein.

Without limiting the foregoing in any way, the DIP Order will include, among other things, the following provisions: (i) Lender will have full stay relief (subject to appropriate notice and cure periods as may be set forth in the Loan Documents) so that Lender can enforce its rights in the event of a default without having to obtain any other or further court order, including, without limitation, the enforcement of such remedies against the Collateral, (ii) the Debtor will not seek to obtain any other loan(s), without the prior written consent of Lender, unless such other loan(s) are part of an overall financing commitment to the Debtor determined after a competitive auction process (conducted pursuant to Bankruptcy Court approved procedures) to be a higher or better offer for financing than the combined package of DIP Financing and Exit Financing that Lender has committed to provide, (iii) the Debtor will not seek approval for, or incur any debt which will prime, or be *pari passu* with, the liens against the Collateral granted to Lender, (iv) the Debtor will agree and the DIP Order will so provide that there will be no Bankruptcy Code § 506(c) surcharge claims against Lender or its Collateral, (v) approval of all fees set forth herein relating to the DIP Financing, and (vi) the Loan is an arms-length transaction, in good faith, for reasonable consideration, and is not a fraudulent transfer under the Bankruptcy Code or other applicable law.

B) The Exit Financing shall be subject to and contingent upon the following:

(1) Stalking Horse Plan and Disclosure Statement: The Bankruptcy Court shall enter one or more order(s) acceptable to Lender: (i) approving the disclosure statement related to the Stalking Horse Plan acceptable to Lender and authorizing solicitation of the Stalking Horse Plan, and (ii) confirming the Stalking Horse Plan acceptable to Lender.

(2) Effective Date: The Stalking Horse Plan approved by Lender shall have become effective by its terms.

FINANCIAL REPORTING: Debtor shall provide the financial reports, statements and budgets as required by Lender and/or customary for the DIP Financing contemplated by this Term Sheet. Lender shall have the right to conduct inspections of the books and records and of the Debtor upon reasonable notice.

BYLAWS: If Lender is providing Exit Financing, the bylaws of the reorganized Debtor shall be subject to Lender's approval. To the extent the bylaws of the Debtor do not currently contain a provision requiring that each director annually stand for re-election, the bylaws shall be timely amended, effective as of the effective date of the Stalking Horse Plan, to reflect the same with respect to the reorganized Debtor.

MANAGEMENT    If Lender is providing Exit Financing, the Stalking Horse Plan will provide that, at the Lender's option, the reorganized Debtor's board of directors will consist of one director designated by Nomis, one director designated by the Black Horse Entities, one director being the CEO of the Debtor and two independent directors named jointly by the Black Horse Entities and Nomis.

# **EXHIBIT 2**

**Redline Comparison of
Amended LOI/Term Sheet to Original LOI/Term Sheet**

March 9,18, 2016

**VIA E-MAIL TO CAMERON DURRANT, MD, MBA
(CAMERONDURRANT@YAHOO.COM)**

Kalobios Pharmaceuticals, Inc.
442 Littlefield Avenue
San Francisco, CA 94080

Dear Dr. Durrant:

  On behalf of a syndicate of investors consisting of Nomis Bay LTD and funds managed by Black Horse Capital LP, Black Horse Capital Master Fund Ltd. and Cheval Holdings, Ltd. (collectively, the *"Lender"*)[1], we are pleased to submit the following amended letter and attached amended term sheet (the *"Term Sheet"*) for debtor-in-possession financing in the principal amount of Three Million Dollars ($3,000,000.00)[2] and exit financing in the principal amount of SevenEleven Million Dollars ($7,000,000.0011,000,000.00)[3] to Kalobios Pharmaceuticals, Inc., a Delaware corporation (the *"Debtor"*).  This amended letter and the amended Term Sheet are collectively referred to herein as the "Letter of Intent."  By executing this Letter of Intent, the signatories are expressing their intent to consummate a transaction on the terms set forth in this Letter of Intent.  As such, it is the intent of the parties hereto to prepare, execute, authorize and deliver agreements relating to the transaction described herein (the *"Transaction"*) and to consummate the Transaction. This Letter of Intent amends and supersedes in its entirety the letter and term sheet, each dated March 9, 2016, between the Debtor and certain of the parties comprising the Lender (the "Superseded Letter of Intent"), which Superseded Letter of Intent shall be null and void effective upon the execution by the parties of this Letter of Intent.

