## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| KALOBIOS PHARMACEUTICALS, INC., | : Case No. 15-12628 (LSS) |
| | : |
| Debtor.[1] | : |
| | : |

## DISCLOSURE STATEMENT WITH RESPECT TO THE PLAN OF REORGANIZATION OF KALOBIOS PHARMACEUTICALS, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**Nothing contained in this Disclosure Statement is an offer, acceptance, or a legally binding obligation of the Debtor or any other party in interest. This Disclosure Statement is subject to the Bankruptcy Court's approval and certain other conditions. This Disclosure Statement is not an offer with respect to any securities. Acceptances or rejections with respect to the accompanying Plan may not be solicited until the Bankruptcy Court has approved this Disclosure Statement in accordance with section 1125 of the Bankruptcy Code. Any solicitation of the accompanying Plan will occur only in compliance with applicable provisions of securities and bankruptcy laws.**

Peter Ivanick
Pieter Van Tol
John D. Beck
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile:  (212) 918-3100

Eric D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
Marcy J. McLaughlin (No. 6184)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to the Debtor*

April 7, 2016

## THIS DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED.

## THIS IS NOT A SOLICITATION.

---

[1] The last four digits of the Debtor's federal tax identification number are 7236. The Debtor's address is 1000 Marina Blvd, #250, Brisbane, CA 94005-1878.

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................1
    A.  General ..........................................................................................................1
    B.  Holders of Claims and Interests Entitled to Vote ........................................5
    C.  Treatment of Claims and Interests ...............................................................6
    D.  Voting Procedures.......................................................................................13
    E.  Confirmation Hearing .................................................................................14
    F.  Projected Financial Information ..................................................................14

II.  BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 FILING ...............15
    A.  Overview .....................................................................................................15
    B.  KaloBios's Business and Employees...........................................................15
    C.  Summary of Events Leading to the Chapter 11 Filing................................17
    D.  Summary of Material Pre-Petition Legal Proceedings................................19

III.  THE CHAPTER 11 CASE ....................................................................................21
    A.  Commencement of the Chapter 11 Case .....................................................21
    B.  Emergency Ex Parte Employee Wage Motion ...........................................21
    C.  "First Day" Motions and Related Applications...........................................21
    D.  Retention of Professionals...........................................................................22
    E.  Significant Events During the Chapter 11 Case ..........................................22

IV.  THE PLAN .........................................................................................................29
    A.  Treatment of Claims and Interests ..............................................................29
    B.  Means for Implementation of the Plan........................................................35
    C.  Provisions Governing Distributions.............................................................38
    D.  Procedures for Resolving Claims ................................................................43
    E.  Executory Contracts and Unexpired Leases................................................44
    F.  Conditions Precedent to Consummation of the Plan ...................................46
    G.  Effect of Confirmation ................................................................................48

V.  RETENTION OF JURISDICTION ...........................................................................54

VI.  MISCELLANEOUS PROVISIONS ..........................................................................56

VII.  CONFIRMATION OF THE PLAN OF REORGANIZATION .......................................60
    A.  Solicitation of Votes....................................................................................60
    B.  The Confirmation Hearing ..........................................................................62
    C.  Confirmation................................................................................................62
    D.  Conditions Precedent to the Confirmation, Effective Date, and
        Consummation of Plan.................................................................................66
    E.  Effect of the Plan on Assets, Claims and Interests .....................................67

VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
PLAN .................................................................................................................. 68
    A.    Liquidation Under Chapter 7 .................................................................. 68
    B.    Alternative Plan of Reorganization ........................................................ 68
    C.    Dismissal of the Debtor's Chapter 11 Case ........................................... 69

IX.    GOVERNANCE OF REORGANIZED KALOBIOS .................................... 69
    A.    Governance of Reorganized KaloBios .................................................. 69

X.    CERTAIN RISK FACTORS TO BE CONSIDERED ................................... 70
    A.    Certain Bankruptcy Considerations ....................................................... 70
    B.    Risks Relating to the New Common Stock to be Issued Under the Plan .............. 72
    C.    Risks Relating to the Inherent Uncertainty of Financial Analysis ....................... 73
    D.    Company-Specific Risk Factors ............................................................ 73

XI.    U.S. SECURITIES LAW MATTERS .......................................................... 77
    A.    Introduction .......................................................................................... 77
    B.    Exemptions from Registration Requirements ....................................... 77
    C.    Resale of New Common Stock .............................................................. 77
    D.    Listing of New Common Stock .............................................................. 78

XII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... 78
    A.    General .................................................................................................. 78
    B.    U.S. Federal Income Tax Consequences to Holders of Interests ....................... 80

XIII.    CONCLUSION ............................................................................................. 81

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, THIS DISCLOSURE STATEMENT AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS SHOULD READ CAREFULLY THE **"RISK FACTORS" SECTION** HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE XI BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") NOR ANY STATE OR FOREIGN SECURITIES REGULATOR, NOR HAS THE SEC OR ANY SUCH REGULATOR PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR INTERESTS IN, INCLUDING EQUITY SECURITIES IN, THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON, PARTY OR ENTITY FOR ANY OTHER PURPOSE EXCEPT AS PERMITTED BY APPLICABLE LAW.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE PLAN SUMMARY IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR POSSIBLE ADDITIONAL LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE

ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR OR ANY OTHER PARTY IN INTEREST.

NONE OF THE OFFER, SALE OR DISTRIBUTION OF ANY OF THE SECURITIES BEING OFFERED, SOLD OR DISTRIBUTED UNDER THE PLAN HAS BEEN REGISTERED UNDER THE SECURITIES ACT OR ANY SIMILAR STATE OR FOREIGN SECURITIES OR "BLUE SKY" LAWS, EXCEPT TO THE EXTENT NECESSARY FOR THE PRIMARY PLAN SPONSOR NEW COMMON STOCK AND SECONDARY PLAN SPONSOR NEW COMMON STOCK WHICH THE DEBTOR SHALL FILE A REGISTRATION STATEMENT FOR UNDER THE SECURITIES ACT PROMPTLY FOLLOWING THE EFFECTIVE DATE.  THE OFFERS AND ISSUANCES OF NEW COMMON STOCK ARE BEING MADE IN RELIANCE ON EXEMPTIONS FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, SUBJECT TO CERTAIN LIMITATIONS DESCRIBED HEREIN.

**STOCKHOLDERS MAY BE SIGNIFICANTLY DILUTED DUE TO NEW COMMON STOCK ISSUED PURSUANT TO THIS PLAN AND/OR DEPENDING ON THE ULTIMATE OUTCOME IN THE PIPE LITIGATION, THE SECURITIES LITIGATION AND OTHER DISPUTES AND THE AMOUNT OF ALLOWED OTHER SUBORDINATED CLAIMS.**

SAFE HARBOR STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTOR INVOLVE MATERIAL KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER IMPORTANT FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE DEBTOR'S CONTROL. ACCORDINGLY, THE DEBTOR'S FUTURE PERFORMANCE AND FINANCIAL RESULTS MAY DIFFER MATERIALLY FROM THOSE EXPRESSED OR IMPLIED IN ANY SUCH FORWARD-LOOKING STATEMENTS. SUCH RISKS, UNCERTAINTIES AND FACTORS INCLUDE, BUT ARE NOT LIMITED TO, THOSE DESCRIBED IN THIS DISCLOSURE STATEMENT.  FORWARD-LOOKING STATEMENTS ARE OFTEN CHARACTERIZED BY THE USE OF WORDS SUCH AS "BELIEVES," "ESTIMATES," "EXPECTS," "PROJECTS," "MAY," "INTENDS," PLANS" OR "ANTICIPATES" OR BY DISCUSSIONS OF STRATEGY, PLANS OR INTENTIONS.  ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTOR SPEAK ONLY AS OF THE DATE THEY WERE MADE AND THE DEBTOR DOES NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE ANY SUCH FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN OR THEREIN WILL NOT BE REALIZED. EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED

IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES OR INTERNATIONAL FINANCIAL REPORTING STANDARDS.

**THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

# I.
# INTRODUCTION

## A.    General

On December 29, 2015 (the "<u>Petition Date</u>"), KaloBios Pharmaceuticals, Inc. ("<u>KaloBios</u>" or the "<u>Debtor</u>") filed a petition for relief under chapter 11 ("<u>Chapter 11</u>") of title 11 of the United States Code, 11 U.S.C. §§ 101–1532, (as amended, the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>" or "<u>Court</u>").

On April 7, 2016, the Debtor filed its proposed Debtor's Plan of Reorganization (as it may be supplemented or amended, the "<u>Plan</u>"), which sets forth the manner in which Claims against, and Interests in, the Debtor will be treated.[2]  This disclosure statement, dated April 7, 2016 (as it may be supplemented or amended, the "<u>Disclosure Statement</u>"), describes certain aspects of the Plan and the Debtor's business.

After detailed and careful consideration of the Debtor's business and its prospects as a going concern, the Debtor, in consultation with its legal and financial advisers, concluded that recoveries to creditors will be maximized by implementing the Plan.  Pursuant to the Plan, the company will continue to operate as a reorganized company (the "<u>Reorganized Debtor</u>").  The Debtor believes that the creditors and stockholders of the Debtor will receive more value through the continuation of the Reorganized Debtor as a going concern than they would receive upon liquidation of the Debtor.

The key components of the Plan include:

<u>Unclassified Claims</u>

- Payment in full of all Allowed Administrative Claims, Fee Claims, Priority Tax Claims, Other Priority Claims, DIP Facility Claim, and U.S. Trustee Fees on the Effective Date of the Plan.

<u>Classified Claims</u>

1. *Secured Claims*

- Unless otherwise agreed by the Holder of an Allowed Secured Claim and the Debtor, each Allowed Secured Claim will be reinstated pursuant to section 1124 of the Bankruptcy Code or will receive such other treatment as is necessary to render such Allowed Secured Claim Unimpaired under section 1124 of the Bankruptcy Code.

2. *General Unsecured Claims*

---

[2]    Unless otherwise indicated, capitalized terms not defined herein are defined in the Plan.

- Each Holder of Allowed General Unsecured Claims will receive, at its election, either (i) <u>All Cash Election</u>: Its pro rata share of Cash from the All Cash GUC Fund in an amount not to exceed [50% - 75%] of the Allowed amount of such Allowed General Unsecured Claim; *provided, however,* if the Cash available from the All Cash GUC Fund is insufficient to provide all Holders of Allowed General Unsecured Claims that make the All Cash Election a pro rata distribution of Cash equal to at least [XX%] of the Allowed amount of their respective Allowed General Unsecured Claims, then each such Holder of an Allowed General Unsecured Claim that makes the All Cash Election shall be entitled to receive, in addition to its ratable share of such Cash as is available from the All Cash GUC Fund, a Company Note in an original principal amount sufficient to allow each such Holder of an Allowed General Unsecured Claim that has made the All Cash Election an aggregate distribution of Cash from the All Cash GUC Fund and the Company Note equal to [XX%] of the Allowed amount of such Allowed General Unsecured Claim; or <u>Mixed Consideration Election</u>: Its pro rata share of Cash from the Mixed Consideration GUC Fund equal to not greater than [33%] of the Allowed amount of such Allowed General Unsecured Claim, *plus* the Company Note in the original principal amount equal to the remaining Allowed amount of such Allowed General Unsecured Claim.

3. *Convenience Class Claims*

- Holders of Allowed Convenience Class Claims will receive Cash on the later of the Effective Date or the first reasonably practicable Distribution Date after such Claim becomes an Allowed Convenience Class Claim in an amount equal to the Allowed amount of such Convenience Class Claim.

4. *PIPE Claims*

- If Class 4 Accepts the Plan, each Holder of a PIPE Claim that has Accepted the Plan will be Allowed and will receive in full and final satisfaction of such PIPE Claim (i) its pro rata share of [163,314] shares of Remaining New Common Stock and (ii) reimbursement of reasonable, documented attorneys' fees incurred in connection with the PIPE Litigation up $250,000 in the aggregate among all Holders of PIPE Claims that have accepted the Plan. The pro rata share of Remaining New Common Stock allocated to each Holder of an Allowed PIPE Claim shall be determined by reference to the allocation of shares purchased in the PIPE Transaction (e.g., a Holder of a PIPE Claim that acquired 5% of the shares of common stock issued in the PIPE Transaction shall receive 5% of the Remaining New Common Stock allocated to Class 4).

- If Class 4 rejects the Plan, each PIPE Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the PIPE Litigation and/or the procedures for resolving Disputed Claims described in Article VII of the Plan. All PIPE Claims will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code. The Holder of any PIPE Claim that becomes an Allowed PIPE Claim will receive, on account of and in full and final satisfaction of such Allowed PIPE Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Allowed

2

PIPE Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock.

- To the extent that any PIPE Claims are determined by Final Order not to be subject to subordination, each such PIPE Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the PIPE Litigation and/or the procedures for resolving Claims described in Article VII of the Plan.  If such a PIPE Claim becomes an Allowed PIPE Claim, such Allowed PIPE Claim shall receive on account of and in full and final satisfaction of such Allowed PIPE Claim, shares of Remaining New Common Stock of a value, as of the date Allowed, equal to the Allowed amount of such PIPE Claim.

5.  *IAC Claims*

- All IAC Claims in Class 5 will be disallowed permanently and for all purposes under the Plan pursuant to section 502(e)(1) of the Bankruptcy Code.  To the extent, however, any IAC Claim is also an Other Subordinated Claim and becomes an Allowed Claim, it shall be deemed an Allowed Other Subordinated Claim and shall receive that treatment provided for Allowed Other Subordinated Claims in Class 7 below.

6.  *Class Action Claim*

- If Class 6 Accepts the Plan, [TBD]

- If Class 6 rejects the Plan, the Class Action Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the Securities Litigation and/or the procedures for resolving Disputed Claims described in Article VII of the Plan.  To the extent Allowed, the Class Action Claim will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  If Allowed, the Class Action Claim will receive, on account of and in full and final satisfaction of such Allowed Class Action Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Allowed Class Action Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock.

7.  *Other Subordinated Claims*

- Other Subordinated Claims are Disputed, and to the extent Allowed, all Other Subordinated Claims will be subordinated to the level of the Debtor's common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  The Holder of any Other Subordinated Claim that becomes an Allowed Other Subordinated Claim will receive, on account of and in full and final satisfaction of such Other Subordinated Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Other Subordinated Claim as a percentage of the

total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock.

8. *Existing Common Stock*

- Existing Common Stock, other than Class 9 Common Stock, is Unimpaired.  All Holders of Allowed Existing Common Stock shall retain such Existing Common Stock under the Plan.

9. *Class 9 Common Stock*

- The Holder of Class 9 Common Stock will receive at his election (i) subject to the Holder of Class 9 Common Stock executing the Class 9 Stockholder Agreement in a form satisfactory to the Debtor and Accepting the Plan, Existing Common Stock in Class 9 will be Allowed and will retain, on account of and in full and final satisfaction of such Class 9 Common Stock, a pro rata share of Existing Common Stock, determined by the amount of such Existing Common Stock as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock; or (ii) if the Holder of Class 9 Common Stock does not execute the Class 9 Stockholder Agreement and Accept the Plan, the Class 9 Common Stock will be Disputed and subject to disallowance, subordination, setoff, recoupment, and any and all claims, causes of actions, defenses, and rights of the Debtor, including, without limitation, injunctive relief.

Exit Financing

- Subject to higher and better offers, the Reorganized Debtor's entry into the Exit Facility with the Stalking Horse on the Effective Date, consisting of the $11 million in equity financing that will provide the Reorganized Debtor with the funding necessary to satisfy the Plan's cash payment obligations and the expenses associated with closing the Exit Facility, certain milestone payments to Savant in connection with the Savant Transaction, and working capital to finance the Reorganized Debtor's ongoing operations and capital needs following the emergence from Chapter 11.

- Subject to higher and better offers, the Stalking Horse will receive 5,885,000 shares of Primary Plan Sponsor New Common Stock in the Reorganized Debtor based upon current outstanding shares of 4,451,000 on a fully anti-dilution basis.

- If the Stalking Horse funds the Exit Facility, conversion of the DIP Facility in the principal amount of approximately $3 million into 1,960,571 shares of Primary Plan Sponsor New Common Stock; *or*, if the Stalking Horse does not fund the Exit Facility, repayment of the DIP Facility in Cash or in shares of Primary Plan Sponsor New Common Stock at the Stalking Horse's election.

This Disclosure Statement is being distributed pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against, and Interests in, the Debtor entitled to vote on the Plan in

4

connection with (i) the solicitation of Acceptances of the Debtor's Plan and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled for [June __], 2016, at [__:_0 _.m.], prevailing Eastern Time. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [____ __], 2016 at [__:_0 _.m.], prevailing Eastern Time (the "Objection Deadline").

A Ballot for voting to Accept or reject the Plan may be provided with this Disclosure Statement for the Holders of Claims and Interests that are entitled to vote to Accept or reject the Plan. If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call the Debtor's voting agent, Prime Clerk (the "Voting Agent"), at (844) 241-2770 or contact Prime Clerk by email at kalobiosinfo@primeclerk.com.

To obtain additional copies of the Plan and/or the Disclosure Statement, please visit the Debtor's restructuring website at https://cases.primeclerk.com/kalobios/. Alternatively, copies are available for review at the Office of the Clerk, United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, DE 19801, or upon written request to the Voting Agent.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The order that approved the Disclosure Statement sets forth in detail the deadlines, procedures and instructions for voting to Accept or reject the Plan and for filing objections to confirmation of the Plan, the Voting Record Date (defined below) and the applicable standards for tabulating the Ballots. Each Holder of a Claim entitled to vote on the Plan should read in their entirety this Disclosure Statement (including the Exhibits attached hereto), the Plan and the instructions accompanying the Ballots before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes to Accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

### B.    Holders of Claims and Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or Interests in Classes of Claims or Interests that are Impaired and that are not deemed to have rejected the Plan are entitled to vote to Accept or reject the Plan. A Claim or Interest is Impaired

under the Plan if the Holder's legal, equitable or contractual rights are altered under the Plan. Classes of Claims or Interests in which the Holders of Claims or Interests are Unimpaired are deemed to have Accepted the Plan and are not entitled to vote to Accept or reject the Plan.

The Plan places Claims against, and Interests in, the Debtor into the Classes set out in the following table, which also indicates whether a Class of Claims or Interests is Impaired or Unimpaired under the Plan and whether such Class is entitled to vote to Accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Secured Claims | Unimpaired | Presumed to Accept |
| 2 | General Unsecured Claims | Impaired | Entitled to Vote |
| 3 | Convenience Class Claims | Impaired | Entitled to Vote |
| 4 | PIPE Claims | Impaired | Entitled to Vote |
| 5 | IAC Claims | Impaired | Entitled to Vote |
| 6 | Class Action Claim | Impaired | Entitled to Vote |
| 7 | Other Subordinated Claims | Impaired | Entitled to Vote |
| 8 | Existing Common Stock | Unimpaired | Presumed to Accept |
| 9 | Class 9 Common Stock | Impaired | Entitled to Vote |

For a detailed description of the requirements for Confirmation of the Plan or more information on the Impairment and Unimpairment of Claims and Interests, see Article VII below.

