## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| KaloBios Pharmaceuticals, Inc., | Case No. 15-12628 (LSS) |
| Debtor.[1] | **Objection Deadline:**<br>**April 21, 2016, at 4:00 p.m. (ET)**<br>**Hearing Date:**<br>**April 28, 2016, at 10:00 a.m. (ET)** |

## DEBTOR'S MOTION FOR
## FINAL ORDER (I) AUTHORIZING DEBTOR TO INCUR POSTPETITION DEBT ON A SUPERPRIORITY BASIS TO DIP CREDIT PARTIES PURSUANT TO 11 U.S.C. §§ 364 AND 507(b); (II) GRANTING LIENS AND SECURITY INTERESTS TO DIP AGENT; (III) GRANTING DIP CREDIT PARTIES RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (IV) GRANTING OTHER RELATED RELIEF

KaloBios Pharmaceuticals, Inc., as debtor and debtor in possession (the "Debtor" or "KaloBios") in the above-captioned chapter 11 case, hereby moves (the "Motion") this Court, under sections 105, 361, 362, 363, 364, and 507 of chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), for entry of a final order, substantially in the form attached hereto as **Exhibit A**, (the "DIP Financing Order"):

(1)     authorizing the Debtor to obtain postpetition financing, consisting of a superpriority, single-draw secured term loan facility in an aggregate principal amount of $3,000,000 (the "DIP Financing") from Black Horse Capital Master Fund Ltd., as administrative

---

[1]     The last four digits of the Debtor's federal tax identification number are 7236.  The Debtor's address is 1000 Marina Blvd, #250, Brisbane, CA 94005-1878.

agent (in such capacity, together with any successor in such capacity, the "DIP Agent"), and as a lender, together with Black Horse Capital LP, Cheval Holdings, Ltd., and Nomis Bay LTD, as lenders[2] (each a "Lender" and collectively, the "Lenders," and together with the DIP Agent, the "DIP Credit Parties");

(2)     authorizing the Debtor to execute and enter into, and to perform all such other and further acts as may be required in connection with, that certain Debtor in Possession Credit and Security Agreement, dated as of April 1, 2016, attached hereto as **Exhibit B**, with such changes or amendments may be made with the agreement of the DIP Credit Parties from time to time (together with all Schedules[3] and Annexes thereto, the "Credit Agreement") and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or reasonably requested by the DIP Credit Parties to give effect to the terms thereof, with such changes or amendments may be made with the agreement of the DIP Credit Parties from time to time (the Credit Agreement with all promissory notes and all ancillary documents executed in connection therewith, collectively, the "Financing Documents");[4]

(3)     authorizing the Debtor to use proceeds of the DIP Financing solely as expressly permitted in the Financing Documents and in accordance with the DIP Financing Order;

(4)     granting (i) automatically perfected first priority priming security interests in and liens on all of the Collateral (as defined in the Credit Agreement) as of the Closing Date (as

---

[2]     Lenders reserve the right to include other investors in the Lender group.  The inclusion of additional investors will not alter the terms of the DIP Financing Order.

[3]     The Schedules to the Credit Agreement (the "Schedules") are voluminous and contain certain confidential and commercially sensitive information about the Debtor and its interests in property.  Accordingly, the Schedules, except for Schedule 2.1 (Conversion Terms) are not attached.  Copies of the Schedules will be made available upon request to parties in interest, subject to putting in place appropriate confidentiality restrictions.

[4]     Capitalized terms not otherwise defined in this Motion have the meanings ascribed to them in the Credit Agreement.

defined in the Credit Agreement), subject only to Permitted Liens (as defined in the Credit Agreement) and the Carve-Out (as defined herein), (ii) automatically perfected non-priming security interests in and liens with respect to Collateral subject to Permitted Liens as of the Closing Date, and (iii) Superpriority Claims (as defined in the Credit Agreement) in the amount of the Obligations (as defined below), subject only to the Carve-Out, in each case on the terms set forth in the Financing Documents;

(5)     authorizing the Debtor to pay the Obligations or satisfy the Obligations (as defined herein) through Conversion (as defined in Schedule 2.1 of the Credit Agreement), each in accordance with the terms of the Credit Agreement and the DIP Financing Order;

(6)     vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Order and the Financing Documents;

(7)     waiving the Debtor's ability to surcharge against the Collateral pursuant to Section 506(c) of the Bankruptcy Code; and

(8)     granting the Debtor such other and further relief as is just and proper.

In support of this Motion, the Debtor incorporates by reference the Declaration of Alexandre Zyngier, dated March 21, 2016 [D.I. 275] (the "Zyngier Declaration") and the declaration of Dr. Cameron Durrant, dated March 21, 2016 [D.I. 276] (the "Durrant Declaration"), and respectfully states as follows:

## JURISDICTION

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This is a core proceeding pursuant to 28

U.S.C. § 157(b).  Venue of this case is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rule 4001-2.

3.      The Debtor consents to the entry of a final order or judgment by the Court in connection with this Motion to the extent that it is later determined that the Court cannot enter such final order or judgment consistent with Article III of the United States Constitution absent consent of the parties.

**BACKGROUND**

A.      **Procedural Background**

4.      On December 29, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No trustee, examiner or committee has been appointed in this chapter 11 case.

7.      On April 7, 2016, the Debtor filed the *Debtor's Plan of Reorganization* [D.I. 318] (as amended from time to time, the "Plan") and its related disclosure statement (as amended from time to time, the "Disclosure Statement").  The Debtor has requested a hearing for this Court to consider approval of the Disclosure Statement on May 6, 2016, at 9:30 a.m. ET.

B.      **The Debtor's Business**

8.      The Debtor is a publicly traded biopharmaceutical company dedicated to helping the lives of patients with innovative therapies.[5]  The Debtor focuses on developing treatments for

---

[5]      The Debtor's common stock traded on the NASDAQ Exchange, until delisted effective January 13, 2016.  The Debtor's common stock currently trades in over-the-counter markets.

rare and neglected diseases. As a small biotech venture, the Debtor also pursues strategic alliances and partnerships with other companies and organizations that share its commitment to developing and advancing treatments for rare and neglected diseases.

**C.    Events Leading To Commencement Of Debtor's Chapter 11 Case**

9.    KaloBios is a development stage venture. KaloBios's business model has always been premised—and still is today—on its ability to successfully meld its technical and scientific experience with adequate capital to develop and make the most of market opportunities for the treatments and therapies being developed or made available to it through partnering with other firms. In late 2014 and early 2015, this business model began to break down for the Debtor after it experienced setbacks in its efforts to research and develop treatments for certain pulmonary conditions. In early 2015, the Debtor attempted to implement a restructuring of its business to reorient its focus on the development and commercialization of certain oncology treatments (for which its research and testing also had shown promise). The Debtor, however, could not fully realize on this restructuring plan because of its liquidity constraints.

10.    On November 5, 2015, the Board of Directors of KaloBios approved a restructuring plan involving, among other measures, reductions in headcount as part of a plan to reduce operating costs. The positions eliminated represented approximately 61% of the company's workforce. KaloBios announced the restructuring plan by a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on November 9, 2015.

11.    The aim of this further restructuring was to allow KaloBios to focus its limited resources on the ongoing development of KB003 (a/k/a lenzilumab) as a treatment for Chronic Myelomonocytic Leukemia. As a part of its restructuring, KaloBios also announced that it would pause enrollment in the Phase 2 cohort expansion phase of its ongoing clinical study of KB004 in certain hematologic malignancies.

5

12.     KaloBios also announced its intent to repay in full its outstanding loan obligations to MidCap Financial, its secured lender.  KaloBios expected this move to generate significant cash savings when compared to repayment of the debt in the ordinary course of business. KaloBios thereafter implemented this aspect of its restructuring plan by repaying approximately $6.6 million of outstanding loan obligations to MidCap Financial. As a result, KaloBios had no appreciable secured debt as of the Petition Date.

13.     Unfortunately, these cost-cutting measures and efforts by the company to explore strategic alternatives were not immediately successful.  On November 13, 2015, KaloBios issued a press release announcing that liquidity constraints had forced the company to move to winddown its remaining operations.

14.     On November 18, 2015, however, KaloBios announced a group of investors, including Martin Shkreli, acquired over 50.1% of KaloBios's outstanding shares of common stock in the aggregate through open market purchases.  By November 23, 2015, as stated in a Form 8-K issued on that date, KaloBios announced that the investor group had acquired in the aggregate approximately 70% of the outstanding shares of common stock of KaloBios.  Based on that announcement, Mr. Shkreli was then a controlling shareholder, beneficially holding more than 50% of the outstanding shares of KaloBios at that time.  The same Form 8-K disclosed that KaloBios's then Interim President, Interim Chief Executive Officer and Chief Financial Officer had been terminated and that Mr. Shkreli had been appointed as Chief Executive Officer of the Company and elected as Chairman of the Board.

15.     On December 9, 2015, KaloBios announced by a Form 8-K filed with the SEC that it entered into a Securities Purchase Agreement with the purchasers identified therein (the "PIPE Investors") relating to a private placement (the "PIPE Transaction") by KaloBios of up to

an aggregate 511,596 shares of the company's common stock, par value $0.001 per share, at a purchase price of $29.32 per share, or up to $15,000,000. Between December 3, 2015 and December 15, 2015, certain of the PIPE Investors wired the company approximately $8.2 million. In a Form 8-K filed on December 16, 2015, it was announced that the PIPE Transaction had closed.

