IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>KaloBios Pharmaceuticals, Inc.[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 15-12628 (LSS)<br><br>Re: D.I. 324 |

**FINAL ORDER (I) AUTHORIZING DEBTOR TO INCUR POSTPETITION DEBT ON A SUPERPRIORITY BASIS TO DIP CREDIT PARTIES PURSUANT TO 11 U.S.C. §§ 364 AND 507(b); (II) GRANTING LIENS AND SECURITY INTERESTS TO DIP AGENT; (III) GRANTING DIP CREDIT PARTIES RELIEF FROM THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362; AND (IV) GRANTING OTHER RELATED RELIEF**

Upon the Motion (the "Motion") of KaloBios Pharmaceuticals, Inc., as debtor and debtor-in-possession (the "Debtor"), in the above-captioned Chapter 11 case (the "Bankruptcy Case"), pursuant to Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States Bankruptcy Court for the District of Delaware (the "Local Bankruptcy Rules"), seeking, among other things, entry of a final order (a "Final Order"):

(1) authorizing the Debtor to obtain postpetition financing, consisting of a superpriority, single-draw secured term loan facility in an aggregate principal amount of $3,000,000 (the "DIP Financing") from Black Horse Capital Master Fund Ltd., as administrative agent (in such capacity, together with any successor in such capacity, the "DIP Agent"), and as a lender, together with Black Horse Capital LP, Cheval Holdings, Ltd., and Nomis Bay LTD, as

---

[1] The last four digits of the Debtor's federal tax identification number are 7236. The Debtor's address is 1000 Marina Blvd #250, Brisbane, CA 94005-1878.

QB\39673733.2

lenders[2] (each a "Lender" and collectively, the "Lenders," and together with the DIP Agent, the "DIP Credit Parties");

 (2) authorizing the Debtor to execute and enter into, and to perform all such other and further acts as may be required in connection with, the DIP Financing and the Credit Agreement (as defined herein) (with such changes or amendments, if any, as were or may be made with the agreement of the DIP Credit Parties prior to or as a result of the Final Hearing (as defined herein) and all instruments, security agreements, assignments, pledges, mortgages, reaffirmations and other documents referred to therein or requested by the DIP Credit Parties to give effect to the terms thereof (the Credit Agreement with all promissory notes and all ancillary documents executed in connection therewith, collectively, the "Financing Documents");

 (3) authorizing the Debtor to use proceeds of the DIP Financing solely as expressly permitted in the Financing Documents and in accordance with this Final Order;

 (4) granting (i) automatically perfected first priority priming security interests in and liens on all of the Collateral (as defined in the Credit Agreement) as of the Closing Date (as defined in the Credit Agreement), subject only to: (a) liens on Collateral other than Accounts and Intellectual Property (both defined in the Credit Agreement), that were valid, properly perfected and unavoidable as the Petition Date ("Permitted Liens"); provided however, that Permitted Liens shall not exceed One Hundred Thousand Dollars ($100,000) and (b) the Carve-Out (as defined herein), (ii) automatically perfected non-priming security interests in and liens with respect to Collateral subject to Permitted Liens as of the Closing Date, and (iii) Superpriority Claims (as defined in the Credit Agreement) in the amount of the Obligations (as defined below), subject only to the Carve-Out, in each case on the terms set forth in the Financing Documents;

---

[2] Lenders reserve the right to include other investors in the Lender group. The inclusion of additional investors will not alter the terms of this Order.

(5)  authorizing the Debtor to pay or satisfy the Obligations (as defined herein) through Conversion (as defined in Schedule 2.1 of the Credit Agreement), each in accordance with the terms of the Credit Agreement and this Final Order;

(6)  vacating and modifying the automatic stay pursuant to Section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the Financing Documents;

(7)  waiving the Debtor's ability to surcharge against the Collateral pursuant to Section 506(c) of the Bankruptcy Code; and

(8)  granting the Debtor such other and further relief as is just and proper.

