## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| KALOBIOS PHARMACEUTICALS, INC., | Case No. 15-12628 (LSS) |
| Debtor.[1] | |
| GREGORY REA, RTAT LLC, EDWARD H. PAINTER, NANCY RETZLAFF, ARMISTICE CAPITAL MASTER FUND, LTD, ANDREW PIZZO, AND SABINE GRITTI, | |
| Plaintiffs, | Adv. Case No. 16-50001 (LSS) |
| v. | |
| KALOBIOS PHARMACEUTICALS, INC., | **Requested Objection Deadline:** **May 5, 2016, at 12:00 p.m. (ET)** **Requested Hearing Date:** **May 6, 2016, at 9:30 a.m. (ET)** |
| Defendant. | |

## DEBTOR'S MOTION PURSUANT TO 11 U.S.C. § 105(a), 363 AND 502 AND FED. R. BANKR. P. 9019 APPROVING SETTLEMENT STIPULATION BY AND BETWEEN (I) THE DEBTOR AND (II) THE SETTLING PIPE PLAINTIFFS

KaloBios Pharmaceuticals, Inc., as debtor and debtor in possession (the "<u>Debtor</u>" or

"<u>KaloBios</u>") in the above-captioned chapter 11 case hereby moves (the "<u>Motion</u>"), pursuant to

sections 105(a), 363, and 502 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") for entry of

an order, substantially in the form attached hereto as **Exhibit A** (the "<u>Proposed Order</u>"),

approving the settlement stipulation, a copy of which is annexed to the Proposed Order as

**Exhibit 1** (the "<u>Stipulation</u>"), by and between (i) the Debtor and (ii) each PIPE Plaintiff (as

defined herein) that has executed the Stipulation (the "<u>Settling PIPE Plaintiffs</u>," and together

---

[1]    The last four digits of the Debtor's federal tax identification number are 7236.  The Debtor's address is 1000 Marina Blvd #250, Brisbane, CA 94005-1878.

with the Debtor, the "Parties") resolving, among other things, the above-captioned adversary proceeding (the "PIPE Litigation"). In support of this Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Debtor is pleased to report that it has reached a settlement with the Settling PIPE Plaintiffs that will enable it to pursue confirmation of a chapter 11 plan of reorganization without the burden, expense and uncertainty of the PIPE Litigation. If the Stipulation is promptly approved, a substantial amount of litigation among the Parties will cease, and the Parties and other parties in interest in the Debtor's chapter 11 case will have certainty as to how the PIPE Plaintiffs' claims will be treated in the Debtor's plan. Avoiding the continued burden, expense and uncertainty of the PIPE Litigation and agreeing to the treatment of the PIPE Plaintiffs' claims greatly increases the likelihood that the Debtor will be successful in exiting chapter 11 in the timeframe contemplated by its deals with Savant (defined below) and the prospective providers of its exit financing package. For these reasons, and the reasons discussed herein, the Debtor submits that approving the Stipulation is the best interests of its estate, creditors, shareholders and other parties in interest.

## JURISDICTION

2.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are sections 105(a), 363 and 502 of the Bankruptcy Code and Bankruptcy Rule 9019.

**BACKGROUND**

4.        On December 29, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner or committee has been appointed in this chapter 11 case.

**Events Leading to the Chapter 11 Case**

5.        The events leading to the Debtor seeking relief under chapter 11 have been well chronicled in the Parties' papers, open court, and the press, so the Debtor will only briefly summarize them here.

6.        The Debtor is a publicly traded biopharmaceutical company.  In November 2015, an investor group comprising Martin Shkreli and others acquired more than 50% of the outstanding shares of the Debtor in open market transactions.  Mr. Shkreli was appointed Chief Executive Officer and Chairman of the Board.

7.        In a filing with the U.S. Securities and Exchange Commission (the "SEC") on December 9, 2015, the Debtor announced that it had entered a Securities Purchase Agreement with certain investors (the "PIPE Investors") for the purchase and sale of the Debtor's common stock in a private placement in public equity transaction (the "PIPE Transaction").

8.        In a filing with the SEC on December 16, 2015, the Debtor announced that the PIPE Transaction had been consummated.  The PIPE Plaintiffs dispute that the PIPE Transaction was consummated.

