## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| KaloBios Pharmaceuticals, Inc., | ) | Case No. 15-12628 (LSS) |
| | ) | |
| Reorganized Debtor. | ) | Re: D.I. 728, 733, 761 & 764 |
| | ) | |

## MEMORANDUM ORDER[1]

Upon consideration of the Reorganized Debtor's Third Omnibus Objection
(Substantive) to Claims Pursuant to 11 U.S.C. § 502, Fed. R. Bankr. P. 7007, and Del. Bankr.
L.R. 3007-1 (No Liability, Misclassified, Reduce and Allow) filed by KaloBios
Pharmaceuticals, Inc. (the "Objection"),[2] specifically with respect to Proof of Claim No. 7
in the amount of $8,760.00 (the "Proof of Claim") filed by Gil DeVincenzi,[3] the response
thereto filed by Mr. DeVincenzi (the "Response");[4] the Reorganized Debtor's Reply (the
"Reply"),[5] and after an evidentiary hearing with oral argument (the "Hearing")[6] and due
deliberation, the Court hereby FINDS and CONCLUDES as follows:

---

[1] This Memorandum Order constitutes the findings of fact and conclusions of law, as required by
Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this claim objection pursuant to
28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

[2] D.I. 728.

[3] Mr. DeVincenzi filed eight additional proofs of claim, Claim Nos. 21–22, 27, 126–29 & 136. The
claims were duplicative of the Proof of Claim, and were disallowed in this Court's orders of June 20,
2016, and February 6, 2017. D.I. 598, 746. KaloBios also reports a scheduled and undisputed
liability of $3,680 to Mr. DeVincenzi for unrelated non-standby services, which is not the subject of
the Objection.

[4] D.I. 733.

[5] D.I. 761.

[6] The Hearing was held on March 21, 2017.

*Procedural Background*

1.      On December 29, 2015, KaloBios filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware.[7]

2.      On February 22, 2016, Mr. DeVincenzi filed the Proof of Claim.[8] The Objection and Response followed.

3.      At the March 21, 2017 hearing, the following evidence was received: (i) the Evidentiary Stipulation; (ii) the Response, which, pursuant to the Evidentiary Stipulation was admitted into evidence for all purposes in place of Mr. DeVincenzi's direct in-person testimony;[9] (iii) certain additional statements made by Mr. DeVincenzi in addition to the Response and cross-examination by KaloBios; (iv) the proffer and cross-examination of Mr. David Tousley; (v) the Consulting Agreement effective January 3, 2012 ("the "Consulting Agreement"), as amended, between KaloBios and Mr. DeVincenzi (Exhibit 1);[10] and (vi) certain e-mails exchanged between Mr. DeVincenzi and Herb Cross—at that time the Reorganized Debtor's Chief Financial Officer—and their related attachments, which, pursuant to the Evidentiary Stipulation were admitted into evidence for all purposes (Exhibit 2).[11]

---

[7] *Evidentiary Stipulation By and Between the Reorganized Debtor and Gil DeVincenzi* (the "Evidentiary Stipulation"). D.I. 764 at 1.
[8] Evidentiary Stipulation at 1.
[9] Evidentiary Stipulation ¶ 2. While the parties state in the Evidentiary Stipulation that the date of the Response is January 23, 2017, it is actually January 19, 2017.
[10] Hearing 11:6–9, 11:12–18.
[11] Hearing 11:10–18.