1.  Effect of Letter of Intent.  Except as set forth in this Section 1, this Letter of Intent is not intended to be, and shall not constitute, a binding or enforceable agreement between the parties hereto.  Instead, it merely sets forth the parties' present intent with regard to the terms proposed, which terms may or may not become part of a definitive agreement.  Except for the provisions of Sections 3 (Governing Law) and 4 (Termination of Breakup Fee Obligations) of this Letter of Intent, the sections of the Term Sheet entitled "Breakup Fee and Expense Reimbursement" and "Attorneys' Fees and Expenses", and this Section 1 (which are intended to be binding agreements of Lender and the Debtor), no legal or

---

[1] Lender reserves the right to include other investors in the Lender group.  The inclusion of additional investors will not alter the terms of this LOI or the Term Sheet.

[2] The funding of the debtor-in-possession financing is conditioned upon, among other things, the Debtor's execution of a binding letter of intent for the Savant Deal (defined in the Term Sheet), as set forth in the section of the Term Sheet entitled "Amount."

[3] The funding of the exit financing is conditioned upon, among other things, the closing of the Savant Deal (defined in the Term Sheet), as set forth in the section of the Term Sheet entitled "Amount."

equitable rights, responsibilities or duties are created hereby or thereby.  Neither party may rely on any promise inconsistent with this Section 1.  This Section 1 supersedes all other conflicting or ambiguous language in this Letter of Intent or any contemporaneous document or other instrument that precedes this Letter of Intent, with the exception of that certain Confidentiality Agreement dated January 26, 2016, between the entities comprising Lender party thereto on such date and the Debtor.  On December 29, 2015, the Debtor filed a voluntary petition for reorganization under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*).  The Debtor's case is No. 15-12628.  The parties acknowledge that this Letter of Intent, any Loan Documents (as defined below) and the terms of the Exit Financing shall not be effective unless and until approved by the Bankruptcy Court.

2.  <u>Negotiation of Definitive Agreements</u>.  The parties shall negotiate and execute Loan Documents (as defined in the Term Sheet) and Exit Financing Documents (as defined in the Term Sheet) as Lender may require in connection with the Transaction.  Lender shall deliver substantially complete drafts of the Loan Documents, proposed DIP Order, and Exit Financing Documents (all defined in the Term Sheet) to the Debtor not later than March 30, 2016.

3.  <u>Governing Law</u>.  This Letter of Intent is governed by and shall be interpreted under the laws of the State of Delaware without giving effect to any choice of law principles.

4.  <u>Termination of Breakup Fee Obligations</u>.  In the event that definitive Loan Documents are not signed by the Debtor and the Lender on or before April 7, 2016 or the Bankruptcy Court fails to enter the DIP Order by April 29, 2016, as described in the Term Sheet, then the Debtor's obligations with respect to the "Breakup Fee" as described in the Term Sheet shall terminate and be of no further force or effect, provided, however, that the Debtor's obligation with respect to such Breakup Fee shall remain in effect and a Breakup Fee shall be payable as described in the Term Sheet if the failure to execute definitive Loan Documents on or before April 7, 2016 or the Bankruptcy Court's failure to enter the DIP Order by April 29, 2016, results from the Debtor's (a) breach of its obligations under the Term Sheet, (b) failure to negotiate in good faith the terms of the Loan Documents or DIP Order (both defined in the Term Sheet) (c) negotiation or consummation of a sale of any of its IP rights or other assets, (d) negotiation or acceptance of an alternative DIP Financing and/or Exit Financing (as defined in the Term Sheet), (e) negotiation or consummation of a plan of reorganization that is not approved by Lender or (f) determination to effect a sale of all or substantially all its assets or of its common stock which is not approved by Lender.

5.  <u>Termination of LOI</u>.  This Letter of Intent is deemed automatically withdrawn by Lender if either: (i) a Chapter 11 Trustee is appointed in the Debtor's bankruptcy case, or (ii) it is not executed by the Debtor by March 10.18. 2016.  Either party shall have the option to withdraw this Letter of Intent  if the Breakup Fee Order (defined in the Term Sheet) is not entered by the Court on or before March 25, 2016.
             [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

This Letter of Intent may be signed in two or more counterparts, any one of which need not contain the signature of more than one party, but all such counterparts will constitute one and the same agreement.