### C.    Treatment of Claims and Interests

The following table summarizes the treatment of Claims and Interests in Classes under the Plan.  The summary is qualified in its entirety by the terms of the Plan, which you should consult for additional detail concerning the classification and treatment of your Claim or Interest.

| SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claims or Interests in Class | Treatment of Claims or Interests in Class | Projected Amount of Claims or Interests | Projected Recovery |

| | | SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| 1 | Secured Claims | Unless otherwise agreed by the Holder of an Allowed Secured Claim and the Debtor, each Allowed Secured Claim will be reinstated pursuant to section 1124 of the Bankruptcy Code or will receive such other treatment as is necessary to render such Allowed Secured Claim Unimpaired under section 1124 of the Bankruptcy Code. | $50,000 | 100% |
| 2 | General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed General Unsecured Claim, at its election, either:<br><br>(1) All Cash Election: Its pro rata share of Cash from the All Cash GUC Fund in an amount not to exceed [50% - 75%] of the Allowed amount of such Allowed General Unsecured Claim; *provided, however,* if the Cash available from the All Cash GUC Fund is insufficient to provide all Holders of Allowed General Unsecured Claims that make the All Cash Election a pro rata distribution of Cash equal to at least [XX%] of the Allowed amount of their respective Allowed General Unsecured Claims, then each such Holder of an Allowed General Unsecured Claim that makes the All Cash Election shall be entitled to receive, in addition to its ratable share of such Cash as is available from the All Cash GUC Fund, a Company Note in an original principal amount sufficient to allow each such Holder of an Allowed General Unsecured Claim that has made the All Cash Election an aggregate distribution of | [$2.8–5 million] | [50-100%] |

| SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| | | Cash from the All Cash GUC Fund and the Company Note equal to [XX%] of the Allowed amount of such Allowed General Unsecured Claim; <br><br> *or* <br><br> (2) Mixed Consideration Election: Its pro rata share of Cash from the Mixed Consideration GUC Fund equal to not greater than [33%] of the Allowed amount of such Allowed General Unsecured Claim, *plus* the Company Note in the original principal amount equal to the remaining Allowed amount of such Allowed General Unsecured Claim. | | |
| 3 | Convenience Class Claims | Each Holder of an Allowed Convenience Class Claim will receive Cash on the later of the Effective Date or the first reasonably practicable Distribution Date after such Claim becomes an Allowed Convenience Class Claim in an amount equal to the Allowed amount of such Convenience Class Claim. | [$  ] | [100%] |
| 4 | PIPE Claims | Each Holder of an Allowed PIPE Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed PIPE Claim, either: <br><br> (1) If Class 4 Accepts the Plan, each Holder of a PIPE Claim that has Accepted the Plan will be Allowed and will receive in full and final satisfaction of such PIPE Claim (i) its pro rata share of [163,314] shares of Remaining New Common Stock and (ii) reimbursement of reasonable, documented attorneys' fees incurred in connection with the PIPE | [$0-8.2 million] | [  ] |

| | | SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| | | Litigation up $250,000 in the aggregate among all Holders of PIPE Claims that have accepted the Plan.  The pro rata share of Remaining New Common Stock allocated to each Holder of an Allowed PIPE Claim shall be determined by reference to the allocation of shares purchased in the PIPE Transaction (e.g., a Holder of a PIPE Claim that acquired 5% of the shares of common stock issued in the PIPE Transaction shall receive 5% of the Remaining New Common Stock allocated to Class 4);<br><br>***or***<br><br>(2) If Class 4 rejects the Plan, each PIPE Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the PIPE Litigation and/or the procedures for resolving Claims described in Article VII of the Plan.  All PIPE Claims will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  The Holder of any PIPE Claim that becomes an Allowed PIPE Claim will receive, on account of and in full and final satisfaction of such Allowed PIPE Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Allowed PIPE Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock; | | |

| | | SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| | | **_or_** <br><br> (3) To the extent that any PIPE Claims are determined by Final Order not to be subject to subordination, each such PIPE Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the PIPE Litigation and/or the procedures for resolving Claims described in Article VII of the Plan. If such a PIPE Claim becomes an Allowed PIPE Claim, such Allowed PIPE Claim shall receive on account of and in full and final satisfaction of such Allowed PIPE Claim, shares of Remaining New Common Stock of a value, as of the date Allowed, equal to the Allowed amount of such PIPE Claim. | | |
| 5 | IAC Claims | All IAC Claims in Class 5 will be disallowed permanently and for all purposes under the Plan pursuant to section 502(e)(1) of the Bankruptcy Code. To the extent, however, any IAC Claim is also an Other Subordinated Claim and becomes an Allowed Claim, it shall be deemed an Allowed Other Subordinated Claim and shall receive that treatment provided for Allowed Other Subordinated Claims in Class 7 below. | [$ ] | [ ] |

| SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| 6 | Class Action Claim | Each Holder of an Allowed Class Action Claim shall receive, in full satisfaction, settlement, discharge and release of, its Allowed Class 6 Claim, either:<br><br>    (1) [TBD];<br><br>    *or*<br><br>    (2) If Class 6 rejects the Plan, the Class Action Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the Securities Litigation and/or the procedures for resolving Claims described in Article VII of the Plan.  To the extent Allowed, the Class Action Claim will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  If Allowed, the Class Action Claim will receive, on account of and in full and final satisfaction of such Allowed Class Action Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Allowed Class Action Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock. | [$0-20 million] | [ ] |

| SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| 7 | Other Subordinated Claims | All Other Subordinated Claims in Class 7 are Disputed.  To the extent Allowed, all Other Subordinated Claims will be subordinated to the level of the Debtor's common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  The Holder of any Other Subordinated Claim that becomes an Allowed Other Subordinated Claim will receive, on account of and in full and final satisfaction of such Other Subordinated Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Other Subordinated Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock. | [ ] | [ ] |
| 8 | Existing Common Stock | Existing Common Stock in Class 8 is unaffected by the Plan.  All Holders of Allowed Existing Common Stock shall retain such Existing Common Stock under the Plan. | [2,375,994] shares | [100%] |

| | SUMMARY OF TREATMENT AND EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| *Class* | *Claims or Interests in Class* | *Treatment of Claims or Interests in Class* | *Projected Amount of Claims or Interests* | *Projected Recovery* |
| 9 | Class 9 Common Stock | (1) Subject to the Holder of Class 9 Common Stock executing the Class 9 Stockholder Agreement in a form satisfactory to the Debtor and Accepting the Plan, Class 9 Common Stock in Class 9 will be Allowed and will retain, on account of and in full and final satisfaction of such Existing Common Stock, a pro rata share of Existing Common Stock, determined by the amount of such Existing Common Stock as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock; <br><br> ***or*** <br><br> (2) if the Holder of Class 9 Common Stock does not execute the Class 9 Stockholder Agreement and Accept the Plan, the Class 9 Common Stock will be Disputed and subject to disallowance, subordination, setoff, recoupment, and any and all claims, causes of actions, defenses, and rights of the Debtor, including, without limitation, injunctive relief. | [2,075,000] shares | [100%] |

### D.    Voting Procedures

If you are entitled to vote to Accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims and/or Interests in different Classes that are each entitled to vote, you will receive separate Ballots that must be used for each separate type of Claim and/or Interest. Please vote and return your Ballot(s) by mail. **FACSIMILE BALLOTS WILL NOT BE ACCEPTED. For more information, please refer to the approved voting procedures in the order approving this Disclosure Statement (the "Disclosure Statement Order").**

**If you received a Ballot from a broker, bank or other institution, you must return such completed Ballot to such broker, bank or other institution promptly so that it can be forwarded to the Voting Agent so it is received on or before the Voting Deadline. If you received a Ballot from the Debtor, please send such completed Ballot directly to the Voting Agent so it is <u>actually received</u> on or before the Voting Deadline. All Ballots sent to the Voting Agent should be sent by U.S. mail, overnight courier or hand delivery to the following address:**

> KaloBios Pharmaceuticals, Inc. Ballot Processing Center
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022

DO NOT RETURN ANY INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

TO BE COUNTED, YOUR BALLOT(S) INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE PROPERLY COMPLETED, EXECUTED, MARKED AND <u>ACTUALLY RECEIVED</u> BY THE VOTING AGENT NO LATER THAN [__]:00 P.M. PREVAILING EASTERN TIME [_____ __], 2016 UNLESS EXTENDED BY THE DEBTOR. ALL BALLOTS MUST BE SIGNED.

The Bankruptcy Court set a date of [_____ ___], 2016, as the record date (the "<u>Voting Record Date</u>") for voting on the Plan. Accordingly, only Holders of record as of the Voting Record Date or otherwise entitled to vote under the Plan, are entitled to receive a Ballot and may vote on the Plan.

### E.    Confirmation Hearing

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan for [June __], 2016 at [__:_0 _.m.], prevailing Eastern Time, before the Honorable Laurie Selber Silverstein, United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, DE 19801. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before [____ __], 2016 at [__]:00 p.m., prevailing Eastern Time, in the manner described below in Section VIII.B. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND INTEREST HOLDERS. THE DEBTOR URGES CREDITORS AND INTEREST HOLDERS TO VOTE TO ACCEPT THE PLAN.

### F.    Projected Financial Information

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Consequently, actual events, circumstances, effects and results may vary significantly from those included in, or contemplated by, such projected financial information and such other forward-looking statements.  The projected financial information contained herein and in the Exhibits annexed hereto is, therefore, not necessarily indicative of the future financial condition or results of operations of the Reorganized Debtor, which in each case may vary significantly from those set forth in such projected financial information.  Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by the Debtor, its advisors or any Person that the projected financial condition or results of operations can or will be achieved.

## II.
## BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 FILING

### A.    Overview

KaloBios is a publicly traded biopharmaceutical development company that prior to the Chapter 11 Case focused on discovery, development, and commercialization of primarily oncology drugs for the treatment of cancer by innovative therapies through its Humaneered® monoclonal antibodies.  As a small company, KaloBios also pursues strategic alliances with organizations that share its commitment to advancing its Humaneered® monoclonal antibodies so that patients may benefit from these medicines.

### B.    KaloBios's Business and Employees

#### 1.    *KB003 and KB004*

KaloBios focuses on researching potential treatments for certain cancers and other diseases, and performing related clinical trials approved by the U.S. Food and Drug Administration ("FDA") and other health regulatory agencies.  Prior to filing for bankruptcy, KaloBios was studying two Humaneered® monoclonal antibodies: KB004 (anti-EphA3) and KB003 (anti-GM-CSF).

(a)    KB004

KB004 targets hematologic malignancies, which are tumors affecting blood, bone marrow and the lymphatic system, as well as tumors affecting solid organs.  KB004 has the potential to selectively attack tumors at the source by targeting tumor stem cells, the microenvironment that protects the tumors and the vasculature that feeds them without harming normal cells.  KaloBios was conducting a Phase 1/2 study of KB004, but wound down Phase 2 due to its restructuring efforts and the filing of the Chapter 11 Case.  Phase 1 of the KB004 study, however, was completed, and the data that was presented at the 2014 American Society of Hematology Annual Meeting showed that KB004 is well tolerated and has promising clinical activity.  As a result of the Phase 1 trial, an acute myeloid leukemia patient experienced a

complete response with incomplete platelet recovery with a "complete response" in a clinical trial being "associated with less infection, bleeding and blood product support." Two other patients demonstrated clinical improvements, defined by international guidelines as "improvement in survival, improvement in a patient's quality of life, improved physical functioning, or improved tumor-related symptoms."

(b)    KB003

KaloBios is currently investigating KB003, also known as lenzilumab, in Chronic Myelomonocytic Leukemia ("CMML"). KaloBios was readying its clinical trial of KB003 for the CMML indication in the weeks leading up to its bankruptcy filing, and was to begin dosing a leukemia patient with KB003 in the week prior to the Petition Date. Unfortunately, the events that led to the bankruptcy filing also delayed the start of the KB003 trial.

Nevertheless, the KB003 trial remains ready to begin, with dosing available for up to 18 adult patients. This trial is critical to KaloBios's business because KB003 is among the KaloBios's most valuable assets due to the current limited treatment options for CMML. KaloBios believes that indications of clinical promise from this trial—even before the trial is complete—will create significant value for the Estate and stakeholders. Most importantly, KB003 has the potential to improve and prolong patients' lives.

(c)    KB003 and Juvenile Myelomonocytic Leukemia

While the currently approved KB003 trial is for treatment of CMML in adults, study of KB003 indicates that it could also be a successful treatment for Juvenile Myelomonocytic Leukemia ("JMML"). If the adult KB003 trial is successful, or as a modified adult trial that may allow a cohort of JMML patients, KaloBios intends to pursue a pediatric or juvenile KB003 study. As an incentive to biopharmaceutical companies to research rare pediatric diseases, the FDA has established a priority review voucher program for rare pediatric diseases. Under this program, if a drug is approved as a potential treatment for a "rare pediatric disease," then the drug's sponsor may receive a priority review voucher (a "PRV"), which entitles the holder to an expedited priority six-month review of either that drug or a subsequent drug. After issuance, the PRV is freely transferable, including for monetary consideration, prior to its redemption. Considering that the ordinary FDA drug approval process can take 10 months to years in some instances, a six-month guaranteed priority review can have significant practical and economic value because it allows the PRV holder to potentially bring a drug to market much more quickly than normal.

KaloBios believes that JMML is a "rare pediatric disease" as defined by the FDA. Thus, KaloBios plans to proceed with research of KB003 as a treatment for juveniles suffering from JMML. Again, if early indications for KB003 as a treatment for CMML are positive, KaloBios believes there is a strong possibility that KB003 will also benefit JMML and that KaloBios will receive FDA approval for KB003 use in juveniles. In addition to developing potentially life-changing or life-prolonging disease treatments, KaloBios's development of KB003 could result in KaloBios receiving a valuable PRV.

2.    *KaloBios's Corporate Headquarters*

16

KaloBios's principal research, development and administrative facilities were located at its corporate headquarters in San Francisco, California. KaloBios now maintains offices at 1000 Marina Blvd, Suite 250, Brisbane, CA 94005.

### 3.    *KaloBios's Employees*

As of the Petition Date, KaloBios had approximately eight employees: six clinical research and development employees, one drug safety employee and one human resource employee. During the pendency of the Chapter 11 Case, one employee left for alternate employment and another employee left by mutual agreement with KaloBios. Additionally, a former clinical research and development employee, Morgan Lam, was promoted to Chief Operating Officer.

### 4.    *KaloBios Common Stock*

As of the Petition Date, there were approximately 4,451,000 shares of common stock in KaloBios issued and outstanding. KaloBios's stock was traded on the NASDAQ Stock Market under the ticker symbol "KBIO" prior to NASDAQ halting trading on December 17, 2015. After the Petition Date, on or about January 13, 2016, KaloBios's common stock resumed trading over the counter under the ticker symbol "KBIOQ."

## C.    **Summary of Events Leading to the Chapter 11 Filing**

### 1.    *Challenges Faced by KaloBios and Restructuring Efforts*

On or about November 9, 2015, KaloBios announced that the Board of Directors had approved a restructuring plan that would reduce the company's workforce by 17 employees, or 61% of the entire workforce, as part of an effort to reduce operating costs. The restructuring plan also focused the company's efforts on the ongoing development of KB003 or lenzilumab, in CMML, while pausing enrollment in Phase 2 of a clinical study of KB004. Additionally as part of the restructuring, the company announced its intent to repay its outstanding secured loan obligation of approximately $6.6 million to MidCap Financial, which was intended to generate cash savings compared to repaying the debt in the ordinary course of business. Lastly, the restructuring plan provided that the company would pursue strategic alternatives, such as a potential sale of the company or its assets, a corporate acquisition or further restructuring efforts such as a wind-down of operations or bankruptcy.

On or about November 13, 2015, KaloBios announced that after discussions of various strategic alternatives, the company concluded that it was highly unlikely that any discussions would generate a viable transaction within the time frame allowed by the company's limited cash resources. Therefore, the company announced that it was discontinuing studies of KB003 and KB004 and that it had repaid in its entirety its secured loan with MidCap Financial. The company also engaged The Brenner Group to assist in the wind-down of operations and liquidation of the company's assets.

### 2.    *Investment by Martin Shkreli and Certain Other Parties*

On or about November 18, 2015, KaloBios announced that an investor group comprising Martin Shkreli and others acquired more than 50% of the outstanding shares of KaloBios in open market transactions and that there were discussions between the Board and Mr. Shkreli to stop the wind-down and return KaloBios to operations. By November 19, 2015, Mr. Shkreli and others had acquired approximately 70% of outstanding shares in KaloBios. Mr. Shkreli was appointed Chief Executive Officer and Chairman of the Board. The former directors of KaloBios subsequently resigned, effective immediately, and David Moradi, Tony Chase and Marek Biestek were appointed to the Board of Directors. Additionally, on November 19, 2015, it was announced that KaloBios had received a commitment from Mr. Shkreli and other investors for an equity investment of at least $3.0 million. In addition, it was announced that Mr. Shkreli and the group of investors had committed to a $10 million equity financing facility, subject to applicable shareholder approval.

3.     *Prepetition Non-Binding LOI with Savant Neglected Diseases to Purchase the Rights to Benznidazole for the Treatment of Chagas Disease*

On December 3, 2015, KaloBios announced that it had entered into a non-binding letter of intent with Savant Neglected Diseases, LLC ("Savant") to acquire the rights to the benznidazole program for the treatment of Chagas Disease. Chagas Disease is caused by a parasite transmitted by insects. According to the United States Centers for Disease Control and Prevention ("CDC"), an estimated 300,000 people in the United States are afflicted by Chagas Disease but there are currently no FDA-approved treatments for the disease in the United States. Due to its lower occurrence rate in the United States and lack of treatment options, it is classified by the World Health Organization ("WHO") and the FDA as a neglected tropical disease. Because of its neglected status, and the FDA's efforts to incentivize treatments for rare diseases, Chagas Disease was listed by the FDA on August 20, 2015 as a "neglected tropical disease" potentially eligible for a neglected tropical disease priority review voucher ("PRV"). The neglected tropical disease PRV program has been in operation since 2007 and a similar program for rare pediatric diseases has been in operation since 2012.

A PRV is a voucher that entitles the holder to a priority review of a human drug application of the voucher holder's choosing. Once awarded, the original holder may exercise or sell the PRV. A PRV is highly valuable because of the importance to pharmaceutical companies of receiving an expedited priority review of a new drug. Therefore, benznidazole may receive an expedited, priority review time of six months by the FDA because of its neglected tropical disease classification, and if approved, KaloBios may receive a valuable PRV.

4.     *PIPE Transaction*

In a filing with the SEC on December 9, 2015, KaloBios announced that it had entered a Securities Purchase Agreement with certain investors for the purchase and sale of the Debtor's common stock in a private placement in public equity transaction (the "PIPE Transaction"). In a subsequent filing with the SEC on December 16, 2015, KaloBios announced that it had entered into an amendment to the Securities Purchase Agreement on December 15, 2015, pursuant to which the per share price was adjusted to $24.85 for investors other than persons who were officers, directors, employees or consultants of KaloBios, the number of shares was reduced to 350,224 and the aggregate purchase price of the PIPE was adjusted to $8,818,000.

KaloBios believes that the PIPE Transaction closed on December 16, 2015, and the company received approximately $8.2 million in proceeds. As described in more detail below, certain of the PIPE Investors have filed a lawsuit against KaloBios alleging, among other things, that the PIPE Transaction did not close and have demanded return of the money they invested.

5.    *Indictment and Arrest of then-CEO, Martin Shkreli*

On December 17, 2015, Mr. Shkreli was arrested following a federal indictment, charging him with multiple counts of securities fraud, securities fraud conspiracy, and wire fraud conspiracy. According to the U.S. Department of Justice's press release announcing the indictment, the indictment relates to Mr. Shkreli's tenure as CEO of Retrophin, Inc., a biopharmaceutical company that trades under the ticker symbol RTRX, and as founder and managing member of hedge funds MSMB Capital Management LP (MSMB Capital) and MSMB Healthcare Management LP (MSMB Healthcare).

Mr. Shkreli was terminated as CEO of KaloBios and resigned from the Board of Directors on December 17, 2015, after serving in those capacities for less than one month. In addition, on December 17, 2015, Tony Chase resigned from the Board of Directors. Also, in a filing with the SEC on December 23, 2015, KaloBios announced that its independent registered public accounting firm, Marcum LLP, resigned, and its Interim Chief Financial Officer, Christopher Thorn, submitted his resignation. On December 28, 2015, KaloBios announced that Tom Fernandez and Marek Biestek resigned as members of the Board of Directors of KaloBios on December 27, 2015.

On December 17, 2015, NASDAQ halted trading in KaloBios stock. As of the date hereof, trading on NASDAQ has not resumed. On December 18, 2015, KaloBios received a letter from NASDAQ indicating that NASDAQ intended to delist KaloBios's securities under its discretionary authority. NASDAQ cited number of reasons for its decision, including, among other things, the recent criminal indictment and arrest of Mr. Shkreli.