16.     On December 17, 2015, Mr. Shkreli was arrested following a federal indictment, charging him with multiple counts of securities fraud, securities fraud conspiracy, and wire fraud conspiracy. According to the U.S. Department of Justice's press release announcing the indictment, Mr. Shkreli's indictment and arrest relate to his tenure as CEO of Retrophin, Inc., an unrelated biopharmaceutical company, and as a founder and managing member of hedge funds MSMB Capital Management LP and MSMB Healthcare Management LP. In addition to Mr. Shkreli, Evan Greebel, an attorney who had briefly represented the Debtor after the Shkreli-lead investor group acquired control, was indicted and arrested.

17.     The same day, Mr. Shkreli was terminated as CEO of KaloBios and resigned from its Board of Directors. In addition, on December 17, 2015 and in the following days, several individuals who had joined the Debtor's Board with Mr. Shkreli also resigned their positions as directors. Further, it was announced that Christopher Thorn, who had come on board as KaloBios's Interim Chief Financial Officer with Mr. Shkreli, also resigned his position with the company. Moreover, the company's independent public accounting firm (which itself had been engaged soon after Mr. Shkreli had joined the company's management) submitted its resignation.

18.     In the weeks that followed, the fallout from these events presented KaloBios with further challenges. Certain of the PIPE Investors engaged counsel and began making demands of KaloBios to return the cash they had funded to it in connection with the PIPE Transaction and

threatened litigation if their demands were not heeded.  Further, multiple purported shareholder class actions (collectively, the "Shareholder Litigations") were filed against KaloBios, Mr. Shkreli and (in one case) Mr. Thorn.

19.     In the face of this adversity, the remaining members of the Debtor's Board, with the assistance of the Debtor's professional advisors, undertook efforts to stabilize the company's situation and to preserve the value of the Debtor's business and assets.  Such actions included the commencement of this chapter 11 case on the Petition Date.  Additionally, on January 7, 2016, the Debtor's Board of Directors was reconstituted with Dr. Cameron Durrant, a veteran pharmaceutical industry executive, and Mr. Ronald Barliant, a former bankruptcy judge, joining the three-person Board as independent directors.

**D.      The Debtor's Go-Forward Business Plan**

20.     As previously discussed in this case, the Debtor's management has made herculean efforts to further develop and implement the Debtor's two-pronged business plan, which is focused on: (a) the Debtor's acquisition of the worldwide rights from Savant Neglected Diseases, LLC ("Savant") of its program for use of benznidazole as a treatment for Chagas Disease in humans; and (b) the KB003 (a/k/a lenzilumab) oncology oriented drug research and development program.

a.      The Savant LOI And Contemplated Transactions

21.     Prior to the Petition Date, on December 3, 2015, the Debtor announced that it had entered into a non-binding letter of intent to acquire a benznidazole program for the treatment of Chagas disease from Savant (the "Savant Prepetition LOI").  Under the Savant Prepetition LOI, the Debtor and Savant agreed, among other things, to a negotiation period through and including February 29, 2016, to pursue a binding agreement with respect to the Debtor acquiring from Savant the rights to benznidazole.

22.     Following the Petition Date, the Debtor and Savant revisited certain terms of the Savant Prepetition LOI in light of the changed circumstances since the original letter of intent was reached and the Debtor's pending bankruptcy.  After intensive, arm's-length negotiations, the Debtor and Savant reached agreement on terms for a proposed postpetition binding Letter of Intent (the "Savant Postpetition LOI"), which were set forth in Exhibit A to the Debtor's motion, dated February 23, 2016, filed under seal [D.I. 196].  On February 26, 2016, this Court entered its Order [D.I. 211] approving the Savant Postpetition LOI and authorizing the Debtor to perform its obligations thereunder.  On February 29, 2016, the Debtor and Savant executed the Savant Postpetition LOI.  The Debtor has since remitted to Savant the initial deposit amount of $500,000 and the initial Development Services payment of $87,500.  Further, the development teams for the Debtor and Savant are in active communication and working together on the development plan for benznidazole, as intended by the Savant Postpetition LOI.

23.     The Savant Postpetition LOI contemplates that the Debtor will emerge from bankruptcy no later than June 30, 2016, and makes the Debtor's timely exit from bankruptcy under a confirmed and effective plan of reorganization one of several conditions to the consummation of the transactions with Savant.  To this end, the Savant Postpetition LOI further provides that the parties will complete definitive documentation by June 30, 2016.  Upon exit from bankruptcy, the Debtor is required to pay Savant the balance of the $3,000,000 initial payment (the "Initial Payment").  Other requirements to consummating the Savant transactions include, *inter alia,* that the Debtor exit bankruptcy with an unencumbered cash balance of not less than $10,000,000.  Following the Debtor's emergence from bankruptcy, additional payments will be due to Savant, including those that become payable as certain developmental and regulatory milestones are surpassed.

24.     The Savant Postpetition LOI provides the Debtor with an opportunity for the Debtor to acquire a proven treatment for a debilitating tropical disease, seek FDA approval of that treatment, and bring that treatment to market in the near term.  In addition, the rights to be acquired by the Debtor under the Savant Postpetition LOI may allow the Debtor to apply for a priority review voucher ("PRV") under the priority review voucher program administered by the U.S. Food and Drug Administration ("FDA").[6]  If the Debtor is granted a PRV, it may be able to market and sell the PRV, potentially for several hundred million dollars.  Even if the Debtor is not granted a PRV in the near term, however, the potential to obtain a PRV and the income from sale of benznidazole for treatment of Chagas disease will aid the Debtor in raising capital to fund investigation and clinical trials of its other existing and future drug lines.

a.      Further Development of KB003

25.     The other current pillar of the Debtor's go-forward business plan is its research and development program for KB003, otherwise known as lenzilumab.  KB003 is a Humaneered®, recombinant monoclonal antibody (mAb) that has shown potential for efficacy in the treatment of a particularly deadly form of leukemia, known as Chronic Myelomonocytic Leukemia ("CMML"), Juvenile Myelomonocytic Leukemia ("JMML") and certain solid tumors.

26.     There presently exists an unmet medical need for CMML and JMML treatments. The Debtor believes KB003 may create significant value for the Debtor's estate and

---

[6]     On August 20, 2015, the FDA published its final order *Designating Additions to the Current List of Tropical Diseases in the Federal Food, Drug, and Cosmetic Act*, 21 C.F.R. Part 317, Docket No. FDA-2008-N-0567 (https://www.federalregister.gov/articles/2015/08/20/2015-20554/designating-additions-to-the-current-list-of-tropical-diseases-in-the-federal-food-drug-and-cosmetic (Last accessed March 10, 2016)), which added Chagas disease to the list of "tropical diseases", treatments for which may be eligible to receive a priority review voucher.

stakeholders.  Further, patients' lives may be improved and prolonged as a result of these drugs proving to be effective and tolerable.[7]

E.    **Background to the DIP Financing Facility**

27.    As soon as was possible after the commencement of the Debtor's chapter 11 case, the Debtor's management and professionals commenced efforts to identify viable sources of financing for KaloBios.  Such efforts included Batuta Capital Advisors, LLC ("Batuta"), the Debtor's financial advisor contacting approximately 190 potential financial and strategic investors.  Of those contacted, approximately 100 parties communicated expressions of interest to the Debtor, including 27 parties who received confidential information from the Debtor.

28.    Those efforts allowed the Debtor, after extensive arms'-length negotiations, to enter into that certain Letter of Intent and annexed Term Sheet, dated March 9, 2016 (collectively, the "Original LOI"), between the Debtor and Cheval Holdings, Ltd., Black Horse Capital LP, and Black Horse Capital Master Fund Ltd. (collectively, the "Original Stalking Horse Parties").  The Original LOI contained the commitment from the Original Stalking Horse Parties, subject to the terms and conditions thereof, to provide the Debtor with a $10 million financing facility, consisting of $3 million of senior secured DIP financing (convertible to equity in the reorganized Debtor upon emergence) and $7 million of equity financing to be made available upon the Debtor's emergence from bankruptcy.

29.    With the Original LOI in hand, on March 10, 2016, the Debtor filed the *Debtor's Motion for an Order: (I) Approving Letter of Intent and Term Sheet with Cheval Holdings, Ltd., Black Horse Capital LP and Black Horse Capital Master Fund Ltd.; (II) Approving Bidding Procedures Governing Submission and Consideration of Competing and Supplemental Plan*

---

[7]    The Debtor continues to believe that its KB004 line has promise.  KB004 has the potential to selectively attack tumors at the source by targeting tumor stem cells, the microenvironment that protects the tumors and the vasculature that feeds them without harming normal cells.

*Sponsorship Proposals; (III) Approving Breakup Fee; (IV) Scheduling and Authorizing the Debtor to Conduct an Auction Pursuant to Such Procedures; and (V) Granting Related Relief* [D.I. 238] (the "Term Sheet Approval Motion").

30.    Soon thereafter, with the assistance of the Original Stalking Horse Entities, the Debtor, the Original Stalking Horse Entities and a new investor party, Nomis Bay LTD (collectively, with the Original Stalking Horse Parties, in such capacity, the "Stalking Horse"), executed an Amended Letter of Intent and Amended Term Sheet, each dated March 18, 2016 (the "Amended Stalking Horse LOI"), as filed with the Court on March 18, 2016 [D.I. 247]. Pursuant to the Amended Stalking Horse LOI, among other changes, the Stalking Horse's exit financing commitment was enlarged to $11 million, for a total financing commitment, subject to the terms thereof, of $14 million.   As was true of the Original Stalking Horse Parties pursuant to the Original Stalking Horse LOI, the Stalking Horse, pursuant to the Amended Stalking Horse LOI, was only willing to commit to provide the Debtor with financing if it had the opportunity (albeit subject to a market check) to provide both the DIP and exit financing facilities.