The Court having held a hearing on the Motion on April 28, 2016 (the "Final Hearing"); the Court having considered all objections, if any, to the Motion; and upon the record made (a) by the Motion and the exhibits attached thereto; and (b) at the Final Hearing, and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND CONCLUDED THAT:**[3]

A.  On December 29, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code commencing the Bankruptcy Case. The Debtor continues to operate its business as debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. Pursuant to Bankruptcy Rule 7052, to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. Statements made by the Court from the bench during the Final Hearing shall constitute additional conclusions of law and findings of fact, as appropriate.

QB\39673733.2

B.      This Court has jurisdiction over the Bankruptcy Case and the Motion pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference* entered February 29, 2012, by the United States District Court for the District of Delaware. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has authority to enter this Final Order consistent with Article III of the United States Constitution.

C.      On February 26, 2016, this Court entered an order [D.I. 211] authorizing the Debtor to execute and enter into a proposed postpetition binding Letter of Intent (the "Savant Acquisition LOI") regarding Debtor's proposed acquisition from Savant of a benznidazole program for the treatment of Chagas disease. On February 29, 2016, the Debtor and Savant executed the Savant Acquisition LOI.

D.      An immediate and ongoing need exists for the Debtor to obtain the DIP Financing in order for the Debtor to pursue its reorganization and maximize the value of its business and assets as a debtor in possession under Chapter 11 through, among other things: the orderly continuation of the operation of its business; to maintain business relationships with vendors, suppliers and customers; to pay payroll obligations; to satisfy other working capital and operational needs; and to achieve the milestones and accomplish the other acts necessary to be in a position to consummate the transactions contemplated by the Savant Acquisition LOI. The Debtor does not have sufficient available resources of working capital to operate its business in the ordinary course without post-petition financing. The Debtor's ability to maintain business relationships with vendors, to pay employees, and otherwise to fund operations is essential to the Debtor's viability and preservation of the going-concern value of its business and successfully reorganize.

E.  The Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense, and the Debtor is unable to obtain the postpetition financing that it needs on terms more favorable than those provided in the Credit Agreement. Without limiting the foregoing, postpetition financing is not available to the Debtor without the Debtor granting to the DIP Agent the Liens (as defined herein), security interests and Superpriority Claims (as defined in the Credit Agreement) provided under the Credit Agreement and this Final Order.

F.  On March 23, 2016, this Court entered an order (the "<u>Term Sheet Approval Order</u>") [D.I. 293] approving the Debtor's entry into a letter of intent and term sheet with the DIP Credit Parties, each dated March 18, 2016 (the "<u>Stalking Horse LOI</u>") and approving and authorizing the Breakup Fee (as defined in the Term Sheet Approval Order).

G.  On April 1, 2016, the Debtor and the DIP Credit Parties entered into that certain Debtor in Possession Credit and Security Agreement, dated as of April 1, 2016 (the "<u>DIP Credit Agreement</u>").

H.  Based on certificates filed with the Court, the Court finds that sufficient and adequate notice of the Motion and entry of this Final Order has been given pursuant to Bankruptcy Code §§ 102(1) and 364(c) and (d) and Bankruptcy Rules 2002 and 4001(c) to all entities entitled thereto and that no other or further notice of the Motion or of the entry of this Final Order need be provided to any entity.

I.  The DIP Financing has been negotiated in good faith and at arms-length between the Debtor and the DIP Credit Parties. Any credit extended and loan made to the Debtor ("<u>DIP Loan</u>") pursuant to the Credit Agreement and this Final Order shall be deemed to have been extended, issued, or made, as the case may be, in good faith as required by, and within the

meaning of, Bankruptcy Code § 364(e), and the DIP Credit Parties are entitled to the protections of Bankruptcy Code § 364(e).

J.  The terms of the DIP Financing are fair and reasonable and reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties. The DIP Credit Parties have provided fair, adequate, and sufficient consideration that constitutes reasonably equivalent value for the Liens (as defined below) conveyed to, and the rights, protections, and benefits obtained by, the DIP Credit Parties under this Final Order and under the Financing Documents.

K.  Entry of this Final Order is in the best interests of the Debtor's estate and creditors because its implementation, among other things, will allow for the availability to the Debtor of working capital and will enhance the Debtor's prospects for successful reorganization.