9.        On December 17, 2015, Mr. Shkreli was arrested following a federal indictment, charging him with multiple counts of securities fraud, securities fraud conspiracy, and wire fraud

conspiracy.    According the U.S. Department of Justice's press release announcing the indictment, the indictment relates to Mr. Shkreli's tenure as CEO of Retrophin, Inc., a biopharmaceutical company that trades under the ticker symbol RTRX, and as founder and managing member of hedge funds MSMB Capital Management LP (MSMB Capital) and MSMB Healthcare Management LP (MSMB Healthcare).

10.    Mr. Shkreli was terminated as CEO of the Debtor and resigned from the Board of Directors on December 17, 2015, after serving in those capacities for less than one month.

11.    In addition, on December 17, 2015, Tony Chase resigned from the Board of Directors.  Also, in a filing with the SEC on December 23, 2015, the Debtor announced that its independent registered public accounting firm, Marcum LLP, resigned, and its Interim Chief Financial Officer, Christopher Thorn, submitted his resignation.  On December 28, 2015, the Debtor announced that Tom Fernandez and Marek Biestek resigned as members of the Board of Directors of the Debtor on December 27, 2015.

12.    On December 17, 2015, NASDAQ halted trading in the Debtor's stock.  As of the date hereof, trading on NASDAQ has not resumed.  On December 18, 2015, the Debtor received a letter from NASDAQ indicating that NASDAQ intended to delist the Debtor's securities under its discretionary authority.  NASDAQ cited a number of reasons for its decision, including, among other things, the recent criminal indictment and arrest of Mr. Shkreli.

13.    As a result of these events and other challenges facing the Debtor, the Debtor sought chapter 11 protection on December 29, 2015.

**The PIPE Litigation**

14.    On January 7, 2016, Gregory Rea, RTAT LLC, Edward H. Painter, Nancy Retzlaff, and Armistice Capital Master Fund, Ltd. (the "Original PIPE Plaintiffs") filed an

adversary complaint (A.D.I. 1; Adv. Case No. 16-50001) against the Debtor. The Complaint was amended (the "Amended Complaint") on January 29, 2016 (A.D.I. 15) to add two additional plaintiffs: Andrew Pizzo and Sabine Gritti (together with the Original PIPE Plaintiffs, the "PIPE Plaintiffs").[2]  In the Amended Complaint, the PIPE Plaintiffs seek, among other things, a declaration that the Debtor holds in a resulting or constructive trust for the benefit of the PIPE Plaintiffs the approximately $6,899,946.86 (the "Funds") that the PIPE Plaintiffs paid to the Debtor in the PIPE Transaction.

15.    On January 7, 2016, the PIPE Plaintiffs also filed the *Emergency Motion of Gregory Rea, RTAT LLC, Edward H. Painter, Nancy Retzlaff, and Armistice Capital Master Fund, Ltd. to (I) Escrow Certain Funds; or Alternatively, (II) Expedite the Adversary Proceeding* (D.I. 13) (the "Escrow Motion"), seeking to prevent the Debtor from using the Funds pending the outcome of the PIPE Litigation. As alternative relief, the PIPE Plaintiffs requested that the Court expedite the PIPE Litigation.

16.    The PIPE Plaintiffs requested expedited consideration of the Escrow Motion (D.I. 14), which the Court granted by order entered on January 7, 2016 (D.I. 15), thereby setting a hearing on the Escrow Motion for January 12.

17.    At the hearing on January 12, 2016, the Debtor and the PIPE Plaintiffs negotiated and agreed (among other things) that, in accordance with the Debtor's obligations under section 363 of the Bankruptcy Code, the Debtor would not expend estate funds outside of the ordinary course of business without seeking Court approval. With this and other assurances, the PIPE Plaintiffs withdrew the Escrow Motion without prejudice.

---

[2]    For ease of reading, the Debtor refers to all of the plaintiffs as the PIPE Plaintiffs, regardless of when they joined the PIPE Litigation.

18.     On February 1, 2016, the Debtor filed a motion to dismiss the Amended Complaint (A.D.I. 18) (the "Motion to Dismiss").

19.     On March 22, 2016, the PIPE Plaintiffs filed their answering brief (A.D.I. 27).

20.     On March 29, 2016, the Debtor filed its reply brief (A.D.I. 29) in support of the Motion to Dismiss.

21.     On April 1, 2016, the PIPE Plaintiffs filed a motion for leave (A.D.I 34) (the "Motion for Leave") to file a further amended complaint (the "Second Amended Complaint").