*Standard for an Objection to a Proof of Claim*

4.    A claim that is properly filed under Federal Rule of Bankruptcy Procedure

3001 and Bankruptcy Code § 501 is deemed allowed unless a party in interest objects.[12]

When a claim objection is filed in a bankruptcy case, the burden of proof as to the validity

of the claim "rests on different parties at different times."[13]   The Court of Appeals for the

Third Circuit described the burden shifting as follows:

> Initially, the claimant must allege facts sufficient to support the claim.  If the
> averments in his filed claim meet this standard of sufficiency, it is "*prima
> facie*" valid.  In other words, a claim that alleges facts sufficient to support a
> legal liability to the claimant satisfies the claimant's initial obligation to go
> forward.  The burden of going forward then shifts to the objector to produce
> evidence sufficient to negate the *prima facie* validity of the filed claim.  It is
> often said that the objector must produce evidence equal in force to the *prima
> facie* case.  In practice, the objector must produce evidence which, if believed,
> would refute at least one of the allegations that is essential to the claim's legal
> sufficiency.  If the objector produces sufficient evidence to negate one or more
> of the sworn facts in the proof of claim, the burden reverts to the claimant to
> prove the validity of the claim by a preponderance of the evidence . . . .  The
> burden of persuasion is always on the claimant.[14]

5.    As applied here, the Proof of Claim contains sufficient facts to be *prima facie*

valid.  In the Proof of Claim signed by Mr. DeVincenzi under penalty of perjury,

Mr. DeVincenzi asserts a claim of $8,760.00 for wages, salaries or commissions under

11 U.S.C. § 507(a)(4), with the basis of the claim described as "SERVICES PROVIDED."[15]

Two pages are annexed to the Proof of Claim listing 5,840 hours of work per year for the

years 2013–2015 at a rate of $0.50 per hour with a description of "Secur[i]ty standby."[16]

---

[12] 11 U.S.C. §§ 501, 502(a); Fed. R. Bankr. P. 3001.
[13] *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992).
[14] *Id.* (citations omitted).
[15] Proof of Claim 2–3.
[16] Proof of Claim 4–5.

6.      In turn, the Objection contains evidence which, if true, refutes at least one of the allegations that is essential to the claim's legal sufficiency.  Annexed as Exhibit 1 to the Objection is the Declaration of David Tousley (the "Tousley Declaration").  In his declaration, signed January 9, 2017, Mr. Tousley states that "KaloBios did not contract for or agree to pay Mr. DeVincenzi for the alleged services, and KaloBios has paid or scheduled Mr. DeVincenzi for all amounts agreed to and validly incurred."[17]

7.      The Objection being sufficient, the Court held the evidentiary hearing. Mr. DeVincenzi must prove his claim by a preponderance of the evidence.

**FINDINGS OF FACT**

8.      Mr. DeVincenzi first began working for KaloBios in April 2008 as a full-time employee.[18]  After a furlough related to a reduction in force, Mr. DeVincenzi was retained by KaloBios as a facility contractor.[19]  This arrangement was memorialized in the Consulting Agreement signed by Edmond Mok, the then-Controller of KaloBios, and Mr. DeVincenzi.[20]

9.      The Consulting Agreement was effective January 3, 2012, and ran for a period of one year.  The Consulting Agreement specifies the services to be provided by Mr. DeVincenzi to KaloBios as facilities management, sale of excess laboratory equipment, decommission of laboratories and "coordination of additional sublease as such related to the activities of KALOBIOS."[21]  His services take the form of "meetings, advice, and the like . . . ."[22]

---

[17] Tousley Declaration at 2–3.
[18] Response at 1.
[19] *Id.*
[20] Ex. 1.
[21] Ex. 1 ¶ 2.
[22] Ex. 1 ¶ 2.

10.    In exchange for his services, Mr. DeVincenzi was to be paid $110 per hour of work completed (exclusive of travel time), plus reasonable and documented out-of-pocket expenses.  The total of all invoiced amounts was capped at $80,000 for the one-year term.[23] The Consulting Agreement was amended twice to extend the term of the agreement and/or to increase the hourly rate and maximum invoice amount.  For the year 2013, Mr. DeVincenzi was to be paid $115 per hour with total invoices capped at $120,000 per year.[24]  For the years 2014 and 2015, Mr. DeVincenzi was to be paid $115 per hour with total invoices across the two years capped at $240,000.[25]  As amended, all other terms of the Consulting Agreement remained the same.  Mr. DeVincenzi was actually paid "amounts well in excess" of the contractual maximum in each of 2012–2015.[26]