If you are in agreement with the terms of this Letter of Intent, please date and sign in the space provided below and return a signed copy to the Lender.

Best regards,

**LENDERS**:

**BLACK HORSE CAPITAL MASTER FUND LTD.**

By:   Black Horse Capital Management LLC,
        its investment advisor_____

        By:_____Dale Chappell_____

Signature:_____

Its:_____


**BLACK HORSE CAPITAL LP**

By:   Black Horse Capital Management LLC,
        its general
        partner_____

        By:_____Dale Chappell
        _____

Signature:_____

Its:_____

_____

_____


**CHEVAL HOLDINGS, LTD.**

By:_____
        By:_____Dale Chappell
        _____

        Signature:_____

Its:_____Director


**NOMIS BAY LTD**

    By:    James Keyes

    Signature:_____

    Its: Director


Agreed and accepted this __18th day of March, 2016.

**KALOBIOS PHARMACEUTICALS, INC.**

By:_____
Name:__Dr. Cameron Durrant_____
Signature:_____
_____
Title:_____

Enclosures

cc: Eric D. Schwartz (~~eschwartz@mnat.com~~eschwartz@mnat.com)
    Peter Ivanick (~~peter.ivanick@hoganlovells.com~~peter.ivanick@hoganlovells.com)
    Gregory Werkheiser (~~gwerkheiser@mnat.com~~gwerkheiser@mnat.com)

## TERM SHEET FOR PROPOSED DIP LOAN AND EXIT FINANCING

MARCH ~~9~~,18, 2016

BORROWER:
: Kalobios Pharmaceuticals, Inc., in all capacities, including, but not limited to its capacity as debtor-in-possession (the "Debtor").

LENDER:
: All references to "Lender" in this term sheet means, collectively, Black Horse Capital LP, Black Horse Capital Master Fund Ltd. ~~and~~, Cheval Holdings, Ltd. (collectively, the "Black Horse Entities") and Nomis Bay LTD ("Nomis"). Lender reserves the right to include other investors in the Lender group.  The inclusion of additional investors will not alter the terms of the LOI or this Term Sheet.

AGENT:
: Black Horse Capital Master Fund Ltd.

BANKRUPTCY CASE:
: The voluntary Chapter 11 bankruptcy proceeding that Debtor commenced on December 29, 2015 in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") with Case Number 15-12628 ("Bankruptcy Case").

ADVERSARY CASE:
: The adversary case commenced in the Bankruptcy Case by the filing of an adversary complaint with case number 16-50001 ("Adversary Case") regarding the Debtor's sale of securities prior to the commencement of the Bankruptcy Case.

OVERVIEW:
: Lender will provide the DIP Financing to provide Debtor with necessary funds to operate its business until confirmation of a reorganization plan, and Exit Financing to facilitate consummation of the Savant Deal (defined below) as well as confirmation of the Stalking Horse Plan (defined below). The entire transaction will be subject to approval by, and under the supervision of, the Bankruptcy Court. Funding of the DIP Financing is conditioned on, among other things, the parties' execution of the Loan Documents and entry by the Bankruptcy Court of the DIP Order (defined below) and an order approving the Breakup Fee.  Funding of the Exit Financing is conditioned on, among other things, the parties' execution of the Exit Financing Documents (defined below), the terms of the Stalking Horse Plan and Stalking Horse Plan confirmation order, which are all subject to Lender's approval, and there being no uncured Event of Default (as defined below).

LOAN DOCUMENTS:
: Debtor shall execute and deliver to Lender such loan and security agreements, deposit control agreements, promissory notes, mortgages,

deeds of trust, assignments, pledges, instruments, documents, certificates, opinions and assurances, and any other documents (the "Loan Documents") as Lender may require in connection with the DIP Financing, all of which shall be in form and substance acceptable to and approved by Lender. The Loan Documents will contain representations and warranties; conditions precedent; affirmative, negative and financial covenants; indemnities; and events of default and remedies as required by Lender, and as are appropriate for a transaction of this type. All orders of the Bankruptcy Court approving or authorizing the DIP Financing and/or Exit Financing, and all motions relating thereto, shall be in form and substance acceptable to and approved by Lender.