**D.    Summary of Material Pre-Petition Legal Proceedings**

1.    *Federal Securities Class Action Litigations*

On December 18, 2015, a putative class action lawsuit under federal securities laws was filed in the Northern District of California against KaloBios, Mr. Shkreli, and a former director of KaloBios. The lawsuit, captioned *Li v. KaloBios Pharmaceuticals, Inc. et al.*, Case No. 15-cv-05841-EJD, asserts a claim for compensatory damages relating to KaloBios's alleged false and misleading statements regarding material adverse facts about the KaloBios's business, operations and prospects. Specifically, the plaintiff alleges that KaloBios and the other named defendants failed to disclose that (i) Mr. Shkreli was engaged in a scheme involving the illegal use of stock from his prior company to pay off debts associated with an unrelated business venture, (ii) that the discovery and revelation of the scheme would likely undermine the company's operations and prospects, and (iii) that as a result, the company's statements about its business, operations and prospects were false and misleading or without a reasonable basis. The suit further claims that as a result of these alleged false and misleading statements, the price of KaloBios's stock sharply declined and caused the class shareholders, who purchased KaloBios

stock between November 19, 2015, and December 17, 2015, to suffer significant losses and damages.

On December 23, 2015, a second putative class action lawsuit under federal securities laws was filed in the Northern District of California against KaloBios and Mr. Shkreli, captioned *Sciabacucchi v. KaloBios Pharmaceuticals, Inc. et al.*, Case No. 15-cv-05992-CRB. Similar to the *Li* suit, the lawsuit asserts a claim for compensatory damages relating to KaloBios's and Mr. Shkreli's alleged false and misleading statements regarding material adverse facts about the company's business, operations and prospects by allegedly failing to disclose that (i) Mr. Shkreli was under federal criminal investigation, (ii) that Mr. Shkreli was engaged in a scheme involving the illegal use of stock from his prior company to pay off debts associated with an unrelated business venture, (iii) that the discovery and revelation of the scheme would likely undermine the company's operations and prospects, and (iv) as a result, KaloBios's and Mr. Shkreli's statements about the company's business, operations and prospects were materially false and misleading at the relevant times and led the class shareholders, purchasers of KaloBios stock between November 19, 2015, and December 17, 2015, to suffer significant losses and damages after the price of KaloBios's stock sharply declined following the indictment of Mr. Shkreli. On March 21, 2016, the *Sciabacucchi* suit was administratively closed by court order due to KaloBios's bankruptcy. The administrative closure is not a dismissal or disposition of the *Sciabacucchi* suit and further proceedings may occur.

On December 31, 2015, a third putative class action lawsuit under federal securities laws was filed in the Northern District of California against KaloBios, Mr. Shkreli and a former officer of KaloBios, captioned *Isensee v. KaloBios Pharmaceuticals, Inc. et al.*, Case No. 15-cv-06331-EJD. The suit was filed in violation of the automatic stay imposed by section 362 of the Bankruptcy Code. Thus the plaintiff voluntarily withdrew the suit as to KaloBios on January 5, 2016.

On February 16, 2016, five motions to consolidate the *Li*, *Sciabacucchi*, and *Isensee* suits were filed, along with motions to appoint a lead plaintiff and approve legal counsel. Between February 29, 2016, and March 1, 2016, four of the competing movants withdrew their motions to appoint a lead plaintiff and approve legal counsel or filed notices of non-opposition to the competing motions. On March 30, 2016, the movants, Kaniz Fatema, Zeke Ingram, Bhaskar R. Gudlavenkatasiva, and Abuhena M. Saifulislam, filed an unopposed administrative motion to reset the hearing date on their now-unopposed motion to consolidate, appoint a lead plaintiff and approve legal counsel. The movants requested a hearing date of April 7, 2016, or the earliest possible date, and cited KaloBios's Chapter 11 Case as a reason to hold the consolidation hearing as soon as possible.

As mentioned above, a consequence of the bankruptcy filing is that all pending litigation against the Debtor was stayed automatically by section 362 of the Bankruptcy Code and, absent further order of the Bankruptcy Court, no party may take any action in any such litigation to recover on prepetition Claims against the Debtor.

## III.
## THE CHAPTER 11 CASE

### A.    Commencement of the Chapter 11 Case

As set forth above, on the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  Since the Petition Date, the Debtor has continued to operate its business as debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    Emergency *Ex Parte* Employee Wage Motion

On the Petition Date, the Debtor filed an emergency *ex parte* employee wage motion [Docket No. 2] requesting authority to pay its employees prepetition compensation and expenses. The Court held an emergency hearing related to the motion on December 30, 2015.  After confirming that none of the compensation or expenses would be paid to Martin Shkreli or his associates or relatives, the Bankruptcy Court entered an order [Docket No. 6] on December 30, 2015, approving the motion.

### C.    "First Day" Motions and Related Applications

Between January 8, 2016, and January 12, 2016, the Debtor filed a number of "first-day" motions and applications designed to ease the Debtor's transition into Chapter 11, maximize the Debtor's assets and minimize the effects of the commencement of the Chapter 11 Case.[3]  On January 12, 2016, the Bankruptcy Court entered orders providing various first-day relief, including:

(a)    authorizing and approving continued use of existing cash management system; maintenance of existing bank accounts; continued use of existing business forms; an extension of time to comply with section 345 and related relief [Docket No. 18];

(b)    prohibiting utility companies from altering, refusing or discontinuing service; deeming utilities adequately assured of future performance; and establishing procedures for determining adequate assurance of payment (final order entered February 4, 2016) [Docket No. 145];

(c)    authorizing continuation of employee programs and payment of certain related prepetition claims [Docket No. 43];

(d)    authorizing the Debtor to (i) honor prepetition obligations to certain critical vendors and (ii) granting related relief (final order entered February 4, 2016) [Docket No. 147].

---

[3]    In addition to the "first-day" motions, the Debtor filed certain other motions that are described more fully herein.

21

D.    **Retention of Professionals**

1.    *Retention of Debtor's Professionals*

By order entered February 4, 2016, the Debtor was authorized to retain Hogan Lovells US LLP as its bankruptcy counsel [Docket No. 146], and by order entered February 8, 2016, the Debtor was authorized to retain Morris, Nichols, Arsht & Tunnell LLP as Delaware bankruptcy co-counsel [Docket No. 156].  By orders entered February 12, 2016, the Debtor was authorized to retain The Brenner Group as Interim Management Service Providers [Docket No. 172] and Batuta Capital Advisors LLC as Financial Advisors [Docket No. 173].

The Debtor was also authorized to retain certain professionals utilized by the Debtor in the ordinary course of business prior to the Petition Date pursuant to an order entered by the Bankruptcy Court on February 12, 2016 [Docket No. 174].

2.    *Retention of Claims and Noticing Agent and Administrative Advisor*

By order entered on January 20, 2016 [Docket No. 79], the Bankruptcy Court authorized the Debtor to retain Prime Clerk as its claims and noticing agent in the Chapter 11 Case.  By order entered January 20, 2016 [Docket No. 80], the Bankruptcy Court also authorized the Debtor to retain Prime Clerk as its administrative advisor in the Chapter 11 Case.

E.    **Significant Events During the Chapter 11 Case**

In addition to the first-day relief sought and received in the Chapter 11 Case, other significant events that have occurred since the commencement of the Chapter 11 Case are summarized below.

1.    *Reconstitution of the Board of Directors and Officers*

On January 7, 2016, the Board of Directors elected two independent directors, Dr. Cameron Durrant and Mr. Ronald Barliant, and Michael Harrison resigned from the Board.  Dr. Durrant was also appointed as Chairman of the Board.

Dr. Durrant is a senior pharmaceutical and biotech executive, former physician and a pharma company builder and turnaround specialist.  Dr. Durrant has previously served in senior roles with blue-chip, global pharma companies and also as a board member, Chairman, CEO, as well as CFO, for both private and public specialty pharma and biotech companies.  Dr. Durrant holds a medical degree (Bachelor of Medicine, Bachelor of Surgery, which is the British equivalent to the American M.D. degree) from the Welsh National School of Medicine in Cardiff, United Kingdom.  In addition, Dr. Durrant earned a Diploma of the Royal College of Obstetricians and Gynecologists, is a member of the Royal College of General Practitioners, London, United Kingdom, and holds an M.B.A. from the Henley Management College in Oxford, United Kingdom.

Mr. Barliant, an attorney who is Of Counsel with the law firm of Goldberg Kohn Ltd. in Chicago, IL, previously served as a United States bankruptcy judge for the Northern District of Illinois from 1988 to 2002.  Mr. Barliant has also served as adjunct faculty at John Marshall

Law School and is a frequent lecturer and author on bankruptcy-related matters. Mr. Barliant holds a J.D. from Stanford University School of Law and a B.A. from Roosevelt University.

The Board learned of Mr. Barliant as a potential candidate for the Board through KaloBios's counsel. The Board learned of Dr. Durrant as a potential candidate for the Board through Martin Shkreli. It is Dr. Durrant's understanding that various vendors, including a recruiter, suggested to Mr. Shkreli that Dr. Durrant be considered as a potential candidate to serve as chief executive officer and/or a director of KaloBios.

On January 20, 2016, the Debtor filed a motion to retain and employ the Brenner Group to provide interim management services (the "Brenner Motion") [Docket No. 81]. Specifically, the Brenner Motion appointed Dean "Kip" Witter III as interim Chief Financial Officer and Caligari Lindsay as interim Controller. Mr. Witter is a seasoned financial and operating executive with over 25 years of experience with both large and small high-technology, fast-paced companies. His areas of emphasis and expertise are finance, operations, administration, and control. He has held positions as chief financial officer and chief operating officer of emerging high-tech companies. Mr. Witter holds an M.B.A. from Stanford University and a B.A. in Applied Mathematics from Harvard College. Mr. Lindsay is a seasoned finance and accounting executive with over 15 years' experience in early and mid-stage technology companies. Mr. Lindsay holds an M.B.A. from Notre Dame de Namur University and a B.A. from the University of Southern California. The Court entered an order approving the retention and employment of the Brenner Group on February 12, 2016 [Docket No. 172].

On February 1, 2016, the Board of Directors promoted Morgan Lam to the position of Chief Operating Officer of KaloBios. Mr. Lam joined the Company in 2015 as Head of Clinical Operations and Interim Development Leader. In such positions, he has supervised the Company's clinical programs and applied his extensive experience in clinical research in the pharmaceutical industry to the Company's product development. Prior to his employment with the Company, Mr. Lam served as Executive Director, Medical Affairs of Geron Corporation, a biopharmaceutical company, from May 2010 to May 2015.

On March 1, 2016, the Board of Directors appointed Dr. Durrant as Chief Executive Officer of KaloBios.

2.    *PIPE Plaintiffs Adversary Proceeding and Escrow Motion*

On January 7, 2016,[4] a group of investors to the PIPE Transaction (the "PIPE Plaintiffs") filed an adversary proceeding, captioned *Gregory Rea, RTAT LLC, Edward H. Painter, Nancy Retzlaff, Armistice Capital Master Fund, Ltd, Andrew Pizzo, and Sabine Gritti v. KaloBios Pharmaceuticals, Inc.*, Adv. Pro. No. 16-50001 (LSS), seeking to have their investment funds returned, alleging that the PIPE Transaction had not closed. Simultaneously with filing the complaint, the PIPE Plaintiffs filed a motion (the "Escrow Motion") in the bankruptcy case to escrow the funds in the Debtor's bank account [Docket No. 12]. By order entered January 7, 2016 [Docket No. 15], the Bankruptcy Court scheduled the Escrow Motion to be heard on

---

[4]    The PIPE Plaintiffs' complaint was amended on January 29, 2016 to add additional plaintiffs.

January 12, 2016.  At the January 12, 2016 hearing, the parties engaged in discussions and the PIPE Plaintiffs withdrew their Escrow Motion without prejudice.  Counsel for the PIPE Plaintiffs stated on the record that withdrawal of the Escrow Motion was based on, among other things, the fact that two of the three directors were now independent, including a former bankruptcy judge and business executive with experience in the pharmaceutical industry.  *In re KaloBios Pharmaceuticals, Inc.*, Case No. 15-12628 (LSS), Hr'g Tr. 6–9 (Jan. 15, 2016).

On February 1, 2016, the Debtor filed a motion to dismiss the adversary proceeding [Adv. Pro. Docket No. 18].  Since January 2016, the parties have been engaged in ongoing settlement negotiations.  On March 14, 2016, the parties participated in mediation.  To date the mediation has been unsuccessful.  On March 22, 2016, the PIPE Plaintiffs filed their response to the Debtor's motion to dismiss [Adv. Pro. Docket No. 27], and on March 29, 2016, the Debtor filed its reply brief in support of its motion to dismiss [Adv. Pro. Docket No. 29].  Oral argument on the motion to dismiss is currently schedule for May 24, 2016.

On April 1, 2016, the PIPE Plaintiffs filed a motion for leave to file an amended complaint, or, to the extent applicable, for relief from the automatic stay (the "Motion for Leave") [Adv. Pro. Docket No. 34].  At a status conference held on April 5, 2016, the Bankruptcy Court scheduled the Motion for Leave to be heard on April 28, 2016.

> 3.     *Denial of U.S. Trustee's Emergency Motion to Appoint a Chapter 11 Trustee or Convert the Case to Chapter 7*

On February 1, 2016, the U.S. Trustee filed an emergency motion to appoint a Chapter 11 trustee, or, in the alternative, convert the case to Chapter 7 liquidation (the "Trustee Motion") [Docket No. 106].  The Trustee Motion argued that the Debtor's management lacked historical knowledge of the company and that a Chapter 11 trustee would be the most efficient and cost-effective means for the Debtor to proceed through bankruptcy.  Alternatively, the Trustee Motion requested that the case be converted to Chapter 7 of the Bankruptcy Code.

On February 3, 2016, the Debtor filed an objection to the Trustee Motion (the "Objection") [Docket No. 133] and three supporting declarations by directors, Dr. Cameron Durrant [Docket No. 144] and Ronald Barliant [Docket No. 127], and the Debtor's financial advisor, Alexandre Zyngier [Docket No. 138].  The Objection asserted, among other things, that (1) there was no cause to appoint a Chapter 11 trustee because there was no misconduct by the Debtor's Board and the Debtor had appropriate corporate governance measures in place, and (2) it was in the best interests of the creditors, equity interest holders and other stakeholders for the Debtor to continue operating as debtor in possession because the members of the Debtor's Board of Directors have extensive experience in the biopharmaceutical industry and bankruptcy restructuring.  Additionally, the Debtor argued that there was no cause to convert the case to Chapter 7 because the Debtor had a reasonable likelihood of being rehabilitated under Chapter 11.

A hearing on the relief sought in the Trustee Motion was held before the Bankruptcy Court on February 4, 2016.  The Court ruled from the bench and denied the Trustee Motion, finding that there was no cause to appoint a Chapter 11 trustee because appropriate corporate governance had been established.  *In re KaloBios Pharmaceuticals, Inc.*, Case No. 15-12628

(LSS), Hr'g Tr. 139–41 (Feb. 4, 2016).    Specifically, the Bankruptcy Court found that all members of the Board of Directors were acting in the best interest of the Debtor and its stakeholders and that all Directors and Mr. Witter, the independent interim CFO, all provided valuable experience to the Debtor.  *Id.* at 140–41.

The Court entered an order [Docket No. 164] on February 10, 2016, denying the Trustee Motion.

### 4.    *Approval of Employee Retention Bonus Plan*

Recognizing the dedication and hard work of its employees during the Chapter 11 Case, the Debtor filed a motion to institute an employee retention bonus plan (the "Employee Retention Bonus Plan") [Docket No. 95].  The motion sought to pay each of its non-insider employees a retention bonus to reward their hard work and dedication to the company, as well as incentivize the employees to continue in employ with the Debtor.

The Employee Retention Bonus Plan proposed to authorize the Debtor to award employee bonuses in the aggregate of $378,000 over the next year, distributing up to $234,000 among its employees prior to March 31, 2016, and an additional $144,000 among its employees between April 1, 2016, and June 30, 2016.  The Employee Retention Bonus Plan also required any recipient to be an employee on the date payment was received as well as remain an employee of the company for at least the next 180 days, otherwise the employee would be at risk of having the payment disgorged if the employee left voluntarily or was dismissed for cause.

The Employee Retention Bonus Plan was objected to by the PIPE Plaintiffs [Docket No. 159].  Thereafter, the Debtor filed a reply [Docket No. 178] and an amended Employee Retention Bonus Plan: (i) removing Morgan Lam as a participant since he had been promoted to Chief Operating Officer on February 1, 2016, and was no longer a non-insider, (ii) removing an employee who would be leaving the company's employ in the next few weeks, (iii) modifying the total amount to be distributed to no more than $146,000 in the first tranche prior to March 31, 2016, and no more than $117,000 to be distributed as part of the second tranche from April 1, 2016, through June 30, 2016, and (iv) providing additional criteria for the Employee Retention Bonus Plan.

An evidentiary hearing regarding the Employee Retention Bonus Plan was held on February 16, 2016.  While no resolution was reached at the hearing, the Debtor and the PIPE Plaintiffs subsequently agreed to approval of the Employee Retention Bonus Plan on amended terms.  The Debtor agreed to reduce its total payments in the first tranche, in exchange for being able to distribute more payments in the second tranche, an increase in the discretionary amount of bonuses and an extension of the PIPE Plaintiffs' deadline to file their response to the Debtor's motion to dismiss the PIPE Litigation.  A certification of counsel on the Employee Retention Bonus Plan was filed reflecting this compromise on February 17, 2016 [Docket No. 187].

The Court entered an order authorizing the Employee Retention Bonus Plan, as revised, on February 17, 2016 [Docket No. 188].

### 5.    *Approval of Binding LOI with Savant to Acquire the Worldwide Rights to the Benznidazole Program for the Treatment of Chagas Disease*

Following the Petition Date, the Debtor negotiated with Savant to reach, enter into, and receive Court approval of a binding letter of intent for the acquisition of the worldwide rights to Savant's benznidazole program for the treatment of Chagas Disease.  As a result of these negotiations, the Debtor achieved a binding letter of intent (the "Letter of Intent") with Savant, subject to Bankruptcy Court approval.  On February 23, 2016, the Debtor filed a motion seeking (i) authorization to execute and enter into the Letter of Intent with Savant, (ii) authorization to make certain payments in connection the Letter of Intent and perform other obligations thereunder, and (iii) granting related relief [Docket No. 197].  The Court entered an order authorizing the Debtor to execute and enter into Letter of Intent on February 26, 2016 [Docket No. 211].

Under the Letter of Intent, and subject to its terms and definitive documentation, KaloBios has the ability to acquire the worldwide rights to benznidazole in consideration for a $500,000 non-refundable deposit to Savant, credited towards the initial payment of $3,000,000 to be paid upon exit from bankruptcy, and interim development payments of $87,500 per month for the service of three full-time employees equivalents to help develop the treatment alongside KaloBios colleagues and outside consultants.  As discussed above, KaloBios believes the benznidazole program may be highly valuable, both because of the lack of an FDA-approved treatment for Chagas Disease in the United States, and because of the potential that KaloBios may receive a PRV from the FDA upon approval of benznidazole.

Closing the transactions contemplated by the binding Letter of Intent with Savant is subject to, among other things, (i) obtaining financing in an amount adequate to permit the Debtor to exit Chapter 11 with at least $10 million in unencumbered Cash and (ii) exiting Chapter 11 by June 30, 2016.

6.    *Approval of Bid Procedures Order for Submission and Consideration of Competing and Supplemental Plan Sponsorship Proposals*

On March 23, 2016, the Bankruptcy Court entered an order  (the "Bid Procedures Order") [Docket No. 293] (i) approving the Debtor's entry into that certain amended letter of intent and annexed amended term sheet, each dated March 18, 2016 (collectively, the "Stalking Horse LOI"), by and between the Debtor and the Stalking Horse; (ii) approving the Bid Procedures to govern the submission and consideration of competing plan proposals for Primary Plan and Secondary Plan Transactions; (iii) approving and authorizing the breakup fee contained in the Stalking Horse LOI provided that the parties completed and executed the DIP Credit Agreement and Stalking Horse SPA on or before April 7, 2016; (iv) scheduling and authorizing the Debtor to conduct an auction for Plan Transactions; (v) approving notice of the Bid Procedures and related noticing procedures; and (vi) granting related relief.

The Stalking Horse LOI offers a DIP Facility of $3 million to provide the Debtor with funds necessary to operate its business until confirmation of the Plan and an Exit Facility of $11 million to facilitate consummation of the Savant Transaction as well as consummation of the Plan.