31.    The Court convened a hearing on the Term Sheet Approval Motion on March 21, 2016, and granted the relief requested therein, as modified by the Amended Stalking Horse LOI and certain revisions required by the Court.   On March 23, 2016, the Court entered an Order [D.I. _293] (the "Term Sheet Approval Order") that, among other things, (i) approved the Amended Stalking Horse LOI, (ii) approved the Bid Procedures (as defined therein) to govern the Debtors' solicitation, receipt and consideration of competing Primary Plan Transaction (as defined therein) proposals and Secondary Plan Transaction (as defined therein) proposals, (iii) imposing a limited "no shop" on the Debtor through April 1, 2016, and (iv) conditionally approving the Breakup Fee for the Stalking Horse.   The Term Sheet Approval Order conditioned

approval of the Breakup Fee upon the Debtor and the Stalking Horse executing substantially complete Financing Documents and substantially complete exit financing documents by April 7, 2016 (the "Documentation Condition"). *See* Bid Procedures Order, ¶ 6. The Debtor and the Stalking Horse satisfied the Documentation Condition effective April 1, 2016, when they completed and executed (i) the Credit Agreement and related Financing Documents and (ii) that certain Securities Purchase Agreement, dated April 1, 2016 (the "SPA").

32.    The Financing Documents and SPA are each subject to higher and better offers as provided for in the Term Sheet Approval Order and Bid Procedures (as defined therein and attached thereto). Accordingly, following the execution of the Credit Agreement and the SPA, Batuta has resumed its marketing efforts on behalf of the Debtor.

33.    Significantly, the schedule for the marketing and auction process approved by this Court provides for the Auction, if necessary, to occur on April 26, 2016, which is prior to the hearing date for this Motion.  Accordingly, the Debtor will have a further opportunity to identify potential higher and better offers and test the terms of this DIP Financing against the market in advance of this Court's consideration of the DIP Financing.

**F.    The Debtor's Need For Financing**

34.    The liquidity provided by the DIP Financing will allow the Debtor to begin reactivating its drug development programs, including reactivating the steps necessary to begin the clinical testing program for KB003.  For the Debtor to pursue a clinical testing program, it must show that it has the financial wherewithal to cover the expenses associated with the program from start to finish.   Further, the DIP Financing will signal to the vendors, employees, and the marketplace that the Debtor's business and restructuring are proceeding in the right direction, and that the Debtor will have the financial wherewithal to carry its drug development programs to fruition.

35.    Additionally, the DIP Financing to be provided by the Stalking Horse is effectively the first tranche of a larger financing package the Stalking Horse has committed to provide to the Debtor.  Under the terms of the Amended Stalking Horse LOI, the Credit Agreement and the SPA, the Stalking Horse is not obligated to provide the Debtor with exit financing unless the DIP Financing is approved.  Hence, while the Debtor will be separately seeking approval (and subject to the Debtor accepting a higher or better offer for a Primary Plan Transaction in accordance with the Bid Procedures Order) of the exit financing and the SPA in connection with confirmation of its Plan, if the DIP Financing is not approved, the Debtor may lose access to the exit financing the Stalking Horse has committed to provide.  Without such exit financing, the Debtor likely will be unable to proceed with the Savant transaction or otherwise to reorganize under the terms contemplated by its recently filed Plan.

## RELIEF REQUESTED

36.    For the reasons set forth herein, the Debtor respectfully requests that the Court enter the DIP Financing Order: (a) authorizing the Debtor to obtain the DIP Financing; (b) authorizing the Debtor to enter into and perform under the Financing Documents; (c) authorizing the Debtor to use the proceeds of the DIP Financing solely as expressly permitted in the Financing Documents and in accordance with the DIP Financing Order; (d) granting (i) the DIP Agent automatically perfected first priority priming security interests in and Liens on all of the Collateral, subject only to Permitted Liens and the Carve-Out, and (ii) the DIP Credit Parties the Superpriority Claims (as defined in the DIP Financing Order), subject only to the Carve-Out; (e) authorizing the Debtor to pay or satisfy the Obligations through Conversion, each in accordance with the terms of the Credit Agreement and the DIP Financing Order; (f) vacating and modifying the automatic stay pursuant to section 362 of the Bankruptcy Code to the extent necessary to

implement and effectuate the terms and provisions of the DIP Financing Order and the Financing Documents; (g) waiving the Debtor's ability to surcharge against the Collateral pursuant to Section 506(c) of the Bankruptcy Code; and (h) granting the Debtor such other and further relief as is just and proper.

**Summary of Principal Terms of DIP Financing**

37.    Pursuant to Bankruptcy Rule 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Financing, as specified in the Financing Documents and the DIP Financing Order:[8]

| Material Provision | Summary Description of Material Provision |
|---|---|
| **Credit Agreement Parties**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement Preamble | **Borrower**: KaloBios Pharmaceuticals, Inc.<br><br>**Lenders**: Black Horse Capital Master Fund Ltd., Black Horse Capital LP, Cheval Holdings, Ltd. and Nomis Bay LTD<br><br>**Administrative Agent**: Black Horse Capital Master Fund Ltd. |
| **Amount**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement Recitals and § 2.1 | A senior secured superpriority single advance loan facility in an aggregate principal amount of $3.0 million. |
| **Availability**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 2.1 | 1. Subject to the terms and satisfaction of all conditions contained in the Credit Agreement, the Lenders will agree to provide to Borrower a single advance in the principal amount of $3.0 million on or before the date which is three (3) Business Days after the DIP Financing Order becomes a Final Order.<br><br>2. The outstanding principal balance of the Term Loan, plus accrued and unpaid interest, plus the Commitment Fee, plus the Upfront Fee, plus all other non-contingent Obligations (the "**Conversion Amount**") shall be paid or satisfied as follows: (i) if the Maturity Date (defined below) occurs, by conversion of the Conversion Amount to common stock of the reorganized Borrower in the manner set forth on Schedule 2.1 or (ii) if the Termination Date occurs, at |

---

[8]    This summary is qualified, in its entirety by the provisions of the Credit Agreement and the DIP Financing Order.  Unless otherwise set forth in this summary, capitalized terms used within this summary shall have the meanings ascribed to them in the Credit Agreement.