L.  The DIP Credit Parties are willing to provide the DIP Financing to the Debtor, but only upon the terms and conditions set forth in the Financing Documents and this Final Order. Absent entry of this Final Order, the DIP Credit Parties would not provide the DIP Financing.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The Motion is GRANTED as set forth herein.

2.  Any objections to the Motion or to entry of this Final Order that have not been withdrawn or otherwise resolved are hereby OVERRULED.

3.  The execution and delivery of the Credit Agreement and other Financing Documents by the Debtor is authorized and approved. Further, the Debtor is expressly authorized and empowered to (a) execute and deliver to the DIP Credit Parties any other document of any kind required to be executed and delivered in connection with the Credit Agreement and the other Financing Documents; (b) take any action to carry out the intent and

purpose of the Credit Agreement and other Financing Documents, including all such actions to create, protect, and perfect the Liens (as defined below) in favor of the DIP Agent, and (c) comply with and perform all of the terms and conditions contained in the Credit Agreement and other Financing Documents.

4. The fees and expenses relating to the DIP Financing, including the Commitment Fee, and the Upfront Fee, are authorized and approved. The Debtor is authorized to pay on the Funding Date (as defined in the Credit Agreement) all of the DIP Credit Parties' reasonable professional costs and fees incurred in connection with the DIP Financing subject to and in accordance with the terms of Section 2.2(a) of the Credit Agreement (collectively, the "DIP Credit Party Legal Expenses"). DIP Agent shall provide copies of the DIP Credit Parties' reasonably detailed invoices reflecting their professional costs and fees incurred in connection with the DIP Financing to Debtor and the United States Trustee, who shall have ten (10) calendar days to object to such invoices. The DIP Credit Party Legal Expenses are not subject to the provisions of sections 327, 328, 329, 330, or 331 of the Bankruptcy Code and will be paid pursuant to the Credit Agreement without further order of this Court, except in the event the Court is required to adjudicate a dispute relating to payment of the DIP Credit Party Legal Expenses. All loans made under the Credit Agreement, interest thereon, and all fees, including the Commitment Fee and Upfront Fee (both as defined in the Credit Agreement), costs, expenses (including the DIP Credit Party Legal Expenses), indebtedness, obligations, and liabilities of the Debtor to the DIP Credit Parties under or in respect of the Financing Documents and this Final Order are referred to herein as the "Obligations."

5. The Debtor is expressly authorized to borrow from the Lenders the DIP Loan in the principal amount of Three Million Dollars ($3,000,000.00) on the terms and conditions set forth in the Financing Documents and this Final Order, including the following:

    a. The DIP Loan is subject to (i) a Commitment Fee (as defined in the Credit Agreement) of One Hundred Fifty Thousand Dollars ($150,000.00), (ii) an Upfront Fee (as defined in the Credit Agreement) of One Hundred Ninety-One Thousand Dollars ($191,000.00), and (iii) interest ("Interest") at the annual rate of twelve percent (12%) calculated on the basis of a 360-day year and actual days elapsed, which interest rate shall increase by five percent (5%) upon an Event of Default (as defined in the Credit Agreement). The Commitment Fee, Upfront Fee, principal, and Interest earned will accrue until Maturity or Conversion.

    b. At the Funding Date for the DIP Financing, the Commitment Fee and the Upfront Fee shall accrue to the benefit of the Lenders, and shall be fully earned and non-refundable.

    c. To the extent provided in Section 4.1 of the Credit Agreement, the Debtor's use of the proceeds of the DIP Loan shall be in accordance with a rolling 13-week Budget prepared by the Debtor and delivered to the DIP Agent on a monthly basis solely for the purposes identified in Section 4.7 of the Credit Agreement. . During any period prior to the effective date of a Debtor's plan of reorganization that has been approved by the DIP Credit Parties ("Stalking Horse Plan") when the Debtor's cash on hand is less than Five Million Dollars ($5,000,000.00), the Budget shall be subject to the DIP Agent's reasonable approval in accordance with Section 4.1 of the Credit Agreement.