22.     The Debtor filed its opposition to the Motion for Leave on April 15, 2016 (A.D.I. 46).

23.     The Court has scheduled a hearing on the Motion for Leave for May 6, 2016.

24.     The Court has scheduled oral argument on the Motion to Dismiss for May 24, 2016.

**The Bar Date and the PIPE Plaintiffs' Proofs of Claim**

25.     On February 16, 2016, the Court entered the Order Granting Debtor's Motion for an Order (I) Establishing Bar Dates for Filing Proofs of Claim, (II) Approving the Form and Manner of Notice Thereof and (III) Granting Related Relief (D.I. 186) (the "Bar Date Order"), which, among other things, established April 1, 2016,[3] as the general bar date (the "General Bar Date") by which creditors must file proofs of claim for pre-Petition Date claims.

26.     After the entry of the Bar Date Order, the Debtor served notice of the General Bar Date (D.I. 219) and appropriate claim forms pursuant to the Bar Date Order. The Debtor also

---

[3]     The Bar Date Order set the General Bar Date as thirty days after the Service Date (as defined in the Bar Date Order). The Service Date occurred on March 1, 2016 and the General Bar Date is therefore April 1, 2016.

published notice of the General Bar Date in the *San Francisco Chronicle* and the National Edition of *The Wall Street Journal*.

27.    The PIPE Plaintiffs each timely filed by the General Bar Date proofs of claim. No other PIPE Investor timely filed a proof of claim related to the PIPE Transaction.

**The Savant Transaction**

28.    Prior to the Petition Date, the Debtor entered into a non-binding letter of intent with Savant Neglected Diseases, LLC ("Savant"), for the acquisition of the worldwide rights to Savant's benznidazole program for the treatment of Chagas Disease (the "Savant Transaction"). Following the Petition Date, the Debtor continued to negotiate with Savant to reach the terms of a binding letter of intent.  As a result of these negotiations, the Debtor achieved a binding letter of intent (the "Letter of Intent") with Savant, subject to Bankruptcy Court approval.

29.    On February 23, 2016, the Debtor filed a motion seeking (i) authorization to execute and enter into the Letter of Intent with Savant, (ii) authorization to make certain payments in connection the Letter of Intent and perform other obligations thereunder, and (iii) granting related relief (D.I. 197).  The Court entered an order authorizing the Debtor to execute and enter into Letter of Intent on February 26, 2016 (D.I. 211), and on February 29, 2016, the Debtor and Savant executed the Letter of Intent.

30.    Closing the transactions contemplated by the Letter of Intent with Savant is subject to, among other things, (i) obtaining financing in an amount adequate to permit the Debtor to exit chapter 11 with at least $10 million in unencumbered cash and (ii) exiting chapter 11 by June 30, 2016.

**The DIP Financing and Exit Financing**

31.    On March 23, 2016, the Bankruptcy Court entered an order (D.I. 293) approving, among other things, the Debtor's entry into that certain amended letter of intent and annexed amended term sheet, each dated March 18, 2016 (collectively, the "Stalking Horse LOI"), by and between the Debtor and Cheval Holdings, Ltd., Black Horse Capital LP, Black Horse Capital Master Fund Ltd., and Nomis Bay LTD (collectively, the "Stalking Horse").

32.    The Stalking Horse LOI provides for a debtor-in-possession financing facility of $3 million (the "DIP Facility") to operate its business until confirmation of a chapter 11 plan and an exit facility of $11 million (the "Exit Facility") to facilitate consummation of the Savant Transaction as well as consummation of the plan.  The Exit Facility of $11 million is conditioned upon, among other things, closing of the Savant Transaction and exiting chapter 11 before the end of June 2016.  Both the DIP Facility and the Exit Facility are contemplated to convert to shares of the Debtor's common stock upon the effective date of a chapter 11 plan, subject to certain terms and conditions.

33.    On April 8, 2016, the Debtor filed a motion to approve the DIP Facility (D.I. 324) (the "DIP Motion").

34.    On April 15, 2016, the PIPE Plaintiffs filed a preliminary objection (D.I. 337) to the DIP Motion.  The PIPE Plaintiffs also served discovery on the Debtor in the form of interrogatories, document requests and deposition notices.  In addition, the PIPE Plaintiffs served document and deposition subpoenas on the Stalking Horse.[4]

---

[4]    In addition to the PIPE Litigation and the DIP Motion, the Parties have previously engaged in litigation concerning, among other things, the Debtor's employee bonus program and fee applications filed by the Debtor's professionals.  Among the arguments asserted by the PIPE Plaintiffs in their opposition to such relief is their claim that the Funds are held in trust for their benefit.