11.    While not specifically addressed in the Consulting Agreement or either of the two amendments, Mr. DeVincenzi was first-in-line with KaloBios' security service for calls, which could occur at any time after regular business hours.[27]  At some point at or after the Consulting Agreement was originally executed, Mr. DeVincenzi "broached the issue" of responsibility for after-hours coverage of security with Mr. Mok.[28]  Mr. Mok asked

---

[23] On a purely mathematical basis, assuming Mr. DeVincenzi was paid the maximum of $80,000 per year, and there were no out-of-pocket expenses, Mr. DeVincenzi would have billed for approximately 727 hours per year, or 14 hours per week.

[24] Amendment No. 1 to Consulting Agreement effective as of January 2, 2013, signed by Mr. DeVincenzi and Mr. Mok.  Ex. 1 at 6–7.  On a purely mathematical basis, assuming Mr. DeVincenzi was paid the maximum of $120,000 per year, and there were no out-of-pocket expenses, Mr. DeVincenzi would have billed for approximately 1,044 hours per year, or 20 hours per week.

[25] Amendment No. 2 to Consulting Agreement entered into December 2, 2013, signed by Mr. DeVincenzi and Mr. Cross.  Ex. 1 at 8–9.  On the same assumptions and the additional assumption that Mr. DeVincenzi spread the cap evenly across the two years, Mr. DeVincenzi's hours per week remained the same.

[26] Ex. 2 at 2.

[27] Response at 1 ("These occurred at all hours of off time . . . ."); Ex 2 at 2 (E-mail from Mr. Cross to Mr. DeVincenzi (Nov. 13, 2015, 8:41 p.m.) (wherein Mr. Cross acknowledges that Mr. DeVincenzi responded to security or other site issues after-hours)).

[28] Response at 1; Hearing 14:24–15:7.

Mr. DeVincenzi to be the first call for the security company.[29]  Subsequently,

Mr. DeVincenzi discussed after-hours security coverage with Mr. Cross, who agreed that

Mr. DeVincenzi should stay in that capacity.[30]  During these conversations there was no

discussion regarding compensation for such services.

      12.     Besides Mr. DeVincenzi, there were two other persons on the alarm company

phone tree.  Prior to leaving town, Mr. DeVincenzi had to designate a second-in-line to

cover him and make certain that person was available.[31]

      13.     Under the Consulting Agreement, Mr. DeVincenzi was to provide invoices no

more frequently than twice per month,[32] and he did bill bi-monthly for at least years 2014

and 2015.[33]  Invoices were payable thirty (30) days after receipt.[34]  KaloBios paid Mr.

DeVincenzi for all time invoiced.[35]

      14.     The invoices submitted by Mr. DeVincenzi to KaloBios for the period from

2012 through 2015 did not include a request for payment for "standby" or "on-call"

services.  The first time that Mr. DeVincenzi invoiced KaloBios for standby services was on

November 10, 2015.[36]  On that date, Mr. DeVincenzi submitted four invoices, one for each

of years 2012–2015 reflecting 6,570 hours per year at a rate "TBD" with no listed amount

---

[29] Response at 1; Hearing 14:24–15:7.
[30] Response at 1–2; Hearing 14:24–15:7.
[31] Hearing 15:22–24.
[32] Ex. 1 ¶ 3, amend. 1 ¶ 2, amend. 2 ¶ 2.
[33] Hearing 10:4–6.
[34] Ex. 1 ¶ 3, amend. 1 ¶ 2, amend. 2 ¶ 2.
[35] Response at 1–2.
[36] Ex. 2 at 3 (E-mail from Mr. DeVincenzi to KaloBios Accounts Payable (Nov. 10, 2015 12:00 p.m.)).