EXIT FINANCING
DOCUMENTS:
Debtor shall execute and deliver to Lender an agreement for the purchase of stock in the reorganized Debtor and any other documents ("Exit Financing Documents") as Lender may require in connection with the Exit Financing as are appropriate for a transaction of this type, all of which shall be in form and substance acceptable to and approved by Lender.

AMOUNT:
A total of $~~10~~14 million, to be advanced as follows:
- First Tranche: DIP Financing
  - DIP Financing shall be $3 million (with OID of 6 points) and shall be made available in one draw.
  - The funding of such DIP Financing shall be conditioned upon, among other things, no uncured Event of Default, entry by the Bankruptcy Court of the DIP Order and an order approving the Breakup Fee (defined below), as well as the Debtor's execution and Bankruptcy Court approval of a binding letter of intent with Savant Neglected Disease LLC ("Savant Deal"). Lender acknowledges that it has been provided complete copies of (i) the Savant Deal as fully executed by the Debtor and Savant Neglected Diseases LLC and (ii) the Bankruptcy Court's Order entered February 26, 2016 (D.I. 211) approving the Savant Deal, such that the Savant Deal-related condition to funding the DIP Financing is satisfied.
  - The DIP Financing will consist of a credit facility secured by a priming lien on all of the Collateral (defined below). Additional terms of the credit facility will include, without limitation, the terms outlined below.
- Second Tranche: Exit Financing.
  - The Exit Financing shall be in the amount of $~~7~~11 million (such amount, the "Exit Financing Amount").

2

> o  Availability of the Exit Financing shall be conditioned upon, among other things, closing of the Savant Deal, no uncured event of default under the DIP Financing, and occurrence of the effective date under the confirmed Stalking Horse Plan (defined below).

DIP FINANCING
MATURITY:

"Maturity Date" for the DIP Financing will be the earlier to occur of (i) the effective date of the Debtor's plan of reorganization that has been approved by Lender ("Stalking Horse Plan") or any other plan of reorganization confirmed by the Bankruptcy Court, or (ii) the occurrence of any event of default (subject to any notice and cure provisions, as may be set forth in the Loan Documents) to be set forth in the Loan Documents ("Event of Default") including, without limitation, (a) failure to achieve a Milestone as set forth below, (b) dismissal or conversion of the Bankruptcy Case, (c) filing by Debtor of one or more motion(s) or application(s) in the Bankruptcy Case and/or approval of a sale or licensing of any of the Collateral with a total book value in excess of $250,000, including, without limitation, Debtor's IP rights, which is not approved by Lender, (d) appointment of a Chapter 11 trustee, (e) entry of one or more order(s) in the Bankruptcy Case granting one or more lien(s) on Collateral with a total book value in excess of $100,000 to any person or entity other than Lender; *provided, however,* that a lien may be granted to Savant in connection with the Savant Deal to the extent that such lien encumbers only the assets Debtor acquires from Savant and does not become valid, perfected and enforceable until after the effective date of a plan, (f) Adversary Case judgment or settlement, without Lender's consent, that results in more than $250,000 debit to the cash resources of the Debtor, and (g) other customary events of default as may be set forth in the Loan Documents.

USE OF PROCEEDS:

Advances under the DIP Financing will be used by the Debtor for working capital purposes and for other costs of the Debtor, all in accordance with a rolling 13 week budget ("Budget"), and in accordance with the terms and conditions of the Loan Documents and DIP Order.  During any period prior to the effective date of a Stalking Horse Plan when the Debtor's cash on hand is less than $5,000,000, the Budget shall be subject to the Lender's reasonable approval.

OID, COMMITMENT FEE
AND INTEREST RATE
FOR DIP FINANCING:

The DIP Financing shall be subject to (i) a commitment fee of $150,000 (5%) ("DIP Financing Commitment Fee"), (ii) OID of 6 points ($191,000) ("OID"), and (iii) interest ("Interest") at the annual rate of twelve percent (12%)  calculated on the basis of a 360-day year and actual days elapsed, which Interest rate shall increase by five percent (5%) upon an Event of Default.

QB\38762158.4

| | |
|---|---|
| DIP FINANCING PAYMENTS: | The DIP Financing Commitment Fee, OID, principal and Interest earned will accrue until Maturity or Conversion. |

COLLATERAL:    The Loan Documents and the DIP Order will grant Lender first priority priming security interests, mortgages, and/or deeds of trust, in and liens on all real and personal property of the Debtor and its estate of any kind or nature whatsoever, tangible, intangible or mixed, now existing or hereafter acquired or created, whether existing before or arising after the commencement of the Bankruptcy Case (the "Collateral").  The Collateral shall include Debtor's cash.  For the avoidance of doubt, the foregoing definition of "Collateral" excludes any chapter 5 avoidance actions or proceeds thereof.