The breakup fee (the "Breakup Fee") approved by the Bankruptcy Court allows the Stalking Horse to be (1) paid either: (a) $420,000 ("Cash Option Breakup Fee"), or (b) if the DIP Facility has not been funded, the option to purchase $2.8 million of stock in the Reorganized

Debtor at a price of $1.75 per share, or if the DIP Facility has been funded, the option to purchase $2 million of stock in the Reorganized Debtor at a price of $1.75 per share; and (2) reimbursed up to $200,000 for reasonable documented attorneys' fees and other expenses incurred by the Stalking Horse in connection with the transaction. The Stalking Horse is entitled to the Breakup Fee if the Debtor (i) sells any of its intellectual property rights without the Stalking Horse's approval, (ii) sells all or substantially all of its assets or common stock without the Stalking Horse's approval, (iii) accepts an alternative Primary Plan Transaction, or (iv) confirms a plan of reorganization not approved by the Stalking Horse.

The Exit Facility of $11 million is conditioned upon, among other things, closing of the Savant Transaction and occurrence of the Effective Date. At the closing of the Exit Facility, a commitment fee of 7% ($770,000) (the "Exit Facility Commitment Fee") shall accrue to the benefit of the Stalking Horse. On the Effective Date, in exchange for the Exit Facility and the Exit Facility Commitment Fee, the Debtor will issue to the Stalking Horse 5,885,000 shares of the Reorganized Debtor based upon current outstanding shares of 4,451,000 on a fully anti-dilution basis.

The Bid Procedures Order also approved Bid Procedures for the submission and consideration of competing or supplemental plan sponsorship proposals. The deadline to submit bids for proposed Plan Transactions was April 20, 2016, at 4:00 p.m. (ET). Additionally, the Bid Procedures Order set an auction (the "Auction") for April 26, 2016, at 10:00 a.m. (ET) if one or more Qualified Bids (as defined in the Bid Procedures) for a proposed Plan Transaction was submitted. The Bid Procedures Order provided that at the conclusion of the Auction, the Debtor would select the highest and best offer for a Primary Plan Transaction and a Secondary Plan Transaction (each, a "Winning Bid").

*[Placeholder for results of bidding/Auction]*

7. *Definitive Documentation of the DIP Credit Agreement and Stalking Horse SPA and the Debtor's Motion for Approval of the DIP Facility*

On April 1, 2016, the Debtor and Stalking Horse reached definitive documentation of the DIP Credit Agreement and the Stalking Horse SPA. On April [__], 2016, the Debtor filed a motion to approve the DIP Facility (the "DIP Motion") [Docket No. ___] on the terms of the DIP Credit Agreement.

The DIP Credit Agreement reflects the DIP financing terms contained in the Stalking Horse's LOI. The DIP Facility consists of a first lien superpriority single advance debtor-in-possession credit facility in an aggregate principal amount of $3 million, by and among the Debtor, as borrower, the DIP Agent, and the DIP Lenders, made available pursuant to the terms of the DIP Credit Agreement and related credit and security documents and the DIP Order. The DIP Facility also includes (i) a commitment fee of $150,000 (5%), (ii) original issue discount of 6 points ($191,000), and (iii) interest at the annual rate of twelve percent (12%) calculated on the basis of a 360-day year and actual days elapsed, which interest rate shall increase by five percent (5%) upon an Event of Default (as defined in the DIP Credit Agreement).

If the Stalking Horse funds the Exit Facility, the approximately $3 million principal amount of the DIP Facility will convert into 1,960,571 shares of Primary Plan Sponsor New Common Stock. If the Stalking Horse does not fund the Exit Facility, however, the Stalking Horse may elect repayment of the DIP Facility in Cash or in shares of Primary Plan Sponsor New Common Stock, in accordance with the terms of the DIP Credit Agreement.

*[Placeholder for results of hearing on DIP Facility]*

8.  *The Claims Process*

(a)  Schedules

On February 29, 2016, the Debtor filed its Schedules of Assets and Liabilities [Docket No. 215] and its Statement of Financial Affairs [Docket No. 216] (collectively, the "Schedules and Statement"). Among other things, the Schedules and Statement set forth the Claims of known creditors against the Debtor as of the Petition Date based upon the Debtor's books and records. The Debtor retains the right to amend the Schedules and Statement during the pendency of the Chapter 11 Case.

(b)  Bar Date Order

On February 16, 2016, the Bankruptcy Court entered an order [Docket No. 186] (the "Bar Date Order") establishing bar dates for filing Proofs of Claim against the Debtor and approving the form and manner of notice. The Bar Date Order established, among other things, deadlines for filing Proofs of Claim against the Debtor, including April 1, 2016, as the General Bar Date.

(c)  Claims Objections

The Debtor and its professionals are reviewing and analyzing Proofs of Claim filed against the Debtor to determine the validity of such Proofs of Claim and anticipate filing objections or have already filed objections to Proofs of Claim that are filed in improper amounts or classifications, or are otherwise subject to objection under the Bankruptcy Code or other applicable law.

9.  *Extension of Time to Remove Actions*

Pursuant to 28 U.S.C. § 1452, a party may remove any claim or cause of action in a civil action other than a proceeding before the United States Tax Court or a civil action by a governmental unit to enforce such governmental unit's police or regulatory power, to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title 28 of the United States Code. Although after a reasonable search the Debtor is not aware of any claims or causes of action subject to removal, out of an abundance of caution, the Debtor filed a motion [Docket No. 264] on March 17, 2016, seeking to the deadline to remove claims and causes of action by 120 days to July 26, 2016. [An order was entered granting the extension of time for removing the Actions on _____ __, 2016 [Docket No. __]].

10.  *Motion to Extend Exclusivity*

On April [__], 2016, the Debtor filed the Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Exclusive Periods During Which Only the Debtor May File a Chapter 11 Plan and Solicit Acceptances Thereof (the "Motion to Extend Exclusivity") [Docket No. ___].  Bankruptcy Code section 1121(b) provides for an initial 120-day period after the Petition Date within which a debtor has the exclusive right to file a Chapter 11 plan (the "Plan Period").  Bankruptcy Code 1121(c) further provides for an initial 180-day period after the Petition Date within which a debtor has the exclusive right to solicit and obtain acceptances of a plan filed by the debtor during the Plan Period (the "Solicitation Period" and together with the Plan Period, the "Exclusive Periods").  In the Chapter 11 Case, the Plan Period is set to expire on April 27, 2016, and the Solicitation Period is set to expire on June 27, 2016.  By the Motion to Extend Exclusivity, the Debtor requested entry of an order (i) extending each of the Exclusive Periods for 90 days, whereby the Plan Period would be extended through July 26, 2016, and the Solicitation Period would be extended through September 25, 2016, and (iii) prohibiting any party, other than the Debtor, from filing a competing plan or soliciting acceptances of a competing plan during the extended Exclusive Periods.  [An order was entered granting the extensions of the Exclusive Periods on _____ __, 2016 [Docket No. __]].

## IV.
## THE PLAN

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THIS DISCLOSURE STATEMENTS IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN.**

### A.      Treatment of Claims and Interests

1.      *Unclassified Claims*

(a)      Administrative Claims.      Each Holder of an Allowed Administrative Claim (other than an Administrative Claim that is a Fee Claim) as of the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as reasonably practicable after either (a) the Effective Date, if such Administrative Claim is Allowed as of the Effective Date, (b) thirty (30) days after the date such Administrative Claim becomes an Allowed Administrative Claim, if such Administrative Claim is Disputed as of, or following, the Effective Date, or (c) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Administrative Claim, if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its business; or (ii) such other treatment as the Debtor and such Holder shall have agreed in writing.

(b)      Fee Claims.

(i)      *Final Fee Applications.*  The Bankruptcy Court shall determine the Allowed amounts of Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtor shall pay Fee Claims in Cash in the amount Allowed by the Bankruptcy Court.  All requests for compensation or reimbursement of Fee Claims shall be Filed and served on the Reorganized Debtor, counsel to the Reorganized Debtor, the U.S. Trustee and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, no later than sixty (60) after the Effective Date, unless otherwise agreed by the Debtor.  Holders of Fee Claims that are required to File and serve applications for final allowance of their Fee Claims that do not File and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtor, Reorganized Debtor, or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be Filed and served on the Reorganized Debtor, counsel to the Reorganized Debtor, and the requesting party no later than fourteen (14) days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Fee Claim).

(ii)      *Post-Effective Date Fees and Expenses.*  The Reorganized Debtor shall pay in Cash the reasonable legal, professional, or other fees and expenses incurred by the Debtor's Professionals on and after the Effective Date, in the ordinary course of business, and without any further notice to or action, order, or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and Professionals may be employed and paid in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

(c)      <u>Priority Tax Claims</u>.  Each Holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, as determined by the Debtor, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim (i) payment in full in Cash, payable in equal Cash installments made on a quarterly basis in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, over a period not to exceed five (5) years following the Petition Date, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (ii) such other treatment as may be agreed upon by such Holder and the Debtor or otherwise determined by a Final Order.

(d)      <u>Other Priority Claims</u>.  Except to the extent that a Holder of an Allowed Other Priority Claim and the Debtor agree in writing to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive (i) payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (a) the Effective Date, (b) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim, or (c) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and

subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Other Priority Claim, if such Allowed Other Priority Claim is based on liabilities incurred by the Debtor in the ordinary course of its business; or (ii) such other treatment, as determined by the Debtor, that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(e)      DIP Facility Claim.  On the Effective Date, the DIP Facility Claim shall be satisfied in accordance with the terms of the DIP Order and the DIP Credit Agreement. For the avoidance of doubt, the Liens and security interests provided in the DIP Order shall not be extinguished until such time as the DIP Facility Claim is satisfied in accordance with the terms of the DIP Order and the DIP Credit Agreement.

(f)      U.S. Trustee Fees.  Notwithstanding anything to the contrary contained herein, on the Effective Date, the Debtor shall pay, in full, in Cash, any fees due and owing to the U.S. Trustee at the time of Confirmation.  On and after the Effective Date, the Reorganized Debtor shall be responsible for filing required post-confirmation reports and paying U.S. Trustee Fees for the Reorganized Debtor until the entry of a final decree in the Chapter 11 Case or until the Chapter 11 Case is converted or dismissed.

2.      *Treatment of Claims*

(a)      **Class 1 - Secured Claims.**

(i)      Classification: Class 1 consists of Secured Claims.

(ii)      Treatment: Unless otherwise agreed by the Holder of an Allowed Secured Claim and the Debtor, each Allowed Secured Claim will be reinstated pursuant to section 1124 of the Bankruptcy Code or will receive such other treatment as is necessary to render such Allowed Secured Claim Unimpaired under section 1124 of the Bankruptcy Code.

(iii)      Voting:  Class 1 is Unimpaired under the Plan.  Each Holder of an Allowed Secured Claim will be conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of an Allowed Secured Claim will not be entitled to vote to Accept or reject the Plan.

(b)      **Class 2 - General Unsecured Claims.**

(i)      Classification:  Class 2 consists of General Unsecured Claims.

(ii)      Treatment:  Unless otherwise agreed between the Holder of an Allowed General Unsecured Claim and the Debtor, each Holder of an Allowed General Unsecured Claim will receive on the later of the Effective Date or the first reasonably practicable Distribution Date after such Claim becomes an Allowed General Unsecured Claim, at its election made on the Ballot, one of the following treatments in full and final satisfaction and discharge of such Allowed General Unsecured Claim:

31

(1)     All Cash Election: Its pro rata share of Cash from the All Cash GUC Fund in an amount not to exceed [50% - 75%] of the Allowed amount of such Allowed General Unsecured Claim; *provided, however,* if the Cash available from the All Cash GUC Fund is insufficient to provide all Holders of Allowed General Unsecured Claims that make the All Cash Election a pro rata distribution of Cash equal to at least [XX%] of the Allowed amount of their respective Allowed General Unsecured Claims, then each such Holder of an Allowed General Unsecured Claim that makes the All Cash Election shall be entitled to receive, in addition to its ratable share of such Cash as is available from the All Cash GUC Fund, a Company Note in an original principal amount sufficient to allow each such Holder of an Allowed General Unsecured Claim that has made the All Cash Election an aggregate distribution of Cash from the All Cash GUC Fund and the Company Note equal to [XX%] of the Allowed amount of such Allowed General Unsecured Claim; **_or_**

(2)     Mixed Consideration Election: Its pro rata share of Cash from the Mixed Consideration GUC Fund equal to not greater than [33%] of the Allowed amount of such Allowed General Unsecured Claim, *plus* the Company Note in the original principal amount equal to the remaining Allowed amount of such Allowed General Unsecured Claim.

Any Holder of a Class 2 Claim that fails to make a Treatment election on its Ballot or that fails to properly submit a Ballot by the Voting Deadline shall be deemed to have made the Mixed Consideration Election for its General Unsecured Claim.  Once the Holder of a Class 2 Claim makes a Treatment election on its Ballot or is deemed hereby to have made such a Treatment election, such Treatment election may only be changed with the written consent of Debtor or Reorganized Debtor, as applicable, acting in its sole discretion

(iii)     Voting:  Class 2 is Impaired under the Plan.  Each Holder of an Allowed General Unsecured Claim is entitled to vote to Accept or reject the Plan.

(c)     **Class 3 - Convenience Class Claims.**

(i)     Classification: Class 3 consists of Convenience Class Claims.

(ii)     Treatment: Each Holder of an Allowed Convenience Class Claim will receive Cash on the later of the Effective Date or the first reasonably practicable Distribution Date after such Claim becomes an Allowed Convenience Class Claim in an amount equal to the Allowed amount of such Convenience Class Claim. A Holder of an Allowed General Unsecured Claim in a greater amount may elect to reduce its Allowed General Unsecured Claim to [$5,000] and have treated as a Convenience Class Claim for all purposes under the Plan.

(iii)     Voting:  Class 3 is Impaired under the Plan.  Each Holder of an Allowed Convenience Class Claim is entitled to vote to Accept or reject the Plan.

(d)     **Class 4 - PIPE Claims.**

(i)     Classification: Class 4 consists of PIPE Claims.

(ii)    Treatment:  Each Holder of a PIPE Claim will receive, one of the following treatments:

(1)    If Class 4 Accepts the Plan, each Holder of a PIPE Claim that has Accepted the Plan will be Allowed and will receive in full and final satisfaction of such PIPE Claim (i) its pro rata share of [163,314] shares of Remaining New Common Stock and (ii) reimbursement of reasonable, documented attorneys' fees incurred in connection with the PIPE Litigation up $250,000 in the aggregate among all Holders of PIPE Claims that have accepted the Plan.  The pro rata share of Remaining New Common Stock allocated to each Holder of an Allowed PIPE Claim shall be determined by reference to the allocation of shares purchased in the PIPE Transaction (e.g., a Holder of a PIPE Claim that acquired 5% of the shares of common stock issued in the PIPE Transaction shall receive 5% of the Remaining New Common Stock allocated to Class 4).

(2)    If Class 4 rejects the Plan, each PIPE Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the PIPE Litigation and/or the procedures for resolving Claims described in Article VII of the Plan.  All PIPE Claims will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  The Holder of any PIPE Claim that becomes an Allowed PIPE Claim will receive, on account of and in full and final satisfaction of such Allowed PIPE Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Allowed PIPE Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock.

(3)    To the extent that any PIPE Claims are determined by Final Order not to be subject to subordination, each such PIPE Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the PIPE Litigation and/or the procedures for resolving Claims described in Article VII of the Plan.  If such a PIPE Claim becomes an Allowed PIPE Claim, such Allowed PIPE Claim shall receive on account of and in full and final satisfaction of such Allowed PIPE Claim, shares of Remaining New Common Stock of a value, as of the date Allowed, equal to the Allowed amount of such PIPE Claim.

(iii)    Voting:  Class 4 is Impaired under the Plan.  Each Holder of a PIPE Claim is entitled to vote to Accept or reject the Plan.

(e)    **Class 5 - IAC Claims.**

(i)    Classification: Class 5 consists of IAC Claims.

(ii)    Treatment: All IAC Claims in Class 5 will be disallowed permanently and for all purposes under the Plan pursuant to section 502(e)(1) of the Bankruptcy Code.  To the extent, however, any IAC Claim is also an Other Subordinated Claim and becomes an Allowed Claim, it shall be deemed an Allowed Other Subordinated Claim and shall receive that treatment provided for Allowed Other Subordinated Claims in Class 7 below.

(iii)    Voting:  Class 5 is Impaired under the Plan.  Each Holder of a Class 5 Claim is entitled to vote to Accept or reject the Plan.

(f)     **Class 6 - Class Action Claim.**

(i)     Classification: Class 6 consists of the Class Action Claim.

(ii)    Treatment:

(1)     [TBD]; *or*

(2)     If Class 6 rejects the Plan, the Class Action Claim will be Disputed and subject to allowance or disallowance in accordance with the outcome of the Securities Litigation and/or the procedures for resolving Claims described in Article VII of the Plan.   To the extent Allowed, the Class Action Claim will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  If Allowed, the Class Action Claim will receive, on account of and in full and final satisfaction of such Allowed Class Action Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Allowed Class Action Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock.

(iii)   Voting:  Class 6 is Impaired under the Plan.  Each Holder of a Class 6 Claim is entitled to vote to Accept or reject the Plan.

(g)     **Class 7 - Other Subordinated Claims.**

(i)     Class 7 consists of Other Subordinated Claims other than IAC that are subject to disallowance as provided in Class 5 above.

(ii)    Treatment: Claims in Class 7 are Disputed.  To the extent Allowed, all Other Subordinated Claims will be subordinated to the level of the Debtor's common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code.  The Holder of any Other Subordinated Claim that becomes an Allowed Other Subordinated Claim will receive, on account of and in full and final satisfaction of such Other Subordinated Claim, a pro rata share of Remaining New Common Stock, determined by the amount of such Other Subordinated Claim as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock.

(iii)   Voting:  Class 7 is Impaired under the Plan.  Each Holder of a Class 7 Claim is entitled to vote to Accept or reject the Plan.

(h)     **Class 8 - Existing Common Stock.**

(i)     Class 8 consists of Existing Common Stock other than Class 9 Common Stock.

(ii)     Treatment: Existing Common Stock in Class 8 is unaffected by the Plan.  All Holders of Allowed Existing Common Stock shall retain such Existing Common Stock under the Plan.

(iii)     Voting:  Class 8 is Unimpaired under the Plan.  Holders of Existing Common Stock will be conclusively presumed to have Accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each Holder of Existing Common Stock will not be entitled to vote to Accept or reject the Plan on account of such Existing Common Stock.

(i)     **Class 9 - Class 9 Common Stock.**

(i)     Class 9 consists of Class 9 Common Stock.

(ii)     Treatment: Class 9 shall receive the following treatment, at the election of the Holder of Class 9 Common Stock:

(1)     Subject to the Holder of Class 9 Common Stock executing the Class 9 Stockholder Agreement in a form satisfactory to the Debtor and Accepting the Plan, Class 9 Common Stock in Class 9 will be Allowed and will retain, on account of and in full and final satisfaction of such Existing Common Stock, a pro rata share of Existing Common Stock, determined by the amount of such Existing Common Stock as a percentage of the total Allowed PIPE Claims, Allowed Class 5 Claims, Allowed Class Action Claim, Allowed Other Subordinated Claims, Allowed Existing Common Stock, and Allowed Class 9 Common Stock; **_or_**

(2)     If the Holder of Class 9 Common Stock does not execute the Class 9 Stockholder Agreement and Accept the Plan, the Class 9 Common Stock will be Disputed and subject to disallowance, subordination, setoff, recoupment, and any and all claims, causes of actions, defenses, and rights of the Debtor, including, without limitation, injunctive relief.

(iii)     Voting:  Class 9 is Impaired under the Plan.  The Holder of Class 9 Common Stock is entitled to vote to Accept or reject the Plan.

B.     **Means for Implementation of the Plan**

1.     *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

2.     *Continued Corporate Existence*

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as Reorganized Debtor in accordance with the applicable laws of the State of Delaware, the jurisdiction in which it is incorporated, and pursuant to the certificate of

incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and by-laws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than any requisite filings required under applicable state, provincial, or federal law).