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Agent's option, the Conversion Amount shall (x) be paid in cash to the Lenders or (y) convert to common stock of the reorganized Borrower in the manner set forth on Schedule 2.1.  The Term Loan may not be prepaid in whole or in part at any time. |
| | "**Maturity Date**" means the Reorganization Effective Date. |
| | "**Reorganization Effective Date**" means the effective date of the Stalking Horse Plan or any plan confirmed by the Bankruptcy Court. |
| **Use of Proceeds**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 4.7(a) | The proceeds of the DIP Financing shall be used only for the following, in each case subject to the terms, conditions and amounts in the Credit Agreement (the "**Approved Purposes**"):<br><br>(a)      Payment of all fees and expenses due and payable to Agent and Lenders pursuant to Section 2.2(a);<br><br>(b)      Working capital;<br><br>(c)      Bankruptcy Related Costs;<br><br>(d)      Funding distributions under the Stalking Horse Plan, and<br><br>(e)      Other costs of the Borrower incurred in the ordinary course of business. |
| **DIP Financing Termination Date**<br><br>Fed. R. Bankr. P. 4001(b)(1)(ii) and (c)(1)(B)<br><br>Credit Agreement §§ 1.1 and 9.2 | The "**Termination Date**" means the earlier to occur of (a) termination of the Credit Agreement pursuant to Section 9.2 or (b) any date on which Agent accelerates the maturity of the Term Loan pursuant to Section 9.2.<br><br>**Section 9.2** provides that upon the occurrence and during the continuance of an Event of Default (defined below), Agent may terminate the Credit Agreement and/or declare all or any portion of the Obligations (defined below) to be, and the Obligations shall thereupon become, immediately due and payable, with accrued interest thereon, without presentment, notice, protest or demand, all of which are hereby waived by Borrower and Borrower will pay the same pursuant to the repayment terms in the Credit Agreement.<br><br>"**Obligations**" means all obligations, liabilities and indebtedness (monetary (including postpetition interest, fees, obligations for costs and expense and indemnity obligations, whether or not allowable or allowed) or otherwise) of Borrower under the Credit Agreement or any other Financing Document, in each case howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due and payable or to become due and payable. |
| **Interest Rate**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 2.1 | **Interest Rate**: The Term Loan will bear interest at a rate of 12% *per annum*.<br><br>Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.<br><br>**Default Interest**: Upon the occurrence of an Event of Default, and during the continuance thereof, and after the Termination Date and the Maturity Date (as long as any Obligations remaining owing thereafter), the outstanding principal balance of the Term Loan and, to the extent permitted by applicable Law, and any other amounts then |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | owing by Borrower to the Lenders, including, without limitation, accrued interest and the fees and expenses provided in Section 2.2(a)-(d), shall bear interest of 17% *per annum*.<br><br>**Maximum Interest**: In no event shall the interest charged with respect to the Term Loan or any other obligations of the Borrower exceed the maximum amount permitted under the laws of the State of Delaware. |
| **Fees**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement §§ 1.1 and 2.2 | **Commitment Fee**: On the Termination Date or Maturity Date, as applicable, Borrower shall pay the Lenders a commitment fee equal to one hundred fifty thousand dollars ($150,000.00), such fee to be deemed fully earned on the Funding Date, and once paid, non-refundable, and payable in cash or by conversion of such amount to common stock of the reorganized Borrower as described above.<br><br>**Upfront Fee**: On the Termination Date or Maturity Date, as applicable, Borrower shall pay the Lenders a commitment fee equal to one hundred ninety-one thousand dollars ($191,000.00), such fee to be deemed fully earned on the Funding Date, and once paid, non-refundable, and payable in cash or by conversion of such amount to common stock of the reorganized Borrower as described above.<br><br>**Breakup Fee**: Upon the occurrence of a Triggering Event, without demand or notice, the Lenders shall be entitled to the Breakup Fee (defined below). The parties agree that the Cash Option Breakup Fee(defined below) and the Breakup Attorneys' Fees (defined below) shall be an allowed administrative claim under 11 U.S.C. §503. The parties further agree that the agreed upon amount of the Breakup Fee is not a penalty, but rather is a reasonable measure of damages, based upon the parties' experience, negotiations and agreement. The Borrower acknowledges and agrees that payment of the Breakup Fee is an integral part of the transactions contemplated by the Credit Agreement and the other Financing Documents, and in the absence of the Borrower's obligation to pay the Breakup Fee, the Lenders would not have entered into the Credit Agreement and the other Financing Documents.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Term Sheet Approval Order, the Lenders shall be entitled to payment of the Breakup Fee as provided herein, and to enforce the remedies provided for hereunder or under applicable Legal Requirements, without further application to or order by the Bankruptcy Court.<br><br>**Remedies Upon the Occurrence of a Triggering Event**:  In addition to Agent's right of termination set forth in <u>Section 9.2</u> of the Credit Agreement, upon the occurrence of a Triggering Event, without demand or notice, the parties agree that Borrower shall pay the Breakup Fee to the Lenders as follows:<br><br>    (i)    In the event that the Breakup Fee is triggered because Borrower accepts an alternative exit financing proposal after the Term Loan has been funded by Lenders, Lenders shall be entitled to: (i) repayment of the Term Loan in accordance with <u>Section 2.1(c)</u> of the Credit Agreement; and (ii) receipt of the Breakup Fee;<br><br>    (ii)    In the event the Breakup Fee is triggered under Sections (i), (ii) or (iii) of the definition of Triggering Event and Lenders exercise the Cash Option |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Breakup Fee, the parties agree that both the Cash Option Breakup Fee and the Breakup Attorneys' Fees shall be payable to the Lenders out of the proceeds of such sale or alternative financing and in any event as an administrative claim under 11 U.S.C. §503; |
| | (iii)   In the event that the Breakup Fee is triggered under Section (iv) of the definition of Triggering Event and Agent exercises the Cash Option Breakup Fee, the parties agree that both the Cash Option Breakup Fee and Breakup Attorneys' Fees shall be payable as a priority administrative claim under any confirmed plan; and |
| | (iv)   The Stock Option Breakup Fee shall be payable on the Reorganization Effective Date. |
| | "**Breakup Fee**" means the sum of (1) either, as determined in Agent's discretion: (a) payment to the Lenders in the amount of Four Hundred Twenty Thousand Dollars ($420,000.00) in immediately available funds (the "**Cash Option Breakup Fee**") or (b) (i) prior to the Funding Date, at Agent's option, the Lenders' purchase of Two Million Eight Hundred Thousand Dollars ($2,800,000.00) of common stock in the reorganized Borrower at a price of $1.75 per share in accordance with each Lender's Term Loan Commitment Percentage or (ii) after the Funding Date, at Agent's option, the Lenders' of purchase Two Million Dollars ($2,000,000.00) of common stock in the reorganized Borrower at a price of $1.75 per share in accordance with each Lender's Term Loan Commitment Percentage (each, a "**Stock Option Breakup Fee**"), plus (2) reimbursement of up to Two Hundred Thousand Dollars ($200,000.00) of reasonable documented attorneys' fees and other expenses incurred by Lenders in connection with the financing provided under the Credit Agreement and other loan documents and the other transactions identified in the Letter of Intent (the "**Breakup Attorneys' Fees**"). |
| **Events of Default**<br><br>Fed. R. Bankr. P. 4001(b)(1)(B) and (c)(1)(B)(iii)<br><br>Credit Agreement Art. IX | **Events of Default** include, without limitation, the following:<br><br>A.   (i) failure to pay when due and payable any principal, interest or fee under any Financing Document or any other amount payable under any Financing Document or<br><br>(ii) any default in the performance of or compliance with Section 4.1, Section 4.2(b), Section 4.4(d), Section 4.11, Section 4.18, and/or Article 5 of the Credit Agreement;<br><br>B.   if Borrower's Board of Directors shall authorize the liquidation of Borrower's business pursuant to one or more Section 363 sales or otherwise,<br><br>C.   if Borrower shall fail to comply with or perform any of the terms, conditions, covenants or other obligations under the Financing Order or the Breakup Fee Order;<br><br>D.   the failure of the Funding Date to occur within three (3) Business Days after entry of the Financing Order becomes a Final Order without the prior |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | written consent of the Agent (unless such failure is caused by Agent or any Lender); |
| | E.    if Borrower fails to achieve any Reorganization Milestone as and when required, except as otherwise consented to in writing by Agent; |
| | F.    the amendment, modification, reversal, revocation, issuance of a stay or order to vacate or supplement the Financing Order, or any other order of the Bankruptcy Court affecting the Credit Agreement, any other Financing Document, or the transactions contemplated hereby or thereby, in each case, in any manner not acceptable to Agent and the Lenders; |
| | G.    if the Confirmation Order or any other order of the Bankruptcy Court confirming a plan of reorganization shall fail to provide for the payment in full, of all Obligations in cash or by conversion into common stock of the reorganized Borrower, at Agent's option, in the manner set forth on Schedule 2.1, on or before the Reorganization Effective Date; |
| | H.    the solicitation by or on behalf of Borrower of any plan of reorganization and/or disclosure statement that does not provide for repayment in full of all Obligations in cash or by conversion into common stock of the reorganized Borrower, at Agent's option, in the manner set forth on Schedule 2.1, on or before the Reorganization Effective Date; |
| | I.    if any plan documentation is filed or any confirmation order is entered which does not provide for repayment in full of all Obligations in cash or by conversion into common stock of the reorganized Borrower, at Agent's option, in the manner set forth on Schedule 2.1, on or before the Reorganization Effective Date; |
| | J.    if Borrower<br><br>(i) consummates a sale of any of its Intellectual Property rights or other assets, which is not approved by Agent,<br><br>(ii) consummates a sale of all or substantially all of its assets or common stock, which is not approved by Agent or<br><br>(iii) files one or more motions or applications in the Bankruptcy Case seeking approval of a sale or licensing of any Collateral, including without limitation, its Intellectual Property rights, with a total book value in excess of Two Hundred Fifty Thousand Dollars ($250,000.00), and/or the Bankruptcy Court approves such sale and/or licensing, unless otherwise consented to in writing by Agent; |
| | K.    the Savant Acquisition is consummated prior to the Maturity Date; |
| | L.    the Adversary Case is settled or the Bankruptcy Court enters a judgment with respect to the Adversary Case, without Agent's consent, in either case, |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | which results in more than a Two Hundred Fifty Thousand Dollar ($250,000.00) reduction of Borrower's cash resources; |
| | M.   if, during any period when Agent has approval over the Budget, Borrower's (i) actual disbursements under any line item on the Budget for any four-week period exceed the budgeted disbursements for such four-week period in such line item by more than five percent (5%) of the budgeted amount for such four-week period, (ii) aggregate actual disbursements under the Budget for any four-week period  exceed the aggregate budgeted disbursements for such four-week period by more than five percent (5%) of the aggregate budgeted amount for such four-week period, or (iii) aggregate actual cash receipts during any four-week period are less than ninety percent (90%) of aggregate projected cash receipts set forth in the Budget for such four-week period; |
| | N.   Martin Shkreli at any time becomes an employee, consultant, officer or director of Borrower; |
| | O.   Borrower consummates a plan of reorganization, which is not approved by Agent |
| | P.   the Term Sheet Approval Order is reversed, stayed, modified, or amended; |
| | Q.   Borrower accepts an alternative debtor-in-possession financing and/or exit financing proposal other than those proposals contemplated by the Letter of Intent; or |
| | R.   any of the following occurs: |
| | (i) the institution of any proceeding by FDA, FTC, or similar Governmental Authority to order the withdrawal of any Product or Product category from the market or to enjoin Borrower or any representative of Borrower from investigating manufacturing, selling, or marketing any Product or Product category, which, in each case, could cause a Material Adverse Effect; |
| | (ii) the commencement of any enforcement action against Borrower by FDA, DEA, HHS, OCR, or any other Governmental Authority, which, in each case, could cause a Material Adverse Effect; or |
| | (iii) any actual legislative change or pending legislative change that advances past committee in the United States Congress that would amend or eliminate the PRV system in such a way to disqualify Benznidazole's ability to earn a PRV upon receiving a new Drug Application approval. |
| | S.   Other Events of Default as set forth in Article IX of the Credit Agreement. |
| | **Remedies**: Upon the occurrence and during the continuance of an Event of Default, Agent may terminate the Credit Agreement and/or declare all or any portion of the Obligations to be, and the Obligations shall thereupon become, immediately due and |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | payable, with accrued interest thereon, without presentment, notice, protest or demand, all of which are waived by Borrower and Borrower will pay the same pursuant to the repayment terms of the Credit Agreement and other Financing Documents.<br><br>**Additional Remedies**:<br>Upon the occurrence of and during the continuance of an Event of Default under the Credit Agreement or the other Financing Documents, Agent, after three (3) Business Days' prior written notice to Borrower, in addition to all other rights, options, and remedies granted to Agent under the Credit Agreement or at law or in equity, may exercise, either directly or through one or more assignees or designees, all rights and remedies granted to it under all Financing Documents and under the UCC and under any other applicable law; including, without limitation:<br><br>(i)    the right to take possession of, send notices regarding, and collect directly the Collateral, with or without judicial process;<br><br>(ii)    the right to (by its own means or with judicial assistance) enter any of Borrower's premises and take possession of the Collateral, or render it unusable, or to render it usable or saleable, or dispose of the Collateral on such premises in compliance with subsection (iii) below and to take possession of Borrower's original books and records, to obtain access to Borrower's data processing equipment, computer hardware and software relating to the Collateral and to use all of the foregoing and the information contained therein in any manner Agent deems appropriate, without any liability for rent, storage, utilities, or other sums, and Borrower shall not resist or interfere with such action (if Borrower's books and records are prepared or maintained by an accounting service, contractor or other third party agent, Borrower hereby irrevocably authorizes such service, contractor or other agent, upon notice by Agent to such Person that an Event of Default has occurred and is continuing, to deliver to Agent or its designees such books and records, and to follow Agent's instructions with respect to further services to be rendered);<br><br>(iii)    the right to require Borrower at Borrower's expense to assemble all or any part of the Collateral and make it available to Agent at any place reasonably designated by Agent;<br><br>(iv)    the right to notify postal authorities to change the address for delivery of Borrower's mail to an address designated by Agent and to receive, open and dispose of all mail addressed to Borrower; and/or<br><br>(v)    the right to enforce Borrower's rights against Account Debtors and other obligors, including, without limitation, (i) the right to collect Accounts directly in Agent's own name (as agent for the Lenders) and to charge the collection costs and expenses, including attorneys' fees, to Borrower to the extent not payable by and collectable from the applicable Account Debtor, and (ii) the right, in the name of Agent or any designee of Agent or Borrower, to verify the validity, amount or any other matter relating to |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | any Accounts by mail, telephone, telegraph or otherwise. Borrower shall cooperate fully with Agent in an effort to facilitate and promptly conclude such verification process. |
| | **Terminated Use of Cash Collateral**: Upon the occurrence of any Event of Default, after three (3) Business Days' prior written notice to Borrower, without limitation of any of the remedies set forth in the Credit Agreement and the other Financing Documents, and as long as such Event of Default is continuing, Borrower shall have no right to use or seek to use any cash Collateral (as defined in Section 363(a) of the Bankruptcy Code) in which Agent or the Lenders has an interest. |
| **Liens, Priorities and Adequate Protection** <br><br> Fed. R. Bankr. P. 4001(c)(1)(B)(i), (ii) <br><br> Credit Agreement §§ 8.1 and 8.2 | **Collateral**: The obligations of the Borrower under the DIP Financing shall, subject to the Pre-Termination Carve-Out or Post-Termination Carve-Out (as defined below), at all times: <br><br> (a) pursuant to Section 364(c)(1) of the Bankruptcy Code, constitute allowed Super-Priority Claims which shall at all times be senior to the rights of the Borrower, any chapter 11 trustee, any chapter 7 trustee and any other creditor (including, without limitation, postpetition counterparties and other postpetition creditors) in the Chapter 11 Bankruptcy Case or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 case; and <br><br> (b) pursuant to Sections 364(c)(2) and 364(d) of the Bankruptcy Code, be secured by perfected first priority, valid, binding, enforceable and perfected security interests in, and Liens upon, all Collateral including any such property that is subject to valid and perfected Liens in existence on the Petition Date, subject only to Permitted Liens under the Credit Agreement. <br><br> "**Collateral**" means all real and personal property of the Borrower and its estate of any kind or nature whatsoever, tangible or mixed, now existing or hereafter acquired or created, whether existing before or arising after the commencement of the Bankruptcy Case, including, without limitation: (a) Accounts; (b) money of every kind; (c) Intellectual Property; (d) Chattel Paper; (e) Commercial Tort Claims; (f) Deposit Accounts; (g) Documents: (h) Electronic Chattel Paper; (i) Equipment; (j) Fixtures; (k) General Intangibles; (l) Goods; (m) Instruments; (n) Inventory; (o) Investment Property; (p) Letter-of-Credit Rights; (q) Payment Intangibles; (r) Promissory Notes; (s) Securities Entitlements; (t) Securities Accounts; (u) Software; (v) Supporting Obligations; (w) Tangible Chattel Paper; (x) all other personal property not otherwise described in clauses (a) through (w) above; and (y) all accessions to, substitutions and replacements for and Proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing and all collateral security and guarantees given by any Person with respect to any of the foregoing.  Notwithstanding the foregoing, the term "Collateral" and the component definitions thereof shall not include and, the Credit Agreement shall not, at any time, constitute a grant of security interest in (i) the Capital Stock of any Foreign Subsidiary, other than sixty-five percent (65%) in total voting power of such Capital Stock and one hundred percent (100%) of non-voting |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Capital Stock; and (ii) any Avoidance Actions. |
| | "**Pre-Termination Carve-Out**" means the sum of: (a) all fees required to be paid to the Clerk of the Bankruptcy Court and U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest, if any, at the statutory rate; and (b) in the event of an occurrence and during the continuation of an "Event of Default" as that term is defined in the Credit Agreement and delivery (which may be by email) of notice (the "**Carve-Out Trigger Notice**") to counsel for the Borrower, subject to the Pre-Termination Carve-Out Cap (as herein defined), to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by any Professional retained in the Bankruptcy Case by the Borrower, in each instance pursuant to section 327, 328 or 363 of the Bankruptcy Code at any time prior to receipt of the Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or thereafter. |
| | "**Post-Termination Carve-Out**" means the Allowed Professional Fees of the Professionals retained in the Bankruptcy Case by the Borrower in an aggregate amount not to exceed $75,000.00 incurred beginning the first Business Day following the receipt of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise. |
| | "**Pre-Termination Carve-Out Cap**" means: (a) for Allowed Professional Fees of the Borrower's Professionals that become payable on any date during which the Budget is not subject to the Agent's approval pursuant to Section 4.1(i) of the Credit Agreement, the aggregate amount of $500,000.00; and (b) for Allowed Professional Fees of Borrower's Professionals that become payable on any date during which the Budget is subject to the Agent's approval pursuant to Section 4.1(i) of the Credit Agreement, the dollar value of professional fees and expenses for the Borrower's Professionals identified on the Agent approved Budget as projected to be paid during such period; *provided, however,* on any date during the period between the Funding Date and the Maturity Date that the Borrower has less than $4,000,000 in immediately available funds, the Pre-Termination Carve-Out Cap shall not exceed $250,000.00. |
| **Representations and Warranties:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement Art. III | The Financing Documents contain customary representations and warranties, including the following: existence and power; organization and governmental authorization; no contravention; binding effect; capitalization; financial information; litigation and governmental proceedings; ownership of property; no default; labor matters; regulated entities; margin regulations; compliance with laws; anti-terrorism laws; taxes; compliance with ERISA; consummation of financing documents; brokers; material contracts; compliance with environmental requirements; intellectual property; full disclosure; subsidiaries; triggering event or event of default; appointment of a trustee or examiner; liquidation; Martin Shkreli; regulatory compliance; regulatory developments; subsidiary representations; affiliate transactions. |
| **Affirmative Covenants and Negative Covenants**<br><br>Fed. R. Bankr. P. | **Affirmative Covenants**: The Financing Documents contain customary affirmative and negative covenants as set forth in Articles IV and V. |