6. The Debtor shall not seek to obtain any other loan(s), without the prior written consent of the DIP Agent, unless such other loan(s) are part of an overall financing commitment to the Debtor determined, after a competitive auction process conducted pursuant to the Bidding Procedures (as defined in the Term Sheet Approval Order) approved in the Term Sheet Approval Order, to be a higher or better offer for financing than the combined package of DIP Financing and Exit Financing that the DIP Credit Parties have committed to provide.

7. In accordance with Bankruptcy Code § 364(c)(1), the Obligations shall constitute claims with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) and 726, and shall at all times be senior to the rights of the Debtor, any Chapter 11 trustee, any Chapter 7 trustee or any other creditor in the Bankruptcy Case (the "Superpriority Claims"), except for the Carve-Out. Except for the Carve-Out, no cost or expense of administration shall be senior to, equal to, or pari passu with the Superpriority Claims of the DIP Credit Parties arising out of the Obligations.

8. As security for the Obligations, and as provided in the Financing Documents and this Final Order, DIP Agent, for the benefit of itself and the other DIP Credit Parties, shall have (effective and continuing, without the necessity of the execution, filing, and/or recordation of mortgages, security agreements, control agreements, patent security agreements, trademarks security agreements, pledge agreements, financing statements, or otherwise) valid and perfected first priority Liens (as defined in the Credit Agreement) in all of the Collateral (as defined in the Credit Agreement), provided, however, that the Collateral shall not include any avoidance actions pursuant to Bankruptcy Code §§ 544, 545, 547, 548, and 553(b) or the proceeds thereof.

QB\39673733.2

9. The Liens are and shall be first priority, senior, perfected Liens securing the Obligations pursuant to Bankruptcy Code §§ 364(c)(2) and 364(d)(1) subject only to the Carve-Out, and Permitted Liens solely as to the specific Collateral they may encumber.

10. None of the DIP Loan, proceeds thereof, or Collateral may be used to fund, directly or indirectly, any effort to: (a) object to or contest in any manner, or raise any defenses to the validity, perfection, priority, or enforceability of the Obligations owing to the DIP Credit Parties or the Liens in favor of the DIP Agent securing such Obligations; (b) assert any claims or causes of action against the DIP Credit Parties of any type, including, without limitation, any avoidance actions under Chapter 5 of the Bankruptcy Code, or any claim or cause of action against any DIP Credit Party in its capacity as an agent or Lender under the DIP Financing, or (c) take any other action prohibited by Section 4.7 of the Credit Agreement.

11. There shall be no surcharge upon the Collateral under section 506(c) of the Bankruptcy Code for any purpose, unless agreed to by the DIP Agent in writing. The DIP Credit Parties will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

12. The Liens granted to the DIP Agent pursuant to this Final Order and the Financing Documents shall be valid and perfected, as of the date of entry of this Final Order, without the need for the execution or filing of any further document or instrument otherwise required to be executed or filed under applicable non-bankruptcy law; provided, however, that the Debtor shall execute and deliver such further documents as the DIP Credit Parties may reasonably require to evidence and give notice of the Liens and Superpriority Claims.

13. Notwithstanding anything in this Final Order, any Financing Document or any other order of this Court to the contrary, prior to full payment of the Obligations, the Liens in

favor of the DIP Agent and the Superpriority Claims in favor of the DIP Credit Parties shall be subject and subordinate in all respects to the payment of the Carve-Out. As used in this Final Order, "Carve-Out" means the following:

    a.    The sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest, if any, at the statutory rate; and (ii) in the event of an occurrence and during the continuation of an "Event of Default" (as defined in the Credit Agreement) and delivery (which may be by email) of notice (the "Carve-Out Trigger Notice") to counsel for the Debtor, subject to the Pre-Termination Carve-Out Cap (as herein defined), to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by any attorneys, accountants, financial advisors and other professional consultants retained by the Debtor pursuant to an order of the Bankruptcy Court to provide representation or advice in connection with the Bankruptcy Case to the Debtor (each a "Professional" and collectively, the "Professionals"), in each instance pursuant to section 327, 328 or 363 of the Bankruptcy Code at any time prior to receipt of the Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or thereafter. For the purpose of the Carve-Out, the term "Pre-Termination Carve-Out Cap" means: (a) for Allowed Professional Fees of the Professionals that become payable on any date during which the Budget is not subject to the DIP Agent's approval pursuant to Section 4.1(i) of the Credit Agreement, the aggregate amount of $500,000.00; and (b) for Allowed Professional Fees of Professionals that become payable on any date during which the Budget is subject to the DIP Agent's approval pursuant to Section 4.1(i) of the Credit Agreement, the dollar