35.     On April 29, 2016, the Court entered an order approving the DIP Facility (D.I. 388).

**The Plan and Disclosure Statement**

36.     On April 7, 2016, the Debtor filed its proposed chapter 11 plan of reorganization (D.I. 318) (as may be amended, modified or supplemented, the "Plan")[5] and related proposed disclosure statement (as may be amended, modified or supplemented, the "Disclosure Statement").

37.     On April 15, 2016, the Debtor filed a motion to approve, among other things, the Disclosure Statement, solicitation procedures for the Plan, and the Plan's classification of claims and interests (D.I. 343) (the "Solicitation Procedures Motion").

38.     A hearing to consider approval of the Disclosure Statement and the Solicitation Procedures Motion is scheduled for May 6, 2016.  Objections to approval of the Disclosure Statement or the Solicitation Procedures Motion are due on April 29, 2016 (extended for the PIPE Plaintiffs through Tuesday, May 3, 2016).

39.     Through the Solicitation Procedures Motion, the Debtor has requested that the Court schedule a confirmation hearing commencing on June 14, 2016, and set related dates and deadlines.

40.     The Debtor believes that the confirmation schedule proposed in the Solicitation Procedures Motion will enable it to pursue confirmation of the Plan in accordance with the timeframes required by the Savant Transaction, the DIP Financing and the Exit Financing.

---

[5]     Capitalized terms not otherwise defined herein are defined in the Plan.

**Mediation and Settlement Negotiations**

41.    Notwithstanding the Parties' considerable disputes in this case, the Parties have been engaged in settlement discussions since February 2016.  Beginning in March 2016, the Parties were aided in their settlement discussions through formal mediation conducted by the Honorable Kevin J. Carey, United States Bankruptcy Judge for the District of Delaware. Although the Parties' initial mediation conference on March 14, 2016, was unsuccessful, the Parties continued to engage in settlement negotiations throughout March and April 2016, aided substantially by the continued mediation assistance of Judge Carey.

42.    Through these extensive settlement negotiations, and with Judge Carey's continued assistance, the Parties were able to reach mutually agreeable terms to resolve the PIPE Litigation and their other disputes.

**The Settlement Stipulation**

43.    The Stipulation reflects the Parties' settlement.  The key terms of the Stipulation are as follows:[6]

(a)    The PIPE Plaintiffs will each retain their original 277,608 aggregate PIPE Transaction shares of common stock (the "PIPE Transaction Shares").  Such PIPE Transaction Shares shall be eligible for resale by the initial holder 180 days after the Effective Date of the Plan provided that (i) such PIPE Transaction Shares are covered by an effective registration statement filed with the SEC (which shall be filed by the Reorganized Debtor at the Reorganized Debtor's cost) or (ii) eligible for resale pursuant to an exemption from registration under the Securities Act

---

[6]    The summary of the Stipulation described in this Motion is qualified in its entirety by the terms of the Stipulation.  In the event of any inconsistency, the Stipulation controls.

(b)    Pursuant to and in accordance with the Plan, on account of, in exchange for, and in full settlement and satisfaction of all PIPE Claims, the PIPE Plaintiffs will receive:

(i)    the following number of shares of common stock of the Debtor as reorganized pursuant to the confirmed and effective Plan (the "Reorganized Debtor"):

| PIPE Plaintiffs | Plan Distribution |
|---|---|
| Gregory Rea | 120,700.00 |
| Armistice Capital Master Fund, Ltd | 60,350.00 |
| Sabine Gritti | 40,233.00 |
| RTAT LLC | 26,151.00 |
| Andrew Pizzo | 20,116.00 |
| Edward Painter | 5,029.00 |
| Nancy Retzlaff | 5,029.00 |
| **TOTALS** | **277,608.00** |

Such shares will be issued pursuant to the Plan and section 1145 of the Bankruptcy Code on the Effective Date of the Plan (or as soon thereafter as is reasonably practicable) and will not be "restricted securities" as that term is used in Rule 144 under the Securities Act of 1933 (the "Securities Act") and therefore may immediately thereafter be resold by non-affiliates without regard for the restrictions imposed by Rule 144;