due.  These invoices did not reflect an agreed-upon rate or number of hours for standby services.[37]

15.     Four days later, by email dated November 14, 2015 from Mr. Cross, KalaBios refused to pay Mr. DeVincenzi for these standby services, expressing the view that such services were not part of the agreement between them.[38]

16.     Mr. DeVincenzi continued to perform under the Consulting Agreement after receiving the November 14, 2015 response from Mr. Cross.[39]  In his response to the November 14, 2015 email, Mr. DeVincenzi states:  I appreciate you reviewing my request. You have paid for my time for after-hours responses to the facility, but wanted to explore the times other than actual response … by 'waiting in the wings'.  I want to pass this by now that you have reviewed and commented."[40]

17.     While not paid for standby services, Mr. DeVincenzi was paid for responding to security and site issues after-hours.[41]

18.     Different invoices are attached to the Proof of Claim.  Each of these invoices reflect hours of 5,840 and a rate of $0.50 per hour for a total of $2,920 per year for each of 2013–2015.  Beside each year claimed is a description: "#1 call back for fire/intrusion per [m]y contract expired 12/31/15."[42]  Mr. DeVincenzi also includes a narrative explanation:

> I was a contract status for the periods outlined above.  The time billed is at a rate of $[0].50/hr for standby time outside of the regular 8hr work day.  I only

---

[37] Ex. 2 at 4.  The description on each invoice reads: "On call for contract period for Fire/In[]trusion/other security issues other than onsite work time."  Further, the body of the e-mail states that: "I am obviously not asking for my hourly but for a mutually agreed upon hourly for this required standby time.  Let me know.  Thank you." Ex. 2 at 3.
[38] Ex. 2 at 2.
[39] Ex. 2 at 2.
[40] Ex. 2 at 1–2.
[41] Ex. 2 at 1.
[42] Proof of Claim 4–5.

contracted for 4hrs during the regular work day but people were onsite for the remaining regular 4hrs and no need to charge for that time.[43]

Mr. DeVincenzi offers no explanation for the difference in hours claimed between the invoices attached to the Proof of Claim and the invoices submitted to the company on November 10, 2015.

### The Parties' Positions

19.     KaloBios' legal argument is that: (1) the unambiguous Consulting Agreement does not include provision of or payment for standby services; (2) the Consulting Agreement has an integration[44] and no-oral-modification clause and thus there could be no oral modification of the Consulting Agreement; and (3) even taken as true, the discussions between Mr. DeVincenzi, Mr. Mok, and Mr. Cross were insufficiently definite to form a separate contract due to the lack of payment terms.[45]

20.     Mr. DeVincenzi, appearing *pro se*, argues that: (1) his conversations with Mr. Mok and Mr. Cross establish that KaloBios wanted him to perform these standby services, and amount to an agreement to compensate him for those services; (2) it is only fair that he be compensated for standby service actually rendered to KaloBios; and (3) the performance of these services restricted his movement as he either needed to stay in town or arrange for coverage from one of the two alternates before he could leave town, thus requiring him to be compensated for standing by to respond to the security company. [46]

---

[43] Proof of Claim 5.

[44] While KalaBios references the integration clause in its Objection, it did not object to, and indeed stipulated to, the admission of parol evidence seeking to establish a collateral agreement. *See* Evidentiary Stipulation. The Court has considered that evidence.

[45] *See* Reply ¶¶ 9–13.

[46] Because Mr. DeVincenzi is proceeding *pro se*, the Court will construe his arguments liberally, but review only those arguments actually presented in some form. *Cf. Boyd v. Russo*, 536 Fed. App'x 203, 205 n.1 (3d Cir. 2013) ("we construe his brief liberally, and will address even those arguments

*Analysis*

21.     The Consulting Agreement is governed by California law, both KaloBios and Mr. DeVincenzi are or were California residents during all relevant time frames and the services were provided in California.[47] Accordingly, California law governs this dispute.