REPAYMENT OF DIP FINANCING:    On the effective date of any plan confirmed by the Bankruptcy Court, the entire principal amount of the First Tranche DIP Financing plus all accrued and unpaid Interest, OID and the DIP Financing Commitment Fee shall, at Lender's option, either (i) be paid in cash, or (ii) convert to common stock of the reorganized Debtor.  The conversion price for the DIP Financing shall be $1.75 per share based upon current outstanding shares of 4,451,000. Delivery of shares at conversion shall be on a fully anti-dilution basis.

SUBSCRIPTION:    On the effective date of the Stalking Horse Plan, in exchange for the Exit Financing Amount plus the Exit Financing Commitment Fee (defined below), Debtor shall issue to Lender ~~3,745,000~~5,885,000 shares of the reorganized Debtor based upon current outstanding shares of 4,451,000.  Delivery of shares at conversion shall be on a fully anti-dilution basis.

MANAGEMENT EQUITY:    Any term of the Stalking Horse Plan regarding or related to any equity package(s) offered to the directors and officers of the reorganized Debtor shall be subject to Lender's approval.

REGISTRATION:    If Lender is providing the Exit Financing, unless an exception to the registration requirement under section 1145 of the Bankruptcy Code or other applicable law applies, issuance of the stock must be registered under the 1933 Act. To the extent necessary, Debtor shall promptly, following the occurrence of the Stalking Horse Plan effective date, file a registration statement under the 1933 Act, and shall comply with all other applicable laws relating to such registration, and shall use its reasonable best efforts to cause such registration statement to be declared effective by the SEC within 180 days following the effective date of the Stalking Horse Plan.

EXIT FINANCING    If Lender is providing the Exit Financing, it shall be an event of

4

EVENT OF DEFAULT:    default under the Exit Financing Documents if within 180 days following the effective date of the Stalking Horse Plan: (i) Debtor fails to obtain either an exemption from registration or to have a registration statement to be declared effective by the SEC, and (ii) to the extent the shares are not freely tradable upon issuance, such shares have not been deemed by the SEC to be freely tradable.  If there is an event of default under the Exit Financing Documents, Debtor shall pay liquidated damages to Lender in the form of additional shares in the reorganized Debtor.  The shares issued to Lender shall increase by 10% for every 30 days that the Debtor remains in default.

LISTING REQUIREMENT:    If Lender provides Exit Financing, Debtor shall use its best efforts to: cause the company's securities to (i) continue to be listed on an exchange, and (ii) be listed on NASDAQ or another reputable exchange within a reasonable period of time after the effective date of the Stalking Horse Plan.

FEES:

- BREAKUP FEE AND EXPENSE REIMBURSEMENT:

    Upon the occurrence of a Triggering Event (defined below), Lender shall be entitled to a breakup fee and expense reimbursement which shall consist of:

    (1)  either, as determined in Lender's discretion,: (a) payment in the amount of $~~300,000~~420,000 ("Cash Option Breakup Fee"), or (b) if the DIP Financing has not been funded, the option to purchase $2.8 million of stock in the reorganized Debtor at a price of $1.75 per share, or if the DIP Financing has been funded, the option to purchase $2 million of stock in the reorganized Debtor at a price of $1.75 per share ("Stock Option Breakup Fee"); and

    (2)  reimbursement of up to $200,000 of reasonable documented attorneys' fees and other expenses incurred by Lender in connection with this transaction ("Breakup Attorneys' Fees").  The Cash Option Breakup Fee, Stock Option Breakup Fee and Breakup Attorneys' Fees are collectively referred to as the "Breakup Fee".

    The Lender shall be entitled to the Breakup Fee (each a "Triggering Event") if Debtor: (i) consummates a sale of any of its IP rights or other assets which is not approved by Lender, (ii) consummates a sale of all or substantially all of its assets or common stock which is not approved by Lender, (iii) accepts an alternative DIP financing and/or exit financing proposal to that contemplated by this Term Sheet, or (iv) consummates a plan of reorganization which is not approved by Lender.