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect the Restructuring Transactions, including, without limitation: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation to the extent consistent with the terms of the Plan and the Plan Documents; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and Plan Documents or having other terms to which the Debtor, the Plan Sponsors, and other applicable parties may agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the Debtor, the Plan Sponsors and any other applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 3.    *Cancellation of Existing Securities and Agreements*

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth herein and in the DIP Order, DIP Credit Agreement or Plan Documents, on the Effective Date all agreements, instruments, and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.  The Holders of or parties to such cancelled instruments, Securities and other documentation will have no rights arising from or relating to such instruments, Securities and other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

### 4.    *Corporate Governance, Directors, and Officers*

(a)    Certificate of Incorporation and By-Laws

The certificate or article of incorporation and by-laws of Reorganized KaloBios shall be amended to satisfy the provisions of the Plan, the Plan Sponsor Documents, and the Bankruptcy Code, shall be included in the Plan Supplement, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.

(b)    Directors and Officers of Reorganized KaloBios after the Effective Date

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of the Reorganized Debtor following the Effective Date shall be as listed in the Plan Supplement. Reorganized KaloBios shall have a board of directors comprising five (5) members as identified in the Plan Supplement, with one director designated by the Nomis Bay Entity, one director designated by the Black Horse Entities, one director being the Chief Executive Officer of the Debtor and two independent directors designated jointly by the Stalking Horse, provided, however, that if the Stalking Horse is not the Primary Plan Sponsor, the officers and directors of Reorganized KaloBios may be designated and identified in accordance with such alternate Primary Plan Sponsor's Primary Plan Sponsor Documents. Each director shall stand for re-election annually.

5.      *Corporate Action*

The Reorganized Debtor shall serve on the *U.S. Trustee* quarterly reports of the disbursements made until such time as a final decree is entered closing the Chapter 11 Case or the Chapter 11 Case is converted or dismissed, or the Bankruptcy Court orders otherwise. Any deadline for filing Administrative Claims shall not apply to U.S. Trustee Fees.

Any action under the Plan to be taken by or required of the Debtor or the Reorganized Debtor, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws, the issuance of Securities and instruments, the selection of officers or directors and the consummation and implementation of the Plan Documents, shall be authorized and approved in all respects, under sections 1123 and 1142 of the Bankruptcy Code and section 303 of the Delaware General Corporate Law, without any requirement of further action by any of the Debtor's or Reorganized Debtor's boards of directors or managers, as applicable, or stockholders of the Reorganized Debtor.

The Debtor and the Reorganized Debtor, shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan, without the necessity of any further Bankruptcy Court, corporate, board or shareholder approval or action. In addition, the selection of the Persons who will serve as the initial directors, officers and managers of the Reorganized Debtor as of the Effective Date shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the board of directors, board of managers, or stockholders of the Reorganized Debtor.

6.      *Authorization, Issuance and Delivery of New Common Stock*

On the Effective Date, Reorganized KaloBios is authorized to and shall issue and distribute, or cause to be distributed the New Common Stock and any and all other Securities, notes, stock, instruments, certificates and other documents or agreements required to be issued, executed or delivered pursuant to the Plan. The issuance of the New Common Stock shall be authorized, as of the Effective Date, without further notice to or order of the Bankruptcy Court, any further corporate action, or any further act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. All of the New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.

### 7. *Savant Transaction*

On the Effective Date, the Reorganized Debtor and its Representatives shall be authorized to consummate the Savant Transaction in accordance with the terms of the Savant Acquisition Agreement.

### 8. *Exit Facility*

On the Effective Date, the Exit Facility shall become effective, if all conditions set forth in the Primary Plan Sponsor Documents are satisfied or waived in accordance with the terms of the Primary Plan Sponsor Documents, including the closing of Savant Transaction. In accordance with the Primary Plan Sponsor Documents, upon the Exit Facility becoming effective, the Reorganized Debtor will issue to the Primary Plan Sponsor the Primary Plan Sponsor New Common Stock.

On the Effective Date, the Reorganized Debtor and its Representatives shall be authorized to consummate any Secondary Plan Transaction(s) in accordance with the terms and conditions of any such Secondary Plan Sponsor Documents and, subject to the terms and conditions of such Secondary Plan Sponsor Documents, the Reorganized Debtor shall issue the Secondary Plan Sponsor New Common Stock to the Secondary Plan Sponsors, if any.

From and after the Effective Date, the Reorganized Debtor, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the Board of Directors of the Reorganized Debtor deems appropriate.

### 9. *Closing of the Chapter 11 Case*

When all Disputed Claims against the Debtor or Reorganized Debtor either have become Allowed or have been Disallowed by Final Order, and no contested matter remains outstanding, the Reorganized Debtor shall ask the Bankruptcy Court to close the Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

## C. Provisions Governing Distributions

### 1. *Distributions*

The Disbursing Agent shall make all Plan Distributions to the appropriate Holders of Allowed Claims in accordance with the terms of the Plan.

### 2. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or nonbankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 3. *Date of Distributions*

Unless otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is practicable to the extent authorized and permitted, provided that the Reorganized Debtor may utilize periodic distribution dates to the extent appropriate. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

4. *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various lists of Holders of Claims in [each of the Classes (other than Classes [___])], as maintained by the Debtor, or its agents, shall be deemed closed and there shall be no further changes in the record Holders of any of the Claims after the Distribution Record Date. Neither the Debtor nor the Disbursing Agent shall have any obligation to recognize any transfer of Claims occurring after the close of business on the Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtor's Executory Contracts and Unexpired Leases, neither the Debtor nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

5. *Disbursing Agent*

All distributions under the Plan shall be made by the Reorganized Debtor or the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by Reorganized Debtor. Furthermore, any such Entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.

6. *Delivery of Distribution*

The Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, make all distributions or payments to any Holder of an Allowed Claim as and when required by the Plan at: (a) the address of such Holder on the books and records of the Debtor or its agents; or (b) at the address in any written notice of address change delivered to the Debtor or the applicable Disbursing Agent, including any addresses included on any Filed Proofs of Claim or transfers of Claim Filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any Holder is returned as undeliverable, no distribution or payment to such Holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such Holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such Holder without interest, provided, however, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of

six months from: (i) the Effective Date; and (ii) the first Distribution Date after such Holder's Claim is first Allowed.

### 7. *Unclaimed Property*

Six months from the later of: (i) the Effective Date, and (ii) the first Distribution Date after the applicable Claim is first Allowed, all unclaimed property or interests in property shall revert to the Reorganized Debtor or the successors or assigns of the Reorganized Debtor, and the Claim of any other Holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtor and the Disbursing Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtor's books and records, or Proofs of Claim filed against the Debtor, as reflected on the Claims Register maintained by the Claims Agent.

### 8. *Satisfaction of Claims*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

### 9. *Manner of Payment Under Plan*

Except as specifically provided herein, at the option of the Debtor or Reorganized Debtor (as applicable), any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtor.

### 10. *Fractional Shares/De Minimis Cash Distributions*

No fractional shares of New Common Stock shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock that is not a whole number, the shares of the New Common Stock subject to such distribution will be rounded to the next higher or lower whole number as follows: (i) fractions equal to or greater than ½ will be rounded to the next higher whole number; and (ii) fractions less than ½ will be rounded to the next lower whole number. The total number of shares of New Common Stock to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtor nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or $[25.00] in Cash. Fractional shares of New Common Stock that are not distributed in accordance with Section 6.10 shall be returned to Reorganized KaloBios.

### 11. *No Distribution in Excess of Amount of Allowed Claim*

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth herein) in excess of the Allowed amount of such Claim.

12.    *Exemption from Securities Laws*

The issuance of and the distribution under the Plan of the Remaining New Common Stock shall be exempt from registration under the Securities Act any other applicable Legal Requirements applicable to Securities pursuant to section 1145 of the Bankruptcy Code, and/or Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder, to the maximum extent permitted thereunder.  Subject to any transfer restrictions contained in the Certificate of Incorporation of Reorganized KaloBios, the New Common Stock issued on account of the [_____] Distribution may be resold by the Holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code.  All of the New Common Stock other than the [_____] Distribution may not be sold or transferred unless there is an effective registration statement under the Securities Act covering the New Common Stock or the Securities are sold or transferred in a transaction that is exempt from or not subject to the registration and prospectus delivery requirement of the Securities Act and otherwise in compliance with Legal Requirements applicable to such Securities.  The availability of the exemption under section 1145 of the Bankruptcy Code, Section 4(a)(2) of the Securities Act and/or any other Legal Requirements applicable to Securities shall not be a condition to occurrence of the Effective Date.

13.    *Setoffs and Recoupments*

The Reorganized Debtor, or its designee as instructed by the Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off and/or recoup against any Allowed Claim or Interest (other than a [____] Claim), and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest, any and all claims, rights and Causes of Action that the Reorganized Debtor or its successors may hold against the Holder of such Allowed Claim or Interest after the Effective Date; provided, however, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim or Interest hereunder will constitute a waiver or release by the Reorganized Debtor or its successor of any and all claims, rights and Causes of Action that the Reorganized Debtor or its successor may possess against such Holder.

14.    *Rights and Powers of Disbursing Agent*

(a)    Powers of Disbursing Agent

The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments contemplated hereby; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)    Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtor, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement Claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

15.    *Withholding and Reporting Requirements*

In connection with the Plan and all distributions hereunder, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Plan Distributions hereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtor shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtor, Reorganized Debtor or the Disbursing Agent believe are reasonable and appropriate, including requiring a Holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan: (i) each Holder of an Allowed Claim that is to receive a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution; and (ii) no Plan Distributions shall be required to be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom.

16.    *Cooperation with Disbursing Agent*

The Reorganized Debtor shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of Holders of Claims, in each case, as set forth in the Debtor's and/or Reorganized Debtor's books and records. The Reorganized Debtor will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 6.15 of the Plan.

17.    *Hart-Scott Rodino Antitrust Improvements Act*

Any New Common Stock to be distributed under the Plan to an Entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity shall have expired or been terminated. In the event any applicable notification and waiting periods do not expire without objection, the Reorganized Debtor or its agent shall, in their sole discretion, be entitled to sell such Entity's shares of New Common Stock that were to be distributed under the Plan to such Entity, and thereafter shall distribute the proceeds of the sale to such Entity.

18.    *Applicability to Stalking Horse*

Except for section 6.12 and 6.15, Article VI of the Plan shall not apply to the New Common Stock issued to the Stalking Horse pursuant to the DIP Credit Agreement or Exit Facility.

### D.    Procedures for Resolving Claims

1.    *Objections to Claims*

Other than with respect to Fee Claims, only the Debtor or Reorganized Debtor shall be entitled to object to Claims or Administrative Claims before or after the Effective Date.  Any objections to Claims or Administrative Claims shall be served and Filed on or before the later of: (i) Claims Objection Deadline; and (ii) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (i) hereof.    Any Claim or Administrative Claim Filed after the Claims Bar Date or Administrative Claims Bar Date, as applicable, shall be deemed Disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtor or the Reorganized Debtor, unless the Person or Entity wishing to File such untimely to Claim or Administrative Claim has received Bankruptcy Court authority to do so.    Notwithstanding any authority to the contrary, an objection to a Claim or Administrative Claim shall be deemed properly served on the Holder if the objecting party effects service in any of the following manners: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified in the Proof Claim or any attachment thereto; or (iii) if counsel has agreed to or is otherwise deemed to accept service, by first class mail, postage prepaid, on any counsel that has appeared on the Holder's behalf in the Chapter 11 Case (so long as such appearance has not been subsequently withdrawn).    From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim or Administrative Claim without approval of the Bankruptcy Court.

2.    *Amendment to Claims*

From and after the Effective Date, no Claim, including an Administrative Claim, may be Filed to increase or assert additional Claims not reflected in an already Filed Claim (or scheduled Claim, unless superseded by a Filed Claim) asserted by such claimant and any such Claim shall be deemed Disallowed and expunged in its entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtor or the Reorganized Debtor unless the claimant has obtained the Bankruptcy Court's prior approval to File such amended or increased Claim.

3.    *Disputed Claims and Interests*

(a)    No Distributions or Payments Pending Allowance.

Disputed Claims and Interests shall not be entitled to any Plan Distributions unless and until such Claims or Interests become Allowed Claims.

(b)    Plan Distributions to Holders of Subsequently Allowed Claims.

On each Distribution Date (or such earlier date as determined by the Reorganized Debtor or the Disbursing Agent in their sole discretion but subject to Section 7.3 of the Plan), the Disbursing Agent will make distributions or payments on account of any Disputed Claim or Interest that has become an Allowed Claim or Interest since the occurrence of the previous Distribution Date.  The Disbursing Agent shall distribute in respect of such newly Allowed Claims or Interests the Plan Distributions to which Holders of such Claims or Interests would have been entitled under the Plan if such newly Allowed Claims or Interests were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims or Interests.

(c)      Distribution of Reserved Plan Consideration Upon Disallowance

To the extent any Disputed Claim or Interest has become Disallowed in full or in part (in accordance with the procedures set forth in the Plan), any Plan Consideration held by the Reorganized Debtor on account of, or to pay, such Disputed Claim or Interest shall become the sole and exclusive property of Reorganized KaloBios or its successors or assigns.

4.      *Estimation of Claims*

The Debtor and/or Reorganized Debtor may request that the Bankruptcy Court enter an order with respect to any Claim, pursuant to section 502(c) of the Bankruptcy Code, for purposes of determining the Allowed amount of such Claim regardless of whether any Entity has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the Allowed amount of such Claim at any time.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum estimated amount on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum Allowed amount on such Claim, the objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Claims may be estimated and subsequently compromised, settled, resolved or withdrawn by any mechanism approved by the Bankruptcy Court.

5.      *Expenses Incurred On or After the Effective Date*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtor, the amount of any reasonable fees and expenses incurred by any Professional Person or the Claims Agent on or after the Effective Date in connection with implementation of the Plan, including without limitation, reconciliation of, objection to, and settlement of Claims, shall be paid in Cash by the Reorganized Debtor, without further application to or approval by the Bankruptcy Code.

**E.      Executory Contracts and Unexpired Leases**

1.      *General Treatment*

44

Except as otherwise set forth herein, all Executory Contracts or Unexpired Leases of the Debtor shall be deemed assumed and/or assumed and assigned in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123 as of the Effective Date, unless such Executory Contract or Unexpired Lease: (a) was previously assumed or rejected by the Debtor; (b) previously expired or terminated pursuant to its terms; (c) is the subject of a motion to assume or reject Filed by the Debtor under Bankruptcy Code section 365 pending as of the Effective Date; or (d) is designated specifically or by category on the Schedule of Rejected Executory Contracts and Unexpired Leases in the Plan Supplement. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such respective assumptions and rejections pursuant to Bankruptcy Code sections 365(a) and 1123. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions and rejections described in Section 8.1 pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to Section 8.1 shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable federal law.

2.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Rejection Damages Claims will be treated as General Unsecured Claims. Upon receipt of the Plan Distribution provided in Section [3.2(b)] of the Plan, all such Rejection Damages Claims shall be discharged on the Effective Date, and shall not be enforceable against the Debtor, the Reorganized Debtor or their respective properties or interests in property. In the event that the rejection of an Executory Contract or Unexpired Lease by the Debtor pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely Filed Proof of Claim, shall be forever barred and shall not be enforceable against the Debtor or the Reorganized Debtor, or their respective properties or interests in property as agents, successors or assigns, unless a Proof of Claim is Filed with the Bankruptcy Court and served upon counsel for the Debtor and the Reorganized Debtor on or before the applicable Rejection Bar Date.

3.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The proposed cure amount (the "Cure Amount") for an Executory Contract or Unexpired Lease that is assumed pursuant to the Plan shall be zero dollars unless otherwise indicated in a Schedule of Assumed Executory Contracts and Unexpired Leases. Cure obligations, if any, shall be satisfied, pursuant to Bankruptcy Code section 365(b)(1), by payment of the Cure Amount in Cash on the Effective Date or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree. In the event of a dispute (each, a "Cure Dispute") regarding (a) the Cure Amount, (b) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, any cure payments required by Bankruptcy Code section 365(b)(1) shall be made following entry of a Final Order resolving the Cure Dispute and approving the assumption; provided, however, that following the resolution of any such Cure Dispute, the Debtor or Reorganized Debtor shall have the right to reject such Executory Contract or Unexpired Lease.

No later than fourteen (14) calendar days prior to the commencement of the Confirmation Hearing, the Debtor shall File the Schedule of Assumed Executory Contracts and Unexpired Leases setting forth a Cure Amount of zero dollars, unless otherwise indicated, for each Executory Contract or Unexpired Lease to be assumed pursuant to Section 8.1 of the Plan, and serve such Cure Schedule on each applicable counterparty.  Any party, whether or not the party was identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, that fails to object to the applicable Cure Amount at the Confirmation Hearing, shall be forever barred, estopped and enjoined from disputing the Cure Amount (including a Cure Amount of $0.00) and/or from asserting any Claim against the Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, and such Executory Contract or Unexpired Lease is deemed assumed and/or assumed and assigned.

### 4.    *Compensation and Benefit Programs*

Except as expressly provided hereunder, all employment and severance policies, and all compensation and benefit plans, policies, and programs of the Debtor to its employees, and retirees including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life, accidental death and dismemberment insurance plans are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.  The Reorganized Debtor may, prior to the Effective Date, enter into employment agreements with employees that become effective on or prior to the Effective Date and survive consummation of the Plan.  Any such agreements (or a summary of the material terms thereof) will be included in the Plan Supplement or otherwise Filed with the Bankruptcy Court on or before the date of the Confirmation Hearing.

### 5.    *Employment Agreements*

Notwithstanding anything to the contrary contained herein, all employment agreements between the Debtor and its current executive officers as of the Effective Date (the  "Current Officer Employment Agreements") are treated as Executory Contracts under the Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code.

## F.    Conditions Precedent to Consummation of the Plan

### 1.    *Conditions Precedent to Confirmation*

Confirmation of the Plan is subject to:

  (a)    the Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code; and

  (b)    entry of the Confirmation Order.

### 2.    *Conditions Precedent to the Effective Date*

The occurrence of the Effective Date is subject to:

(a)     all of the conditions precedent for effectiveness of the Exit Facility and the Primary Plan Sponsor Documents shall have been satisfied or waived in accordance with the terms thereof (including with the consent of the Primary Plan Sponsor to the extent provided therein); and

(b)     to the extent so required by any Plan Documents (other than the Primary Plan Sponsor Documents, such Plan Documents being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith.

3.     *Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay*

The condition precedents set forth in Section 9.2 may be waived by the Debtor, except Section 9.2(a), which may only be waived by the Debtor with the consent of the Primary Plan Sponsor.

Subject to Section 9.3(a), the Debtor shall have the right to waive any condition precedent set forth in Section 9.2 of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan.  Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by the Confirmation Order.

If any condition precedent to the Effective Date is waived pursuant to Section 9.3 and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court

4.     *Notice of Effective Date*

Upon satisfaction of all the conditions to the Effective Date set forth in Section 9.2, or if waivable, waiver pursuant to Section 9.3, or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Reorganized Debtor in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing.  A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtor's option, by courier or facsimile) to those Entities that have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

5.     *Effect of Failure of Conditions*

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived (as provided in Section 9.3) on or before the first Business Day that is more than 45 days after the Confirmation Date, or by such later date as set forth by the Debtor in a notice Filed with the Bankruptcy Court prior to the expiration of such period, then the Debtor may File a motion to vacate the Confirmation Order before all of the conditions have been satisfied or duly waived.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 9.2 are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to Section 9.5, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Debtor and all Holders of Claims and Interests in the Debtor shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtor; (b) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other Entity with respect to any matter set forth in the Plan.

### G.    Effect of Confirmation

#### 1.    *Binding Effect; Plan Binds All Holders of Claims and Interests*

On the Effective Date, and effective as of the Effective Date, the Plan shall, and shall be deemed to, be binding upon the Debtor and all present and former Holders of Claims against and Interests in any Debtor, and their respective Related Persons, regardless of whether any such Holder of a Claim or Interest has voted or failed to vote to Accept or reject the Plan.

Further, pursuant to section 1142 of the Bankruptcy Code and in accordance with the Confirmation Order, the Debtor and any other necessary party shall execute, deliver and join in the execution or delivery (as applicable) of any instrument, document or agreement required to effect a transfer of property, a satisfaction of a Lien or a release of a Claim dealt with by the Plan, and to perform any other act, and the execution of documents necessary to effectuate the Restructuring Transactions and all other documents set forth or contemplated in the Plan, including in the Plan Supplement, that are necessary for the consummation of the Plan and the transactions contemplated herein.