| Material Provision | Summary Description of Material Provision |
|---|---|
| 4001(c)(1)(B)<br><br>Credit Agreement Arts. IV and V | |
| **Financial Reporting Requirements**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 4.1 | Borrower will deliver to Agent: (a) as soon as available, but no later than forty-five (45) days after the last day of each month, a company prepared balance sheet, cash flow and income statement covering Borrower's operations during the prior month, prepared under GAAP, consistently applied, certified by a Responsible Officer and in a form acceptable to Agent; (b) within five (5) days of delivery or filing thereof, copies of all statements, reports and notices made available to Borrower's security holders and copies of all reports and other filings made by Borrower with any stock exchange on which any securities of Borrower are traded and/or the SEC; (c) prompt written notice of an event that affects the value of any Intellectual Property; (d) at Agent's request, following the close of each payroll period, evidence that all Payroll Taxes have been timely and fully paid to the applicable Governmental Authorities (including, without limitation, copies of any documentation, calculations, cancelled checks, wire or ACH confirmations pertaining to Borrower's Payroll Taxes); (e) within ten (10) days of (i) acquiring and/or developing any new material Intellectual Property, or (ii) entering or becoming bound by any additional material license or sublicense agreement or other material agreement with respect to rights in Intellectual Property (other than over-the-counter software that is commercially available to the public), deliver to Agent an updated Schedule 3.18 reflecting same, and upon any other change in Borrower's Intellectual Property from that listed on Schedule 3.18; (f) prior to any filing with the Bankruptcy Court, copies of all Plan Documentation; and (g) within five (5) Business Days after the same are sent or received, copies of all material correspondence, reports, documents and other filings with any Governmental Authority that could reasonably be expected to have an effect on any of the Governmental Approvals material to Borrower's business or otherwise on the operations of Borrower or any of its Subsidiaries.  At Agent's request, Borrower shall deliver to Agent copies of all Material Contracts. |
| **Budget**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 4.1 | **Budget**: Borrower will deliver to Agent prior to the Funding Date, the Budget, and on the first Business Day of each month thereafter until the Maturity Date, an updated "rolling" 13-week budget for the next 13 week period in a form similar to the initial Budget, which shall supplement the prior Budget without further notice, motion, application to, order of, or hearing before the Bankruptcy Court; provided, that, if at any time between the Funding Date and the Reorganization Effective Date, Borrower has less than Five Million Dollars ($5,000,000.00) in immediately available funds, each Budget delivered by Borrower during such period shall be subject to Agent's reasonable approval.  If the Budget becomes subject to Agent's approval above, then, simultaneously with Borrower's delivery of each Budget, Borrower shall provide (i) a reconciliation of budgeted and actual amounts, and (ii) a written narrative explanation if, during any period when Agent has approval over the Budget, Borrower's (i) actual disbursements under any line item on the Budget for any four-week period exceed the budgeted disbursements for such four-week period in such line item by more than five percent (5%) of the budgeted amount for such four-week period, (ii) aggregate actual disbursements under the Budget for any four-week period exceed the aggregate budgeted disbursements for such four-week period by more than five percent (5%) of |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | the aggregate budgeted amount for such four-week period, or (iii) aggregate actual cash receipts during any four-week period are less than ninety percent (90%) of aggregate projected cash receipts set forth in the Budget for such four-week period. |
| **Reorganization Milestones**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>Credit Agreement §§ 1.1 and 4.15 | Borrower shall comply with the Reorganization Milestones, it being expressly understood that time is of the essence.<br><br>"**Reorganization Milestones**" means:<br><br>(a) on or before April 1, 2016, Borrower shall have provided to Agent and Lenders substantially complete draft of its proposed Stalking Horse Plan;<br><br>(b) on or before April 7, 2016, Borrower shall have filed a Motion to enter the Financing Order;<br><br>(c) on or before April 13, 2016, Borrower shall have filed with the Bankruptcy Court the Stalking Horse Plan and related disclosure statement, both of which shall be in form and substance acceptable to Agent, consistent with the terms of the Securities Purchase Agreement and the Credit Agreement;<br><br>(d) on or before April 29, 2016, the Bankruptcy Court shall have entered the Financing Order;<br><br>(e) on or before May 13, 2016, the Bankruptcy Court shall have entered an order acceptable to Agent approving the disclosure statement related to the Stalking Horse Plan, which is in form and substance acceptable to Agent and authorizing solicitation of the Stalking Horse Plan;<br><br>(f) on or before June 15, 2016, the Bankruptcy Court shall have entered an order in form and substance acceptable to Agent confirming the Stalking Horse Plan, which is in form and substance acceptable to Agent; and<br><br>(g) on or before June 30, 2016, the Stalking Horse Plan shall have become effective by its terms. |
| **Conditions to Closing**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 6.1 | The obligation of each Lender under, and the effectiveness of, the Credit Agreement shall be subject to the satisfaction of the following conditions precedent, each to the satisfaction of Agent and the Lenders in their sole discretion, and the conditions set forth under "Conditions to Funding" below:<br><br>A.    Agent shall have received an executed Secretary's Certificate of Borrower certifying:<br><br>(i) the certificate of incorporation and bylaws of Borrower;<br><br>(ii) resolutions of the board of directors of Borrower, authorizing the execution and delivery of the Credit Agreement and the other Financing Documents; and<br><br>(iii) the names and titles of the officer or officers of such Borrower authorized to sign the Credit Agreement and the other Financing |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | Documents, together with true signatures of such officers. |
| **Conditions to Funding**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)<br><br>Credit Agreement § 6.3 | The obligation of each Lender to make its portion of the Term Loan on the Funding Date shall be subject to satisfaction (or waiver by Agent) of the conditions set forth in Section 6.1 and 6.2, and to the satisfaction (or waiver by Agent) of Agent in its sole discretion of the following conditions precedent:<br><br>(a)  the Agent shall have received the Financing Documents, each duly executed by an authorized officer of Borrower and other parties thereto;<br><br>(b)  the Financing Order shall be a Final Order;<br><br>(c)  Agent shall have received the Budget covering the first thirteen (13) weeks after the Funding Date, in form and substance satisfactory to Agent;<br><br>(d)  the payment of the fees and expenses identified in Section 2.2(a);<br><br>(e)  other than the filing and pendency of the Bankruptcy Case, since December 31, 2015, the absence of any Material Adverse Effect;<br><br>(f)  no Default or Event of Default shall have occurred and be continuing;<br><br>(g)  the representations and warranties of Borrower contained in the Financing Documents shall be true, correct and complete on and as of the date of the Funding Date, except to the extent that any such representation or warranty relates to a specific date in which case such representation or warranty shall be true and correct as of such date;<br><br>(h)  original certificates of all insurance policies of Borrower confirming that they are in effect and that the premiums due and payable with respect thereto have been paid in full and endorsements naming Agent, for the benefit of itself and the Lenders, as lender's loss payee or additional insured, as appropriate;<br><br>(i)  no Triggering Event shall have occurred;<br><br>(j)  Agent shall have received all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the USA Patriot Act, with respect to Borrower and its Subsidiaries;<br><br>(k)  Agent shall have received a copy of the certificate of incorporation of Borrower, certified as of a recent date by the Secretary of State of Delaware;<br><br>(l)  Agent shall have received a Funding Certificate of Borrower certifying that all conditions set forth in Section 6.3 have been satisfied;<br><br>(m) Borrower and each of the Subsidiaries shall be duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization and no other jurisdiction.  Agent shall have received certificates of good standing, statements of status or similar documentation with respect to Borrower and each of its Subsidiaries, issued as of a recent date by the Secretary of State, or other similar official, of each state or country in which Borrower or its Subsidiaries is organized or is qualified to transact business as |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | a foreign corporation; and |
| | (n) such other agreements, documents, instruments and certificates as Agent may reasonably request. |
| **Expenses and Indemnification:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>Credit Agreement §§ 2.2 and 11.13 | **Expenses**: On the Funding Date, subject to receipt by Borrower of a reasonably detailed invoice and receipt by Borrower of such other information supporting such invoice as may be reasonably requested by Borrower, Borrower shall pay in full all of the Lenders' reasonable professional costs and fees incurred in relation to the Term Loan, including, without limitation, in connection with the due diligence related to, and the preparation, negotiation, documentation and court approval of the Letter of Intent, the Credit Agreement, the other Financing Documents, the Breakup Fee Order, and the Financing Order, which amounts shall (i) be deducted from the proceeds of the Term Loan funded on the Funding Date and (ii) not reduce the amount of the Term Loan or the Obligations; provided, however, for the avoidance of doubt the defined term "Obligations" as used in Section 2.2 does not include the professional costs and fees deducted from the proceeds of the Term Loan pursuant to clause (i).<br><br>**Indemnification**: Borrower hereby agrees to pay (i) all costs and expenses of Agent and Lenders as set forth in Section 2.2(a); (ii) without limitation of the preceding clause (i), all costs and expenses of Agent and Lenders in connection with the creation, perfection and maintenance of Liens pursuant to the Financing Documents; (iii) without limitation of the preceding clause (i), all costs and expenses of Agent and Lenders in connection with protecting, storing, insuring, handling, maintaining or selling any Collateral; (iv) without limitation of the preceding clause (i), all costs and expenses of Agent in connection with Agent's reservation of funds in anticipation of the funding of the Term Loan to be made hereunder; and (v) all costs and expenses incurred by Lenders in connection with any litigation, dispute, suit or proceeding relating to any Financing Document and in connection with any workout, collection, bankruptcy, insolvency and other enforcement proceedings under any and all Financing Documents, whether or not Agent or Lenders are a party thereto; provided, however, that, notwithstanding anything herein to the contrary or in the Financing Order, Borrower shall not be responsible for the payment of any amounts set forth in Section 2.2(a) or under Section 11.13 to Agent or any Lender (x) if Agent or such Lender is in breach of its respective obligations hereunder, under any other Financing Documents, or under the Financing Order, or (y) if such amounts result from or are related to the respective gross negligence, willful misconduct or unlawful acts of Agent or the Lenders, as determined by a Final Order (with respect to this subclause (y)).<br><br>Borrower hereby agrees to indemnify, pay and hold harmless Agent and Lenders and each of their officers, directors, employees, trustees, agents, investment advisors, collateral managers, servicers, and counsel (collectively called the "Indemnitees") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including the fees and disbursements of counsel for such Indemnitee) in connection with any investigative, response, remedial, administrative or judicial matter or proceeding, whether or not such Indemnitee shall be designated a party thereto and including any such proceeding initiated by or on behalf of Borrower, and the reasonable expenses of investigation by engineers, environmental consultants and similar technical personnel and any commission, fee or compensation claimed by any broker (other than |