QB\39673733.2

value of professional fees and expenses for the Professionals identified on the DIP Agent approved Budget as projected to be paid during such period; *provided, however,* on any date during the period between the Funding Date and the Maturity Date (as defined in the Credit Agreement) that the Debtor has less than $4,000,000 in immediately available funds, the Pre-Termination Carve-Out Cap shall not exceed $250,000.00.

    b.  the Allowed Professional Fees of the Professionals in an aggregate amount not to exceed $75,000.00 incurred beginning the first Business Day following the receipt of a Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise.

  14.  Notwithstanding anything to the contrary in this Final Order or the Financing Documents, no Lien of or for the benefit of the DIP Agent or other DIP Credit Party securing the repayment of Obligations shall be senior to or <u>pari passu</u> with any Lien of Comerica Bank encumbering: (i) account number 1892-86533-6 maintained by the Debtor with Comerica Bank (the "<u>Comerica Account</u>"); (ii) all replacements, substitutions, or renewals of the Comerica Account; (iii) all interest accruing on the Comerica Account; and (iv) all products and proceeds of the Comerica Account (collectively, the "<u>Comerica Collateral</u>"). As to Comerica Bank, solely with respect to the Comerica Collateral, the automatic stay imposed by Bankruptcy Code § 362(a) is hereby modified, to the extent necessary, for Comerica Bank to exercise its rights and remedies on account of any reimbursement obligations of the Debtor in accordance with the terms and conditions of the standby letter of credit agreements between Comerica Bank and the Debtor, as the same may have been amended from time to time (the "<u>LC Agreements</u>"), which are annexed to Comerica Bank's proof of claim, filed March 30, 2016 (identified by the Debtor's claims agent as Claim No. 109). Immediately following the entry of this Final Order, Comerica

Bank may debit $10,916.18 from the remaining balance of the Comerica Account on account of the Debtor's obligations to Comerica Bank pursuant to the LC Agreements that were identified to the Debtor on April 21, 2016. To the extent that Comerica Bank seeks to debit the Comerica Account for other obligations in connection with the LC Agreements (the "Future Reimbursement Obligations"), Comerica Bank shall provide counsel to the Debtor, counsel to the DIP Agent and the U.S. Trustee with not less than five (5) calendar days' prior notice of the amount it seeks to deduct from the Comerica Account, together with appropriate documentation for the amount it seeks to deduct. In connection with the foregoing, Comerica Bank may redact the invoices of its attorneys and other professionals, as necessary to preserve any applicable attorney-client, work product or similar privilege for Comerica Bank. If no objection is received from counsel to the Debtor, counsel to the DIP Agent or the U.S. Trustee within such five (5) calendar day notice period, the automatic stay shall be deemed modified, to the extent necessary, for Comerica Bank to exercise its rights and remedies on account of any Future Reimbursement Obligations of the Debtor in accordance with the LC Agreements.

15.    While any portion of the Obligations remains unpaid or any of the Financing Documents remain in effect, the Debtor shall not seek entry of any order approving or authorizing (under Bankruptcy Code §§ 105 or 364, or otherwise) (a) the granting of any lien or security interest in any of the Collateral in favor of any party other than the DIP Agent or (b) the obtaining of credit or the incurring of indebtedness that is entitled to superpriority administrative status, in either case pari passu with or superior to that granted to DIP Agent pursuant to this Final Order, unless, in connection with any transaction cited in clause (a) or (b) of this Paragraph, such request by the Debtor seeks to authorize and direct, and such order requires, that

the full amount of the Obligations shall first be paid indefeasibly and in full, or paid simultaneously with the closing of such transaction.