(ii)    an additional 50,000 shares of common stock of the Reorganized Debtor to be allocated among the PIPE Plaintiffs as agreed among the PIPE Plaintiffs, which will not be "restricted securities" as that term is used in Rule 144 under the Securities Act and therefore may be resold by non-affiliates without regard for the limitations imposed by Rule 144, provided that such shares may not be resold until after 180 days following the Effective Date of the Plan;

(iii)    cash on the Effective Date of the Plan (or as soon as reasonably practicable thereafter) in the amount of $250,000; and

(iv)    fifty percent (50%) of the proceeds, net of any and all expenses, costs and fees in any way related to the investigation, prosecution or settlement of a lawsuit against Kaye Scholer LLP ("Former Counsel"), of the first $2 million of any recovery by the Debtor or the Reorganized Debtor (or any successor thereof) against Former Counsel on account of any claim or cause of action held by the Debtor, the Debtor's estate or the Reorganized Debtor arising out of or related to the PIPE Transaction (the "Former Counsel Claims").  For the avoidance of doubt, the Parties agree that neither the Debtor or the Reorganized Debtor shall have any obligation to pursue the Former Counsel Claim if, despite their commercially reasonable efforts (including the consideration of litigation counsel that may be suggested by the Settling PIPE Plaintiffs) to identify litigation counsel reasonably acceptable to the Debtor or Reorganized Debtor, as applicable, the Debtor or Reorganized Debtor has been unable to engage such litigation counsel pursuant to a contingent fee arrangement and terms and conditions that, individually and in the aggregate, are reasonably acceptable to the Debtor or the Reorganized Debtor, as applicable, within one hundred eighty (180) days following the Effective Date.

(c)    Additionally, the Stipulation provides that nothing in the Plan shall waive, release or enjoin any of the PIPE Plaintiffs from pursuing any direct claims or causes of action (collectively, the "Chardan Direct Claims") the PIPE Plaintiffs may have against Chardan Capital Markets, LLC ("Chardan"), arising from or relating in any way to the PIPE Transaction. Notwithstanding the foregoing, the PIPE Plaintiffs agree that, if Chardan asserts a claim or cause of action against the Debtor or the Reorganized Debtor as a result of the PIPE Plaintiffs asserting such Chardan Direct Claims against Chardan, then the PIPE Plaintiffs shall immediately stay their efforts to pursue or otherwise recover upon the Chardan Direct Claims so as to permit the Reorganized Debtor to seek to enforce the discharge injunction under the Plan or otherwise

12

enjoin Chardan from asserting a claim or cause of action against the Debtor or the Reorganized Debtor.  The PIPE Plaintiffs may resume prosecution of the Chardan Direct Claims only upon entry of a Final Order enjoining Chardan from asserting claims or causes of action against the Debtor and the Reorganized Debtor.  In the event that Chardan is not enjoined from asserting claims or causes of action against the Debtor and the Reorganized Debtor, the PIPE Plaintiffs shall be barred from pursuing the Chardan Direct Claims.

44.    In addition, the Stipulation provides that unless the Bankruptcy Court has entered an order denying approval of the Stipulation or the Bankruptcy Court has adjudicated the Debtor to be in material breach of its obligations pursuant to the Stipulation, subject to the terms and conditions of the Stipulation, each of the Settling PIPE Plaintiffs agrees that he, she or it shall:

(a)    Not vote to reject the Plan so long as the Plan is consistent in all material respects with the Stipulation; and

(b)    Support the Plan and not (i) withdraw or revoke its vote with respect to the Plan, (ii) object to the Plan or any related disclosure statement, so long as each of the foregoing is consistent in all material respects with the Stipulation and (iii) support any alternative plan or transaction which the Debtor does not support.

45.    The Stipulation also provides customary additional terms, including agreement to and consent to be bound by the PIPE Settlement Releases (as defined in the Plan) and dismissal with prejudice of the Amended Complaint as set forth therein.

46.    The Stipulation is subject to Court approval and the Effective Date of the Plan as set forth therein.

**RELIEF REQUESTED**

47.     By this Motion, the Debtor requests that the Court enter the Proposed Order approving the Stipulation pursuant to section 105(a), 363 and 502 of the Bankruptcy Code and Bankruptcy Rule 9019.