22.     KaloBios is correct that the unambiguous Consulting Agreement does not specifically include provision of or payment for standby services.  Mr. DeVincenzi does not contend otherwise, nor is his claim based on a breach of the Consulting Agreement.  Thus, Kalabios' first argument is inapposite.

23.     Nonetheless, the existence of the Consulting Agreement is important to the analysis as it was in effect when the conversations with Messrs. Mok and Cross occurred. Kalabios cites to paragraph 19 of the Consulting Agreement (which, as discussed below, contains a no oral modification clause) and California Civil Code § 1698(c) for the proposition that the Consulting Agreement could not be modified by the discussions between Mr. DeVincenzi and Messrs. Mok and Cross.  This is an overly broad statement of California law as embodied in § 1698(c), when the statute is read in its entirety.

24.     California Civil Code § 1698 sets forth the rules of law regarding modifications of written agreements.  It provides:

> (a) A contract in writing may be modified by a contract in writing.

> (b) A contract in writing may be modified by an oral agreement to the extent that the oral agreement is executed by the parties.

> (c) Unless the contract otherwise expressly provides, a contract in writing may be modified by an oral agreement supported by new consideration.  The statute of frauds (Section 1624) is required to be satisfied if the contract as modified is within its provisions.

---

that he has not developed in great detail." (citing *United States v. Otero*, 502 F.3d 331, 334 (3d Cir. 2007))).
[47] Ex. 1 ¶ 14.

(d) Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts.[48]

Thus, there are multiple ways under California law for a written contract to be modified by an oral agreement. As applied here, however, the Court concludes that none of subsections (a) through (d) assist Mr. DeVincenzi.

25.     First, as to subsection (a), and as recognized by Mr. DeVincenzi, there is no writing embodying an agreement for KaloBios to pay for standby services. As Mr. DeVincenzi acknowledges, notwithstanding the communications with Messrs. Mok and Cross, the Consulting Agreement, even as amended twice since the first discussion occurred, does not contain any specific provision for standby services for responding to the security company. Further, Mr. DeVincenzi did not produce, nor does he allege, any other writing.

26.     Second, as used in subsection (b), an "executed" oral agreement means a fully performed contract.[49]  At first blush, it could appear that there was a fully performed contract: Mr. DeVincenzi performed his part of any agreement by providing services and Kalabios performed its part of the agreement by accepting those services.[50] But, because, as

---

[48] CAL. CIV. CODE § 1698 (cited by KaloBios at Reply ¶ 12 n.6).
[49] *See Davidson v. ConocoPhillips Co.*, No. C08-1756 BZ, 2009 WL 2136535, at *3 (N.D. Cal. 2009 July 10, 2009) (in order to be "executed" for purposes of § 1698(b) an agreement must be fully performed on both sides); *see also* CAL. CIV. CODE § 1661 ("An executed contract is one, the object of which is fully performed.").
[50] *See Coldwell Banker & Co. v. Pepper Tree Office Ctr. Assocs.*, 106 Cal. App. 3d 272 (Cal. Ct. App. 1980), *overruled on other grounds*, *Barrett v. Bank of Am.*, 183 Cal. App. 3d 1362, 1370–71 (Cal. Ct. App. 1986) (holding that an oral modification of a written agreement requiring performance was executed to the extent that one party did not perform and the other accepted that nonperformance); *see also Fanucchi & Limi Farms v. United Agri Prods.*, 414 F.3d 1075, 1081 (9th Cir. 2005) (finding no oral modification where party alleged failure to perform an unexecuted portion of an agreement).

further discussed below, there was no agreement as to compensation for standby services, the Court cannot find an actual agreement to enforce under subsection (b).[51]

27.    Third, subsection (c) does not supply applicable legal authority because the Consulting Agreement contains a no-oral-modification clause.  Subsection (c) provides for oral modification of a written contract under two conditions: (i) the oral modification must be supported by new consideration; and (ii) the contract must not have a clause that specifically prohibits oral modification.[52]  Here, paragraph 19 of the Consulting Agreement provides, in relevant part:

> No . . . modification of this Agreement will be binding upon either party unless made in writing and signed by duly authorized representatives of both parties . . .[53]

As the Consulting Agreement clearly expresses the intent of the parties that oral modifications are prohibited, subsection (c) does not aid Mr. DeVincenzi in his argument that an oral agreement is in place.