    For the avoidance of doubt:

QB\38762158.4

- o In the event that the Breakup Fee is triggered because the Debtor accepts an alternative exit financing proposal after the DIP Financing has been funded by Lender, Lender shall be entitled to: (i) repayment of the DIP Financing through issuance of stock as set forth herein, and (ii) receipt of the Breakup Fee.
- o The Cash Option Breakup Fee and the Breakup Attorneys' Fees shall be an allowed administrative claim under 11 U.S.C. §503.
- o In the event the Breakup Fee is triggered under (i), (ii) or (iii) above and Lender exercises the Cash Option Breakup Fee, both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable to Lender out of the proceeds of such sale or alternative financing.  In the event that the Breakup Fee is triggered under (iv) above and Lender exercises the Cash Option Breakup Fee, both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable as a priority administrative claim under any confirmed plan.
- o Upon the occurrence of a Triggering Event, the Breakup Fee is due and owing regardless of whether the parties have executed definitive Loan Documents and/or Exit Financing Documents.

- <u>DIP FINANCING COMMITMENT FEE</u>: At the closing of the DIP Financing, the DIP Financing Commitment Fee shall accrue to the benefit of the Lender and shall be fully earned when due and is non-refundable in all cases.

- <u>EXIT FINANCING COMMITMENT FEE</u>: At the closing of the Exit Financing, a commitment fee of 7% ($~~490,000~~770,000) ("Exit Financing Commitment Fee") shall accrue to the benefit of the Lender and shall be fully earned when due and is non-refundable in all cases.

- <u>ATTORNEYS' FEES AND EXPENSES</u>:
    Debtor shall pay in full at the closing of the DIP Financing all of Lender's reasonable professional costs and fees incurred in relation to the DIP Financing ("DIP Financing Attorneys' Fees"), including, without limitation, due diligence for and the negotiation and documentation of this Term Sheet, the Loan Documents, the Breakup Fee Order (defined below), and the DIP Order.

6

Debtor shall pay in full at the closing of the Exit Financing all of Lender's reasonable professional costs and fees incurred in relation to the Exit Financing ("Exit Financing Attorneys' Fees"), including, without limitation, negotiation and documentation of Exit Financing Documents, the Stalking Horse Plan and Disclosure Statement and confirmation order.

For the avoidance of doubt, if Lender funds the DIP Financing, Debtor shall pay the DIP Financing Attorneys' Fees; if Lender funds the Exit Financing, Debtor shall also pay the Exit Financing Attorneys' Fees. If Lender is entitled to the Breakup Fee, at the time the Breakup Fee is paid or the stock is issued, Lender shall also be entitled to payment of the Breakup Attorneys' Fees.

MILESTONES:    Each of the following shall constitute a milestone ("Milestone"). Either Party shall have the right to waive or defer the date for the other Party's compliance with a Milestone without constituting an event of default under the DIP Financing.

- On or before March 10,18, 2016: Debtor shall have filed a Motion with the Bankruptcy Court an amendment to a Motion presently pending, seeking approval of this Term Sheet and the Breakup Fee in substitution of the Prior Letter of Intent.

- On or before March 25, 2016: The Bankruptcy Court shall have entered the Breakup Fee Order.

- On or before March 28,April 1, 2016: Debtor shall provide Lender with a substantially complete draft of its proposed Stalking Horse Plan.

- On or before March 30, 2016: Lender to provide Debtor with substantially complete drafts of Loan Documents, proposed DIP Order, and Exit Financing Documents.

- On or before April 7, 2016: Debtor shall have filed a Motion to approve the DIP Financing.

- On or before April 13, 2016: Debtor shall have filed with the Bankruptcy Court the Stalking Horse Plan and related disclosure statement, both of which are acceptable to Lender.

- On or before April 29, 2016: The Bankruptcy Court shall have entered the DIP Order.

QB\38762158.4

- On or before May 13, 2016: The Bankruptcy Court shall have entered an order acceptable to Lender approving the disclosure statement related to the Stalking Horse Plan acceptable to the Lender and authorizing solicitation of the Stalking Horse Plan.

- On or before June 15, 2016: The Bankruptcy Court shall have entered an order acceptable to the Lender confirming a Stalking Horse Plan acceptable to the Lender.

- On or before June 30, 2016: The Stalking Horse Plan shall have become effective by its terms.