#### 2.    *Revesting of Assets*

Except as provided in the Plan, on the Effective Date, all property of the Estate, to the fullest extent provided by section 541 of the Bankruptcy Code, and any and all other rights and assets of the Debtor of every kind and nature, including, without limitation, insurance policies, shall revest in the Reorganized Debtor free and clear of all Liens, Claims and Interests other than (a) those Liens, Claims and Interests retained or created pursuant to the Plan or any document entered into in connection with Restructuring Transactions and (b) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.  On and after the Effective Date, except as otherwise provided in the Plan, the

Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

3.    ***RELEASES AND RELATED INJUNCTIONS***

**The releases, discharges, injunctions and exculpations set forth in the Plan and described herein are the product of a global compromise and settlement with parties in interest.  The Debtor believes that the releases, discharges, injunctions and exculpations are reasonable, narrowly tailored and necessary for the Debtor to exit Chapter 11.**

**For purposes of the Plan, "Released Parties" means each of (i) the Debtor, (ii) the Primary Plan Sponsor, and (iii) each of their respective successors and assigns, subsidiaries, affiliates, current directors, officers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each instance, except for the Non-Released Parties.**

4.    ***RELEASES BY THE DEBTOR.***

**AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, EACH OF THE DEBTOR, THE DEBTOR'S ESTATE, AND THE REORGANIZED DEBTOR, AND ANY PERSON OR ENTITY HOLDING OR SEEKING TO EXERCISE THE RIGHTS OF THE DEBTOR, THE DEBTOR'S ESTATE OR THE REORGANIZED DEBTOR, INCLUDING, WITHOUT LIMITATION, ANY SUCCESSOR TO THE DEBTOR OR ANY ESTATE REPRESENTATIVE APPOINTED OR SELECTED PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, SHALL BE DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE EACH OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, REMEDIES, RIGHTS, CAUSES OF ACTION (INCLUDING AVOIDANCE ACTIONS), RIGHTS OF SETOFF AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR) IN CONNECTION WITH OR IN ANY WAY RELATING TO THE DEBTOR, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, OR THE PLAN (OTHER THAN THE RIGHTS OF THE DEBTOR OR THE REORGANIZED DEBTOR TO ENFORCE THE OBLIGATIONS UNDER THE CONFIRMATION ORDER AND THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER) WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING IN <u>SECTION 10.3(A)</u> OF THE PLAN:**

(a) **SHALL RELEASE ANY ENTITY, INCLUDING THE RELEASED PARTIES, FROM ANY OBLIGATION UNDER THE PLAN, CONFIRMATION ORDER, PLAN DOCUMENTS (INCLUDING, WITHOUT LIMITATION, THE PLAN SPONSOR DOCUMENTS AND THE SAVANT ACQUISITION AGREEMENT), OR RESTRUCTURING TRANSACTIONS.**

(b) **SHALL BE DEEMED TO RELEASE, WAIVE OR OTHERWISE PROHIBIT THE REORGANIZED DEBTOR FROM ASSERTING AND ENFORCING ANY CLAIMS, CAUSES OF ACTION, OBLIGATIONS, SUITS, JUDGMENTS, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES THEY MAY HAVE AGAINST ANY EMPLOYEE (INCLUDING DIRECTORS AND OFFICERS) FOR ALLEGED BREACH OF CONFIDENTIALITY, ALLEGED MISAPPROPRIATION OR INFRINGEMENT OF TRADE SECRETS, PATENTS, COPYRIGHTS OR OTHER INTELLECTUAL PROPERTY, OR ANY OTHER CONTRACTUAL OBLIGATIONS OWED TO THE DEBTOR OR THE REORGANIZED DEBTOR, INCLUDING NON-COMPETE AND RELATED AGREEMENTS OR OBLIGATIONS;**

(c) **SHALL RELEASE ANY OF THE CAUSES OF ACTIONS AGAINST THE NON-RELEASED PARTIES; OR**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE FOREGOING RELEASE BY THE DEBTOR, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN OR ELSEWHERE IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE FOREGOING RELEASE BY THE DEBTOR IS:   (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, INCLUDING, WITHOUT LIMITATION, THE SERVICES ON OR AFTER THE PETITION DATE OF THE DEBTOR'S OFFICERS, DIRECTORS, MANAGERS, ATTORNEYS, PROFESSIONALS AND ADVISORS IN FACILITATING THE RESTRUCTURING TRANSACTIONS CONTEMPLATED HEREBY; (2) A GOOD-FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE FOREGOING BY THE DEBTOR; (3) IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTOR OR THE REORGANIZED DEBTOR ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE FOREGOING RELEASE BY THE DEBTOR.**

5. *RELEASES BY HOLDERS OF CLAIMS AND INTERESTS.*

**NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, FOR GOOD AND VALUABLE CONSIDERATION, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, THE HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTOR SHALL BE**

**DEEMED TO FOREVER RELEASE, WAIVE, AND DISCHARGE EACH OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION, RIGHTS OF SETOFF AND LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS ASSERTED ON BEHALF OF THE DEBTOR) IN CONNECTION WITH OR IN ANY WAY RELATING TO THE DEBTOR, THE CONDUCT OF THE DEBTOR'S BUSINESS, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, OR THE PLAN (OTHER THAN THE RIGHTS OF THE DEBTOR, THE REORGANIZED DEBTOR, OR A CREDITOR HOLDING AN ALLOWED CLAIM OR AN INTEREST HOLDER HOLDING AN ALLOWED INTEREST TO ENFORCE THE OBLIGATIONS UNDER THE CONFIRMATION ORDER AND THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS OR DOCUMENTS DELIVERED THEREUNDER) WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, WHETHER FOR TORT, CONTRACT, VIOLATION OF LEGAL REQUIREMENTS APPLICABLE TO SECURITIES OR OTHERWISE, THAT ARE BASED IN WHOLE OR PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT NOTHING IN THIS <u>SECTION 10.3(B)</u> OF THE PLAN SHALL OPERATE AS A RELEASE, WAIVER OR DISCHARGE OF: (I) ANY CAUSES OF ACTION OR CLAIMS FOR CONTRIBUTION OR PROPORTIONATE FAULT THAT ANY PARTY OTHER THAN THE DEBTOR WHO IS A NAMED DEFENDANT IN THE SECURITIES LITIGATION MAY HAVE AGAINST ANY OTHER PERSON (EXCLUDING THE DEBTOR) THAT ARISES FROM OR IS RELATED TO THE LIABILITY CLAIMS ASSERTED AGAINST THEM IN THAT ACTION; OR (II) ANY CAUSES OF ACTION AGAINST ANY OLD DEBTOR RELATED PARTIES THAT ARE NON-RELEASED PARTIES TO THE EXTENT THE TERM "NON-RELEASED PARTIES" APPLIES TO THIS <u>SECTION 10.3(B)</u>.**

6.    *DISCHARGE OF CLAIMS*

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order: (1) all consideration distributed under the Plan shall be in exchange for, and in complete satisfaction, settlement, discharge and release of, all Interests and all Claims of any kind or nature whatsoever against the Debtor or any of its assets or properties and regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Interests or Claims; (2) the Plan shall bind all Holders of Claims and Interests, notwithstanding whether any such Holders failed to vote to Accept or reject the Plan or voted to reject the Plan; and (3) all Persons and Entities shall be precluded from asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, their respective successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective

51

**Date. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor shall be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) of the Bankruptcy Code from any and all Claims of any kind or nature whatsoever, including, without limitation, demands and liabilities that arose on or before the Effective Date, and all debts of the kind specified in section 502(g), 502(h) or 502(i) of the Bankruptcy Code.**

7.    *Preservation of Rights of Action*

Except as otherwise expressly provided in the Plan, the Confirmation Order or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order of the Bankruptcy Court, in accordance with section 1123(b) of the Bankruptcy Code, the Debtor, its Estate and the Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, in its sole discretion, any and all Causes of Action, whether arising before or after the Petition Date, including, without limitation, (i) the Avoidance Actions, (ii) all Causes of Action to subordinate any Claims or Interests (whether pursuant to sections 510(a), 510(b) or 510(c) of the Bankruptcy Code, or otherwise), (iii) all Causes of Action against the Non-Released Parties, and (iv) all Causes of Actions identified in the Plan Supplement as Causes of Action retained pursuant to Section 10.5(a) of the Plan (collectively, the "Retained Causes of Action"), and the Reorganized Debtor's rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; provided that no Causes of Action released pursuant to Section 10.3(a) of the Plan against the Released Parties shall vest in the Reorganized Debtor. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Disclosure Statement, or the Confirmation Order to any Retained Cause of Action against them as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Retained Causes of Action against them.** The Debtor and the Reorganized Debtor expressly reserve all rights to prosecute any and all Retained Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Reorganized Debtor expressly reserves all Retained Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the confirmation or consummation of the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action that the Debtor may hold against any Entity shall vest in the Reorganized Debtor. The Reorganized Debtor may pursue such Retained Causes of Action, or decline to do any of the foregoing, as appropriate, in accordance with the best interests of the Reorganized Debtor and without further notice to or action, order or approval of the Bankruptcy Court..

8.    ***EXCULPATIONS AND LIMITATIONS OF LIABILITY***

ON THE EFFECTIVE DATE, THE EXCULPATED PARTIES SHALL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY HOLDER OF CLAIM OR INTEREST, THE DEBTOR, THE REORGANIZED DEBTOR, OR ANY OTHER PARTY IN INTEREST, OR ANY OF THEIR RELATED PERSONS FOR ANY PREPETITION OR POSTPETITION ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF THE CHAPTER 11 CASE, THE FORMULATION, NEGOTIATION, OR IMPLEMENTATION OF THE DISCLOSURE STATEMENT OR THIS PLAN, THE SOLICITATION OF ACCEPTANCES OF THE PLAN, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN OR THE ADMINISTRATION OF THE PLAN, EXCEPT FOR ACTS OR OMISSIONS THAT ARE THE RESULT OF WILLFUL MISCONDUCT OR GROSS NEGLIGENCE; PROVIDED, HOWEVER, THAT (I) THE FOREGOING IS NOT INTENDED TO LIMIT OR OTHERWISE IMPACT ANY DEFENSE OF QUALIFIED IMMUNITY THAT MAY BE AVAILABLE UNDER APPLICABLE LAW; (II) EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER, OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN; AND (III) THE FOREGOING EXCULPATION SHALL NOT BE DEEMED TO RELEASE, AFFECT, OR LIMIT ANY OF THE RIGHTS AND OBLIGATIONS OF THE EXCULPATED PARTIES FROM, OR EXCULPATE THE EXCULPATED PARTIES WITH RESPECT TO, ANY OF THE EXCULPATED PARTIES' OBLIGATIONS OR COVENANTS ARISING PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.

9.    *INJUNCTION*

Except as otherwise provided in the Plan or in any document, instrument, release or other agreement entered into in connection with the Plan or approved by order of the Bankruptcy Court, the Confirmation Order shall provide, among other things, that from and after the Effective Date all Persons or Entities who have held, hold, or may hold Claims against or Interests in the Debtor are (i) permanently enjoined from taking any of the following actions against the Estate or any of its property on account of any such Claims or Interests and (ii) permanently enjoined from taking any of the following actions against any of the Debtor, the Reorganized Debtor or their property or against the Released Parties or the Exculpated Parties on account of such Claims or Interests:  (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (C) creating, perfecting, or enforcing any Lien or encumbrance; (D) asserting a setoff or right of subrogation of any kind against any debt, liability or obligation due to the Debtor; and (E) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such Persons or Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, indentures and other agreements or documents delivered under or in connection with the Plan.

**By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest will be deemed to have specifically consented to the injunctions set forth in Section 10.7 of the Plan.**

   10. *Term of Bankruptcy Injunctions or Stays*

   All injunctions or stays provided for in the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  Upon the Effective Date, all injunctions or stays provided for in the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, shall be lifted and of no further force or effect—being replaced, to the extent applicable, by the injunctions, discharges, releases and exculpations of Article X of the Plan.

   11. *Subordination of Claims*

   The Debtor believes that it can subordinate Classes 4, 5, 6 and 7 under section 510(b) of the Bankruptcy Code pursuant to the Plan.  In *In re Washington Mutual, Inc.*, 462 B.R. 137 (Bankr. D. Del. 2011), the court found that mandatory subordination may be accomplished in a Chapter 11 plan and does not require a separate adversary proceeding.  The court stated that:

> An adversary proceeding is only required for claim subordination if subordination is not provided for under a chapter 11 plan. In this case, the Debtors' plan has provided for a class of subordinated claims.  Therefore, an adversary proceeding is not required to reach the issue of claim subordination, and the Court will consider it in the context of the Debtors' Objection to Tranquility's claim.

*Id.* at 145.  The Debtor will provide further proof of its ability to subordinate Classes 4, 5, 6 and 7 under the Plan in its confirmation brief.  The Plan will constitute a motion to subordinate such Claims to the extent necessary.

**V.**
**RETENTION OF JURISDICTION**

   Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under or related to the Chapter 11 Case and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

   (a) allow, disallow, determine, liquidate, classify, estimate, subordinate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

   (b) resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which the Debtor or the Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

54

(c)      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

(d)      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

(e)      enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(f)      resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, including, without limitation, any other contract, instrument, release or other agreement or document that is executed or created pursuant to the Plan, or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(g)      modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

(h)      hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 327, 330, 331, 363, 503(b), 1103 and 1129(c)(9) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtor, including counsel fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(i)      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j)      hear and determine Causes of Action by or on behalf of the Debtor or the Reorganized Debtor;

(k)      hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

(l)    hear and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or distributions pursuant to the Plan are enjoined or stayed;

(m)    determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order or any contract, instrument, release (including the releases in favor of the Released Parties) or other agreement or document created in connection with the Plan or the Confirmation Order;

(n)    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Case;

(o)    hear and determine such other matters as may be provided in the Confirmation Order, other orders of the Bankruptcy Court, or as may be authorized under the Bankruptcy Code; and

(p)    enter an order closing the Chapter 11 Case.

## VI.
## MISCELLANEOUS PROVISIONS

### 1.    *Effectuating Documents and Further Transactions*

The Debtor and the Reorganized Debtor are authorized to execute, deliver, file or record such contracts, instruments, releases, consents, certificates, resolutions, programs and other agreements or documents and take such acts and actions as may be reasonable, necessary or appropriate to effectuate, implement, consummate or further evidence the terms and conditions of the Plan, any notes or Securities issued pursuant to the Plan, and any transactions described in or contemplated by the Plan.

### 2.    *Authority to Act*

Prior to, on or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, Security Holders, officers, directors, partners, managers, members or other owners of the Debtor or Reorganized Debtor shall be deemed to have occurred and shall be in effect prior to, on or after the Effective Date (as appropriate) pursuant to the applicable law of the states or jurisdictions in which the Debtor or the Reorganized Debtor are formed, without any requirement of further vote, consent, approval, authorization or other action by such stockholders, Security Holders, officers, directors, partners, managers, members or other owners of such Entities or notice to, order of or hearing before the Bankruptcy Court.

### 3.    *Insurance Preservation*

Nothing in the Plan, including any releases, shall diminish or impair the enforceability of any insurance policies or other policies of insurance that may cover insurance Claims or other Claims against the Debtor or any other Person. All insurance policies are assumed and assigned

or otherwise transferred to the Reorganized Debtor and no other or further action shall be required for such to occur.

4. *Exemption from Transfer Taxes*

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, Transfer or exchange (or deemed issuance, Transfer or exchange) of the New Common Stock; (b) the creation of any mortgage, deed of trust, Lien, pledge or other security interest; (c) the making or assignment of any lease or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan (including, without limitation, any merger agreements, agreements of consolidation, restructuring, disposition, liquidation, dissolution, deeds, bills of sale and transfers of tangible property) will not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, transaction privilege tax, privilege taxes, or other similar taxes in the United States. Unless the Bankruptcy Court orders otherwise, all sales, transfers and assignments of owned and leased property approved by the Bankruptcy Court on or prior to the Effective Date shall be deemed to have been in furtherance of or in connection with the Plan.

5. *Bar Dates for Administrative Claims*

Holders of asserted Administrative Claims (other than Fee Claims) not paid prior to the Effective Date shall submit Proofs of Claim on or before the Administrative Claims Bar Date or forever be barred from doing so.

6. *Payment of U.S. Trustee Fees*

All U.S. Trustee Fees shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Case is converted, dismissed or closed, whichever occurs first.

7. *Amendment or Modification of the Plan*

Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123 and 1125 of the Bankruptcy Code, the Debtor reserves the right to alter, amend or modify the Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of the Plan. A Holder of a Claim or Interest that has Accepted the Plan shall be deemed to have Accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such Holder.

8. *Severability of Plan Provisions*

If, prior to the Confirmation Date, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be

affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

9.    *Successors and Assigns*

The Plan shall be binding upon and inure to the benefit of the Debtor and its successors and assigns, including, without limitation, the Reorganized Debtor.  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

10.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.  Except as otherwise provided in the Plan, pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtor reserves the right to re-classify any Allowed Claim or Interest in Classes 1–9 in accordance with any contractual, legal, or equitable subordination relating thereto.

11.    *Revocation, Withdrawal, or Non-Consummation*

Subject to the terms of the Primary Plan Sponsor Documents, the Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization.   If the Debtor revokes or withdraws the Plan, or if confirmation or consummation as does not occur, then, except as otherwise provided by the Debtor, (a) the Plan shall be null and void in all respects, (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtor or any other Person or Entity, (ii) prejudice in any manner the rights of the Debtor or any other Person or Entity or (iii) constitute an admission of any sort by the Debtor or any other Person or Entity.

12.    *Notice*

All notices, requests and demands to or upon the Debtor or Reorganized KaloBios to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

KaloBios Pharmaceuticals, Inc.
1000 Marina Blvd, #250
Brisbane, CA 94005-1878

Attn: Dr. Cameron Durrant
Telephone: (650) 243-3100
Facsimile: (650) 243-3260

If to the U.S. Trustee:

Office of the U.S. Trustee for the District of Delaware
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Attn: Hannah McCollum & Mark Kenney
Telephone: (302) 573-6491
Facsimile: (302) 573-6497

in each case, with copies (which shall not constitute notice hereunder) to:

Hogan Lovells US LLP
875 Third Avenue
New York, New York 10022
Attn: Peter Ivanick, Esq.
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

-and-

Morris Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19801
Attn:  Eric D. Schwartz, Esq. & Gregory W. Werkheiser, Esq.
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

13.    *Governing Law*

Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that a Plan Document or Exhibit provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

14.    *Fees and Expenses*

59

From and after the Effective Date, the Reorganized Debtor may, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of Professionals employed by the Debtor or the Reorganized Debtor thereafter incurred, including those fees and expenses incurred in connection with the implementation and consummation of the Plan.

15.    *No Admissions*

Notwithstanding anything herein to the contrary, nothing in the Plan shall be deemed as an admission by the Debtor with respect to any matter set forth herein, including liability on any Claim.

16.    *Filing of Additional Documents*

On or before substantial consummation of the Plan, the Debtor shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## VII.
## CONFIRMATION OF THE PLAN OF REORGANIZATION

### A.    Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims and Allowed Interests in Classes 2, 3, 4, 5, 6, 7 and 9 of the Plan are Impaired, and only the Holders of Allowed Claims and Interests in Classes 2, 3, 4, 5, 6, 7 and 9 are permitted to vote to Accept or reject the Plan.  The Claims and Interests in Classes 1 and 8 are Unimpaired and are conclusively presumed to have Accepted the Plan, and the solicitation of acceptances with respect to such Classes is not required under section 1126(f) of the Bankruptcy Code.