| Material Provision | Summary Description of Material Provision |
|---|---|
| | any broker retained by Agent or Lenders) asserting any right to payment for the transactions contemplated hereby, which may be imposed on, incurred by or asserted against such Indemnitee as a result of or in connection with the transactions contemplated hereby or by the other Financing Documents (including (i)(A) as a direct or indirect result of the presence on or under, or escape, seepage, leakage, spillage, discharge, emission or release from, any property now or previously owned, leased or operated by Borrower, any Subsidiary or any other Person of any Hazardous Materials, (B) arising out of or relating to the offsite disposal of any materials generated or present on any such property, or (C) arising out of or resulting from the environmental condition of any such property or the applicability of any governmental requirements relating to Hazardous Materials, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of Borrower or any Subsidiary, and (ii) proposed and actual extensions of credit under the Credit Agreement) and the use or intended use of the proceeds of the Term Loan, except that Borrower shall have no obligation hereunder to an Indemnitee with respect to any liability resulting from the gross negligence, willful misconduct or unlawful acts of such Indemnitee, as determined by a Final Order.  To the extent that the undertaking set forth in the immediately preceding sentence may be unenforceable, Borrower shall contribute the maximum portion which it is permitted to pay and satisfy under applicable Law to the payment and satisfaction of all such indemnified liabilities incurred by the Indemnitees or any of them.<br><br>Notwithstanding any contrary provision in the Credit Agreement, the obligations of Borrower under Section 11.13 shall survive the payment in full of the Obligations and the termination of the Credit Agreement. No indemnitee shall be responsible or liable to Borrower or to any other party to any Financing Document, any successor, assignee or third party beneficiary or any other person asserting claims derivatively through such party, for indirect, punitive, exemplary or consequential damages which may be alleged as a result of credit having been extended, suspended or terminated under the Credit Agreement or any other financing document or as a result of any other transaction contemplated hereunder or thereunder. |
| **Assignments and Participations:**<br><br>Fed. R. Bankr. P. 4001(c)(1)(B)(vi)<br><br>Credit Agreement § 10.16 | **Lender Assignments and Participations**.  Any Lender may assign any or all of its rights under the Credit Agreement to any Affiliate, provided however, that any such assignment or transfer shall not relieve such Lender of its respective obligations hereunder.<br><br>**Borrower Assignments**.  Borrower may not assign the Credit Agreement or any of its rights or obligations hereunder without the prior written consent of each Lender. |