16. Upon the occurrence and during the continuance of an Event of Default (as defined in the Credit Agreement) that is able to be cured, but is otherwise not cured within five (5) business days after the earlier of (i) receipt by Debtor of notice from DIP Agent of such default, or (ii) actual knowledge of Debtor of such default, unless the Court orders otherwise, the DIP Agent may, acting pursuant to the Financing Documents and subject to the terms thereof, including any applicable notice requirements, exercise its rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to Bankruptcy Code § 362(a) or any other applicable stay or injunction (which will be modified by this Final Order), or further order of or application to this Court: (a) declare the principal and accrued interest, fees, and other liabilities constituting the Obligations to be immediately due and owing; (b) take possession of the Collateral and enforce rights against any Collateral in the possession of the DIP Credit Parties; (c) charge a default rate of interest as set forth in the Credit Agreement; and (d) take any and all other actions or exercise any and all other rights or remedies permitted to the DIP Agent and Lenders under the Financing Documents, this Final Order, or by operation of law.

17. The automatic stay imposed by Bankruptcy Code § 362(a) is hereby modified, to the extent necessary, to implement and effectuate the terms and conditions of this Final Order.

18. Nothing in this Final Order shall limit the rights of any DIP Credit Party to seek any appropriate relief, including, without limitation, modification or termination of the automatic stay for good cause shown.

19. The Debtor is authorized to perform all acts and execute and comply with the terms of such other documents, instruments, and agreements in addition to the Financing Documents, as the DIP Credit Parties may reasonably require, as evidence of and for the protection of the Obligations, or which otherwise may be deemed reasonably necessary by the DIP Credit Parties to effectuate the terms and conditions of this Final Order and the Financing Documents. The Debtor and the DIP Credit Parties are hereby authorized to implement, in accordance with the terms of the Financing Documents, any non-material modifications of the Financing Documents without further order of this Court.

20. Without limiting the rights of access and information afforded the DIP Credit Parties under the Financing Documents, the Debtor shall afford representatives, agents, and/or employees of the DIP Credit Parties reasonable access to the Debtor's premises and its books and records in accordance with the Financing Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as they may reasonably request. The Debtor shall also provide to the DIP Credit Parties, at the time filed or provided, all statements, schedules, or financial reports which the Debtor files in the Bankruptcy Case or provides to the United States Trustee in accordance with applicable Bankruptcy Rules, Local Bankruptcy Rules, or guidelines of the United States Trustee.

21. The reversal or modification on appeal of this Order will not affect the validity of any debt incurred, or any priority or lien granted herein unless the authorization or incurrence of the debt, or the granting of such priority or lien, is stayed pending appeal.

22. The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in the Bankruptcy Case (and, to the extent not satisfied in full, the Obligations shall not be discharged by the entry of any such order, notwithstanding Bankruptcy Code § 1141(d)); (b) converting the Bankruptcy Case to a Chapter 7 case; (c) appointing a Chapter 11 Trustee, or (d) dismissing the Bankruptcy Case. The terms and provisions of this Final Order as well as the Superpriority Claims and Liens granted pursuant to this Final Order and the Financing Documents shall continue in full force and effect notwithstanding the entry of such order, and such Superpriority Claims and Liens shall maintain their priority as provided by this Final Order until all of the Obligations are paid indefeasibly and in full.

23. Nothing in the Credit Agreement or this Final Order shall be construed as a consent by any DIP Credit Party to, or an approval by any DIP Credit Party of, the terms of any plan of reorganization or any amendment or modification thereto.

24. The outstanding principal balance of the Term Loan, plus accrued and unpaid interest, plus the Commitment Fee, plus the Upfront Fee, plus all other non-contingent Obligations shall be paid or satisfied in accordance with the terms prescribed in the Credit Agreement.

25. The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Credit Parties, the Debtor, and their respective successors and assigns, including any trustee appointed or elected in the Bankruptcy Case, whether under chapter 11 or chapter 7.

26. If there is any inconsistency between the terms of the Financing Documents and the provisions of this Final Order, the provisions of this Final Order shall control to the extent of such inconsistency.

27. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be valid, take full effect, and be enforceable immediately upon entry hereof; there shall be no stay of execution or effectiveness of this Final Order; and any stay of the effectiveness of this Final Order that might otherwise apply is hereby waived for cause shown.

28. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

Dated: April 29, 2016

THE HONORABLE LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

-17-
QB\39673733.2