**BASIS FOR RELIEF**

48.     Bankruptcy Rule 9019 governs approval of settlements by a debtor and provides that, "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."   Fed. R. Bankr. P. 9019.   In addition, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

49.     The starting point in analyzing any proposed settlement is the general policy of encouraging settlements and favoring compromises.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) ("Compromises are favored in bankruptcy."); *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (finding settlements "generally favored in bankruptcy").   The Third Circuit has recognized that "[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) (internal quotation marks omitted) (quoting *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

50.     To approve a settlement, a bankruptcy court must determine that such settlement is in the best interest of a debtor's estate. *Law Debenture Trust Co. of New York v. Kaiser*

*Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 95–96 (D. Del. 2006).    In

addition, a court must:

> assess and balance the value of the claim that is being
> compromised against the value to the estate of the acceptance of
> the compromise proposal in light of four factors: (1) the probability
> of success in the litigation, (2) the likely difficulties in collection,
> (3) the complexity of the litigation involved, and the expense,
> inconvenience and delay necessarily attending it, and (4) the
> paramount interests of the creditors.

*Id*. at 96 (quoting *Martin*, 91 F.3d at 393).    The court's ultimate inquiry is whether a settlement is

fair, reasonable, and in the best interest of a debtor's estate.    *In re Marvel Entm't Grp., Inc.*, 222

B.R. 243, 249 (D. Del. 1998) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

51.     The decision whether to approve a proposed compromise and settlement is

committed to the sound discretion of the bankruptcy court.    *See*, *e.g.*, *In re Coram Healthcare

Corp.*, 315 B.R. 321, 329 (Bankr. D. Del. 2004).    A court need not decide the numerous issues of

law and fact raised by the settlement and it need not be convinced that the proposed settlement is

the best possible, rather "[t]he court need only conclude that the settlement falls within the

reasonable range of litigation possibilities somewhere above the lowest point in the range of

reasonableness." *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 833 (Bankr. D. Del. 2008)

(quoting *In re Coram Healthcare Corp.*, 315 B.R. 321, 330 (Bankr. D. Del. 2004)).

52.     In the Debtor's business judgment, the resolution of the many disputed issues

between the Debtor and the Settling PIPE Plaintiffs embodied in the Stipulation is reasonable

and in the best interest of the Debtor's estate, creditors, shareholders and other parties in interest.

The Stipulation is the product of extensive and lengthy discussions and negotiations between the

Settling PIPE Plaintiffs and the Debtor, including a formal mediation process before Judge

Carey.  The Stipulation provides a resolution of the PIPE Litigation, the PIPE Plaintiffs' claims and related issues that falls well within the range of reasonable litigation outcomes.

53.    Importantly, the Stipulation also provides a fair and practical resolution of disputes that will facilitate the ongoing efforts to approve the Disclosure Statement and confirm the Debtor's Plan in a timely and efficient manner and consistent with the requirements the Savant Transaction, the DIP Financing and the Exit Financing.

54.    Moreover, as discussed below, the relevant *Martin* factors weigh in favor of approving the Stipulation.[7]

## A.    The Probability of Success in Litigation

55.    The Debtor believes it has strong defenses to the claims asserted by the PIPE Plaintiffs, and further believes that such claims, to the extent allowed, would be subordinated pursuant to section 510(b) of the Bankruptcy Code.  The PIPE Plaintiffs, however, vigorously dispute the applicability of section 510(b) of the Bankruptcy Code to their claims, and contend that the PIPE Transaction failed to close and that the Funds are held in trust for them.  The Court has not yet issued any ruling on these important issues, and the ultimate outcome of the issues is uncertain.

56.    In addition, even if the claims are subordinated to the level of common stock pursuant to section 510(b) of the Bankruptcy Code, the Parties' disputes would not end.  The Debtor believes, and its proposed Plan contemplates, that the Debtor is solvent and existing common stock will retain their interests.  As a result, even claims subordinated to the level of common stock may be entitled a distribution.  Therefore, the Parties would still need to litigate, at a minimum, the appropriate amount of damages.  In addition, the Parties would potentially

---

[7]    Given the nature of the Parties' disputes, the "the likely difficulties in collection" factor is not relevant and is therefore not addressed in this Motion.

have to litigate the allocation of shares of common stock on account of any such damages.  The ultimate outcome of such proceedings is uncertain.  *See*, *e.g.*, *In re Orange Cty. Nursery, Inc.*, 2013 WL 3776320, at *6–8 (Bankr. C.D. Cal. July 17, 2013), *rev'd on other grounds*, 523 B.R. 692 (C.D. Cal. 2014).