28.    Finally, subsection (d) lists five general principles that are not precluded by application of the other three subsections, and that may prevail notwithstanding a written contract.  The only potentially applicable principle here is the existence of an oral

---

[51] Contrast this to a scenario in which KalaBios would have refused to pay Mr. DiVencenzi for services clearly covered by the Consulting Agreement, but in excess of the yearly cap.  In such a scenario, both parties would have fully performed the oral modification—Mr. DiVencenzi by providing services and KalaBios by accepting those services.  Mr. DiVencenzi, then, would have been entitled to the agreed upon hourly rate for all services in excess of the cap.  The Court notes that this, in fact, occurred.  *See supra* ¶ 10.

[52] *See ConocoPhillips*, 2009 WL 2136535, at *4 (California law "allows oral modification of a written contract only if the written contract does not provide otherwise."); *see also Fanucchi & Limi Farms*, 414 F.3d at 1081 (upholding a functional integration and no-oral-modification clause); *Andrews v. U.S. Sec. Holdings, Inc.*, No. 2:14–cv–03207–ODW(VBK), 2015 WL 1238890, at *12 (C.D. Cal. Mar. 17, 2015) (upholding an explicit integration and no-oral-modification clause).

[53] Ex. 1 ¶ 19.

independent collateral contract.[54] "In order to qualify as an independent collateral contract, the alleged collateral agreement must not qualify or be inconsistent with any of the terms of the written contract."[55]

29.    While an alleged oral agreement to provide standby services in-and-of-itself may not be inconsistent with the Consulting Agreement, any agreement to compensate such services at less than the stated hourly rate would be.  An independent collateral contract must not be inconsistent with *any* of the terms of the written contract.  Being first-in-line to respond to calls from KaloBios' security service was not inconsistent with the Consulting Agreement as Mr. DeVincenzi was paid for after-hour responses to security or other site issues.  But, payment for those services at fifty cents per hour is wholly inconsistent with the payment portion of the Consulting Agreement, which provides for payment at a rate of $110–$115 per hour.[56]  Thus, there was no oral independent collateral contract between Mr. DeVincenzi and KalaBios.

30.    More fundamentally, an oral contract (whether collateral or not) for standby services simply does not exist.  The conversations between Mr. DeVincenzi and Messrs. Mok and Cross, respectively, were insufficiently definite to form a binding contract.  Under California law, "unless the parties all agree upon the same thing in the same sense," there is no mutuality of consent to form a contract, and no contract is formed.[57]  "[T]he failure to reach a meeting of the minds on all material points prevents the formation of a

---

[54] Mr. DeVincenzi has not set forth facts suggesting estoppel, a novation or substitution of a contract for standby services as a replacement of the Consulting Agreement, or that KaloBios has waived any provision of the Consulting Agreement.  Nor does he seek its rescission.

[55] *ConocoPhillips*, 2009 WL 2136535, at *5.

[56] The Court recognizes that the inconsistency of the payment terms favors KalaBios, nonetheless it highlights this point.