To the extent that any of the foregoing Milestones contemplate one party's opportunity to review and approve pleadings or other documents prepared by the other party before filing with the Bankruptcy Court, the reviewing party shall provide its comments on such pleadings or other documents to the drafting party within three (3) business days of receipt of such drafts, unless the parties agree otherwise.

SHKRELI EQUITY:    The availability of any DIP Financing or Exit Financing to be provided by Lender is conditioned upon, among other things, the requirement that Martin Shkreli not be an employee, consultant, officer or director of the Debtor. Additionally, it shall be a condition, among others, of the availability of the Exit Financing that after the effective date of the Stalking Horse Plan, Martin Shkreli will not hold with power to vote more than 20% of the voting common stock of the Reorganized Debtor.

CONDITIONS TO FUNDING:    A) The DIP Financing shall be subject to and contingent upon the following:

(1) Breakup Fee Order: The Bankruptcy Court shall enter an order in form and substance acceptable to Lender approving this Term Sheet and the Breakup Fee (the "Breakup Fee Order").

(2) DIP Order: The Bankruptcy Court shall enter an order in form and substance acceptable to Lender approving the DIP Financing (the "DIP Order"). The DIP Order will, among other things, adjudicate (i) all indebtedness under the Loan to have superpriority claim status under Bankruptcy Code §§ 364(c)(1) and 507(b), and (ii) Lender's claims to be fully secured as stated below under Bankruptcy Code §§ 364(c) and (d), with first priority liens on all of the Collateral having the priorities specified herein.

8

Without limiting the foregoing in any way, the DIP Order will include, among other things, the following provisions: (i) Lender will have full stay relief (subject to appropriate notice and cure periods as may be set forth in the Loan Documents) so that Lender can enforce its rights in the event of a default without having to obtain any other or further court order, including, without limitation, the enforcement of such remedies against the Collateral, (ii) the Debtor will not seek to obtain any other loan(s), without the prior written consent of Lender, unless such other loan(s) are part of an overall financing commitment to the Debtor determined after a competitive auction process (conducted pursuant to Bankruptcy Court approved procedures) to be a higher or better offer for financing than the combined package of DIP Financing and Exit Financing that Lender has committed to provide, (iii) the Debtor will not seek approval for, or incur any debt which will prime, or be *pari passu* with, the liens against the Collateral granted to Lender, (iv) the Debtor will agree and the DIP Order will so provide that there will be no Bankruptcy Code § 506(c) surcharge claims against Lender or its Collateral, (v) approval of all fees set forth herein relating to the DIP Financing, and (vi) the Loan is an arms-length transaction, in good faith, for reasonable consideration, and is not a fraudulent transfer under the Bankruptcy Code or other applicable law.

B) The Exit Financing shall be subject to and contingent upon the following:

(1) Stalking Horse Plan and Disclosure Statement: The Bankruptcy Court shall enter one or more order(s) acceptable to Lender: (i) approving the disclosure statement related to the Stalking Horse Plan acceptable to Lender and authorizing solicitation of the Stalking Horse Plan, and (ii) confirming the Stalking Horse Plan acceptable to Lender.

(2) Effective Date: The Stalking Horse Plan approved by Lender shall have become effective by its terms.

FINANCIAL REPORTING:    Debtor shall provide the financial reports, statements and budgets as required by Lender and/or customary for the DIP Financing contemplated by this Term Sheet.  Lender shall have the right to conduct inspections of the books and records and of the Debtor upon reasonable notice.

BYLAWS:    If Lender is providing Exit Financing, the bylaws of the reorganized Debtor shall be subject to Lender's approval.  To the extent the bylaws of the Debtor do not currently contain a provision requiring that each director annually stand for re-election, the bylaws shall be timely amended, effective as of the effective date of the Stalking Horse Plan, to reflect the same with respect to the reorganized Debtor.

QB\38762158.4

| | |
|---|---|
| MANAGEMENT RIGHTS: | If Lender is providing Exit Financing, ~~Lender shall be entitled, but not obligated, to designate one person for election to the reorganized Debtor's board of directors~~ the Stalking Horse Plan will provide that, at the Lender's option, the reorganized Debtor's board of directors will consist of one director designated by Nomis, one director designated by the Black Horse Entities, one director being the CEO of the Debtor and two independent directors named jointly by the Black Horse Entities and Nomis. |