As to Classes of Claims entitled to vote on the Plan, section 1126(c) of the Bankruptcy Code defines acceptance of the Plan by a Class of Claims as acceptance by Holders of at least two-thirds in amount and more than one-half in number of the Claims of that Class that have timely voted to Accept or reject a plan.  As to Classes of Interests entitled to vote on the Plan, section 1126(d) of the Bankruptcy Code defines acceptance of a Plan by a Class of Holders of Interests as acceptance by Holders of at least two-thirds in amount of the Interests of a Class that have timely voted to Accept or reject the Plan.  Any Class of Claims that is not occupied as of the commencement of the Confirmation Hearing by an Allowed Claim or Interest or a Claim or Interest temporarily Allowed under Bankruptcy Rule 3018, shall be deemed eliminated from the Plan for purposes of voting to Accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.  If no votes to Accept or reject the Plan are received with respect to a Class whose votes have been solicited under the Plan (other than a Class that is deemed eliminated pursuant to Section 4.4(a) of the Plan), such Class shall be deemed to have voted to Accept the Plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Unless otherwise agreed by the Debtor, any Holder of a Claim that is scheduled by the Debtor as unliquidated, disputed or contingent is not entitled to vote unless the Holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan. In addition, unless otherwise agreed by the Debtor, Holders of Claims or Interests entitled to vote on the Plan that wish to vote their Claims in an amount listed on a Proof of Claim filed before the applicable Bar Date, rather than as scheduled by the Debtor, will likewise need to obtain an order of the Bankruptcy Court temporarily allowing such Claim in such amount. To the extent not liquidated, Allowed, or temporarily Allowed for voting purposes in a different amount, each Claim or Interest in Classes 2, 3, 4, 5, 6, 7 and 9 will be temporarily Allowed for voting purposes in the amount of $1.00.

1.      *Solicitation Package*

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the Plan; (ii) the notice of among other things, the time for submitting Ballots to Accept or reject the Plan, the date, time, and place of the Confirmation Hearing; and, as applicable, (iii) a Ballot or Ballots (and return envelope(s) that you may use in voting to Accept or reject the Plan), or a notice of non-voting status, (collectively the "Solicitation Package"). Only Holders eligible to vote in favor of or against the Plan will receive a Ballot or Ballots as part of their Solicitation Package. Such Holders will only receive a Ballot in respect of each Class in which such Holder holds a Claim or Interest that is Allowed or temporarily Allowed and entitled to vote to Accept or reject the Plan. If you did not receive a Ballot and believe that you should have, please contact the Voting Agent at the address, telephone number, or email address listed below:

KaloBios Pharmaceuticals, Inc. Ballot Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 3rd Floor
New York, NY 10022
Telephone: (844) 241-2770
Email: KalobiosInfo@primeclerk.com

2.      *Voting Instructions*

After carefully reviewing the Plan, this Disclosure Statement, all related Exhibits, and the instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot. Please complete and sign your Ballot and return it in the envelope provided. Your ballot must be **ACTUALLY RECEIVED** by the Voting Agent on or before the Plan voting deadline of [_____], 2016, at 5:00 p.m. prevailing Eastern Time (the "Voting Deadline") as set forth on the Ballot.

Any person signing a Ballot in a fiduciary or representative capacity, including but not limited to those acting as a trustee, executor, administrator, guardian, attorney-in-fact, or officer

of a corporation, should indicate such capacity when signing and, unless otherwise determined by the Debtor, submit proper evidence satisfactory to the Debtor of authority to so act.

### B.    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider confirmation of a proposed plan.  The Bankruptcy Court has scheduled the Confirmation Hearing for [_____], 2016 at [__:_0 _.m.], prevailing Eastern Time, before the Honorable Laurie Selber Silverstein, United States Bankruptcy Judge for the District of Delaware, at the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, Wilmington, Delaware, 19801.  The Debtor may adjourn the Confirmation Hearing from time to time without further notice except for the announcement of adjournment at the Confirmation Hearing, or at any subsequent adjourned Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the plan.  Any objection to the Confirmation of the Plan must: (i) be made in writing; (ii) state the name and address of the objecting party and the nature of the Claim or Interest of such party; (iii) state with particularity the legal and factual basis and nature of any objection to the Plan; and (iv) be filed with the Bankruptcy Court, together with proof of service, and served so that they are received **on or before [_____], 2016, at 4:00 p.m. prevailing Eastern Time** by the Debtor and the other parties set forth in the Disclosure Statement Order, and certain other parties.    THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will consider the terms of the Plan and determine whether the terms satisfy the requirements set out in section 1129 of the Bankruptcy Code.  The Debtor believes that the Plan satisfies or will satisfy the following applicable requirements of section 1129, certain of which are discussed in more detail below:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as proponent of the Plan, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the Debtor or by a person acquiring property under the Plan for services or costs and expenses in, or connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment (i) made before the Confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable, if such payment is to be fixed after Confirmation of the Plan.

- Each Holder of an Impaired Claim or Interest either has Accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim or Interest, property of a value as of the Effective Date that is not less than the amount such Holder would receive or retain if the Debtor was liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.

- Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code, each Class of Claims or Interests either has Accepted the Plan or is not an Impaired Class under the Plan.

- Except to the extent that the Holder of a particular Claim or Interest has agreed to a different treatment of such Claim or Interest, the Plan provides that Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Other Priority Claims will be paid as required by the Bankruptcy Code.

1. *Acceptance*

The Bankruptcy Code requires, as a condition to Confirmation, that except as described in the following section, each Class of Claims or Interests that is Impaired under the Plan Accept the Plan. A Class that is not Impaired under the Plan is deemed to have Accepted the Plan and solicitation of acceptances with respect to such a Class is therefore not required. A Class is Impaired unless the Plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the Claim or Interest entitles the Holder of that Claim or Interest; or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim or Interest after the occurrence of a default—(1) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in Bankruptcy Code section 365(b)(2) of this title or of a kind that Bankruptcy Code section 365(b)(2) expressly does not require to be cured; (2) reinstates the maturity of such Claim or Interest as such maturity existed before such default; (3) compensates the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (4) if such Claim or such Interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to Bankruptcy Code section 365(b)(1)(A), compensates the Holder of such Claim or such Interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (5) does not otherwise alter the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder of such Claim or Interest.

2. *Confirmation Without Acceptance by All Impaired Classes*

Pursuant to section 1129(b) of the Bankruptcy Code, also known as the "cramdown" provision, the Bankruptcy Court may confirm the Plan even if all Classes of Claims or Interests have not Accepted the Plan, as long as at least one Impaired Class of Claims has Accepted the Plan (excluding the votes of insiders, if any) and the plan is "fair and equitable" and "does not discriminate unfairly" against the non-accepting Class(es).

The Plan Impairs certain Classes of Claims and Interests.  The Debtor may, if applicable, pursue confirmation through the "cramdown" provision under section 1129(b), which states, in pertinent part, that a plan must be "fair and equitable" to a dissenting Class and must not "discriminate unfairly" against such dissenting Class.

With respect to a class of unsecured Claims, a plan is "fair and equitable" if "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim."  With respect to a class of Interests, a plan is "fair and equitable" if "the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property."

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair" in light of the facts and circumstances.  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims or interests of equal rank (e.g., classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of similar priority differently without unfairly discriminating against either class.

The Debtor will invoke the "cramdown" provisions of section 1129(b)(2) of the Bankruptcy Code should any voting Class fail to Accept the Plan.

3.  *Feasibility*

In connection with Confirmation of the Plan, the Bankruptcy Court must determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the Confirmation of the Plan is not likely to be followed by the need for further financial reorganization or liquidation of the Debtor.

To demonstrate the feasibility of the Plan, the Debtor, with assistance of its financial advisor, Batuta Capital Advisors LLC, will prepare and file a feasibility analysis with its Plan Supplement. See Article X (*Certain Risk Factors To Be Considered*) of this Disclosure Statement, for a discussion of certain risk factors that may affect financial feasibility of the Plan.

4.  *Best Interests Test*

(i)  Generally

Notwithstanding acceptance of the Plan by each Impaired Class, in order to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any such Impaired Class who has not voted to Accept the Plan. Accordingly, if an Impaired Class does not unanimously Accept the Plan, the "best interests" test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such Class member would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

(ii)      Liquidation Analysis

In a Chapter 7 liquidation, a Chapter 7 trustee would be appointed. The net amount generated from the liquidation of the Debtor's assets would be reduced by the administrative expenses of both the Chapter 7 Case and the Chapter 11 Case, including the fees and commissions of the Chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the Chapter 7 trustee, in addition to unpaid expenses incurred by the Debtor during the Chapter 11 Case. These expenses and costs would reduce the net proceeds available to Holders of Allowed Claims or Allowed Interests.

Any remaining net Cash would be allocated to Holders of Claims and Interests in strict accordance with the priorities set forth in section 726 of the Bankruptcy Code. The present value of such allocation of the hypothetical liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the proposed distributions under the Plan to each of the Classes of Claims and Interests to determine if the Plan is in the best interests of each Holder of a Claim or Interest.

If the present value of the distributions available to Holders of Claims and Interests under the hypothetical liquidation is less than or equal to the present value of the distributions available to Holders of Claims and Interests under the Plan, then the Plan is in the best interests of Holders of Claims and Interests and can be considered in the "best interests" of Holders of Claims and Interests by the Bankruptcy Court.

The Debtor believes that the Plan will produce a recovery for Holders of Claims and Interests that would be equal to or better than would be achieved in a Chapter 7 liquidation for several reasons. First, a chapter 7 liquidation would likely result in an increase in Administrative Claims, because there would be an additional tier of Administrative Claims by the Chapter 7 trustee and his or her professionals. The Chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims against and Allowed Interests in the Debtor. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as Fee Claims), which would continue to be a liability of the Debtor in the Chapter 7 case as well. In addition, the Cash to be distributed to Holders of Claims would be reduced by the Chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the Chapter 7 trustee. Finally, it is likely that distributions from a Chapter 7 estate would be significantly deferred. As a result, the present value of such distributions is likely to be lower than if made under the Plan.

65

Moreover, if the Chapter 11 Case were converted to a case under Chapter 7, the Debtor's business operations would cease, and neither the Savant Transaction nor the Exit Facility would proceed. Accordingly, there would be no ability to make a distribution to Holders of Claim or Interests except from Cash on hand and proceeds of causes of action or assets, less the expenses discussed above. Importantly, the Debtor believes that among its most valuable assets are its intellectual property assets, but that the value of such intellectual property is largely dependent upon the ability to continue as a going concern pursuing clinical development of drugs and treatments based on such intellectual property.

For all of these reasons, and the additional reasons that will be discussed in the Plan Supplement, the Debtor believes that the Plan will produce a recovery for Holders of Claims and Interests that would be equal to or better than would be achieved in a Chapter 7 liquidation.

### 5.    *Consummation of the Plan*

Upon confirmation of the Plan by the Bankruptcy Court, the plan will be deemed consummated on the Effective Date. Distributions to Holders of Claims and Interests receiving a distribution pursuant to the terms of the Plan will follow consummation of the Plan.

### D.    **Conditions Precedent to the Confirmation, Effective Date, and Consummation of Plan**

### 1.    *Conditions to Confirmation of the Plan*

The conditions precedent to the confirmation of the Plan are that (i) the Disclosure Statement has been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code; and; (ii) the Confirmation Order shall have been entered.

### 2.    *Conditions to Effective Date*

Each of the following is a condition precedent to the occurrence of the Effective Date:

(a)    all of the conditions precedent for effectiveness of the Exit Facility and the Primary Plan Sponsor Documents shall have been satisfied or waived in accordance with the terms thereof (including with the consent of the Primary Plan Sponsor to the extent provided therein); and

(b)    to the extent so required by any Plan Documents (other than the Primary Plan Sponsor Documents, such Plan Documents being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by a Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith.

### 3.    *Waiver of Conditions*

66

Section 9.3 of the Plan provides that the conditions set forth in Section 9.2 of the Plan may be waived in whole or in part by the Debtor, except Section 9.2(a), which may only be waived by the Debtor with the consent of the Primary Plan Sponsor.  Subject to Section 9.3(a), the Debtor shall have the right to waive any condition precedent set forth in Section 9.2 of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan.  Further, the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), shall be deemed waived by the Confirmation Order.  If any condition precedent to the Effective Date is waived pursuant to Section 9.3 of the Plan and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court.

4.      *Notice of Effective Date*

Upon satisfaction of all the conditions to the Effective Date set forth in Section 9.2, or if waivable, waiver pursuant to Section 9.3, or as soon thereafter as is reasonably practicable, the Debtor shall File with the Bankruptcy Court the "Notice of Effective Date" in a form reasonably acceptable to the Debtor in its sole discretion, which notice shall constitute appropriate and adequate notice that the Plan has become effective; provided, however, that the Debtor shall have no obligation to notify any Person of such fact.  The Plan shall be deemed to be effective as of 12:01 a.m., prevailing Eastern Standard Time, on the date of such filing. A courtesy copy of the Notice of Effective Date may be sent by United States mail, postage prepaid (or at the Debtor's option, by courier or facsimile) to those Persons who have Filed with the Bankruptcy Court requests for notices pursuant to Bankruptcy Rule 2002.

5.      *Consequences of Non-Occurrence of Effective Date*

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived (as provided in Section 9.3 of the Plan) on or before the first Business Day that is more than 45 days after the Confirmation Date, or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtor may file a motion to vacate the Confirmation Order before all of the conditions have been satisfied or duly waived.  Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 9.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to Section 9.5 of the Plan, the Plan shall be null and void in all respects, the Confirmation Order shall be of no further force or effect, no distributions under the Plan shall be made, the Debtor and all Holders of Claims and Interests in the Debtor shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and upon such occurrence, nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtor; (b) prejudice in any manner the rights of the Holder of any Claim against or Interest in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other entity with respect to any matter set forth in the Plan.

**E.      Effect of the Plan on Assets, Claims and Interests**

67

Pursuant to Section 10.2 of the Plan, except as provided in the Plan, on the Effective Date, all property of the Estate, to the fullest extent provided by section 541 of the Bankruptcy Code, and any and all other rights and assets of the Debtor of every kind and nature, including, without limitation, insurance policies, shall revest in the Reorganized Debtor free and clear of all Liens, Claims and Interests other than (a) those Liens, Claims and Interests retained or created pursuant to the Plan or any document entered into in connection with the transactions described in the Plan and (b) Liens that have arisen subsequent to the Petition Date on account of taxes that arose subsequent to the Petition Date.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

# VIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords Holders of Claims and Interests the potential for the greatest realization of value and, therefore, is in the best interests of such Holders.  Further, if the Plan is not consummated, the Debtor may be unable to service their debt obligations or to cure defaults thereunder.  If the Plan is not confirmed or consummated, the theoretical alternatives include (a) liquidation of the Debtor under Chapter 7 or Chapter 11 of the Bankruptcy Code, (b) formulation of an alternative plan of reorganization, or (c) dismissal of the Chapter 11 Case.

### A.        Liquidation Under Chapter 7

If no plan is confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by Chapter 7 of the Bankruptcy Code.  A discussion of the effects that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests is set forth in the liquidation analysis in the Plan Supplement.  For the reasons articulated in Article VII of this Disclosure Statement, the Debtor believes that liquidation under Chapter 7 would result in lower distributions to the Holders of Allowed Claims than those provided in the Plan.

### B.        Alternative Plan of Reorganization

The Debtor believes that the Plan represents the best opportunity to maximize the value of the Debtor's estate for the benefit of all stakeholders.  In formulating and developing the Plan, the Debtor has explored numerous alternatives and engaged in an extensive negotiating process involving many parties with disparate interests.

The Debtor believes that not only does the Plan fairly adjust the rights of various Classes of Claims and Interests and enable the Holders of Allowed Claims and Interests to maximize their returns, but also that rejection of the Plan in favor of some alternative will require, at the very least, an extensive and time consuming process (including the possibility of protracted and

costly litigation) and will not result in a better recovery for any Class.  As a result, any alternatives now available to the Debtor are inferior.

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE DISTRIBUTIONS TO ALL HOLDERS OF ALLOWED CLAIMS AND INTERESTS, AND ANY ALTERNATIVE WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES AND INCREASE RESTRUCTURING EXPENSES. THEREFORE, THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### C.    Dismissal of the Debtor's Chapter 11 Case

Dismissal of the Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the status quo ante.  Upon dismissal of the Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with its Creditors, and possibly resulting in costly and protracted litigation in various jurisdictions.  Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtor.  The Debtor believes that these actions would seriously undermine its ability to reorganize and could lead ultimately to the liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.  Therefore, the Debtor believes that dismissal of the Debtor's Chapter 11 Case is not a preferable alternative to the Plan.

### IX.
### GOVERNANCE OF REORGANIZED KALOBIOS

### A.    Governance of Reorganized KaloBios

1. *Certificate of Incorporation and By-Laws.*

The certificate or articles of incorporation and by-laws of Reorganized KaloBios shall be amended to satisfy the provisions of the Plan and the Bankruptcy Code, shall be included in the Plan Supplement, and shall (i) include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code and (ii) to the extent necessary or appropriate, include such provisions as may be needed to effectuate and consummate the Plan and the transactions contemplated herein.

2. *Officers of Reorganized KaloBios after the Effective Date*

Subject to any requirement of Bankruptcy Court approval pursuant to section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the initial officers of the Reorganized Debtor following the Effective Date shall be as listed in the Plan Supplement.

3. *Directors of Reorganized Debtor*

Reorganized KaloBios shall have a board of directors comprising five (5) members as identified in the Plan Supplement, with one director designated by the Nomis Bay Entity, one director designated by the Black Horse Entities, one director being the Chief Executive Officer of the Debtor and two independent directors designated jointly by the Stalking Horse, provided, however, that if the Stalking Horse is not the Primary Plan Sponsor, the officers and directors of Reorganized KaloBios may be designated and identified in accordance with such alternate Primary Plan Sponsor's Primary Plan Sponsor Documents. Each director shall stand for re-election annually.

# X.
# CERTAIN RISK FACTORS TO BE CONSIDERED

## A.    Certain Bankruptcy Considerations

### 1.    *Bankruptcy Matters.*

#### (a)    General

Although the Debtor has undertaken every effort to minimize any impact of the bankruptcy proceedings on its operations, delays in Plan confirmation could have an adverse effect on KaloBios's business by giving rise to significant expenses and diverting the attention of KaloBios's management from the operation of the business.

Further, the Plan provides for conditions that must be satisfied (or waived) prior to the Confirmation Date and for other conditions that must be satisfied (or waived) prior to the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived). Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance as to when or whether the Plan will be consummated and the restructuring completed.

The extent to which the confirmation process disrupts KaloBios's business will likely be directly related to the length of time it takes to complete the proceeding. If the Debtor is unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, its emergence from Chapter 11 may be further delayed while it works to develop a different plan of reorganization that can be confirmed. That would increase both the probability and the magnitude of the adverse effects described above. Even assuming a successful emergence from Chapter 11, there can be no assurance as to the overall long-term viability of KaloBios's business.

#### (b)    Failure to Confirm the Plan

Although the Debtor believes that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. While the Debtor may be able to pursue a modified plan, there can be no assurance that modification would not necessitate the re-solicitation of votes to Accept the Plan, as modified.

#### (c)    Non-Occurrence of the Effective Date

Operating in bankruptcy imposes significant risks and costs for the Debtor's operations. Although the Debtor believes that the Effective Date will occur by June 30, 2016, there can be no assurance as to such timing or that the conditions to the Effective Date will ever be satisfied, including without limitation: (i) entry of the Confirmation Order by the Bankruptcy Court in form and substance reasonably satisfactory to the Debtor, and not having been stayed or reversed or vacated on appeal; (ii) the satisfaction (or waiver in accordance with the terms therein) of the conditions precedent for the closing of the Exit Facility; and (iii) satisfaction or waiver of all of the conditions precedent for entry into the Exit Facility in accordance with the terms thereof. If the Effective Date does not occur by June 30, 2016, the consummation of the Savant Transaction may be prevented.

2.    *KaloBios's business could suffer from the loss of key personnel.*

KaloBios is dependent on the continued services of its senior management team and other key personnel. The loss of key personnel could have a material adverse effect on the company's business, financial condition, and results of operations. The company may be unable to retain and motivate key executives and employees through the process of reorganization and may have difficulty attracting new employees. In addition, so long as the Chapter 11 Case continues, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. Additionally, under the Letter of Intent with Savant, KaloBios will require key personnel to assist in the development of benznidazole as the development and FDA approval of benznidazole is a key part of the KaloBios's Plan.