## BASIS FOR RELIEF REQUESTED

38.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor

in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(c) of the Bankruptcy Code, a court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to superpriority administrative expense status or is secured by a senior lien on property of the estate, or a combination of the foregoing. Because the Debtor proposes to obtain financing under the Credit Agreement that affords to the Lenders superpriority administrative claims and liens that prime any liens that may exist on the Collateral, approval of the DIP Financing is governed by sections 364(c) and 364(d) of the Bankruptcy Code.

## A.     Financing Under Section 364(c)

39.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

- with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;

- secured by a lien on property of the estate that is not otherwise subject to a lien; or

- secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c). Thus, pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain adequate unsecured credit, and the proposed borrowing is in the best interests of its estate. *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors in possession to exercise their basic business judgment

consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448–49 (D. Colo. 1985) (authorizing interim financing where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate); *Richmond Leasing Co. v. Capital Bank, NA.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (Indeed, "more exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *see also* 3 COLLIER ON BANKRUPTCY ¶ 364.03, at 364-7–18 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.).

40.    The statutory requirement for obtaining postpetition credit under section 364(c) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under § 503(b)(l) of [the Bankruptcy Code] as an administrative expense." *See Ames Dep't Stores*, 115 B.R. at 37–39 (a debtor must show it has made a reasonable effort to seek other sources of financing under Bankruptcy Code §§ 364(a) and (b)); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking secured credit under Bankruptcy Code § 364(c) must prove it was unable to obtain unsecured credit pursuant to Bankruptcy Code § 364(b)); *In re McKenzie Energy Corp.*, 228 B.R. 854, 874 (S.D. Tex. 1998) (The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—(A) the trustee is unable to obtain such credit otherwise […]".).

41.    Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c):

- the debtor is unable to obtain unsecured credit solely under section 364(b) (i.e., by granting a lender administrative expense priority);

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

*In re Aqua Assocs.*, 123 B.R. 192, 195–96 (Bankr. E.D. Pa. 1991) (applying the above test and holding that "[o]btaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for the use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere"); *Ames Dep't Stores*, 115 B.R. at 37–39.

42.     To show financing required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c). *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtors could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

43.    The Debtor attempted to secure financing on terms other than a secured superpriority basis, but given the Debtor's asset base, balance sheet and the taint remaining from the Debtor's short-term connection with Martin Shkreli, it was unable to do so. The Debtor has been unable to obtain (a) adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense; (b) credit for money borrowed secured solely by a lien on property of the estate that is not otherwise subject to a lien; or (c) credit for money borrowed secured by a junior lien on property of the estate which is subject to a lien, in each case, on more favorable terms and conditions than those provided in the DIP Financing. Indeed, as set forth above, no other sophisticated third-party lender was willing to extend the financing proposed by the Lenders on anything less than a priming/superpriority claim basis. Therefore, the Debtor believes entering the Credit Agreement with superpriority administrative claims, priming liens on encumbered property, and first priority liens on the Debtor's unencumbered property is appropriate under the circumstances of this chapter 11 case.[9]

44.    For these reasons, the Debtor submits that the DIP Financing is in the best interest of the Debtor's estate, is necessary to preserve the value of estate assets and is an exercise of the Debtor's sound and reasonable business judgment. The Debtor respectfully requests the Court to authorize the Debtor to provide the Lenders a superpriority administrative expense status for any

---

[9]    Although the Liens being granted to the DIP Credit Parties in connection with the DIP Financing are priming Liens with priority over all other liens, except for the Carve-Out and Permitted Liens (as defined in the Credit Agreement), on information and belief, there are no other material liens encumbering the Collateral in existence at this time.  Specifically, although the Debtor's Schedules of Assets and Liabilities reflect that the Debtor's former lender, MidCap Financial, holds a lien against certain Cash Collateral in the approximate amount of $144,000, such Cash Collateral relates to a now terminated letter of credit issued as security for the Debtor's obligations under the lease for its former headquarters premises.  Therefore, MidCap Financial has no interest in such Cash Collateral at the present time.

obligations arising under the Credit Agreement and other Financing Documents as provided for in sections 364(c)(1) and (c)(2) of the Bankruptcy Code.

## B.    Financing and Adequate Protection Under Section 364(d)(l)

45.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected. *See* 11 U.S.C. § 364(d)(1). The Debtor seeks approval of the DIP Financing under section 364(d)(l) of the Bankruptcy Code.

46.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtor's business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lender(s); and

- whether the proposed financing agreement was negotiated in good faith and at arm's-length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *Barbara K. Enter.*, No. 08-11474, 2008 WL 2439649, at *13 (Bankr. S.D.N.Y. Jun. 16, 2008); *see also* 3 Collier on

Bankruptcy ¶ 364.05 (Alan N. Resnick & Henry J. Sommer eds. 16th ed.). The Debtor respectfully submits the DIP Financing is appropriate under this analysis and the facts of this chapter 11 case.

47.    First, the Debtor and its advisors explored a variety of possible financing sources, and ultimately determined the Lenders offered the best option for obtaining the postpetition financing the Debtor requires. The Debtor and the DIP Credit Parties negotiated the DIP Financing in good faith and at arm's-length, and the DIP Financing reflects the most favorable terms on which the DIP Credit Parties were willing to offer financing.

48.    Second, the Debtor requires access to the DIP Financing to provide adequate liquidity for the maintenance of the Debtor's assets and to preserve and enhance the value of its estate for the benefit of all creditors, equity security holders and other parties in interest. Specifically, the DIP Financing will provide the Debtor with the liquidity it needs to take the steps necessary to consummate the Savant transaction on the schedule required by the Postpetition Savant LOI and will allow the Debtor to begin the initial steps of a clinical testing program in connection with its KB003 product development program. Moreover, absent the DIP Financing, the Debtor is at risk of losing the $11 million exit financing commitment from the Stalking Horse, which it is willing provide only if the Debtor obtains approval for and consummates the DIP Financing transaction.

49.    Third, the DIP Financing will provide access to up to $3.0 million in liquidity, which the Debtor has determined is sufficient and necessary to allow the Debtor to maintain its operations, maintain and ultimately increase the value of its assets, and to its long term ability to reorganize. Accordingly, the terms of the DIP Financing are reasonable and adequate to support the Debtor's operations and restructuring activities through the pendency of this chapter 11 case.

34

50.    <u>Fourth</u>, and as discussed more fully below, the Debtor will provide adequate protection to the prepetition secured parties that will be subject to priming liens arising under the DIP Financing.

51.    <u>Fifth</u>, the DIP Financing has been obtained and negotiated in good faith.  As set forth in the Durrant Declaration and the Zyngier Declaration, the DIP Financing is the product of extensive arms'-length negotiations between the Debtor and the DIP Credit Parties.  Further, prior to the hearing on this Motion, the DIP Financing, together with the rest of the financing package the Stalking Horse has committed to provide, will have been subjected to a robust market check pursuant to the terms of the Bid Procedures Order.

### a.    Requirement under Section 364(d) of Providing Adequate Protection

52.    A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if "the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)). The DIP Financing will provide adequate protection to the prepetition secured parties in several critical ways.

53.    <u>First</u>, the DIP Financing will provide funds for expenditures necessary to consummate the Savant transaction and other aspects of the Debtor's Plan, which is central to the Debtor' go-forward business plan.

54.    <u>Second</u>, the DIP Financing will facilitate a net increase in asset value to the Debtor, which increase in value will serve to further adequately protect any prepetition secured parties' interests in the assets, by affording the Debtor liquidity for ongoing maintenance and capital expenditures.