57.    Put simply, even if the Debtor were successful in subordinating the PIPE Plaintiffs' claims, the Debtor still might have faced lengthy, complex litigation with the PIPE Plaintiffs over the allowance, amount, and allocation of stock on account of their claims.  The Stipulation avoids the burden, expense and uncertainty of such litigation.

**B.     The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It**

58.    As described in detail above, the Debtor is facing lengthy litigation involving complex issues with an uncertain outcome, therefore, this factor strongly militates in favor of approving the Stipulation.

**C.     The Paramount Interest of Holders of Claims and Interests**

59.    The interests of creditors, interest holders and other stakeholders is best served by approving the Stipulation.  Absent approval of the Stipulation, the PIPE Plaintiffs will continue to assert that the Funds—which represent nearly all of the Debtor's currently available cash—are not property of the Debtor's estate.  Although, as discussed above, the Debtor believes it would ultimately prevail on this issue, the damage to the Debtor's estate, creditors, and other stakeholders if the Debtor does not prevail is potentially devastating and could put in serious jeopardy the ability of general unsecured creditors and equity security holders to recover any meaningful distribution on their claims.  With the Stipulation in hand, the Debtor will be in a much better position to pursue confirmation of the Plan, which contemplates that general unsecured creditors will be paid in full over time, with interest, and existing equity security

holders will retain its interests.    Accordingly, there can be no doubt that approving the Stipulation is in the best interests of creditors.

## CONCLUSION

60.    Approving the Stipulation will greatly benefit the Debtor's estate and bolster its efforts to successfully reorganize on the timeframe required by the Savant Transaction, the DIP Financing and the Exit Financing.  Moreover, there can be no doubt that the Stipulation falls well within the range of reasonable litigation outcomes faced by the Parties.  The Stipulation is the product of extensive, arm's-length negotiations, including before Judge Carey as mediator.  It provides for a fair and practical resolution of the PIPE Litigation, the PIPE Plaintiffs' claims and related disputes between the Debtor and the Settling PIPE Plaintiffs.  If approved, the Stipulation will facilitate confirmation of the Debtor's Plan, which provides that that general unsecured creditors will be paid in full over time and existing equity will retain their interests.

61.    For these reasons, the Court should find that the Stipulation (i) is fair, equitable and in the best interests of the Debtor, its estate, creditors, stockholders, and other parties in interest; (ii) represents an exercise of the Debtor's sound business judgment; and (iii) should be approved pursuant to sections 105(a), 363 and 502 of the Bankruptcy Code and Bankruptcy Rule 9019.

## NOTICE

62.    Copies of this Motion have been served by email, hand delivery, facsimile, and/or overnight delivery upon the following: (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the PIPE Plaintiffs; (c) counsel to the named plaintiffs in the class action litigation; (d) counsel to Martin Shkreli; (e) the PIPE Investors; (f) the SEC; (g) Kaye Scholer LLP; (h) Chardan Capital Markets, LLC and its known counsel; (i) current and prior

insurers providing directors and officers liability insurance to the Debtor; (j) the parties included on the Debtor's list of twenty (20) largest unsecured creditors; and (k) all parties who have requested notice under Bankruptcy Rule 2002.    The Debtor submits that, under the circumstances, no other or further notice is required.

WHEREFORE, the Debtor respectfully requests that the Court (i) grant this Motion and the relief requested herein; (ii) enter the Proposed Order attached as **Exhibit A** hereto approving the Stipulation attached to the Proposed Order as **Exhibit 1**; and (iii) grant such other and further relief as it deems just and proper.

Dated: May 2, 2016
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/      Marcy J. McLaughlin*

Eric D. Schwartz (No. 3134)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
Marcy J. McLaughlin (No. 6184)
1201 N. Market St., 16th Floor
PO Box 1347
Wilmington, DE  19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
E-mail: eschwartz@mnat.com
      gwerkheiser@mnat.com
      mharvey@mnat.com
      mmclaughlin@mnat.com

- and -

Peter Ivanick, Esq. (admitted *pro hac vice*)

Pieter Van Tol, Esq. (admitted *pro hac vice*)
John D. Beck, Esq. (admitted *pro hac vice*)
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile:  (212) 918-3100
E-mail:peter.ivanick@hoganlovells.com
        pieter.vantol@hoganlovells.com
        john.beck@hoganlovells.com


*Counsel to the Debtor and Debtor in Possession*

10005579