[57] CAL. CIV. CODE § 1580.

contract *even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.*[58]  The form and amount of compensation is a material point or term necessary to the formation of a contract.[59]

31.    Here, while there was agreement that Mr. DeVincenzi would be the first-in-line for calls from the security company, there was never an agreement between the parties on the hourly rate payable for standby time.  The evidence is abundant on this point.  The first time that Mr. DeVincenzi submitted any invoice for standby time was November 10, 2015—almost four years after he began performing this service.  Further, those invoices did not contain a rate of pay, and in the covering e-mail he seeks a "mutually agreed upon hourly" rate for standby time.  Moreover, the number of hours of standby services varies between the initial invoices and the Proof of Claim without explanation.  Clearly, then, at no time did Mr. DeVincenzi and KaloBios agree upon a method of measuring hours to calculate total compensation nor a rate of compensation.

32.    Perhaps recognizing this, Mr. DeVincenzi argues, generally, that it is only fair to compensate him for the hours he spent standing by instead of leaving KaloBios "in the lurch."[60]  This is functionally an argument for quantum meruit.  Under California law, quantum meruit is "an equitable remedy implied by the law under which a plaintiff who has rendered services benefiting the defendant may recover the reasonable value of those

---

[58] *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 215 (Cal. Ct. App. 2006) (quoting *Banner Entm't v. Superior Court (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 359 (Cal. Ct. App. 1998)).
[59] *See id.*; *see also Grove v. Grove Valve & Regulator Co.*, 4 Cal. App. 3d 299, 312–13 (Cal. Ct. App. 1970) ("The compensation to be paid and the areas in which the license was to be exclusive still remained undetermined issues.  There could be no binding contract as to any of the proposed matters until these were resolved.").
[60] Hearing 17:4.

services when necessary to prevent unjust enrichment of the defendant."[61] If a contract

covers the disputed work, quantum meruit will not lie; quantum meruit cannot supply

"missing terms of a contract that are not missing."[62]

33.     The elements of quantum meruit are: (1) the plaintiff performed certain

services for the defendant; (2) their reasonable value; (3) they were rendered at defendant's

request; and (4) they were unpaid.[63] "To state a claim for quantum meruit, a plaintiff must

allege it acted pursuant to either an express or implied request for services and that the

services rendered benefitted the defendant."[64] And, importantly for purposes of this

decision, the claimant must show that "the services were rendered under some

understanding or expectation of both parties that compensation therefore was to be made."[65]

34.     Initially, KalaBios does not specifically argue that the standby work was

within the scope of the work to be performed under the Consulting Agreement.  In fact,

KalaBios questions whether the conversations regarding standby services even took place.[66]

Accordingly, a quantum meruit recovery is not prohibited under California law.

---

[61] *Imperial Irrigation Dist. v. Cal. Indep. Sys. Operator Corp.*, No.: 15-CV-1576-AJB-RBB, 2016 WL 4087302, at *11 (S.D. Cal. Aug. 1, 2016) (quoting *In re De Laurentiis Entm't Grp., Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992).

[62] *CSC Consulting, Inc. v. Tosco Refining Co.*, 19 Fed.Appx. 698, 701 (9th Cir. 2001) (reversing trial court grant of summary judgment; finding a genuine issue of material fact as to whether two change orders were part of the contract between the parties).

[63] *See id.* (citing *Haggerty v. Warner*, 115 Cal. App. 2d 468, 475 (Cal. Ct. App. 1953)).

[64] *Id.* (citing *Day v. Alta Bates Med. Ctr.*, 98 Cal. App. 4th 243, 248 (Cal. Ct. App. 2002)).

[65] *Huskinson & Brown, LLP v. Wolf*, 32 Cal. 4th 453, 458 (Cal. 2004) (quoting *In re Estate of Mumford*, 173 Cal. 511, 523 (Cal. 1916)); *see also* 1 Witkin, Summary of Cal. Law (Contracts § 1037) (2005) (Supp.); *Long v. Rumsey*, 84 P.2d 146, 12 Cal.2d 334, 342 (Cal. 1938) ("Under well-established principles the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered."); *Meredith v. Marks*, 27 Cal.Rptr. 737 (Cal. Ct. App. 5th Dist. 1963).