3.    *Pursuit of litigation by parties in interest could disrupt the confirmation of the Plan and could have material adverse effects on KaloBios's business and financial condition.*

There can be no assurance that any parties in interest will not pursue litigation strategies to enforce any Claims in respect of KaloBios. Litigation is by its nature uncertain and there can be no assurance of the ultimate resolution of the litigated Claims. The pursuit of litigation in connection with objections to this Disclosure Statement or the Plan, including the effectiveness and effect of the steps required for the implementation of the Plan, could delay and disrupt confirmation of the Plan and the Debtor's emergence from bankruptcy. Any litigation may be expensive, lengthy and disruptive to the company's normal business operations and the Plan Confirmation process, and a resolution of any such litigation that is unfavorable to the Debtor could have a material adverse effect on the Plan Confirmation process, emergence from bankruptcy or on KaloBios's business, results of operations, financial condition, liquidity and cash flow. Moreover, the cost, burdens, and uncertainty associated with litigation may negatively impact the Debtor's business and the values received by Holders of Claims and Interests, even if the Debtor ultimately prevails in such litigation.

4.    *Adverse publicity in connection with the Chapter 11 Case or otherwise, could negatively affect the company's business.*

Adverse publicity or news coverage relating to the Debtor, including but not limited to publicity or news coverage in connection with the Chapter 11 Case and Martin Shkreli, may

negatively affect, among other things, (i) the Debtor' business during the Chapter 11 Case; (ii) the Reorganized Debtor's efforts to establish and promote name recognition and a positive image after the Effective Date; and (iii) the ability to raise capital.

>5.      *Counterparties to assumed contracts may object to the assumption of such contracts on the grounds that such contracts may not be assumed and assigned pursuant to section 365 of the Bankruptcy Code.*

Under section 365 of the Bankruptcy Code, anti-assignment clauses in executory contracts are generally unenforceable.  However, section 365(c)(1) of the Bankruptcy Code provides that a contract may not be assumed or assigned if applicable nonbankruptcy law excuses the nondebtor party from accepting performance from or rendering performance to a party other than the Debtor.  While the Debtor does not believe that applicable nonbankruptcy law would prohibit the Debtor's assumption of contracts under the Plan, a counterparty may nevertheless object to an assumption on such grounds, and the ultimate outcome of such a dispute cannot be predicted with any certainty.

## B.      Risks Relating to the New Common Stock to be Issued Under the Plan

>1.      *Uncontrollable market factors could negatively affect the value of the New Common Stock.*

The New Common Stock may trade at prices higher or lower than the estimated value at Confirmation depending upon many factors, including, without limitation, prevailing interest rates, macroeconomic and market conditions, markets for similar securities, industry conditions and the performance of, and investor expectations for, the Reorganized Debtor.  Furthermore, Persons or Entities to whom the New Common Stock are issued pursuant to the Plan may prefer to liquidate their investments rather than hold such securities on a long-term basis.  Accordingly, the market for the New Common Stock may be volatile.

>2.      *Dividends are not expected to be paid with respect to the New Common Stock for the foreseeable future.*

The Debtor does not anticipate that cash dividends or other distributions will be paid with respect to the New Common Stock in the foreseeable future.

>3.      *Certain Holders of New Common Stock may be restricted under applicable securities laws in their ability to transfer or sell their securities.*

Holders of the New Common Stock who are deemed to be "underwriters" for the purposes of section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities.  These Persons will be permitted to transfer or sell such securities only pursuant to: (i) ordinary trading transactions by a holder that is not an issuer within the meaning of section 1145(b) of the Bankruptcy Code; (ii) the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act; or (iii) an effective registration statement under the Securities Act.

4.    *There is a risk of significant dilution to stockholders due to the amount of New Common Stock that may be required to be issued pursuant to the Plan and/or depending on the ultimate outcomes of the PIPE Litigation, Securities Litigation, and other disputes.*

There is a risk of significant dilution to Holders of Existing Common Stock and Class 9 Common Stock and Holders of Claims who receive New Common Stock on account of such Claims and/or depending on the ultimate outcome of the PIPE Litigation, Securities Litigation, and other disputes that may require the Debtor to issue additional shares of New Common Stock. To date, neither the PIPE Litigation nor the Securities Litigation have been settled or had a judgment entered. Therefore, Holders of Existing Common Stock and Class 9 Common Stock and those issued New Common Stock pursuant to the Plan may have their Interests diluted, potentially up to the $8.2 million Claim asserted in the PIPE Litigation and the approximately $20 million Claim asserted in connection with the Securities Litigation. In addition, there may be other Claims, such as Other Subordinated Claims, that if Allowed, could result in significant dilution through issuance of New Common Stock on account of such Claims.

## C.    Risks Relating to the Inherent Uncertainty of Financial Analysis

The Projections set forth in the Plan Supplement cover the operations of the Reorganized Debtor through fiscal year [__]. As set forth in the Plan Supplement, the Projections are based on numerous assumptions, including that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on June 30, 2016.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, many of the assumptions on which the Projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and the Reorganized Debtor. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the [___] year periods of the Projections may vary from the projected results and the variations may be material.

The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants. The Projections have not been examined or compiled by independent accounts. No assurance can be given that the Projections will be realized. The Debtor makes no representation or warranty as to the accuracy of the Projections or its ability to achieve the projected results.

## D.    Company-Specific Risk Factors

1.    *The Reorganized Debtor may not be able to generate sufficient cash to service all of its indebtedness.*

The Reorganized Debtor's earnings and cash flow vary significantly over time due to the nature of being a pharmaceutical development company. As a result, the amount of debt that the Reorganized Debtor can manage in some periods may not be appropriate in other periods.

Additionally, future cash flow may be insufficient to meet the Reorganized Debtor's debt obligations and commitments. Any insufficiency could negatively impact its business. A range of economic, competitive, financial, business, industry and other factors will affect future financial performance, and, as a result, its ability to generate cash flow from operations and to pay debt. Many of these factors, such as success of clinical trials, economic and financial conditions in the pharmaceutical industry, the global economy or competitive initiatives of competitors and the continuance of the FDA's priority review voucher program are beyond its control. If the Reorganized Debtor does not generate sufficient cash flow from operations to satisfy its debt obligations, it may have to undertake alternative financing plans, such as:

- refinancing or restructuring its debt;

- selling equipment or other assets;

- reducing or delaying investments and capital expenditures; or

- seeking to raise additional capital.

No assurance can be given that undertaking alternative financing plans, if necessary, would be successful in allowing it to meet its debt obligations. Its ability to restructure or refinance its debt will depend on the condition of the capital markets, its access thereto and its financial condition at such time. Any refinancing of debt could be at higher interest rates and may require it to comply with more onerous covenants, which could further restrict its business operation. The terms of existing or future debt instruments may restrict it from adopting some of these alternatives. These alternative measures may not be successful and may not permit it to meet its scheduled debt service obligations. Its inability to generate sufficient cash flow to satisfy its debt obligations, or to obtain alternative financing, could materially and adversely affect its business, financial condition, results of operations, cash flows and prospects.

     2.     *The clinical trials of KB003 and KB004 may not be successful or the resulting drug products may not receive FDA approval.*

While previous studies and trials of KB003 and KB004 indicate that the antibodies have the potential to treat CMML, JMML and other hematologic and solid tumors, clinical trials of the antibodies in these indications have not been completed and such trials may ultimately be unsuccessful. Additionally, even if the clinical trials are successful, there is the potential that the FDA will not grant approval to the drugs. KaloBios's business, cash flow and future prospects may be negatively affected if the clinical trials are not successful or the FDA does not approve the drugs.

     3.     *KaloBios may not enter into or consummate a binding agreement with Savant to acquire the rights to benznidazole.*

While KaloBios anticipates being able to reach a binding agreement with Savant to acquire the rights to benznidazole as set out in the Letter of Intent, KaloBios and Savant have not currently entered the Savant Acquisition Agreement. If KaloBios and Savant do not enter a binding agreement or may fail to consummate it, KaloBios will not acquire the rights to

benznidazole, and KaloBios's business, cash flow and future prospects may be negatively affected.

4.     *Benznidazole may not receive FDA approval.*

KaloBios anticipates benznidazole receiving FDA approval if the FDA's requirements are met, in part because benznidazole is a proven successful treatment for Chagas Disease and has been approved in other countries outside the United States.  There is the possibility, however, that the FDA will not approve benznidazole.  If the FDA denies approval, KaloBios's business, cash flow and future prospects may be negatively affected.

5.     *The FDA priority review voucher program for rare pediatric diseases may be discontinued if not renewed by Congress.*

The rare pediatric disease priority review voucher program is currently only authorized until September 2016.  Prior to September, the United States Congress must pass a bill to approve the program's extension.  While the program has been extended previously and a recent report from the Government Accountability Office supports the extension because it is too early to evaluate the program's effectiveness, it is currently unknown whether Congress will extend the program.  If the rare pediatric disease priority review voucher program is not extended beyond September 2016, KaloBios may not be able to benefit from the program as it is unlikely to have developed KB003 for treatment of JMML in children to the point where the drug would be ready to seek FDA approval prior to September 2016.  Even if Congress extends the priority review voucher program prior to September 2016, there are no assurances that further extensions of the priority review voucher program will be made in the future.

6.     *The Securities Litigation could result in substantial costs, judgments and other adverse effects.*

The Debtor believes that the Securities Litigation is not meritorious and that the Debtor has strong defenses, but substantial costs may be incurred to defend and resolve litigation proceedings relating to, or arising out of, the purported securities class action lawsuits seeking relief against KaloBios and certain of its former officers and directors.

The pending civil proceedings may also divert the efforts and attention of its management from business operations, particularly if adverse developments are experienced in any of them.  Depending on the ultimate outcome of the Securities Litigation, stockholders may have their Interests diluted, potentially to a significant degree, up to the asserted amount of the Claim associated with the Securities Litigation of $20 million, or more.

7.     *The PIPE Litigation could result in substantial costs, judgment and other adverse effects.*

The Debtor believes that the PIPE Litigation is not meritorious and that the Debtor has strong defenses, but substantial costs may be incurred to defend and resolve litigation proceedings relating to, or arising out of, the PIPE Litigation seeking relief against KaloBios.

The pending adversary proceeding may also divert the efforts and attention of its management from business operations, particularly if adverse developments are experienced.

Depending on the ultimate outcome of the PIPE Litigation, stockholders may have their Interests diluted, potentially to a significant degree, up to the asserted claim in the PIPE Litigation of $8.2 million, or more.

8.    *IAC Claims, to the extent also Allowed Other Subordinated Claims, could result in significant dilution to stockholders.*

IAC Claims have been filed or may be filed related to the Securities Litigation or other disputes. IAC Claims will be disallowed permanently and for all purposes under the Plan pursuant to section 502(e)(1). To the extent, however, any IAC Claim is also an Other Subordinated Claim and becomes Allowed, it shall receive the treatment provided for Allowed Other Subordinated Claims. To the extent Allowed, however, the Debtor believes that Other Subordinated Claims will be subordinated to the level of common stock for distribution purposes under the Plan pursuant to section 510(b) of the Bankruptcy Code. To the extent that any Other Subordinated Claims are subordinated pursuant to section 510(b) of the Bankruptcy Code and the Debtor is required to issue additional shares of the New Common Stock, there is a risk of significant dilution to Holders of Existing Common Stock and Class 9 Common Stock and Holders of Claims who receive New Common Stock on account of such Claims.

9.    *Failure to have an effective registration statement in accordance with the Stalking Horse SPA may result in additional dilution to stockholders.*

Under the terms of the Stalking Horse SPA, the Debtor agrees that, under certain conditions, if a registration statement is not effective or the Primary Plan Sponsor New Common Stock is not eligible to be sold under Rule 144, then the Debtor will issue additional shares of Primary Plan Sponsor New Common Stock to the Stalking Horse in amounts required to cause the amount of Primary Plan Sponsor New Common Stock to increase by 10% for each thirty-day period (or portion thereof) until such time that a registration statement is effective and the Primary Plan Sponsor New Common Stock is eligible to be sold under Rule 144. Accordingly, if these conditions are not met in the time required by the Stalking Horse SPA, stockholders may be diluted to a significant degree.

10.    *Other factors may dilute stockholders.*

Other factors, including, without limitation, satisfaction of Claims or other obligations, or incentives to employees, management, or directors, may result in the issuance of additional shares of common stock in the Reorganized Debtor that could dilute stockholders, potentially to a significant degree.

11.    *The market for KaloBios common stock may be illiquid.*

KaloBios common stock is currently traded on the OTC Markets – KBIOQ Tier. The future liquidity of the trading markets for the Reorganized Debtor's common stock will depend, among other things, upon the number of holders of such securities and whether such securities become listed for trading on an exchange or trading system at some future time. Although KaloBios has undertaken pursuant to the Stalking Horse SPA Documents, following the Effective Date, if the Stalking Horse is the Winning Bidder, to use commercially reasonable best efforts to resume the listing and trading of its capital stock on the NYSE MKT, the Nasdaq Stock

Market, or the New York Stock Exchange (each a "Major Trading Market"), no assurances exist that Reorganized KaloBios will be successful in this endeavor.  Moreover, if other Entity or Entities is/are determined pursuant to the Bid Procedures and the Bid Procedures Order to be the Winning Bidder for a Primary Plan Transaction and such Winning Bidder's Primary Plan Sponsor Documents do not contemplate the relisting of the Reorganized Debtor's common stock on a Major Trading Market, the trading market for common stock may be illiquid.

## XI.
## U.S. SECURITIES LAW MATTERS

### A.    Introduction

The issuance, distribution, exercise and resale (as applicable) of securities pursuant to the Plan, including New Common Stock, will be exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended (the "Securities Act"), pursuant to Section 1145 of the Bankruptcy Code ("Section 1145"), Section 4(a)(2) under the Securities Act and/or other available exemptions from registration under the Securities Act and state securities laws, as applicable.  Other than as noted below in Section XII.B, no registration statement will be filed under the Securities Act or pursuant to any state securities laws with respect to the offer, distribution and resale of New Common Stock.

### B.    Exemptions from Registration Requirements

Section 1145(a)(1) of the Bankruptcy Code ("Section 1145(a)") exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities hold prepetition or Administrative Claims against the debtor or an interest in the debtor; and (iii) the securities are issued either entirely in exchange for such recipient's Claim or Interest, or principally in such exchange and partly for cash or other property.  Except to the extent necessary for the Primary Plan Sponsor New Common Stock and Secondary Plan Sponsor New Common Stock, the issuance and distribution of Remaining New Common Stock pursuant to the Plan will be exempt from the Securities Act and state law registration requirements pursuant to Section 1145(a) and/or other available exemptions from registration under the Securities Act and state securities laws, as applicable.

Pursuant to the Stalking Horse SPA Documents, the Debtor shall promptly, following the Effective Date, file a registration statement under the Securities Act for the Primary Plan Sponsor New Common Stock and shall comply with all other applicable laws relating to such registration, and shall use its reasonable best efforts to cause such registration statement to be declared effective by the SEC within 180 days following the Effective Date.

### C.    Resale of New Common Stock

1.    *General*

77

Section 1145(c) of the Bankruptcy Code provides that the offer or sale of securities pursuant to Section 1145 (such securities, "<u>1145 Securities</u>") shall be deemed a "public offering."  As a result, other than to the extent described below, the 1145 Securities shall not be deemed to be "restricted securities" as defined in the Securities Act, and may be resold without registration under the Securities Act subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, and compliance with the rules and regulations of the U.S. Securities and Exchange Commission and any state or foreign securities laws applicable at the time of such future transfer; (2) contractual restrictions, if any, on the transferability of such securities and instruments; and (3) the terms of any other applicable regulatory approvals.

2.      *Underwriters; Definitions of Underwriter and Affiliate.*

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of determining whether any Person that acquires New Common Stock is deemed to be an "underwriter."  To the extent that any such Person is deemed to be an "underwriter," resale of New Common Stock by such Person may not be exempted from registration under the Securities Act or other applicable law by Section 1145.

Whether or not any Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to any Plan Security will depend upon the facts and circumstances applicable to that Person.  Accordingly, the Debtor expresses no view as to whether any Person would be an "underwriter" with respect to any Plan Security.  **PERSONS ACQUIRING NEW COMMON STOCK SHOULD CONFER WITH THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER OR NOT ANY SUCH PERSON IS AN "UNDERWRITER" UNDER THE BANKRUPTCY CODE.**  Persons that are deemed to be underwriters who acquire New Common Stock that are deemed to be "restricted securities" may nonetheless sell those securities without registration in compliance with the relevant provisions of Rule 144 under the Securities Act applicable to "affiliates."

**D.      Listing of New Common Stock**

Pursuant to the Stalking Horse SPA, the Reorganized Debtor will use its commercially reasonable best efforts to resume the listing and trading of its capital stock on a national exchange as set forth in the Stalking Horse SPA.

**XII.**
**CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.      General**

The following discussion summarizes certain anticipated U.S. federal income tax consequences relating to the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended ("<u>IRC</u>"), U.S. Treasury regulations (proposed, temporary and final) issued thereunder and administrative and judicial interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in U.S. federal income tax consequences different from those discussed below.

The following summary is for general information only.  The tax treatment of a beneficial owner of Claims (each a "Holder" and collectively, the "Holders") may vary depending upon such Holder's particular situation.  This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences, and does not address the tax consequences to a Holder that has made an agreement to resolve its Claim in a manner not explicitly provided for in the Plan.  This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on the Plan; Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, Holders that are, or hold Claims or New Common Stock through, partnerships and other pass-through entities; Holders that hold Claims as a position in a "straddle" or as part of a "synthetic security," "hedging," "conversion" or other integrated transaction; Holders that have a "functional currency" other than the United States dollar; and Holders that have acquired Claims in connection with the performance of services.  The following summary assumes that the Claims are held by Holders as "capital assets" (as defined in the IRC) and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount and timing of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives distributions under the Plan in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder.  Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

IRS CIRCULAR 230 DISCLOSURE:  TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT (INCLUDING ANY APPENDICES OR ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE IRC, (B) ANY SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THE DISCLOSURE STATEMENT AND IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.      U.S. Federal Income Tax Consequences to Holders of Interests**

1.      <u>General</u>.

The Debtor believes that, at the Effective Date, a Holder of an Interest in KaloBios will generally recognize gain or loss equal to (1) the amount of the fair market value of any Interest in the KaloBios less (2) the tax basis of the Holder in the Interest. The tax basis of the Holder of an Interest will be equal to the Holder's cost therefore.  The characterization of gain or loss realized by a Holder as capital or ordinary will be determined by a number of factors, including the tax status of the Holder, whether the Interest constitutes a capital assets in the hands of the Holder, whether the Interest was acquired at a market discount, whether and to what extent the Holder previously had claimed a bad debt deduction, and the original of the Interest.  The deductibility of capital losses is subject to limitations.  Any capital gain or loss recognized by a Holder will be long-term capital gain or loss if the Interest was held for more than one year.

2.      <u>Information Reporting and Withholding</u>.

Unless The Debtor receives a properly executed W-9 "Request for Taxpayer Identification Number and Certification" checking the box "Exempt from backup withholding", all distributions to Holders of Claims and Interests under the Plan are subject to any applicable withholding obligations. Under federal income tax law, interest and other reportable payments may, under certain circumstances, be subject to "backup withholding: at the then-applicable rate. Backup withholding generally applies if the holder: (1) fails to furnish its social security number or other taxpayer identification number ("<u>TIN</u>"); (2) furnishes an incorrect TIN; (3) fails properly to report interest or dividends; or (4) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, included, in certain circumstances, corporations and financial institutions.

# XIII.
## CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to Holders of Claims and Interests.   Other alternatives would involve significant delay, greater erosion of value, uncertainty and substantial administrative costs and are likely to reduce, if not eliminate, any return to any creditors who hold Impaired Claims.   The Debtor urges the Holders of Impaired Claims and Interests in Classes 2, 3, 4, 5, 6, 7 and 9 who are entitled to vote on the Plan to vote to Accept the Plan and to evidence such acceptance by casting their Ballots as set forth in the instructions enclosed with the Ballots so that they will be received not later than [__]:00 p.m., prevailing Eastern Time, on [____ __], 2016.

Dated:  April 7, 2016

Respectfully Submitted,

**KALOBIOS PHARMACEUTICALS, INC.**

**By:**    _____
**Name:  Dr. Cameron Durrant**
**Title:    Chairman & CEO**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Eric. D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
Marcy J. McLaughlin (No. 6184)
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

- and -

HOGAN LOVELLS US LLP

Peter Ivanick
Pieter Van Tol
John D. Beck
875 Third Avenue
New York, New York 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Counsel to the Debtor*