55.    <u>Third</u>, the Debtor's assets were almost entirely unencumbered as of the Petition Date.  One exception, approximately $144,000 of cash collateral that was encumbered by another lender's lien securing a letter of credit reimbursement obligation, has since become unencumbered because the letter of credit was terminated without having been drawn.

### b.    *The DIP Financing is Necessary to Preserve the Assets of the Estate*

56.    As detailed above, it is essential for the Debtor to obtain financing necessary to continue, among other things, the orderly operation of the Debtor's business and the chapter 11 case, and to otherwise satisfy its working capital requirements. The DIP Financing will allow continued development of KB003 and provide sufficient financing for the Debtor to be well positioned to Savant transaction upon its exit from bankruptcy. Absent the DIP Financing, the Debtor could suffer material and irreparable harm and a liquidity crisis.

### c.    *The Terms of the DIP Financing Are Fair, Reasonable, and Appropriate*

57.    The DIP Financing provides generally that the security interests and superpriority administrative expense claims granted to the Lenders are subject to the Carve-Out described above. In *Ames Department Stores*, the bankruptcy court found that such "carve-outs" are not

only reasonable but are necessary to insure the debtors' estates are adequately assisted by counsel and other professionals. *Ames*, 115 B.R. at 40.

58.    Likewise, the Debtor believes the fees and other charges required by the DIP Credit Parties under the DIP Financing are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) (approving a debtor in possession financing facility that included a lender "enhancement fee"); *In re Korea Chosun Daily Times, Inc.*, 337 B.R. 773, 783 (Bankr. E.D.N.Y. 2005) (postpetition financing arrangements under 364 "may include the payment of a loan commitment fee and reimbursement of reasonable fees and expenses in the event that the financing arrangement is not consummated."); *In re Mayco Plastics Inc.*, 379 B.R. 691, 698–99 (Bankr. E.D. Mich. 2008) (section 364 provides "certain incentives that a trustee or debtor in possession may offer, with court approval, to induce potential lenders to undertake the risks involved in providing post-petition financing to a bankruptcy estate….The greater the debtor's inability to obtain the necessary post-petition financing, the greater the inducements the debtor may offer to obtain such debt. Similarly, the greater the risk undertaken by the post-petition lender, the more heightened its need becomes to obtain the additional inducements that §§ 364(c) and (d) permit the Court to authorize a debtor to offer.").

59.    The Debtor is unable to obtain alternate credit sources, the terms of the DIP Financing have been negotiated at arm's-length and are not principally for the benefit of a creditor to the detriment of other parties in interest, and the Debtor believes, in its business judgment, the DIP Financing is in the best interest of all parties involved. The terms of the DIP Financing are in the realm of the incentives contemplated by section 364 to induce potential

lenders to undertake the risks involved in providing postpetition financing to a bankruptcy estate, and should be approved.

### d.    Application of the Business Judgment Standard

60.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under the circumstances specified therein. Provided that an agreement to obtain secured credit does not undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit. *See, e.g.*, *In re Ames Dept. Stores, Inc.*, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. at 881 (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment"); *In re YL W. 87th Holdings I, LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); *Trans World Airlines, Inc. v. Travelers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"). Thus, the "normal function in reviewing requests for post-petition financing is to defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest." *In re Barbara K Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008).

61.    To determine whether this standard is met, the Court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting courts should not second guess a debtor's business decision when the decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code") (internal citation omitted).

62.    And, in exercising its business judgment, courts recognize a debtor is entitled (if not required) to consider non-economic benefits offered by a proposed postpetition facility:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant features of the financing must be evaluated, including noneconomic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.

*In re ION Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

63.    As described above, after appropriate investigation and analysis, the Debtor has concluded the DIP Financing provides the best alternative available under the circumstances of this chapter 11 case. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting the interim loan, receivables facility, and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment on the part of TWA . . . [were] reasonable under the circumstances and in the best interest of TWA and its creditors"). In fact, "[m]ore

exacting scrutiny would slow the administration of the Debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially."); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

64.    The Debtor's determination to move forward with the DIP Financing is an exercise of its sound business judgment and should be approved. Specifically, the Debtor and its advisors undertook an analysis of the Debtor's projected financing needs and determined the Debtor would require postpetition financing to support its restructuring activities. Accordingly, the Debtor negotiated the Credit Agreement with the DIP Credit Parties in good faith, at arm's-length, and with the assistance of their advisors. The DIP Financing provides the Debtor with the capital necessary to meet its working capital needs, the costs of this chapter 11 case, and the requirements for consummation of the Savant transaction. This determination reflects the quintessential exercise of business judgment and is entitled to deference from the Court. *See In re Trans World Airlines, Inc.*, 163 B.R. at 974 (finding the debtor's entry into the financing that served as the "framework" and "cornerstone" for the debtor's plan of reorganization reflected exercise of the debtor's "sound and prudent business judgment").

65.    Indeed, the Debtor negotiated the DIP Financing in conjunction with its overall efforts to determine a path forward for this chapter 11 case. There can be no reasonable dispute that the DIP Financing is an important step toward achieving this goal: the DIP Financing will support not only the Debtor's near term liquidity needs, but will also provide the funding necessary for the Debtor to effectuate a plan of reorganization and consummate the Savant transaction. Accordingly, the DIP Financing reflects an exercise of sound business judgment that should be approved. *See ION Media*, 2009 WL 2902568, at *4 ("[C]ooperation and establishing

40

alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.").

## C.    <u>The Scope of the Carve-Out is Appropriate</u>

66.    The proposed DIP Financing subjects the security interests and administrative expense claims of the Lenders to the Carve-Out. Such carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can obtain appropriate assistance from counsel and other professionals. *See, e.g.*, *Ames*, 115 B.R. at 40; *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Gen. Maritime Corp.*, Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011). The Carve-Out protects against administrative insolvency during the course of this chapter 11 case by ensuring assets remain for the payment of U.S. Trustee fees and professional fees notwithstanding the grant of superpriority and administrative liens and claims under the DIP Financing.

## D.    **The DIP Credit Parties Should Be Deemed Good Faith Lenders Under Section 364(e)**

67.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its rights in any lien or security interest securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this Section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this Section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

68.     As explained in detail herein, the DIP Financing is the result of the Debtor's reasonable and informed determination that the DIP Credit Parties offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's-length, good faith negotiations between and among the Debtor and the DIP Credit Parties. The terms and conditions of the DIP Financing are fair and reasonable, and the proceeds of the DIP Financing will be used only for purposes that are permissible under the Bankruptcy Code and pursuant to the Budget. Further, no consideration is being provided to any party to the DIP Financing other than as described herein. Accordingly, the Court should find the DIP Credit Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded thereby.

E.     **Request for Modification of the Automatic Stay**

69.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition. The proposed Order contemplates the modification of the automatic stay (to the extent applicable) to the extent necessary to implement the terms of the Order. Stay modification provisions of this sort are ordinary and usual features of DIP Financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. Accordingly, the Debtor respectfully requests the Court to authorize the modification of the automatic stay in accordance with the terms set forth in the Order and Credit Agreement.

F.     **The Debtor Should Be Authorized to Use Cash Collateral**

70.     In connection with its need for DIP Financing, the Debtor also requires the use of Cash Collateral. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Section 363(e) of the Bankruptcy Code

provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996).

71.     The Debtor has satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use Cash Collateral. As described above, the Debtor does not believe there are any prepetition secured parties with an interest in cash collateral. Further, to the extent protection is required, Debtor is providing such creditors with adequate protection which is fair and reasonable and adequately protects such creditors' interests in the Debtor's prepetition collateral from diminution. Accordingly, the Court should authorize the Debtor to use the Cash Collateral under section 363(c)(2) and (e) of the Bankruptcy Code.

## Wavier of Bankruptcy Rules Regarding Notice of Stay of an Order

72.     To implement the foregoing successfully, the Debtor seeks a waiver of any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062 or otherwise for all of the reasons described above.

## NOTICE

73.     Notice of this Motion will be given by first class mail to: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the plaintiffs in Adv. Pro. No. 16-50001 (LSS); (c) counsel to the named plaintiffs in the Shareholder Litigations; (d) counsel to Savant; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the United States Attorneys for the District of Delaware, the Northern District of California and the Eastern District of New York; (h) the Attorneys General for the states of California and New York; (i) the United States Food and Drug Administration; (j) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; (k) counsel to the

Stalking Horse; (l) all other known parties (after reasonable inquiry) asserting a lien against the Debtor's assets, and (m) all parties who have requested notice under Bankruptcy Rule 2002. The Debtor submits that, under the circumstances, no other or further notice is required.

[CONTINUED ON NEXT PAGE]

WHEREFORE, the Debtor respectfully requests the Court grant the relief requested herein and such other and further relief as is just and proper.

Dated: April 8, 2016
Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Gregory W. Werkheiser*
Eric D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
Marcy J. McLaughlin (No. 6184)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail:eschwartz@mnat.com
        gwerkheiser@mnat.com
        mharvey@mnat.com
        mmclaughlin@mnat.com

        - and -

Peter Ivanick, Esq. (admitted *pro hac vice*)
Pieter Van Tol, Esq. (admitted *pro hac vice*)
John D. Beck, Esq. (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile:   (212) 918-3100
E-mail:peter.ivanick@hoganlovells.com
        pieter.vantol@hoganlovells.com
        john.beck@hoganlovells.com

*Counsel for the Debtor and Debtor in Possession*

9959786.1