[66] As pointed out on cross-examination, however, KalaBios' witness had no firsthand knowledge to dispute these conversations (Hearing 12:20-13:2), and, as evident from the Findings of Fact, *supra* ¶¶ 8–18, the Court found Mr. DeVincenzi's testimony credible.

35.    Here, Mr. DeVincenzi has successfully proven that he performed standby services for KalaBios with its knowledge and agreement.  Further, KalaBios does not argue that it did not benefit from the standby services or that the requested compensation of fifty cents per hour is unreasonable.  But, KalaBios does dispute that either party had an expectation of compensation for these services.

36.    While, normally, the provision of services to an unrelated party might warrant an expectation of payment, based on the evidence presented, the Court cannot conclude that it does in this instance.  The circumstances are: (i) Mr. DeVincenzi broached the subject of standby services to KalaBios (not vice versa); (ii) compensation for these services was not specifically included in the Consulting Agreement or any of the amendments; (iii) Mr. DeVincenzi performed standby services for four years without seeking compensation from KalaBios; (iv) during at least two of those four years, Mr. DeVincenzi invoiced KalaBios bi-weekly for services under the Consulting Agreement, but did not seek compensation for standby services at the same time; (iv) when he billed for services in November, 2015, his cover email indicates he was "explor[ing]" payment for those services; and (v) KalaBios immediately denied the request for compensation when it finally received invoices for standby services. Moreover, this arrangement benefitted Mr. DeVincenzi as being first-in-line for calls from the security company lead directly to compensable work, i.e. payment at a rate of $110 to $115 per hour each time the after-hours call required him to perform work required under the Consulting Agreement.

37.    Based on the evidence presented, the Court cannot find that Mr DeVincenzi has met his burden to show by a preponderance of the evidence that the circumstances

-15-

warrant the inference that both he and KalaBios had an expectation of compensation for standby services.[67]

*Conclusion*

For the reasons set forth above, Mr. DeVincenzi has not met his burden of proof to show that he is entitled to compensation for the standby services provided.

**ACCORDINGLY, IT IS HEREBY ORDERED** that the Reorganized Debtor's Objection is **SUSTAINED** with respect to the Proof of Claim.

Dated: May 24, 2017

LAURIE SELBER SILVERSTEIN
UNITED STATES BANKRUPTCY JUDGE

---

[67] *See Payne v. Bank of America National Trust & Savings Ass'n*, 128 Cal.App.2d 295, 305 275 P.2d 128 (Cal. Ct. App.2nd Dist. 1954) (finding that there was no expectation of compensation for personal services rendered to decedent when, among other things: (i) there was no express contract between the parties, (ii) claimant was an accountant and experienced businessman who could be expected to render bills for services provided, (iii) claimant rendered bills to decedent for accounting services on an annual basis for the four years prior to the decedent's death, all of which were paid, and (iv) the record was otherwise "barren of any substantial indication that plaintiff intended to charge for the services on which he now bases his claim."); *see also Berry v. County of Sonoma*, 30 F.3d 1174 (9th Cir. 1994). In *County of Sonoma*, the Court of Appeals reversed the district court, finding that plaintiff/coroners were not entitled to pay for time spent on-call under the Fair Labor Standards Act in that the agreements between the coroners and the County of Sonoma provided for compensation only for actual time worked and not for on-call waiting time, and after a review of the coroners' ability to engage in personal activities during on-call time. As to the latter, the court considered the following factors: (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities; (6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time. Here, the Consulting Agreement does not provide for compensation for standby time, and while Mr. DeVincenzi was geographically restricted in the event he was unable to obtain a substitute to be on call, there was no evidence on the frequency of the calls, whether the second and third-in-line for calls were generally available, or the extent to which Mr. DeVincenzi was able to engage in personal activities during on-call periods.

*KaloBios's counsel is to serve Mr. DeVincenzi with a copy of this Memorandum Order.